No. 23-1457

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

United States of America,
*Plaintiff-Appellee*,

v.

State of Missouri, et al.,
*Defendants-Appellants*.

Appeal from the United States District Court for the Western District of Missouri,
The Honorable Brian C. Wimes

# APPELLANTS' MOTION FOR STAY OF JUDGMENT
# AND INJUNCTION PENDING APPEAL

Missouri and the United States disagree about whether specific restrictions on firearm ownership are valid under the Second Amendment. But according to the United States and the district court, Missouri is not allowed even to *express* that disagreement. Here, the district court held that Missouri's declaration of disagreement is itself unconstitutional (along with everything else in the statute). Worse, the district court entered this order even though no named defendant has authority to enforce this statute. The order violates recent Supreme Court precedent, never identifies a cause of action, and even fails to apply the required four-factor

1

analysis before granting an injunction. The order invalidating a duly enacted state law should be stayed pending appeal.

The appeal arises from a suit challenging Missouri's Second Amendment Preservation Act (SAPA), Mo. Rev. Stat. §§ 1.410–1.485. The General Assembly enacted this law to declare the legislature's interpretation of the Second Amendment and prohibit state law enforcement agencies and state political subdivisions from enforcing laws conflicting with state policy. *City of St. Louis v. State*, 643 S.W.3d 295, 297 (Mo. 2022) (attached as Exhibit A). Private parties, not state officials, are charged with enforcing this statute. Mo. Rev. Stat. §§ 1.460–1.470. The law is thus a tool Missourians may use to hold their own state government accountable.

On March 7, 2023, the district court ruled that the Act itself violates the Constitution and granted the United States' request to enjoin SAPA. Ex. B, R. Doc. 88, at 24. The court's order never identifies any activity by the federal government prohibited by SAPA. Nonetheless, it frees "[s]tate and local law enforcement officials in Missouri" to help enforce certain federal restrictions on firearm ownership that the General Assembly has instructed them not to enforce. *Id.*

The district court's order is deeply flawed for two basic reasons: (1) the Second Amendment Preservation Act is enforced by private parties, not state officials; and (2) the Act can be enforced only against *the State* (its agencies and

2

subdivisions), not against the federal government. So at every turn, the district court's order fails.

First, because private parties, not state officials, are charged with enforcing this law, the United States has no cause of action and no standing to sue the State or state officials. In the last two years, the Supreme Court made this crystal clear in *Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021), as did the Fifth Circuit when the United States sued Texas over a statute Texas officials did not enforce, *United States v. Texas*, No. 21-50949, 2021 WL 4786458, at *1 (5th Cir. Oct. 14, 2021). Courts may only "enjoin named defendants from taking specified unlawful actions," not "enjoin challenged laws themselves." *Whole Woman's Health*, 142 S. Ct., at 535. Because none of the named defendants here enforce this law, this Court's injunction runs against the statute itself. Indeed, the district court dedicated the bulk of its analysis to enjoining *definitional* provisions. This is a paradigmatic example of an impermissible injunction against the "laws themselves."

Second, because the Act can be enforced only against Missouri agencies and political subdivisions—as the Missouri Supreme Court has explained, *City of St. Louis*, 643 S.W.3d at 297—the United States lacks a cause of action and the preemption arguments fail. Missouri's authority to decline to participate in federal law enforcement is well-established under *Printz v. United States*, 521 U.S. 898, 935

3

(1997). The United States cannot enjoin the statute simply because it interprets the Second Amendment differently than does the Missouri General Assembly.

The district court's erroneous order carries real consequence for Missourians. Missouri's General Assembly exercised core sovereign authority when it declared its interpretation of the Second Amendment and prohibited Missouri's subdivisions and agencies from spending resources to enforce laws contrary to that interpretation. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign."). The district court's order dismantles that exercise of sovereign authority.

Under Federal Rules of Appellate Procedure 8(a)(1) and 27, this Court should stay the district court's order and allow Missouri's law to remain in effect, as it has been since June 12, 2021, pending appeal. Unlike the United States, which can continue to enforce its laws, the people of Missouri will suffer irreparable injury if their duly enacted statute is enjoined. The injunction encroaches on the General Assembly's sovereign authority and denies everyday Missourians their right to hold their own State government accountable. Despite SAPA being in force for almost two years, the United States cannot point to a single case where it has been hauled into any court over SAPA.

4

When courts declare state laws unconstitutional and enjoin state officials from enforcing them, the "ordinary practice is to suspend those injunctions from taking effect pending appellate review." *Strange v. Searcy*, 135 S. Ct. 940, 940–41 (2015) (Thomas and Scalia, JJ., dissenting from denial of the application for a stay) (collecting cases). There is no reason to depart from this practice. If the Court does not grant the requested stay, Missouri alternatively requests that the Court enter a temporary administrative stay to permit the Supreme Court of the United States to rule on its forthcoming request for relief.

## FACTUAL BACKGROUND

Signed into law on June 12, 2021, SAPA begins with four sections that the Missouri Supreme Court has authoritatively interpreted to contain "legislative findings and declarations." *City of St. Louis*, 643 S.W.3d at 297. The first section reaffirms Missouri's policy of active federalism and all duties that entails, including "support[ing] and defend[ing] the Constitution of the United States" and supporting Congress's authority "in the exercise of a few defined powers," while still "reserving for the state governments the power to legislate on matters concerning the lives, liberties, and properties of citizens in the ordinary course of affairs." Mo. Rev. Stat. § 1.410.2(2). The next three sections declare the General Assembly's interpretations of the Second Amendment and its state analogue, including that certain restrictions on firearm ownership infringe those provisions, *id.* § 1.420; declare that these

5

restrictions "shall be invalid to this state, shall not be recognized by this state, shall be specifically rejected by this state, and shall not be enforced by this state," *id.* § 1.430; and declare that state courts and state law enforcement agencies have a general duty to protect Missourians' rights, *id.* § 1.440. The district court's order enjoins these provisions even though they simply declare policy.

The "five remaining sections comprise the substantive provisions to enforce these legislative declarations." *Id.* In § 1.450, the General Assembly removes state law enforcement's "authority to enforce" restrictions listed in § 1.420. "Sections 1.460 and 1.470 impose civil liability on state political subdivisions and law enforcement agencies that employ individuals who knowingly violate 'section 1.450 or otherwise knowingly deprive[ ]' Missouri citizens of their rights to keep and bear arms." *City of St. Louis*, 643 S.W.3d at 297–98. Missouri entities face a $50,000 civil penalty for their employees violating SAPA. Section 1.480 carves out certain acts that are not violations of the other sections, and § 1.485 is a severability clause.

More than eight months after SAPA became law, the United States sued Missouri in federal district court. R. Doc. 1. It alleged that SAPA violated the Supremacy Clause as an "improper attempt at nullifying federal law," *id.* ¶ 78, was preempted by federal firearms laws that "expressly forbid certain conduct that [SAPA] allows," *id.* ¶ 82, and violated "intergovernmental immunity by directly regulating the activities of Federal agents and those with whom the Federal

6

Government deal," *id.* ¶ 85. Twelve days after filing its complaint, the United States moved for summary judgment. R. Doc. 8. Missouri opposed summary judgment and moved to dismiss. R. Docs. 13, 16, 25.

The court issued a permanent injunction on March 7, 2023. The court focused its analysis on the declaratory provisions, §§ 1.420–.440. R. Doc. 88, at 14–22. It found that the General Assembly's interpretation of the Second Amendment "is an impermissible nullification attempt that violates the Supremacy Clause" because the General Assembly declared its belief that some federal laws are unconstitutional. *Id.* at 14–16. It then determined that SAPA is also preempted because it "creates confusion" for Missouri citizens. *Id.* at 17. Then, having determined that the first declaratory provision is critical to the statute, the district court held that "SAPA is unconstitutional in its entirety." *Id.* at 19.

Turning to whether the Act violates the doctrine of intergovernmental immunity, the district court again focused on provisions that the Missouri Supreme Court has already held are merely declaratory. *Id.* at 20–21 (assessing §§ 1.430–.440). In the court's remaining analysis—barely more than one page long—the court finally turned to the substantive provisions and concluded that they violate the doctrine of intergovernmental immunity because civil penalties against political subdivisions could arise from a state employee's previous enforcement of federal laws and thus might "discourage federal law enforcement recruitment efforts." *Id.*

7

at 23. The court held that no part of SAPA was severable and prohibited Missouri "from any and all implementation and enforcement" of it. *Id.* at 23–24.

One day after this order, the State moved to stay the judgment and injunction pending appeal. R. Doc. 91. The court denied the request but ordered an administrative stay until this Court rules on this stay motion. R. Docs. 96 (Exhibit C), 99 (Exhibit D).

## ARGUMENT

Injunctive relief is "an extraordinary remedy," and "the burden of establishing the propriety of an injunction is on the movant." *Watkins Inc. v. Lewis*, 346 F.3d 841, 44 (8th Cir. 2003); *Weinberger v. Romero-Barcelo*, 102 S. Ct. 1798, 1803 (1982) ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). "In determining whether to issue a stay pending appeal, we consider four factors: (1) whether the party seeking the stay has demonstrated a strong likelihood of success on the merits; (2) whether the party seeking the stay will be irreparably injured without a stay; (3) whether a stay would substantially injure other parties; and (4) the public's interest." *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) (citing *Brakebill v. Jaeger, 905 F.3d 553, 557* (8th Cir. 2018)) (granting stay pending appeal). All four factors are met here.

8

## I. On appeal, the State is likely to succeed on the merits.

Defendants are likely to succeed on appeal because (1) state officials have no role in enforcing the challenged law, (2) the United States would suffer no injury (and have no cause of action) even if Missouri officials did have that authority, and (3) the district court failed to apply the standard for issuing an injunction.

### A. The federal government lacks standing because state officials do not enforce the law.

As the Supreme Court made clear just over a year ago, federal courts have equitable jurisdiction only to "enjoin named defendants from taking specified unlawful actions"; courts have no authority to "enjoin challenged laws themselves." *Whole Woman's Health*, 142 S. Ct. 522, at 535. Yet enjoining the statute itself is exactly what the district court's order purports to do.

Begin first with the court's decision to hold §§ 1.420 through 1.440 unconstitutional. Almost all of the district court's analysis is dedicated to declaring these sections unconstitutional. R. Doc. 88, at 14–22. The court devotes barely one page to other sections. Yet, as the Missouri Supreme Court has held, these three sections are purely declaratory; they "contain legislative findings and declarations." *City of St. Louis*, 643 S.W.3d at 297. Indeed, the district court's opinion describes these provisions as definitional at least nine times. R. Doc. 88, at 15–20, 22. Because these sections are purely declaratory—that is, *incapable* of enforcement by anyone—the district court's declaration that these provisions are unconstitutional is

9

simply an improper injunction against the "laws themselves." *Whole Woman's Health*, 142 S. Ct. 522, at 535; *see Webster v. Reprod. Health Servs.*, 492 U.S. 490, 506 (1989) ("It will be time enough for federal courts to address the meaning of the preamble should it be applied to restrict the activities of appellees in some concrete way.").

This case is thus no different from the recent challenge to the individual mandate of the Affordable Care Act—a mandate amended by Congress to eliminate any enforcement mechanism. There, the Supreme Court held that the plaintiffs did not have standing to sue. As the Supreme Court put it, the "problem lies in the fact that the statutory provision, while it tells them to obtain that coverage, has no means of enforcement." *California v. Texas*, 141 S. Ct. 2104, 2114 (2021). "Because of this, there is no possible Government action that is causally connected to the plaintiffs' injury." *Id.* So too, here. Legislative findings and definitions cannot be held unconstitutional, even if the district court thought that the definitions cause confusion. R. Doc. 88, at 17–18. The United States has no standing to challenge purely declaratory provisions, and there is no federal jurisdiction to enjoin statutes themselves.

The district court's determination that these provisions are unconstitutional because they "create confusion" (R. Doc. 88, at 17–18, 21) proves far too much. The General Assembly is free to declare its interpretation of the Second Amendment

10

whether by resolution, statute, or any other method. But under the district court's reasoning, any joint resolution declaring the General Assembly's interpretation of the Constitution is unconstitutional if the United States happens to disagree. Indeed, if a court can enjoin a simple declaration by the General Assembly on the ground that the declaration creates confusion, courts could place gag orders on the Speaker of the House from declaring his interpretation. That cannot be correct. Federal courts may enjoin only specific actions by persons, and "no court may lawfully enjoin the world at large." *Whole Woman's Health*, 142 S. Ct. at 535 (quotation omitted). Courts may not enjoin the statutes themselves, no matter how much confusion the district court thinks the text might create.

The district court's decision is no stronger on the next three statutory provisions: sections 1.450–.470. True, these provisions *can* be enforced. But the United States runs into another fatal problem: none of these provisions is enforced by any named defendant. As in *Whole Woman's Health*, private parties, not state officials, enforce violations of the Act, so the United States cannot sue the Governor or the Attorney General for relief. And because an injunction "operat[es] in personam" and must be "directed at someone, and govern[ing] that party's conduct," *Nken v. Holder*, 556 U.S. 418, 428 (2009), if the United States cannot sue a Missouri official, then the United States cannot sue the State of Missouri. It is thus unsurprising that neither the United States nor the district court ever identifies a

11

cause of action that would permit the United States to sue state officials over a statute enforced by private parties.

In an attempt to get around this problem, the district court's opinion suggests that the Attorney General *can* enforce SAPA because of a Missouri statute giving the Attorney General authority, generally, to maintain litigation "to protect the rights and interests of the state."  R. Doc. 88, at 6.  This Court rejected precisely this argument when confronted with a materially identical Arkansas statute in *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015), a case the district court failed to assess at all in its analysis despite Defendants' consistent reliance on it.  *Digital Recognition Network* is on all fours.  There, as here, the challenged statute "provide[d] for enforcement only through private actions for damages," so the court held that the plaintiffs could not sue state officials.  *Id.* at 958.  It was not enough that the Arkansas Attorney General, like the Missouri Attorney General here, had authority to bring suit "in all litigation where the interests of the state are involved."  *Id.* (citing Ark. Code § 25-16-703).  Even further, the Arkansas Attorney General expressly had "statewide law enforcement jurisdiction and authority."  *Id.* (citing Ark. Code § 25-16-713).  And yet because the text of the "law at issue" was one "that provides only for private civil enforcement," the Eighth Circuit held that there was no standing to sue the state officials.  *Id.* at 960–61.

12

Thus, under *Digital Recognition Network*, a plaintiff cannot manufacture standing by relying on a statute providing general authority to represent the State's interests when the challenged statute at issue provides only for private civil enforcement. *Digital Recognition Network* cannot be distinguished, and the district court's opinion makes no attempt to do so.

### B. The federal government fails to state a claim (or even identify a cause of action).

The opinion, and the United States' arguments, suffer from yet another fatal flaw: the federal government has not stated a claim, or even identified a cause of action, because SAPA can be enforced only against Missouri's agencies and political subdivisions, not the federal government.

SAPA provides an enforcement mechanism only against state entities. Mo. Rev. Stat. §§ 1.460, 1.470. Binding Missouri Supreme Court precedent confirms this: "Sections 1.460 and 1.470 impose civil liability on state political subdivisions and law enforcement agencies." *City of St. Louis*, 643 S.W.3d at 297–98. Nothing in the text extends enforcement against the federal government. Indeed, SAPA explicitly states that it does not prohibit "Missouri officials from accepting aid from federal officials in an effort to enforce Missouri laws," § 1.450, and providing "material aid" to federal officials, including for certain federal prosecutions, § 1.480.

The United States thus has no ground, and no cause of action, to challenge this law. The United States raises three arguments: nullification, preemption, and

13

intergovernmental immunity. Each rests on the assumption that SAPA applies to non-Missouri governmental entities, and all three boil down to an assertion that SAPA is invalid under the Supremacy Clause. But the Supremacy Clause is not the "source of any federal rights," and certainly does not create a cause of action. *Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 324–27 (2015). And the United States' assumption that SAPA applies to non-Missouri governmental entities is incorrect, as the Missouri Supreme Court has already explained. The Act has been law since June 12, 2021. To date, the United States has not identified a single attempt to bring suit against it. And it never will.

As the United States has conceded and must concede, Missouri has no obligation to enforce federal law and thus owes federal officials no duties. *Printz*, 521 U.S. at 925 ("Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."); *id.* (questionable statute only constitutional "after assuring ourselves that they did not require the States to enforce federal law."). That dooms the United States' challenge to the first four provisions of SAPA, §§ 1.410–1.440, which the Missouri Supreme Court has explained are merely "legislative findings and declarations." *City of St. Louis*, 643 S.W.3d at 297. It also dooms the United States' challenge to the remaining provisions, §§ 1.450–1.470, which do have practical legal effect, because these

Appellate Case: 23-1457     Page: 14     Date Filed: 03/13/2023 Entry ID: 5254573

provisions apply only against Missouri governmental entities. SAPA thus falls squarely within the scope of *Printz*.

The district court also errs by failing to apply binding precedent from the Missouri Supreme Court construing SAPA. It is long established that "[t]hat the construction of the statutes of a State by its highest courts, is to be regarded as determining their meaning and generally as binding upon United States courts, cannot be questioned." *Supervisors v. United States*, 85 U.S. 71, 81–82 (1873). The district court's decision never even discusses the binding interpretation of SAPA, instead deciding *de novo* how each of the provisions applies to non-governmental actors. The district court spends the bulk of its analysis declaring §§ 1.420–1.440 unconstitutional, and it does so contrary to Missouri Supreme Court precedent. For example, the district court says that "§ 1.440 effectively imposes an affirmative duty to effectuate an obstacle to federal firearms enforcement within the state," R. Doc. 88, at 22, but the Missouri Supreme Court says that § 1.440 (and §§ 1.420–1.430) are nonsubstantive, declaratory provisions only—*i.e.*, provisions that impose no affirmative duty and enable no enforcement at all, *City of St. Louis*, 643 S.W.3d at 297. The district court says that § 1.450 directly regulates the United States, R. Doc. 88, at 22, but again, the Missouri Supreme Court says otherwise, *City of St. Louis*, 643 S.W.3d at 297.

Appellate Case: 23-1457    Page: 15    Date Filed: 03/13/2023 Entry ID: 5254573

The district court's opinion similarly violates the constitutional-avoidance canon. Section 1.450 states, "No entity or person, including any public officer or employee of this state or any political subdivision of this state, shall have the authority to enforce or attempt to enforce [certain] federal acts …." Interpreting "entity" to include *federal* entities—as the district court's order did—is not only an inferior interpretation of the plain text, but it also violates the command for courts to adopt any reasonable interpretation that would avoid constitutional problems. *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 407 (1909) (If a statute is "reasonably susceptible of two interpretations," one of which is constitutional, then it is the court's "plain duty to adopt that construction which will save the statute from constitutional infirmity.") This rule is particularly poignant when the court is "invited to pass upon the constitutional validity of a state statute which has not yet been applied or threatened to be applied by the state courts to petitioners or others in the manner anticipated." *Webster*, 492 U.S. at 506 ((quoting *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 465 (1945)). The mandated reading (and better reading) is that "entity" encompasses only *state* entities.

The district court's conclusions about §§ 1.460 and 1.470 fare no better. Again, neither the district court nor the United States has ever identified a cause of action authorizing suits against state officials who have no enforcement authority.

16

And SAPA limits only the activities of Missouri governmental agencies, not the federal government. The penalties for failing to comply are not assessed against the United States, so there is no discrimination against the federal government. Even if the district court was correct that SAPA might discourage federal law enforcement recruitment efforts—a contention for which the district court provided no evidence and which was not advanced by the United States as a basis for intergovernmental immunity in its motion, R. Doc. 29, at 37–38, or its reply, R. Doc. 45—that chilling is legally immaterial. A state law is not "unconstitutional just because it indirectly increases costs for the Federal Government, so long as the law imposes those costs in a neutral, nondiscriminatory way." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022). As the district court recognized, Missouri law restricts political subdivisions and law enforcement agencies from hiring *any* official—federal *or* state—who has enforced certain laws. *See* R. Doc. 88, at 22–23. Because the law treats federal employees who have enforced certain restrictions enshrined in federal statute the same as, say, state employees who have enforced those restrictions when enshrined in municipal ordinances, Missouri's law in no way singles out federal officials. *Washington*, 142 S. Ct. at 1984.

### C. The district court failed to apply the required four-factor test before granting an injunction.

Missouri will also likely succeed in convincing this Court that the district court erred by automatically granting an injunction. Nowhere in the district court's

17

order did the court apply the standard to grant a permanent injunction. Injunctions are not automatic. "[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger*, 102 S. Ct. at 1803. Instead, a "plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010). "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 156–57. The district court did not discuss how the United States met that standard, and indeed, the United States devoted only a single page to this analysis. R. Doc. 8, at 29–30.

Failing to apply the proper legal analysis, including by failing to cite controlling precedent, discuss or mention the applicable factors, and make the necessary findings, is clear and reversible error. *See In re Bieter Co.*, 16 F.3d 929, 940 (8th Cir. 1994) ("the district court's error was in its clear failure to apply the proper legal analysis."). Even if the district court's analysis for the declaratory judgment was correct, and it is not, the district court had a duty to assess these four factors and decide whether an injunction should issue against the State.

Appellate Case: 23-1457    Page: 18    Date Filed: 03/13/2023 Entry ID: 5254573

## II. The Balance of Harms and the Public Interest Favor a Stay.

The remaining equitable factors also strongly favor a stay of injunction pending appeal.

### A. Missouri is irreparably injured without a stay.

Declaring that a duly enacted statute is unconstitutional in all respects is de facto irreparable harm. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). When the State is blocked from implementing its statutes, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law." *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013); *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997). Here, the General Assembly created an action for all Missouri citizens. The injunction irreparably harms their interests and Missouri's interests.

### B. The balance of harms and public interest favor Missouri.

The public interest greatly favors Missouri. As the Eighth Circuit recently reaffirmed, "it is in the public interest to uphold the will of the people, as expressed by acts of the state legislature, when such acts appear harmonious with the

19

Constitution." *Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 909 (8th Cir. 2020) (granting a stay of injunction pending appeal of election procedures).

SAPA is harmonious with the Constitution. SAPA exists because "[t]he general assembly of the state of Missouri is firmly resolved to support and defend the Constitution of the United States," Mo. Rev. Stat. § 1.410.2(1), and seeks to ensure that its citizens enjoy their right to keep and bear arms under the Missouri and U.S. Constitutions to the fullest constitutional extent, Mo. Rev. Stat. § 1.410.3(9). The Supreme Court's precedent in *Printz* confirms that states may instruct their officials and subdivisions not to enforce certain federal firearms laws.

The district court's decision also harms the public interest because it burdens the private rights of Missouri's citizens. SAPA provides causes of actions to law-abiding citizens when Missouri governmental entities infringe on their right to bear arms under not just the federal constitution, but also the state constitution. Mo. Rev. Stat. §§ 1.460, 1.470. The right to keep and bear arms backstops "the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally . . . enable the people to resist and triumph over them." 2 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1897, pp. 620–621 (4th ed. 1873). SAPA is a state version of 28 U.S.C. § 1983 to protect this freedom and empower citizens. By enjoining SAPA, the district has injured law-abiding Missourians' ability to hold their own government accountable.

20

The United States cannot possibly show that a stay, for the purposes of appeal, would cause any injury, let alone a substantial injury, as the law requires. *First*, the United States failed to show any injury to begin with. The district court suggested that the United States' law enforcement operations have been affected, R. Doc. 88 at 5, but the district court did not show that the United States had a right to subsidize its law enforcement efforts with Missouri law enforcement resources. This is not a cognizable injury, as the United States agreed that States may "lawfully decline to assist with federal enforcement[.]" R. Doc. 1, at 3. *Second*, after nearly two years, the United States has failed to show any attempted enforcement of SAPA against its own agencies and law enforcement officers. Of course, the Missouri Supreme Court's authoritative reading of SAPA also prevents any such suit. *City of St. Louis*, 643 S.W.3d at 297. *Third*, the undisputed facts show that (1) state and officials simply told the federal government that they "could not help any federal agency at this time," and (2) federal officers continued to enforce federal law. R. Doc. 40, at 47–48 (citing declarations filed by the United States). So there is no injury to federal law enforcement. *Fourth*, to the extent that the district court believes there is any confusion about the extent of SAPA, the United States has encouraged this confusion by claiming that SAPA somehow applies to its agencies. It cannot receive benefit from self-inflicted harms. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("Respondents cannot manufacture standing merely by inflicting harm on

21

themselves based on their fears of hypothetical future harm that is not certainly impending.").

The district court upended the constitutional balance between the federal government and Missouri on a matter central to Missouri's sovereignty: the conduct of Missouri law enforcement agencies and political subdivisions. Under the district court's order, the General Assembly may no longer set the bounds of Missouri law enforcement. The decision exacts a grave injury because "[w]hen the Federal Government asserts authority over a State's most fundamental political processes, it strikes at the heart of the political accountability so essential to our liberty and republican form of government." *Alden v. Maine*, 527 U.S. 706, 751 (1999).

## CONCLUSION

Missouri respectfully requests that this Court stay the district court's judgment and injunction pending a final ruling on appeal, or in the alternative, a temporary administrative stay to permit the Supreme Court of the United States to act on the State's forthcoming request for a stay.

Appellate Case: 23-1457    Page: 22    Date Filed: 03/13/2023 Entry ID: 5254573

Respectfully submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeff P. Johnson*

Jeff P. Johnson, MO #73294
*Deputy Solicitor General*
Joshua M. Divine, MO # 69875
*Solicitor General*
Office of the Missouri Attorney General
Supreme Court Building
P.O. Box 899
Jefferson City, Missouri 65102
Phone: 314-340-7366
Fax: 573-751-0774
Jeff.johnson@ago.mo.gov

*Counsel for Appellants*

23

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_/s/ Jeff P. Johnson_
Jeff P. Johnson

## CERTIFICATE OF COMPLIANCE

I hereby certify that this response complies with the typeface and formatting requirements of Fed. R. App. P. 27 and 32, and that it contains 5,120 words as determined by the word-count feature of Microsoft Word.

_/s/ Jeff P. Johnson_

Appellate Case: 23-1457    Page: 24    Date Filed: 03/13/2023 Entry ID: 5254573