# [Exhibits A-D are attached to Defendants' March 13, 2023 motion for stay pending appeal]

# Exhibit E

Electronically Filed - Cole Circuit - June 21, 2021 - 01:52 PM

FIRST REGULAR SESSION

[TRULY AGREED TO AND FINALLY PASSED]

SENATE SUBSTITUTE FOR

SENATE COMMITTEE SUBSTITUTE FOR

HOUSE COMMITTEE SUBSTITUTE FOR

# HOUSE BILL NOS. 85 & 310

## 101ST GENERAL ASSEMBLY

0767S.10T                                        2021

## AN ACT

To repeal section 1.320, RSMo, and to enact in lieu thereof nine new sections relating to the sole purpose of adding additional protections to the right to bear arms, with penalty provisions and an emergency clause.

*Be it enacted by the General Assembly of the state of Missouri, as follows:*

Section A.  Section 1.320, RSMo, is repealed and nine new sections enacted in lieu thereof, to be known as sections 1.410, 1.420, 1.430, 1.440, 1.450, 1.460, 1.470, 1.480, and 1.485, to read as follows:

**1.410.  1.  Sections 1.410 to 1.485 shall be known and may be cited as the "Second Amendment Preservation Act".**

**2.  The general assembly finds and declares that:**

**(1)  The general assembly of the state of Missouri is firmly resolved to support and defend the Constitution of the United States against every aggression, whether foreign or domestic, and is duty-bound to oppose every infraction of those principles that constitute the basis of the union of the states because only a faithful observance of those principles can secure the union's existence and the public happiness;**

**(2)  Acting through the Constitution of the United States, the people of the several states created the federal government to be their agent in the exercise of a few defined powers, while reserving for the state governments the power to legislate on matters concerning the lives, liberties, and properties of citizens in the ordinary course of affairs;**

EXPLANATION —  Matter enclosed in bold-faced brackets **[thus]** in the above bill is not enacted and is intended to be omitted from the law. Matter in **bold-face** type in the above bill is proposed language.

Exhibit A

Exhibit 1 (motion)

Electronically Filed - Cole Circuit - June 21, 2021 - 01:52 PM

13    (3)  The limitation of the federal government's power is affirmed under Amendment
14  X of the Constitution of the United States, which defines the total scope of federal powers
15  as being those that have been delegated by the people of the several states to the federal
16  government and all powers not delegated to the federal government in the Constitution of
17  the United States are reserved to the states respectively or the people themselves;

18    (4)  If the federal government assumes powers that the people did not grant it in the
19  Constitution of the United States, its acts are unauthoritative, void, and of no force;

20    (5)  The several states of the United States respect the proper role of the federal
21  government but reject the proposition that such respect requires unlimited submission.
22  If the federal government, created by a compact among the states, were the exclusive or
23  final judge of the extent of the powers granted to it by the states through the Constitution
24  of the United States, the federal government's discretion, and not the Constitution of the
25  United States, would necessarily become the measure of those powers.  To the contrary, as
26  in all other cases of compacts among powers having no common judge, each party has an
27  equal right to judge for itself as to whether infractions of the compact have occurred, as
28  well as to determine the mode and measure of redress.  Although the several states have
29  granted supremacy to laws and treaties made under the powers granted in the Constitution
30  of the United States, such supremacy does not extend to various federal statutes, executive
31  orders, administrative orders, court orders, rules, regulations, or other actions that collect
32  data or restrict or prohibit the manufacture, ownership, or use of firearms, firearm
33  accessories, or ammunition exclusively within the borders of Missouri; such statutes,
34  executive orders, administrative orders, court orders, rules, regulations, and other actions
35  exceed the powers granted to the federal government except to the extent they are
36  necessary and proper for governing and regulating the United States Armed Forces or for
37  organizing, arming, and disciplining militia forces actively employed in the service of the
38  United States Armed Forces;

39    (6)  The people of the several states have given Congress the power "to regulate
40  commerce with foreign nations, and among the several states", but "regulating commerce"
41  does not include the power to limit citizens' right to keep and bear arms in defense of their
42  families, neighbors, persons, or property nor to dictate what sorts of arms and accessories
43  law-abiding Missourians may buy, sell, exchange, or otherwise possess within the borders
44  of this state;

45    (7) The people of the several states have also granted Congress the powers "to lay
46  and collect taxes, duties, imports, and excises, to pay the debts, and provide for the
47  common defense and general welfare of the United States" and "to make all laws which
48  shall be necessary and proper for carrying into execution the powers vested by the

Electronically Filed - Cole Circuit - June 21, 2021 - 01:52 PM

49  **Constitution of the United States in the government of the United States, or in any**
50  **department or office thereof". These constitutional provisions merely identify the means**
51  **by which the federal government may execute its limited powers and shall not be construed**
52  **to grant unlimited power because to do so would be to destroy the carefully constructed**
53  **equilibrium between the federal and state governments. Consequently, the general**
54  **assembly rejects any claim that the taxing and spending powers of Congress may be used**
55  **to diminish in any way the right of the people to keep and bear arms;**

56  **(8) The general assembly finds that the federal excise tax rate on arms and**
57  **ammunition in effect prior to January 1, 2021, which funds programs under the Wildlife**
58  **Restoration Act, does not have a chilling effect on the purchase or ownership of such arms**
59  **and ammunition;**

60  **(9) The people of Missouri have vested the general assembly with the authority to**
61  **regulate the manufacture, possession, exchange, and use of firearms within the borders of**
62  **this state, subject only to the limits imposed by Amendment II of the Constitution of the**
63  **United States and the Constitution of Missouri; and**

64  **(10) The general assembly of the state of Missouri strongly promotes responsible**
65  **gun ownership, including parental supervision of minors in the proper use, storage, and**
66  **ownership of all firearms; the prompt reporting of stolen firearms; and the proper**
67  **enforcement of all state gun laws. The general assembly of the state of Missouri hereby**
68  **condemns any unlawful transfer of firearms and the use of any firearm in any criminal or**
69  **unlawful activity.**

1  **1.420. The following federal acts, laws, executive orders, administrative orders,**
2  **rules, and regulations shall be considered infringements on the people's right to keep and**
3  **bear arms, as guaranteed by Amendment II of the Constitution of the United States and**
4  **Article I, Section 23 of the Constitution of Missouri, within the borders of this state**
5  **including, but not limited to:**

6  **(1) Any tax, levy, fee, or stamp imposed on firearms, firearm accessories, or**
7  **ammunition not common to all other goods and services and that might reasonably be**
8  **expected to create a chilling effect on the purchase or ownership of those items by law-**
9  **abiding citizens;**

10  **(2) Any registration or tracking of firearms, firearm accessories, or ammunition;**

11  **(3) Any registration or tracking of the ownership of firearms, firearm accessories,**
12  **or ammunition;**

13  **(4) Any act forbidding the possession, ownership, use, or transfer of a firearm,**
14  **firearm accessory, or ammunition by law-abiding citizens; and**

Electronically Filed - Cole Circuit - June 21, 2021 - 01:52 PM

15      **(5)   Any act ordering the confiscation of firearms, firearm accessories, or**
16  **ammunition from law-abiding citizens.**

**1.430.   All federal acts, laws, executive orders, administrative orders, rules, and**
2  **regulations, regardless of whether they were enacted before or after the provisions of**
3  **sections 1.410 to 1.485, that infringe on the people's right to keep and bear arms as**
4  **guaranteed by the Second Amendment to the Constitution of the United States and Article**
5  **I, Section 23 of the Constitution of Missouri shall be invalid to this state, shall not be**
6  **recognized by this state, shall be specifically rejected by this state, and shall not be**
7  **enforced by this state.**

**1.440.  It shall be the duty of the courts and law enforcement agencies of this state**
2  **to protect the rights of law-abiding citizens to keep and bear arms within the borders of**
3  **this state and to protect these rights from the infringements defined under section 1.420.**

**1.450.  No entity or person, including any public officer or employee of this state or**
2  **any political subdivision of this state, shall have the authority to enforce or attempt to**
3  **enforce any federal acts, laws, executive orders, administrative orders, rules, regulations,**
4  **statutes, or ordinances infringing on the right to keep and bear arms as described under**
5  **section 1.420.  Nothing in sections 1.410 to 1.480 shall be construed to prohibit Missouri**
6  **officials from accepting aid from federal officials in an effort to enforce Missouri laws.**

**1.460.  1.  Any political subdivision or law enforcement agency that employs a law**
2  **enforcement officer who acts knowingly, as defined under section 562.016, to violate the**
3  **provisions of section 1.450 or otherwise knowingly deprives a citizen of Missouri of the**
4  **rights or privileges ensured by Amendment II of the Constitution of the United States or**
5  **Article I, Section 23 of the Constitution of Missouri while acting under the color of any**
6  **state or federal law shall be liable to the injured party in an action at law, suit in equity,**
7  **or other proper proceeding for redress, and subject to a civil penalty of fifty thousand**
8  **dollars per occurrence.  Any person injured under this section shall have standing to**
9  **pursue an action for injunctive relief in the circuit court of the county in which the action**
10  **allegedly occurred or in the circuit court of Cole County with respect to the actions of such**
11  **individual.  The court shall hold a hearing on the motion for temporary restraining order**
12  **and preliminary injunction within thirty days of service of the petition.**

13      **2.  In such actions, the court may award the prevailing party, other than the state**
14  **of Missouri or any political subdivision of the state, reasonable attorney's fees and costs.**

15      **3.  Sovereign immunity shall not be an affirmative defense in any action pursuant**
16  **to this section.**

**1.470.  1.  Any political subdivision or law enforcement agency that knowingly**
2  **employs an individual acting or who previously acted as an official, agent, employee, or**

Electronically Filed - Cole Circuit - June 21, 2021 - 01:52 PM

3  **deputy of the government of the United States, or otherwise acted under the color of**
4  **federal law within the borders of this state, who has knowingly, as defined under section**
5  **562.016, after the adoption of this section:**
6      **(1)  Enforced or attempted to enforce any of the infringements identified in section**
7  **1.420; or**
8      **(2)  Given material aid and support to the efforts of another who enforces or**
9  **attempts to enforce any of the infringements identified in section 1.420;**
10
11  **shall be subject to a civil penalty of fifty thousand dollars per employee hired by the**
12  **political subdivision or law enforcement agency.  Any person residing in a jurisdiction who**
13  **believes that an individual has taken action that would violate the provisions of this section**
14  **shall have standing to pursue an action.**
15      **2.  Any person residing or conducting business in a jurisdiction who believes that**
16  **an individual has taken action that would violate the provisions of this section shall have**
17  **standing to pursue an action for injunctive relief in the circuit court of the county in which**
18  **the action allegedly occurred or in the circuit court of Cole County with respect to the**
19  **actions of such individual.  The court shall hold a hearing on the motion for a temporary**
20  **restraining order and preliminary injunction within thirty days of service of the petition.**
21      **3.  In such actions, the court may award the prevailing party, other than the state**
22  **of Missouri or any political subdivision of the state, reasonable attorney's fees and costs.**
23      **4.  Sovereign immunity shall not be an affirmative defense in any action pursuant**
24  **to this section.**

    **1.480.  1.  For sections 1.410 to 1.485, the term "law-abiding citizen" shall mean a**
2  **person who is not otherwise precluded under state law from possessing a firearm and shall**
3  **not be construed to include anyone who is not legally present in the United States or the**
4  **state of Missouri.**
5      **2.  For the purposes of sections 1.410 to 1.480, "material aid and support" shall**
6  **include voluntarily giving or allowing others to make use of lodging; communications**
7  **equipment or services, including social media accounts; facilities; weapons; personnel;**
8  **transportation; clothing; or other physical assets.  Material aid and support shall not**
9  **include giving or allowing the use of medicine or other materials necessary to treat physical**
10  **injuries, nor shall the term include any assistance provided to help persons escape a**
11  **serious, present risk of life-threatening injury.**
12      **3.  It shall not be considered a violation of sections 1.410 to 1.480 to provide material**
13  **aid to federal officials who are in pursuit of a suspect when there is a demonstrable**

Electronically Filed - Cole Circuit - June 21, 2021 - 01:52 PM

14 **criminal nexus with another state or country and such suspect is either not a citizen of this**
15 **state or is not present in this state.**
16     **4. It shall not be considered a violation of sections 1.410 to 1.480 to provide material**
17 **aid to federal prosecution for:**
18     **(1) Felony crimes against a person when such prosecution includes weapons**
19 **violations substantially similar to those found in chapter 570 or chapter 571 so long as such**
20 **weapons violations are merely ancillary to such prosecution; or**
21     **(2) Class A or class B felony violations substantially similar to those found in**
22 **chapter 579 when such prosecution includes weapons violations substantially similar to**
23 **those found in chapter 570 or chapter 571 so long as such weapons violations are merely**
24 **ancillary to such prosecution.**
25     **5. The provisions of sections 1.410 to 1.485 shall be applicable to offenses occurring**
26 **on or after August 28, 2021.**

    **1.485. If any provision of sections 1.410 to 1.485 or the application thereof to any**
2 **person or circumstance is held invalid, such determination shall not affect the provisions**
3 **or applications of sections 1.410 to 1.485 that may be given effect without the invalid**
4 **provision or application, and the provisions of sections 1.410 to 1.485 are severable.**

    [~~1.320. The general assembly of the state of Missouri strongly promotes~~
2 ~~responsible gun ownership, including parental supervision of minors in the~~
3 ~~proper use, storage, and ownership of all firearms, the prompt reporting of stolen~~
4 ~~firearms, and the proper enforcement of all state gun laws. The general assembly~~
5 ~~of the state of Missouri hereby condemns any unlawful transfer of firearms and~~
6 ~~the use of any firearm in any criminal or unlawful activity.~~]
7

    Section B. Because immediate action is necessary to ensure the limitation of the federal
2 government's power and to protect the citizens' right to bear arms, section A of this act is deemed
3 necessary for the immediate preservation of the public health, welfare, peace, and safety, and is
4 hereby declared to be an emergency act within the meaning of the constitution, and section A of
5 this act shall be in full force and effect upon its passage and approval.

               ✓

# Exhibit F

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

THE UNITED STATES OF AMERICA    )
                                    )
            Plaintiffs,        )
                                    )
v.                                   )     Case No. 2:22-cv-4022-BCW
                                    )
                                    )
THE STATE OF MISSOURI, *et al.*     )
                                    )
            Defendants.      )
_____)

## DECLARATION OF FREDERIC D. WINSTON

I, Frederic D. Winston, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 as follows:

1.      I am the Special Agent in Charge of the Kansas City Field Division of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I have served in my current capacity since January 3, 2021. As Special Agent in Charge, I am responsible for overseeing the criminal and regulatory enforcement operations of the Kansas City Field Division and for ensuring that such operations are consistent with federal law and the policies of ATF and the Department of Justice.

2.      I have been a law enforcement officer since July 15, 1991 and employed by ATF since August 27, 2001. Before serving in my current capacity, I worked as a local police officer and street-level federal agent. I have served in several law enforcement capacities and worked in different judicial districts and states. Most of my law enforcement work stems from information sharing, whether it was done face-to-face or through review of databases and records systems. Like my law enforcement colleagues, my job in general relies upon communication and cooperation at all levels. Previously as a local officer, I served as a federally deputized task force

1

officer and learned the value of teamwork in law enforcement.  As a Resident Agent in Charge of an ATF Field Office, I led a multi-agency gang investigation unit.  The unit was comprised of federal and state law enforcement personnel who worked in collaboration to successfully serve and protect the citizens within our area of responsibility.  Later, as an Assistant Special Agent in Charge, I created a multi-agency strike force in the St. Louis area built upon the premise of federal agents and local officers working as a team, sharing information and resources, and all working together in an effort to decrease violent gun crimes.

3.     The purpose of this declaration is to explain ATF Kansas City Field Division's role in protecting Missouri citizens from violent crime and to identify ways in which Missouri House Bill 85, also called the Second Amendment Preservation Act, impedes ATF's ability to carry out that role.  This declaration is based on my personal knowledge as well as knowledge made available to me in the course of my duties as the Special Agent in Charge.

**ATF's Mission, Organization, and Administration of Federal Firearms Laws**

4.     ATF's mission is to fight violent crime and to protect the public by interdicting and preventing illegal firearms trafficking and the criminal possession and use of firearms, and by ensuring compliance with federal laws and regulations by firearms industry members.  ATF has twenty-five field divisions throughout the country.  The Kansas City Field Division is located in Kansas City, Missouri and encompasses all of Missouri, with additional offices in St. Louis, Cape Girardeau, Springfield, and Jefferson City, Missouri. This Division also covers the States of Nebraska, Kansas, Illinois, and Iowa. Along with our high volume of criminal enforcement responsibilities, this Division is also tasked with regulating the over 4,100 federal firearms licensees with a business premises in Missouri.

2

5.      ATF is responsible for administering and enforcing laws related to firearms and ammunition, specifically the Gun Control Act of 1968 (GCA), 18 U.S.C. §§ 921 et seq. and the National Firearms Act of 1934 (NFA), 26 U.S.C. §§ 5801 et seq. See 28 U.S.C. § 599A; 28 C.F.R. § 0.130. Some of the key purposes of these laws are to effectively regulate firearms that travel in or affect interstate commerce to reduce the likelihood that they are used by those involved in criminal activities.

6.      ATF is the only federal agency authorized to license and inspect firearms dealers to ensure they comply with laws governing the sale, transfer, possession, and transport of firearms. See 28 U.S.C. § 599A; 28 C.F.R. § 0.131.

**Violent Crime Within Missouri**

7.      Violent crime is a significant problem in Missouri. In 2020, the Missouri State Highway Patrol (MSHP), which is responsible for reporting state-wide crime statistics, reported 33,267 violent crime offenses state-wide, an increase of 8.38% from the previous year.[1] That same year, MSHP reported 731 homicide offenses state-wide, an increase of 26.47% from 577 such offenses reported in 2019.

8.      Firearms are used in a significant number of violent crimes in Missouri. MSHP reports a total of 13,964 firearm-related offenses in 2020, an increase of 109.20% from 2019. MSHP also reports that, of the 731 homicides in the state in 2020, 506 involved a firearm. Further, of Kansas City's 176 homicides in 2020, 148 (84.1%) were committed by firearms. The St. Louis Metropolitan area, for its part, experienced 264 homicides in 2020, 92.1% of which were committed by firearms.

---

[1] The MSHP data referenced in this declaration are available at https://showmecrime.mo.gov/CrimeReporting/Crime ReportingTOPS.html (last visited 2/28/22).

3

9.     Gun violence in the State has continued through 2021, with MSHP reporting 20,690 firearm-related crimes, an increase of 48.17% from 2020, and 571 homicides, 77.5% of which involved a firearm.  Further, Kansas City suffered 137 homicides in 2021, while the St. Louis Metropolitan Area reported 189 homicides, the vast majority of which involved a firearm.

10.    ATF's role in limiting unlawful access to firearms is thus key to preventing additional violent crimes in the State.  Additionally, ATF's ability to solve and assist in the prosecution of violent crime frequently depends on data associated with firearms, *e.g.*, ballistics information, or records maintained by federal firearms licensees, as discussed further below.

11.    Federal firearms investigations and prosecutions are key components of combating violent crime, and promoting public safety, within Missouri.  The arrest and conviction of those violating the Federal firearms laws are frequently one of the most effective tools for taking violent criminals off the street.

**Missouri Second Amendment Preservation Act**

12.    On June 12, 2021, the Governor of Missouri signed Missouri House Bill Number 85 (HB85), also called the "Second Amendment Preservation Act" or the "SAPA" into law. As enacted, the SAPA purports to create significant new limits on the ability and authority of state and local law enforcement to enforce federal firearms laws and imposes sanctions on those who violate these limits or enable their violation.  Additionally, the SAPA declares certain federal firearms laws unlawful.  Based upon the passage of this law, ATF has seen impacts that I believe hinder the collaborative partnerships and investigative information sharing that protect the people of Missouri, as well as other states.  As discussed further below, the SAPA has negatively impacted law enforcement and public safety within Missouri by:  (1) prompting the withdrawal of state and local officers from joint task forces; (2) limiting the amount of information that ATF receives from

4

state and local entities; and (3) purporting to nullify, and consequently creating confusion about the validity of, federal firearms laws.

### Effects of the SAPA: Withdrawal from Task Forces and other Partnerships

13. The SAPA has already had a significant impact on ATF's partnerships with state and local law enforcement offices. Those partnerships, which include task forces designed to address crimes in the locations specific to a partner department, are critical to ATF's law enforcement mission of protecting Missouri communities from violent crimes.

14. Before the passage of the SAPA, there were approximately 69 ATF Special Agents, 22 ATF Industry Operations Investigators, 44 full-time Task Force Officers, and 9 Special Deputies, with a post of duty in Missouri.

15. As of this declaration, 13—and soon to be 14—of the 53 state and local officers with federal deputizations (the Task Force Officers and Special Deputies referenced in the preceding paragraph), have withdrawn from participation in ATF task forces in some capacity based on the SAPA, specifically:

    a. The MSHP withdrew three troopers from participation in any ATF Task Forces;

    b. The Columbia Police Department (PD) withdrew four officers from participation in an ATF Task Force;

    c. The Johnson County Sheriff withdrew one deputy from participation in an ATF Task Force;

    d. The O'Fallon PD withdrew two officers with K-9s from participation in an ATF Task Force;

5

e.  The Sedalia PD withdrew two officers from participation in an ATF Task Force;

f.  The Hazelwood PD has advised that it will withdraw from participation in an ATF Task Force; and

g.  The Cape Girardeau PD has allowed its TFO to continue to participate in an ATF Task Force, but that TFO has been instructed to limit his activities and not participate in certain federal firearms matters.

16.  These task forces are primarily dedicated to investigating and enforcing the laws relevant to the illegal use, possession, and trafficking of firearms.  Such task forces, as well as ATF's overall partnerships with state and local departments and agencies, are key to holding violent persons and those illegally using firearms accountable under the law.  For example, from its creation in January 2020 through August 2021, the Columbia Violent Crimes Task Force has recovered 55 firearms from prohibited persons; made 30 arrests for violation of federal law and 35 arrests for violation of state law.  Without exception, these arrests stem from collaborative investigations involving violent crime offenses, firearm possession, or association with violent gang organizations.  However, since the passage of the SAPA, state and local law enforcement no longer work with the Violent Crimes Task Force at all.  Indeed, state and local law enforcement partners have limited their cross-jurisdictional cooperation with ATF all across the state.

17.  There are numerous instances in which Federal partnership via the National Integrated Ballistic Information Network (NIBIN) has assisted in resolving violent crime investigations, such as in Columbia and the greater Boone County area.  An example of the combined effectiveness of a strong local and Federal partnership is the arrest of those responsible for the tragic murder of Shamya Brimmage in March of 2017 in Columbia, Missouri.  Brimmage

Case 2:22-cv-04022-BCW   Document 8-2   Filed 02/28/22   Page 6 of 14
Appellate Case: 23-1457   Page: 15   Date Filed: 03/17/2023 Entry ID: 5256484

was celebrating her birthday inside a house when a drive-by shooting occurred, resulting in her death and another injured victim. A confidential source provided a local TFO with suspect information. Working in combination with an ATF agent partner, the team was able to detain the suspect in a vehicle matching other information relayed. Spent casings were recovered from that vehicle and NIBIN confirmed they were a match to those recovered from the homicide scene. Second Degree Murder charges remain pending against one defendant while another suspect pled guilty to Voluntary Manslaughter, among other charges, and is currently serving a 20-year sentence.

18.     Because of the withdrawal of state and local officials from ATF task forces, ATF is no longer able to fulfill its duties as effectively, including preventing, investigating, and assisting in the prosecution of violent offenders. These state and local officials are critical members of ATF's law enforcement efforts. As a result of the withdrawals identified above, the SAPA has harmed law enforcement and public safety in Missouri.

19.     For example, with respect to federal prosecutions initiated in Missouri federal court from ATF investigations, from June 12 through December 15 of 2019, 318 prosecutions were initiated (of which the vast majority involved firearms crime), defendants numbered 364, and the number of criminal charges was 679. Of that same time-period in 2020, 285 prosecutions were initiated (of which the vast majority involved firearms crime), defendants numbered 380, and the number of charges was 788. Of that same time-period in 2021, 177 prosecutions were initiated (of which the vast majority involved firearms crime), defendants numbered 230, and the number of charges was 365. The 2021 numbers represent a forty-four percent (44%), thirty-seven percent (37%), and forty-six percent (46%) percent drop, respectively from the 2019 numbers. While it is likely

Case 2:22-cv-04022-BCW   Document 8-2   Filed 02/28/22   Page 7 of 14
Appellate Case: 23-1457    Page: 16    Date Filed: 03/17/2023 Entry ID: 5256484

that other factors such as COVID-19 also played a role in the decline of prosecutions, the SAPA was undoubtedly a factor.

20.     Moreover, ATF has had planned enforcement operations, such as search warrants, where we normally would have collaborated with our local partners, but these departments now feel they cannot participate due to the SAPA.  This has caused ATF to pull resources from other areas of responsibility to ensure agent and public safety.

**Effects of the SAPA: Limits on Information from State and Local Officials**

21.     The SAPA has also impacted ATF's ability to rely on state and local partners for information related to ATF's own investigations, including those related to the criminal use, possession, and trafficking of firearms.

22.     For example, citing the SAPA, the Director of the MSHP Missouri Information Analysis Center (MIAC) informed ATF that the Center will no longer provide any investigative support to ATF, to include assisting in providing background information on investigative targets. The MIAC also indicated it will no longer submit firearms trace requests directly to ATF, a process used to help identify firearms used in crimes and link persons to unlawful activities.  Additionally, MIAC will not assist in Federal Bureau of Investigation National Instant Criminal Background Check System (NICS) referral investigations that are assigned to ATF, *e.g.*, after a purchaser receives a firearm from a licensee but is then determined to be prohibited from possessing the firearm.  Prior to the implementation of the SAPA, the MIAC has been a great partner and resource for ATF investigations associated with firearms investigations and violent criminals.

23.     In the United States District for the Western District of Missouri, local and state collaboration varies, with many departments still hesitant of fully cooperating with ATF because of the uncertain ramifications of the SAPA.  Agents are required to get subpoenas for information

8

that pre-SAPA was readily available. In parts of the Western District, local law enforcement will only provide assistance in emergency situations. In the Eastern District of Missouri, most departments are similarly hesitant to assist ATF based on the SAPA.

24. Perhaps most concerning, several state and local law enforcement entities have indicated that they will no longer input data into NIBIN. NIBIN is the only interstate automated ballistic imaging network in operation in the United States and seeks to automate ballistics evaluations and provide actionable investigative leads in a timely manner. This technology is vital to any violent crime reduction strategy because it enables investigators to match ballistics evidence with other cases across the nation. This process also helps reveal previously hidden connections between violent crimes in different states and jurisdictions.

25. Some jurisdictions previously stopped inputting data into NIBIN but have now resumed doing so. However, most of those jurisdictions will only input data after complying with additional procedures, which delays the entry of information into NIBIN and likewise harms its efficacy.

26. NIBIN is a critical tool in efforts to combat violent crime nationwide and in Missouri. NIBIN, however, is only as good as the information put into the system. If state and local law enforcement do not timely input data into NIBIN, our collective efforts in fighting violent crime are diminished. A key component of the NIBIN process is information sharing and the timeliness of inputting data which generates potential leads. Potential leads increase the likelihood of linking, solving or preventing additional firearm violence. The stoppage or hesitancy to use NIBIN caused by the SAPA, has placed an avoidable risk upon the public.

27. The following statistics demonstrate the utility and importance of NIBIN within Missouri. Over the three years preceding the SAPA's enactment, NIBIN was used to generate

9

over 6,000 leads, including 3,149 cross-jurisdictional leads. From October 2019 to June 2021, approximately 200 suspects were identified in NIBIN-related incidents in the State.

28.    In the absence of state and local law enforcement officials voluntarily providing the information and assistance described above, particularly with respect to NIBIN, ATF's law enforcement responsibilities are harder to execute. Thus, the SAPA has deprived ATF of cooperative information-sharing relationships which harm law enforcement and public safety in Missouri.

**Effects of the SAPA: Nullifying Federal Law and Creating Confusion**

29.    The SAPA purports to nullify certain federal firearms laws that are important for maintaining public safety. For example, since there is no corresponding Missouri state violation, the SAPA would appear to allow certain federally prohibited persons to possess firearms, such as those under a restraining order and those convicted of misdemeanor crimes of domestic violence, 18 U.S.C. §§ 922(g)(8), (g)(9).

30.    For reference, from October 2017 through July 2021, ATF referred approximately eight cases for prosecution to the respective Missouri Offices of the U.S. Attorney for violations of 18 U.S.C. § 922(g)(8), as well as approximately 20 cases for prosecution to those Offices for violations of 18 U.S.C. § 922(g)(9). During that same timeframe, ATF received approximately 81 FBI referrals for violations of § 922(g)(8), and approximately 744 FBI referrals for violations of § 922(g)(9).

31.    From August 2021 through the present, no further cases have been referred for prosecution and ATF received an additional 11 FBI referrals for violations of § 922(g)(8) and an additional 148 FBI referrals for violations of § 922(g)(9).

10

32.     All of these referrals involved people located in Missouri and identified by the Federal Bureau of Investigation's NICS System as prohibited persons who attempted to purchase, or actually did purchase firearms.  State and local partners, and more specifically task force officers, often assist in investigating these referrals.  Without this assistance, ATF will not be able to investigate these referrals as quickly, which in turn allows prohibited persons who were able to purchase firearms to retain them longer at greater risk to the public.

33.     Prosecuting those who possess firearms after being convicted of a disqualifying misdemeanor crime of domestic violence and/or are in violation of qualifying restraining orders, is an important part of ATF's public safety mission, especially as to those offenders who have threatened violence or committed violent acts against family members.

34.     By way of further example, local officers have indicated to ATF that even State court protective orders, on which State judges issue the orders with the advisement that possession of firearms would violate Federal law, could not be enforced by local officers due to the SAPA and that ATF—instead of local officers—are now responsible for retrieving those firearms.

35.     Along with those noted GCA violations, the SAPA also appears to prohibit the imposition of federal taxes and registration requirements on any firearm covered by the NFA.  The NFA defines "firearm" to include shotguns with a barrel length of less than 18 inches or weapons made from shotguns with an overall length of less than 26 inches; rifles with a barrel length of less than 16 inches or weapons made from rifles with an overall length of less than 26 inches; machineguns; silencers; and destructive devices.  26 U.S.C. § 5845.  The NFA also requires the registration of such firearms in the National Firearms Registration and Transfer Record maintained by ATF.  See 26 U.S.C. § 5841.  Like with GCA violations, ATF conducts substantial enforcement efforts on these NFA-type weapons, and often work with our local partners in these investigations.

11

Case 2:22-cv-04022-BCW   Document 8-2   Filed 02/28/22   Page 11 of 14
Appellate Case: 23-1457    Page: 20    Date Filed: 03/17/2023 Entry ID: 5256484

Enforcing these requirements of federal law are important aspects of ATF's mission to ensure lawful, safe ownership of firearms.

36.     Federal firearms licensees also play a significant role in helping to protect the public, and their compliance with the federal laws and regulations is critical to this important goal. I specifically note the requirements of licensees to accurately and timely maintain acquisition and disposition records and to ensure that the ATF Form 4473 and multiple handgun sales forms are correctly completed and maintained when applicable.  These records are key components to assisting in trace requests for recovered crime guns.  Licensees also carry an important responsibility of ensuring a person acquiring any firearms is correctly identified and a background check is done to prevent prohibited persons from receiving firearms.  The SAPA purports to declare these responsibilities of federal firearms licensees invalid.

37.     Since the enactment of the SAPA, federal firearms licensees have indicated confusion about the current status of the law.  In an attempt to affirm that these legal responsibilities continue regardless of the SAPA, and to address questions and confusion the Kansas City Field Division has received related to the SAPA, on July 26, 2021, ATF issued an informational letter addressed to all federal firearms licensees in Missouri.  <u>See</u> www.atf.gov/firearms/docs/open-letter/missouri-open-letter-all-ffls-house-bill-number-85-second-amendment/download.

38.     Federal firearms licensees' compliance with federal laws and regulations are critical in the fight against gun violence.  For example, when ATF recovers a firearm, tracing the ownership of that firearm is crucial to the resulting investigation and frequently depends upon the records kept by federal firearms licensees.  Without those records, a successful trace becomes much more difficult to achieve.

12

39.     The SAPA's attempt to nullify federal law could also create confusion amongst private citizens about whether federal firearms laws remain valid and enforceable.  If a private citizen were to erroneously believe that federal firearms laws were invalid, and sought to oppose ATF's lawful authority on that basis, that would pose an unacceptable and unnecessary risk of violent confrontation, use of force, and serious injury.

## Conclusion

40.     In sum, based upon my knowledge and law enforcement experience in working with state and local partners, the SAPA has caused and will continue to cause a strain on law enforcement relationships due to the inability to communicate as effectively and to efficiently share information and investigative resources.  This, in turn, will prevent law enforcement at all levels from effectively serving and protecting the citizens of Missouri and other states.

41.     As discussed above, the SAPA (1) prevents federal, state, and local law-enforcement partners from cooperating effectively to investigate and enforce the law; (2) constrains information-sharing with the Federal Government, which deprives law enforcement of information needed to successfully investigate crimes, including violent crimes; and (3) creates confusion about the current status of federal firearms laws, which could harm the Federal Government's ability to effectively enforce federal law and potentially even lead to unnecessary, dangerous situations.  For all of these reasons, the SAPA has an extremely negative effect on successful law enforcement and public safety within the State of Missouri.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:

13

_____

Frederic D. Winston
Special Agent in Charge
ATF Kansas City Field Division
U.S. Department of Justice

14

# Exhibit G

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-4022-BCW |
| | ) | |
| | ) | |
| THE STATE OF MISSOURI; *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## EFFECTS OF H.B. 85 ON UNITED STATES MARSHALS
## LAW ENFORCEMENT EFFORTS IN MISSOSURI

I, Jonathan D. Jordan, being duly sworn upon my oath, do state and testify that:

1.      I am employed by the United States Marshals Service (USMS) as the Presidentially Appointed United States Marshal for the Eastern District of Missouri and as so, have knowledge of the USMS operations in the Eastern District of Missouri. The statements in this declaration are based on my personal knowledge as well as information provided to me in the course of my official duties.

2.      I have 42 years of law enforcement experience. Prior to becoming United States Marshal, I was the duly elected Sheriff of Cape Girardeau County Sheriff for twenty-five years. I am a past President of the Missouri Sheriff's Association and a graduate of the National Sheriff's Institute of Longmont Colorado. I have served as an undercover narcotic officer, chief of detectives, and supervisor of the Cape Girardeau County Major Case Squad. I also served on many state, local, and national law enforcement organizations.

1

**Background on USMS Operations**

3.     The USMS was the first federal enforcement agency in the United States. Federal Marshals have served the country since 1789, often in unseen but critical ways. The USMS occupies a uniquely central position in the federal justice system. It is the enforcement arm of the federal courts, involved in various federal law enforcement initiatives. Presidentially appointed U.S. Marshals, one for each federal judicial district, direct the activities of 94 districts. Approximately 3,738 Deputy U.S. Marshals and criminal investigators form the backbone of the agency. The duties of the USMS include protecting the federal judiciary, apprehending federal fugitives, managing, and selling seized assets acquired by criminals through illegal activities, housing and transporting federal prisoners, and operating the witness security program.

4.     The USMS is the federal government's primary agency for fugitive investigations. The Marshals have the broadest arrest authority among federal law enforcement agencies. The Marshals aid state and local agencies in locating and apprehending their most violent fugitives. The USMS arrest, on average, 310 fugitives every day. The USMS task forces combine the efforts of federal, state, and local law enforcement agencies to locate and arrest the most dangerous fugitives. Task force officers are state and local police officers who receive special deputations with the USMS. While on a task force, these officers can exercise federal USMS authority, such as crossing jurisdictional lines. The USMS "15 Most Wanted" fugitive program draws attention to some of the country's most dangerous and high-profile fugitives. These fugitives tend to be career criminals with histories of violence, and they post a significant threat to public safety.

5.     The USMS is the lead agency for 56 interagency fugitive task forces located throughout the United States, as well as seven congressionally funded regional fugitive task forces.

2

In 2020, the USMS led fugitive task forces resulting in the arrests of over 77,460 federal, state, and local fugitives, and cleared over 90,446 warrants.

6. In the State of Missouri, the USMS operates in two districts, the Eastern District (E/MO) and the Western District (W/MO). I am responsible for the USMS activities in the Eastern District of MO which generally covers the eastern half of Missouri and includes approximately 49 counties.

7. The E/MO Fugitive Task Force (EMOFTF) is divided into two different enforcement teams. The teams are: The Heartland Fugitive Task Force (HFTF), which consists of our southern office located in Cape Girardeau, Missouri and the Metro Fugitive Task force (MFTF) located in St. Louis, Missouri. The Metro Fugitive Task Force also has deputies detached to enforcement teams at the local DEA office, and Organized Crime and Drug Task Force (OCDEFT) Strike Force located in Maryland Heights, Missouri. Both these task forces are comprised of a combination of USMS Deputies, and officers from state, local, and other federal agencies. The task forces seek to apprehend individuals, some of whom may be wanted for federal firearm violations.

**Impacts of Missouri H.B. 85**

8. I understand that Missouri has enacted H.B. 85, which purports to nullify several categories of federal firearm laws and imposes penalties on state and local law enforcement agencies who enforce, or assist in the enforcement of, those federal laws. The USMS' duties include enforcing federal firearm laws with respect to fugitives. As discussed further below, H.B. 85 has had several negative impacts on USMS operations in E/MO.

9. EMOFTF is comprised of approximately 48 deputized federal, state, and local officers. We have 13 full-time TFOs on the MFTF. We also have 3 full-time TFOs in Cape (14

3

in STL and 3 in Cape). These TFOs have all been restricted at one time or another in various degrees from enforcing federal firearms laws. One agency, the Missouri State Highway Patrol, is not allowed to enforce the federal violations.

10.     In FY2021, E/MO received 421 federal weapons related warrants from the U.S. Attorney's Office. These warrants related to felon in possession of firearm, or similar, charges that originated from arrests, executed by state and local officers, of subjects for state firearms violations. These charges were then referred to the U.S. Attorney's Office for federal indictments. E/MO also had 320 weapons related warrants stemming from supervised release violations and/or bond violations with an underlying charge of felon in possession. E/MO seized an additional 233 firearms during arrests of state and federal fugitives. Many of these were prosecuted federally. With the passage of HB-85, local task force officers are hesitant to participate in task force operations and seize firearms knowing that the subjects qualify for federal prosecution.

11.     Since January 2020, EMOFTF recovered 393 firearms from prohibited persons and made 1,201 arrests for state and federal weapons offenses. In addition to the weapons arrests, E/MO task force arrested 470 additional persons for homicide, assault, and robbery, which all involved firearms.

12.     Since the passage of HB-85, we have not lost any EMOFTF TFOs due to H.B. 85, but most of the EMOFTF TFOs have been restricted at one time or another, and in various degrees, from enforcing federal firearms violations. This hesitancy initially impacted fugitive operations in such areas as failure to share information that can be helpful in locating the fugitive; failing to act when a firearm is discovered at the scene; refusing to share information to determine if a firearm is stolen; and walking away from an operation when other task force members were actively involved in executing an arrest warrant. Of all the agencies that EMOFTF works with,

4

the Missouri State Highway Patrol still has not allowed their officers, who are part of the task force, to enforce federal firearms violations. However, some other task force officers have been allowed to resume normal operations by their agencies.

13. A specific incident where H.B. 85 caused problems for E/MO occurred when our Task Force was attempting to apprehend a federal fugitive in Cape Girardeau, Missouri. Our officers were on scene to arrest a federally wanted fugitive on a dangerous drugs warrant. They called for assistance with establishing an outer perimeter from Cape Girardeau Police Department, which has long been standard practice. The outer perimeter contains the fugitive inside of a dwelling or specific area and is important for protecting the safety of law enforcement officers and the surrounding community. The officers from Cape PD apologized and informed the USMS deputies that the Department had been ordered to leave and that it could not help any federal agency at this time. Except for an extreme emergency, that remains the policy of the Cape Girardeau Police Department.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Jonathan D. Jordan
United States Marshal
Eastern District of Missouri

# Exhibit H

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-4022-BCW |
| | ) | |
| THE STATE OF MISSOURI; *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## EFFECTS OF H.B. 85 ON UNITED STATES MARSHALS
## LAW ENFORCEMENT EFFORTS IN MISSOSURI

I, Micheal Vernon Stokes, being duly sworn upon my oath, do state and testify that:

1.      I am an adult resident of Clay County, Missouri and I have firsthand knowledge of the matters set forth herein, including based on information provided to me in the course of my official duties. I have been employed by the United States Marshals Service (USMS), Western District of Missouri since October 2002 and have served continually in this district since that time. I currently serve as the Marshals Service Enforcement Supervisor for the federal district.

2.      I was previously employed by the Kearney Nebraska Police Department as a Police Officer from November 1998 to October 2002. I directly supervise fugitive task force operations and the enforcement of all orders of the federal court as they pertain to arrest warrants for federal law violations where the USMS takes primary responsibility or by delegation from another law enforcement agency. The fugitive task force also assists state and local agencies in locating and arresting subjects wanted on state arrest warrants. I oversee all USMS enforcement program activities for the district. I have a Master's Degree in Public Affairs and a Master's Certificate in Emergency Management from Park University.

**Background on USMS Operations**

3.       The USMS was the first federal enforcement agency in the United States. Federal Marshals have served the country since 1789, often in unseen but critical ways. The USMS occupies a uniquely central position in the federal justice system. It is the enforcement arm of the federal courts, involved in various federal law enforcement initiatives. Presidentially appointed U.S. Marshals, one for each federal judicial district, direct the activities of 94 districts. Approximately 3,738 Deputy U.S. Marshals and criminal investigators form the backbone of the agency. The duties of the USMS include protecting the federal judiciary, apprehending federal fugitives, managing and selling seized assets acquired by criminals through illegal activities, housing and transporting federal prisoners, and operating the witness security program.

4.       The USMS is the federal government's primary agency for fugitive investigations. The Marshals have the broadest arrest authority among federal law enforcement agencies. The Marshals aid state and local agencies in locating and apprehending their most violent fugitives. The USMS arrest, on average, 310 fugitives every day. The USMS task forces combine the efforts of federal, state, and local law enforcement agencies to locate and arrest the most dangerous fugitives. Task force officers are state and local police officers who receive special deputations with the USMS. While on a task force, these officers can exercise federal USMS authority, such as crossing jurisdictional lines. The USMS "15 Most Wanted" fugitive program draws attention to some of the country's most dangerous and high-profile fugitives. These fugitives tend to be career criminals with histories of violence, and they pose a significant threat to public safety.

5.       The USMS is the lead agency for 56 interagency fugitive task forces located throughout the United States, as well as seven congressionally funded regional fugitive task forces.

In 2020, the USMS led fugitive task forces resulting in the arrests of over 77,460 federal, state, and local fugitives, and cleared over 90,446 warrants.

6.      In the State of Missouri, the USMS operates in two districts, the Eastern District (E/MO) and the Western District (W/MO). I am responsible for USMS enforcement activities in W/MO, which comprises the western half of Missouri and encompasses 66 of the 114 counties in the state to include the state capital in Jefferson City, and the major metro areas of Columbia, Springfield and Kansas City. E/MO comprises the eastern 48 counties and the largest metro area of St. Louis.

7.      The W/MO operates one fugitive task force. The U.S. Marshals Midwest Violent Fugitive Task Force (MVFT), headquartered in Kansas City, Missouri, operates in conjunction with members of the Kansas City, Independence, and St. Joseph Police Departments; Jackson, Cass, Clay, Buchanan, Nodaway, and Clinton County Sheriff's Departments; Missouri State Highway Patrol; and other federal law enforcement partners. The Springfield Division partners with members of the Green County Sheriff's Office, the Christian County Sheriff's Office, the Springfield Police Department, and the Joplin Police Department. Officers from these state and local law enforcement agencies participating in the MVFT are federally deputized pursuant to USMS federal authorities. The MVFT is comprised of approximately 29 USMS deputies, and approximately 44 federally deputized task force officers from state and local law enforcement agencies within Western Missouri. On average, 5 task force officers work with the MVFT on a full-time basis and approximately 20 others are very active on a part-time basis.

8.      The task force objectives are to seek out and arrest both state and federal fugitives charged with violent crimes, serious drug offenses, weapons violations, homicide, sex offenders, and other serious felonies. Many of these individuals are wanted for federal firearm violations or

federal supervised release violations for the same. The task force also provides direct support to law enforcement agencies in tracking down and recovering missing children.

9.     USMS operations produce significant results in fighting violent crime. For example, since the summer of 2018, the USMS W/MO, Kansas City Office has conducted multiple enforcement operations resulting in the arrest of 2,568 fugitives.

10.     The USMS takes the lead in serving all federal warrants sought by state and local law enforcement agencies that file cases directly with the U.S. Attorney's Office. Other federal agencies delegate federal warrants sought by their agency to the USMS for apprehension purposes. From 2017 to 2021, 1003 subjects were charged by the U.S. Attorney's Office in federal court with firearms related offenses and were processed through the USMS. The USMS W/MO apprehended 180 of these individuals through its task force work. While the W/MO apprehended 63 individuals in 2020 for federal firearms related charges, in 2021 the W/MO only apprehended 30 individuals for federal firearms related charges due to a significant drop in the number of federal firearms violation cases charged by the U.S. Attorney's Office. This is due to H.B. 85.

11.     The USMS, by virtue of conducting its fugitive apprehension mission, also seizes large numbers of firearms from prohibited persons each year. In late 2018, as part of Project Safe Neighborhoods and the Public Safety Partnership initiative in Kansas City, as directed by the Department of Justice, the USMS W/MO stepped up efforts to seek out subjects with felony warrants who were actively committing crimes in the community and placing innocent citizens at risk of becoming victims of violent crime. This resulted in a dramatic increase of firearms seized at the time of the fugitive arrests. From 2017 to 2021, a total of 328 firearms were seized. Although the total number of firearms seized increased every year between 2017 to 2020, 95 firearms were seized in 2020, and only 51 firearms were seized in 2021. Although there are many

factors involved, including a reduction in TFOs and COVID, H.B. 85 is the only change that caused the significant drop in the numbers.

**Impacts of Missouri H.B. 85**

12. I understand that Missouri has enacted H.B. 85, which purports to nullify several categories of federal firearm laws and imposes penalties on state and local law enforcement agencies who enforce, or assist in the enforcement of, those federal laws. As discussed further below, H.B. 85 has had several negative impacts on USMS operations in W/MO.

13. The predominant number of federal firearms violation warrants generated in the W/MO come from the Kansas City Division and are related to investigations conducted in the Kansas City metro area. Prior to the passage of H.B. 85, the Kansas City Missouri Police Department and other local agencies routinely worked directly with the U.S. Attorney's Office to indict subjects for federal firearms offenses. If the officer presenting the case was not a task force officer for another federal agency, fugitive apprehension efforts are led by the USMS. Since the passage of H.B. 85, and more specifically, the penalty phase implementation on August 28, 2021, the filing of federal firearms offenses by local law enforcement agencies has slowed dramatically. From 2018 to 2021, the USMS W/MO received a total of 128 firearm related fugitive apprehension referrals from local law enforcement. While there were 46 referrals in 2020, there were only 15 in 2021, and only five such referrals since August 2021 due directly to the reduction in cases filed directly with the USAO by state and local agencies due to H.B. 85.

14. Six members of the Kansas City Missouri Police Department, Fugitive Apprehension and Arraignment Section, are specially deputized by the USMS and work on a daily basis with the USMS W/MO fugitive task force to apprehend violent offenders wanted throughout the metro area. Since the passage of H.B. 85, they too have experienced a significant "cooling

effect" in regard to their participation with the USMS task force if the subject sought is wanted for a federal weapons violation warrant. This approach is the same whether the case is one that is brought to the U.S. Attorney's Office by the Kansas Police Department or another agency. When the federal firearms offense is the primary charge for the warrant, and the USMS task force is working to apprehend the fugitive, these federally deputized officers are not allowed to assist the USMS.

15.     The Kansas City Police Department lab, prior to the passage of H.B. 85, processed seized firearms to assist law enforcement agencies in identifying links between seized firearms and other crimes. After the passage of the law, the lab would not process firearms for DNA if in support of a federal agency conducting a federal firearms investigation. For example, the USMS had a felon in possession of a firearm case affected by this policy that we are unable to get a firearm in possession of the ATF processed for DNA. The subject is in custody on a federal probation violation and felon in possession of a firearm.

16.     On September 5, 2021, a Missouri State Highway Patrol Trooper stopped a vehicle for speeding in Buchanan County and determined that the driver was wanted on a USMS warrant for a federal weapons violation, which was issued out of the District of Arizona. The vehicle was registered in Arizona and the driver did not have ties to Missouri, but instead was just passing through. The Trooper did not arrest the subject and instead released him at the scene believing that his department prevented him from making an arrest on the federal arrest warrant for the firearms violation. The USMS W/MO was not contacted on the date of this stop and did not receive a request for assistance. The USMS only learned of the vehicle stop after the fact, and by happenstance. The USMS then had to divert resources toward apprehending the individual and conducting a local investigation to determine if the subject was still in the local area or was

"passing through." The subject was apprehended by local law enforcement in Arizona approximately one month later. Although the Highway Patrol later clarified that the arrest of a subject who has an outstanding federal firearms warrant was not prohibited if randomly encountered during their duties, Missouri State Highway Patrol investigators that work routinely with the USMS W/MO on fugitive matters are still reluctant to participate in the actual investigation of a fugitive wanted on federal firearms warrant if it is not secondary to other primary charges such as narcotics, assault, etc.

17. Since the passage of H.B. 85, the W/MO has experienced varying levels of participation in task force operations by local law enforcement. First, some TFOs have stepped away from all fugitive operations related to the execution of an arrest warrant for a federal firearms offense at the outset. Second, as it relates to state or federal convicted felons, TFOs have initially participated in fugitive operations; however, when a firearm is discovered, some TFOs have reduced their level of participation, including immediately disengaging from the operation. Third, for non-firearm related fugitive operations, TFOs may initially participate in the fugitive operation, but depending on the developments at the scene, including the discovery of a firearm, TFOs have disengaged while execution of the arrest warrant is in process. This creates grave security issues within the context of the operation for other task force members.

18. As members of the USMS W/MO management team routinely visit with heads of the local law enforcement agencies in the district, a prevailing theme over the past year, since the passage of H.B. 85, has been one of a "wait and see" approach to joining the USMS task force due to the uncertainty of civil liability they could potentially face if involved in the enforcement of federal firearms violation warrants. This has negatively impacted recruitment efforts for the task force, to the detriment of the task force's overall effectiveness.

19.    In conclusion, I believe that H.B. 85 constitutes a threat to public safety in Missouri, because it interferes with USMS' responsibility to apprehend fugitives, including violent offenders, and because it limits the information and resources available to USMS in performing those duties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

Mike Stokes
Deputy United States Marshal
Western District of Missouri

# Exhibit I

# Exhibit I

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-4022-BCW |
| | ) | |
| THE STATE OF MISSOURI; MICHAEL | ) | |
| L. PARSON, Governor of the State of Missouri, | ) | |
| in his official capacity; ERIC SCHMITT, | ) | |
| Attorney General of the State of Missouri, in | ) | |
| his official capacity; and SANDY KARSTEN, | ) | |
| Director of the Missouri Department of Public | ) | |
| Safety, in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DECLARATION OF FEDERAL SECURITY DIRECTOR ANGELA BROOKS**

I, Angela Brooks, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 as follows:

1.     I am the Federal Security Director ("FSD") for the Transportation Security Administration's ("TSA") operations at federalized airports in the state of Missouri. The TSA is a component agency of the United States Department of Homeland Security ("DHS"). As the FSD, my responsibilities include overseeing all TSA screening operations at Missouri airports, and ensuring that such operations are consistent with federal law and the policies of TSA and DHS.

2.     I have extensive experience in law enforcement and in the federal aviation sector, having started my career with the Federal Aviation Administration ("FAA") as a Civil Aviation Security Specialist with the FAA's Civil Aviation Security Field Office in Kansas City,

Missouri. While at the FAA, I was trained as a Federal Air Marshal and flew several missions to high threat international destinations.

3.     In 2002, after the terrorist attacks on 9/11, I joined the TSA as the Assistant FSD for Regulatory Inspections at the Kansas City International Airport (MCI). I was selected to be the Assistant FSD for Operations in 2003, and then selected to be the Deputy FSD for the State of Missouri in September of 2013. In May of 2018, I was selected to serve as the FSD for the State of Wyoming, and returned to my home state in my current position as the FSD for Missouri in September of 2020.

4.     The purpose of this declaration is to explain the TSA's role in securing the national aviation system and to identify ways in which Missouri House Bill 85 ("H.B. 85"), also known as the Second Amendment Preservation Act, may impede TSA's ability to carry out its role. This declaration is based on my personal knowledge, as well as knowledge made available to me in the course of my duties as the FSD for the State of Missouri.

**TSA's Mission and Congressional Mandate**

5.     Following the events of 9/11, it was clear that the security screening at airports was not sufficient to protect the traveling public, and Congress therefore created the TSA to better secure all modes of transportation, including aviation. It is TSA's mission to prevent terrorist attacks and reduce the vulnerability of the United States to terrorism within the nation's transportation networks. In furtherance of this mission at airports across the country, including those in Missouri, TSA screens all individuals and accessible property entering the sterile area of the airport—i.e., the physical portion of an airport that provides passengers access to boarding aircraft—in order to deter, detect, and prevent the carriage of prohibited items such as any explosive, incendiary, firearm, or weapon into that sterile area or onboard an aircraft.

2

Case 2:22-cv-04022-BCW   Document 8-5   Filed 02/28/22   Page 2 of 7
Appellate Case: 23-1457   Page: 41   Date Filed: 03/17/2023 Entry ID: 5256484

6.      In accordance with the Aviation and Transportation Security Act ("ATSA"), TSA is charged with screening airport passengers at TSA checkpoints across the nation to ensure that airline passengers do not bring unauthorized explosives, firearms, and incendiary devices or other prohibited items, either on their person or in accessible property, into the security screening checkpoint and/or the sterile area of the airport. *See* 49 U.S.C. §§ 44901, 44903; 49 C.F.R. § 1540.111. It is a federal crime to knowingly and willfully enter an airport area where TSA conducts or regulates screening activities in violation of TSA security requirements, *see* 49 U.S.C. § 46314, which generally prohibit the carrying of weapons during TSA inspection (even before a person is otherwise permitted to enter the sterile area of an airport). *See* 49 C.F.R. § 1540.111(a)(1); *see also, e.g.*, 49 U.S.C. § 46505 (prohibiting carrying a weapon when on, or attempting to get on, an aircraft); 49 C.F.R. § 1503.401 (allowing TSA to impose civil penalties on individuals who bring prohibited items to the checkpoint or onboard aircraft).

7.      TSA checkpoints serve as the screening location where the agency ensures that passengers are not carrying prohibited items into the sterile area of an airport. Congress contemplated that, in general, airports would rely on "the services of qualified State, local, and private law enforcement personnel" to "provide[] a law enforcement presence and capability . . . that is adequate to ensure the safety of passengers." 49 U.S.C. § 44903(c)(1). Thus, when a passenger's prohibited firearm is discovered at a TSA checkpoint, TSA generally refers the passenger to state or local law enforcement to pursue any potential criminal violations and ensure that the firearm is not allowed into the sterile area of the airport.

8.      TSA also has a comprehensive civil enforcement program to impose civil penalties on passengers who bring prohibited items, including firearms, whether loaded or unloaded, to the TSA checkpoint. 49 C.F.R. § 1503.401 (TSA may impose civil penalties

3

Case 2:22-cv-04022-BCW   Document 8-5   Filed 02/28/22   Page 3 of 7
Appellate Case: 23-1457   Page: 42   Date Filed: 03/17/2023 Entry ID: 5256484

against individuals who bring prohibited items to the checkpoint or onboard aircraft). Transportation Security Inspectors (TSIs) coordinate with local law enforcement to collect the initial evidence necessary to pursue the investigation of a regulatory violation and potential civil penalty.

### Firearms at TSA Checkpoints Nationwide and in Missouri

9.      TSA screeners frequently and consistently discover firearms in carry-on luggage at checkpoints around the nation. This problem is recurrent and increasing. In the first nine months of 2021, TSA firearm catches at checkpoints set a 20-year record. See TSA firearm catches at checkpoints sets 20-year record in first nine months of 2021 | Transportation Security Administration, *available at* https://www.tsa.gov/news/press/releases/2021/10/13/tsa-firearm-catches-checkpoints-sets-20-year-record-first-nine.

10.     The discovery of firearms at the checkpoint is particularly problematic in Missouri. From 2018 through 2021, TSA discovered a total of 526 firearms at screening checkpoints in Missouri, with 183 firearm discoveries in 2021. The incidence rate for Missouri is substantially higher than the nationwide average – in 2021, the nationwide average was one firearm discovery for every 97,999 passengers, but in Missouri, it was one firearm discovery for every 51,184 passengers. *See* Rate of TSA firearm discoveries at Missouri airports trends upward in 2021 | Transportation Security Administration, *available at* https://www.tsa.gov/news/press/releases/2022/01/19/tsa-firearm-discoveries-missouri-airports-trends-upward-2021.

### The Impact of H.B. 85 on TSA Operations

11.     On June 12, 2021, the Governor of Missouri signed H.B. 85 into law. H.B. 85 purports to nullify federal firearms laws that Missouri considers an infringement on the Second

4

Amendment rights of Missourians. In doing so, H.B. 85 purports to limit the ability and authority of state and local law enforcement to enforce federal firearms laws. H.B. 85 ensures this limitation by allowing civil lawsuits against state and local law enforcement agencies that would impose hefty fines – up to $50,000 – on those entities that are found to violate H.B. 85.

12. Because H.B. 85 appears to nullify all federal acts "forbidding the possession . . . of a firearm . . . by law-abiding citizens," H.B. 85 appears to nullify all federal laws that prohibit firearm possession by *all* citizens in certain places, such as airports. However, even if H.B. 85 were construed to incorporate Missouri state law's place-based restrictions on firearm possession, H.B. 85 would still purport to nullify important federal restrictions on firearms in airports.

13. More specifically, it is my understanding that Missouri state law does not affirmatively prohibit concealed carry permit-holders from carrying firearms into airports or prohibit members of the public from carrying unloaded firearms into airports when ammunition is not readily accessible.

14. In contrast to Missouri state law, federal law explicitly prohibits individuals from possessing firearms (including unloaded firearms) at airports at the beginning of TSA inspection. *See* 49 C.F.R. § 1540.111(a)(1). Thus, TSA's statutory and regulatory provisions that prevent firearms from being carried into the sterile area of an airport or onto an aircraft go beyond Missouri's place-based possession restrictions.

15. As indicated above, Congress contemplated that TSA's screening operations and efforts will work in concert with local law enforcement personnel. When passengers bring firearms in their carry-on luggage, the very presence of that firearm necessarily creates a potentially dangerous and attention-grabbing situation at the checkpoint. In order to ensure that

a firearm discovered during screening is secured and prevented from entering the sterile area, TSA relies on local law enforcement officers to respond to the checkpoint. TSA standard operating protocols require TSA screeners to call local law enforcement if they believe that a carry-on bag contains a firearm. For every airport in Missouri at which TSA conducts screening, the responding airport police are provided by state and/or local jurisdictions.

16.     Given the federal prohibition on carrying a firearm into the sterile area of an airport or onto an aircraft, and the broad nullifying provisions of H.B. 85, the law poses a risk to the federal aviation system because it may discourage state and local law enforcement personnel at airports from assisting promptly in responding to TSA when firearms are discovered at the checkpoint.

17.     Additionally, it cannot be guaranteed that state and local law enforcement personnel at airports will continue to provide TSA with information necessary for TSA to carry out its civil enforcement actions against persons who bring firearms to the screening checkpoint.

18.     Thus, H.B. 85 increases the dangers associated with firearms at airports by creating confusion over whether state and local law enforcement personnel will continue to fulfill their passenger safety functions when a firearm is discovered. Any delay or hesitation in fulfilling this critical duty represents a substantial public safety threat, given the importance of acting swiftly to neutralize potential dangers in sensitive environments such as airports.

19.     Finally, given the ever-increasing discovery of firearms at TSA checkpoints nationwide and in Missouri, TSA may need to be more proactive in deterring and dissuading the public from bringing firearms to the checkpoint, such as by asking law enforcement to retain a firearm discovered during screening pending federal enforcement efforts, whether civil or criminal. H.B. 85 would hinder these efforts in Missouri by creating confusion over whether

6

Case 2:22-cv-04022-BCW   Document 8-5   Filed 02/28/22   Page 6 of 7
Appellate Case: 23-1457   Page: 45   Date Filed: 03/17/2023 Entry ID: 5256484

local law enforcement entities in Missouri would cooperate with any such enhanced federal mandates.

**Conclusion**

20.     In sum, based upon my knowledge, and aviation and law enforcement experience in working with state and local airport law enforcement officers, H.B.85 diminishes the certainty that Missouri law enforcement officers will continue to work cooperatively and effectively with TSA in fulfilling its mission.  This potential weakness could be exploited by persons seeking to do significant harm to the United States through its aviation system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:

Angela Brooks
Federal Security Director, State of Missouri
Transportation Security Administration
Department of Homeland Security

7

# Exhibit J

# IN THE UNITED STATES DISTRICT COURT FOR THE

## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

### JUDGMENT IN A CIVIL CASE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Case No. 22-4022-CV-w-BCW |
| STATE OF MISSOURI, et al., | ) |
| | ) |
| Defendants. | ) |

___**Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

_X_ **Decision by Court.** This action came before the Court. The issues have been determined and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that

the United States' motion for summary judgment (Doc. #8) is GRANTED.

**IT IS FURTHER ORDERED AND ADJUDGED** that

Defendants' motions to dismiss (Docs. #13 & #15) are DENIED.

**IT IS FURTHER ORDERED AND ADJUDGED** that

SAPA is invalidated as unconstitutional in its entirety as violative of the Supremacy Clause. H.B. 85 is invalid, null, void, and of no effect. State and local law enforcement officials in Missouri may lawfully participate in joint federal task forces, assist in the investigation and enforcement of federal firearm crimes, and fully share information with the Federal Government without fear of H.B. 85's penalties. The States of Missouri and its officers, agents, and employees and any others in active concert with such individuals are prohibited from any and all implementation and enforcement of H.B. 85.

**IT IS FURTHER ORDERED AND ADJUDGED** that

the United States' request for costs is GRANTED.

March 7, 2023                          Paige Wymore-Wynn
Date                                              Clerk of Court

/s/ Tracy L. Diefenbach
(by) Deputy Clerk