No. 23-1457

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

UNITED STATES,

*Plaintiff-Appellee,*

**v.**

MISSOURI et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Missouri

**Brief for *Amici Curiae* Brady Center to Prevent Gun Violence, Everytown for Gun Safety Support Fund, March For Our Lives Foundation, and Giffords Law Center to Prevent Gun Violence in Support of Plaintiff-Appellee**

Rukesh A. Korde
Samuel J. Greeley
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
Tel: (202) 662-6000
rkorde@cov.com
sgreeley@cov.com

Priya S. Leeds
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Tel.: (415) 591-6000
pleeds@cov.com

Abigail O. Kertzman
Ryan A. Partelow
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Tel.: (212) 841-1000
akertzman@cov.com
rpartelow@cov.com

*Counsel for Amici*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the corporate *amici* do not have parent corporations, they are not publicly traded companies, and no publicly held corporation owns 10% or more of their stocks.

Appellate Case: 23-1457    Page: 2    Date Filed: 08/17/2023 Entry ID: 5307122

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .................................................................. i

INTEREST OF *AMICI CURIAE* AND CONSENT TO FILE .................................... 1

INTRODUCTION .................................................................................................... 3

ARGUMENT ............................................................................................................ 5

I.     Courts Have Rejected Nullification Attempts Throughout Our History. .......................... 6

     A.     Early Attempts to Nullify a Federal Statute Failed ................................. 8

     1.     The Kentucky and Virginia Resolutions of 1798 and 1799 .................................... 8

     2.     The South Carolina Nullification Ordinance of 1832 ............................................ 9

     B.     The Framers of the Reconstruction Amendments Intended Them to Shut the Door on Nullification. .................................................................. 11

     C.     Recent Attempts at Nullification Have Likewise Failed. .................................... 12

II.     SAPA Exemplifies the Practical Problems Nullification Creates and Would Corrode Our Constitutional Order. .................................................................. 15

     A.     SAPA Is Without Any Doubt an Attempt to Nullify Federal Laws. .................... 15

     B.     Missouri's Attempt at Nullification Must Be Rejected. ........................................ 17

III.     SAPA Impermissibly Interferes with Constitutional and Effective Federal Laws. .......... 20

     A.     Federal Firearms Laws Are Compatible With the Second Amendment ............... 21

     B.     Federal Firearms Laws Are Effective and Keep People Safe. .............................. 22

CONCLUSION ...................................................................................................... 25

CERTIFICATE OF SERVICE .............................................................................. 26

CERTIFICATE OF COMPLIANCE ..................................................................... 26

Appellate Case: 23-1457    Page: 3    Date Filed: 08/17/2023 Entry ID: 5307122

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*City of Syracuse v. ATF*,
No. 20-cv-06885 (S.D.N.Y. 2020) ......................................................2

*Cooper v. Aaron*,
358 U.S. 1 (1958)........................................................................14, 19

*Virginia ex rel. Cuccinelli v. Sebelius*,
656 F.3d 253 (4th Cir. 2011) ...............................................................17

*District of Columbia v. Heller*,
554 U.S. 570 (2008).........................................................................1, 21

*Everytown for Gun Safety Support Fund v. ATF*,
21-cv-00376 (S.D.N.Y. 2021) ..........................................................1, 2

*Gonzales v. Raich*,
545 U.S. 1 (2005)...............................................................................18

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)............................................................................19

*Hanson v. District of Columbia*,
No. 22-2256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ....................1

*Montana Shooting Sports Ass'n v. Holder*,
727 F.3d 975 (9th Cir. 2013) .........................................................18, 20

*Morehouse Enterprises, LLC v. ATF*,
Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022)................................1, 2

*Nat'l. Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012)............................................................................21

*National Ass'n for Gun Rights, Inc. v. City of San Jose*,
2023 U.S. Dist. LEXIS 120797 (N.D. Cal. July 13, 2023) ...................1

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022)....................................................................1, 21

Appellate Case: 23-1457　　Page: 4　　Date Filed: 08/17/2023 Entry ID: 5307122

*New York v. United States*,
505 U.S. 144 (1992)............................................................................17, 19

*Paxton v. Restaino*,
No. 22-CV-0143, 2023 WL 4614124 (N.D. Tex. July 18, 2023) ....................20

*Printz v. United States*,
521 U.S. 898 (1997)............................................................................17

*Sonzinsky v. United States*,
300 U.S. 506 (1937)............................................................................21

*U.S. v. Cabbler*,
429 F.2d 577 (4th Cir. 1970) (*per curiam*), *cert. denied*, 400 U.S.
901............................................................................................21

*United States v. Cox*,
235 F. Supp. 3d 1221, 1224 (D. Kan. 2017)............................20, 21, 22

*United States* v. *Hayes*,
555 U.S. 415 (2009)..............................................................................1

*Ex parte Virginia*,
100 U.S. 339 (1880)............................................................................12

*Whole Woman's Health v. Jackson*,
142 S. Ct. 522 (2021).............................................................................9

*Wickard v. Filburn*,
317 U.S. 111 (1942)............................................................................18

*Worth v. Jacobson*,
No. 23-2248 (8th Cir. July 28, 2023)..................................................1

## Statutes

26 U.S.C. § 5845(b) ............................................................................23

Fed. R. App. P. 29(a) ..........................................................................1

Fed. R. App. P. 32(a)(5)-(6)..................................................................26

Fed. R. App. P. 32(a)(7)(B) ..................................................................26

Appellate Case: 23-1457     Page: 5     Date Filed: 08/17/2023 Entry ID: 5307122

H.R. Res. 85 & 310, 101st Gen. Assemb., 1st Reg. Sess. (Mo. 2021) ..................20

Missouri's Second Amendment Preservation Act...........................................*passim*

Mo. Rev. Stat. §§ 1.410-85 ...........................................................................20, 22

Mo. Rev. Stat. § 1.430 ...................................................................................5, 15

Mo. Rev. Stat. § 1.450 .......................................................................................5

Mo. Rev. Stat. § 1.460 ......................................................................................15

Mo. Rev. Stat. § 1.470 ......................................................................................15

Pub.L. 22−, 4 Stat. 632 (enacted March 2, 1833) ....................................................11

U.S. Const. art. VI, cl. 2..................................................................................6

**Other Authorities**

Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425,
    1429 (1987).................................................................................................12

*An Act Concerning Aliens*, July 6, 1798; Fifth Congress; Enrolled
    Acts and Resolutions; General Records of the United States
    Government; Record Group 11; NATIONAL ARCHIVES,
    https://www.archives.gov/milestone-documents/alien-and-sedition-
    acts .........................................................................................................8

Annette Choi, *Children and teens are more likely to die by guns than
    anything else*, CNN (Mar. 29, 2023, 8:41 AM),
    https://www.cnn.com/2023/03/29/health/us-children-gun-deaths-
    dg/index.html. ...........................................................................................4

Ari Davis, Rose Kim, & Cassandra Crifasi,, *U.S. Gun Violence in
    2021: An Accounting of a Public Health Crisis*, JOHNS HOPKINS
    CENTER FOR GUN POLICY AND RESEARCH (2021),
    https://publichealth.jhu.edu/sites/default/files/2023-06/2023-june-
    cgvs-u-s-gun-violence-in-2021.pdf .................................................................22

Appellate Case: 23-1457    Page: 6    Date Filed: 08/17/2023 Entry ID: 5307122

ATF, National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two Report, PART III: Crime Guns Recovered and Traced Within the United States and Its Territories, 2, https://www.atf.gov/file/175291/download...............................24

Austin Raynor, *The New State Sovereignty Movement*, 90 Ind. L.J. 613, 620–21 (2015)............................................................................7

The Avalon Project, President Jackson's Proclamation Regarding Nullification, December 10, 1832, YALE LAW SCHOOL (2008), https://avalon.law.yale.edu/19th_century/jack01.asp.....................7, 10

The Avalon Project, South Carolina Ordinance of Nullification, November 24, 1832, YALE LAW SCHOOL (2008), https://avalon.law.yale.edu/19th_century/ordnull.asp....................9, 19

Casandra Crifasi, *Repeal of Missouri's Background Check Law Associated with Increase in State's Murders*, JOHN HOPKINS CENTER FOR GUN POLICY AND RESEARCH (Feb. 17, 2014, updated May 15, 2014), https://publichealth.jhu.edu/2014/repeal-of-missouris-background-law-associated-with-increase-in-states-murders ..............................................................................................22

Christopher W. Schmidt, *Cooper v. Aaron and Judicial Supremacy*, 41 U. Ark. Little Rock L. Rev. 255, 265–66 (2019) ....................13, 14

Connor Brooks, *Background Checks for Firearm Transfers, 2016-2017*, U.S. BUREAU OF JUSTICE STATISTICS (Feb. 2021), https://bjs.ojp.gov/content/pub/pdf/bcft1617.........................................4

Dan T. Carter, THE POLITICS OF RAGE: GEORGE WALLACE, THE ORIGINS OF THE NEW CONSERVATISM, AND THE TRANSFORMATION OF AMERICAN POLITICS 82-83 (1995) ..................................................13

Dana Rieck, *St. Louis officials warn of uptick in attachments that make guns fully automatic*, ST. LOUIS POST-DISPATCH (Jan. 5, 2023), https://www.stltoday.com/news/local/crime-courts/st-louis-officials-warn-of-uptick-in-attachments-that-make-guns-fully-automatic/article_d3f56870-cc02-5281-b3d3-6f3f91b38f3c.html....................23

Appellate Case: 23-1457   Page: 7   Date Filed: 08/17/2023 Entry ID: 5307122

Everytown for Gun Safety, *2020 FBI Data Obtained by Everytown Shows Background Checks Stopped Over 300,000 Illegal Gun Sales — A Record High, Nearly Double 2019 Numbers* (June 22, 2021), https://www.everytown.org/press/2020-fbi-data-obtained-by-everytown-shows-background-checks-stopped-over-300000-illegal-gun-sales-a-record-high-nearly-double-2019-numbers/ .........................23

Everytown for Gun Safety, *National Instant Criminal Background Check System, data from Jan. 1, 2020 through December 31, 2020* (Feb. 4, 2021), https://www.everytown.org/documents/2021/06/background-checks-denials-data-2020.pdf .............................................................................23

Gabrielle Hays, *Law blocking federal gun regulation sows confusion in Missouri*, PBS (Jan. 27, 2023), https://www.pbs.org/newshour/nation/law-blocking-federal-gun-regulation-sows-confusion-in-missouri. ...........................................................24

*Gun Violence Archive 2023*, https://www.gunviolencearchive.org/ (last visited Aug. 15, 2023)....................................................................4

*Interposition and Nullification – Virginia*, 1 Race Rel. L. Rep. 445-47 (1956)................................................................................................13

James Madison, *Notes on Nullification, December 1834*, ROTUNDA, UNIVERSITY OF VIRGINIA https://rotunda.upress.virginia.edu/founders/default.xqy?keys=FOEA-print-02-02-02-3065 (last visited Aug. 16, 2023)....................................5, 11

James H. Read & Neal Allen, *Living, Dead, and Undead: Nullification Past and Present, in* American Political Thought 263, 268 (Vol. 1, No. 2 Sept. 2012), https://www.jstor.org/stable/10.1086/667615?origin=JSTOR-pdf .....................7

Jennifer Mascia, *Gun Deaths Dropped Slightly in 2022 — But Were Still High,* THE TRACE (July 10, 2023), https://www.thetrace.org/2023/07/gun-deaths-cdc-data-suicide-homicide/...............................................................................................4

Appellate Case: 23-1457    Page: 8    Date Filed: 08/17/2023 Entry ID: 5307122

Jeanne Kuang, *Missouri Police ask Republican legislators to amend act blocking federal gun laws*, KANSAS CITY STAR (Nov. 22, 2021), https://www.kansascity.com/news/politics-government/article255973367.html ................................................................24

John C. Calhoun, *South Carolina Exposition and Protest*, S.C. STATE LIBRARY 30 (1828), https://dc.statelibrary.sc.gov/bitstream/handle/10827/21911/HOUSE_CR_Exposition_and_Protest_1828-12-19.pdf?sequence=1&isAllowed=y .........................................................9

Karen Anderson, LITTLE ROCK: RACE AND RESISTANCE AT CENTRAL HIGH SCHOOL (Princeton Uni. Press 2010) ..........................................14

Kentucky General Assembly, *III. Resolutions Adopted by the Kentucky General Assembly, 10 November 1798*, FOUNDERS ONLINE, NATIONAL ARCHIVES (Nov. 10, 1798), https://founders.archives.gov/documents/Jefferson/01-30-02-0370-0004.............................................................................................................7

Letter from John C. Calhoun to Virgil Maxcy, (Sept. 11, 1830), available in Freehling, William W., Prelude to Civil War: The Nullification Crisis in South Carolina 1816-1836, 257 (1965) ISBN 0-19-507681-8 ........................................................................10

President Dwight D. Eisenhower, Radio and Television Address to the American People on the Situation in Little Rock (Sept. 24, 1957) (transcript available at https://www.presidency.ucsb.edu/documents/radio-and-television-address-the-american-people-the-situation-little-rock) ....................................14

Siladitya Ray, *More Than 300 U.S. Mass Shootings Recorded Halfway Into 2023—This Year Is On Pace To Be Deadliest Ever*, Forbes (June 19, 2023, 8:06 AM), https://www.forbes.com/sites/siladityaray/2023/06/19/more-than-300-us-mass-shootings-recorded-halfway-into-2023-this-year-is-on-pace-to-be-deadliest-ever/?sh=5c2bf13674ee..................................................4

Appellate Case: 23-1457     Page: 9     Date Filed: 08/17/2023 Entry ID: 5307122

## INTEREST OF *AMICI CURIAE* AND CONSENT TO FILE[1]

*Brady Center to Prevent Gun Violence* is the nation's oldest nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady works across Congress, courts, and communities, uniting gun owners and non-gun-owners alike, to take action to prevent gun violence. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live. Brady has filed *amicus* briefs in many cases involving the regulation of firearms, including in this Court.[2]

*Everytown for Gun Safety Support Fund* is the education, research, and litigation arm of Everytown for Gun Safety ("Everytown"), the largest gun violence prevention organization in the country. Everytown was founded in 2014 as the combined efforts of Mayors Against Illegal Guns, a national, bipartisan

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), *amici* certify that (1) both parties consented to the filing of this brief, (2) no party's counsel authored the brief in whole or in part, (3) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and (4) no person other than *amici* contributed money that was intended to fund preparing or submitting this brief.

[2] *See, e.g.*, *Worth v. Jacobson*, No. 23-2248 (8th Cir. July 28, 2023); *Morehouse Enterprises, LLC v. ATF*, Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022); *see also New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022); *District of Columbia v. Heller*, 554 U.S. 570 (2008). Court decisions have cited Brady's research and expertise on these issues. *See, e.g.*, *United States v. Hayes*, 555 U.S. 415 (2009); *National Ass'n for Gun Rights, Inc. v. City of San Jose*, 2023 U.S. Dist. LEXIS 120797, at *14-15, *18-19 (N.D. Cal. July 13, 2023); *Hanson v. District of Columbia*, No. 22-2256, 2023 WL 3019777, at *10, *14, *16 & nn.8, 10 (D.D.C. Apr. 20, 2023).

1

coalition of mayors combatting illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the Sandy Hook massacre. Everytown seeks to improve public understanding of the causes of gun violence and help to reduce that violence by conducting groundbreaking original research, developing evidence-based policies, communicating this knowledge to the American public, and advancing gun safety and gun violence prevention in communities and the courts. Everytown has extensive experience litigating cases involving the interpretation of federal firearms laws and has submitted numerous *amicus* briefs in cases involving challenges to federal firearms laws and regulations.[3]

*Giffords Law Center to Prevent Gun Violence* is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others to reduce gun violence and improve the safety of their communities. The organization was founded thirty years ago following a massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Through partnerships with gun violence researchers, public

---

[3] *See, e.g.*, Amicus Br., *Morehouse Enterprises, LLC v. ATF*, Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022) (amicus brief in support of ATF rulemaking); *Everytown for Gun Safety Support Fund v. ATF*, 21-cv-00376 (S.D.N.Y. 2021) (challenge to ATF action); *City of Syracuse v. ATF*, No. 20-cv-06885 (S.D.N.Y. 2020) (challenge to ATF actions).

Appellate Case: 23-1457     Page: 11     Date Filed: 08/17/2023 Entry ID: 5307122

health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence. Together with its partner organization, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

*March For Our Lives Foundation* ("MFOL") is a youth-led non-profit organization seeking to promote civic engagement, education, and direct action in support of sensible gun regulations that protect communities and save lives. MFOL arose in the wake of the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida. It immediately organized the largest single day of protest against gun violence in the nation's history. Five years later, MFOL has established itself as one of the foremost authorities at the intersection of youth-led activism and advocacy to prevent gun violence.

## INTRODUCTION

Federal firearms laws serve the critical and fundamental purpose of civil society as articulated by the Constitution: to "insure domestic Tranquility" and "Promote the general welfare." Firearms have lawful uses, but they also cause massive individual and societal harm. The firearms regulated by federal statutes bring death and tragedy daily to American communities. That includes over 300

3

mass shootings so far this year,[4] and 48,117 deaths last year (including 995 children younger than twelve).[5]  Firearms are *the* leading cause of death for children and teens nationally.[6]

Without federal firearms laws, these statistics would be even more dire. Such laws help keep Americans safer by reducing the illegal use and purchase of firearms by persons who intend to use them in criminal ways.  Since 1994, when the Brady Handgun Violence Prevention Act went into effect, through 2017, over 3.5 million applications for gun sales were legally blocked due to failed background checks, keeping guns away from those most likely to misuse them.[7]

Missouri's Second Amendment Preservation Act ("SAPA") attempts to do away with those protections based upon its idiosyncratic interpretation of the U.S.

---

[4] Siladitya Ray, *More Than 300 U.S. Mass Shootings Recorded Halfway Into 2023—This Year Is On Pace To Be Deadliest Ever*, Forbes (June 19, 2023, 8:06 AM), https://www.forbes.com/sites/siladityaray/2023/06/19/more-than-300-us-mass-shootings-recorded-halfway-into-2023-this-year-is-on-pace-to-be-deadliest-ever/?sh=5c2bf13674ee.

[5] Jennifer Mascia, *Gun Deaths Dropped Slightly in 2022 — But Were Still High*, The Trace (July 10, 2023), https://www.thetrace.org/2023/07/gun-deaths-cdc-data-suicide-homicide/.

[6] *Gun Violence Archive 2023*, https://www.gunviolencearchive.org/ (last visited Aug. 15, 2023); Annette Choi, *Children and teens are more likely to die by guns than anything else*, CNN (Mar. 29, 2023, 8:41 AM), https://www.cnn.com/2023/03/29/health/us-children-gun-deaths-dg/index.html.

[7] Connor Brooks, *Background Checks for Firearm Transfers, 2016-2017*, U.S. Bureau of Justice Statistics (Feb. 2021), https://bjs.ojp.gov/content/pub/pdf/bcft1617; *see also* Appellee's Br. at 10.

Constitution's Second Amendment.  As explained in the brief for the United States, SAPA purports to override the applicable federal law, which provides important safeguards on the sale of guns.  As the United States has demonstrated, SAPA plainly violates the Supremacy Clause of the Constitution.  *See* Appellee's Br. at 47.  Moreover, SAPA rests on a repeatedly rejected legal theory: "nullification," a doctrine James Madison once described as a "fatal inlet of anarchy" and a "deadly poison" to our constitutional order.[8]

## ARGUMENT

SAPA provides explicit language that all federal laws that Missouri believes violate the Second Amendment "shall be invalid to this state, shall not be recognized by this state, shall be specifically rejected by this state, and shall not be enforced by this state."[9]  The statute goes on to penalize both federal and state officials not only for enforcing, but even "attempt[ing] to enforce," the supposedly null federal gun safety laws.[10]

Under the theory of nullification, a single state legislature can nullify any federal legislation with which it disagrees.  This inherently flawed doctrine is flatly

---

[8] James Madison, *Notes on Nullification, December 1834*, ROTUNDA, UNIVERSITY OF VIRGINIA https://rotunda.upress.virginia.edu/founders/default.xqy?keys=FOEA-print-02-02-02-3065 (last visited Aug. 16, 2023).

[9] Mo. Rev. Stat. § 1.430.

[10] Mo. Rev. Stat. § 1.450.

5

antithetical to the federalist system established by our Constitution. Indeed, it disregards both the abundantly clear, plain language[11] and basic theory of the Supremacy Clause, as well as *Marbury v. Madison*'s holding that the U.S. Supreme Court is the ultimate judge of the Constitution's meaning. 1 Cranch 137 (1803). In its appeal to the nullification doctrine, Missouri asks this Court to violate the Supremacy Clause and ignore some 240 years of American history and experience.

In this brief, we describe the disastrous history of state nullification attempts. We then demonstrate that SAPA is simply another invalid nullification statute requiring judicial rejection, and that it impermissibly interferes with constitutional and effective federal laws.

## I. Courts Have Rejected Nullification Attempts Throughout Our History.

Nullification has a long, sordid, and consistently unsuccessful history. It is "the theory that each . . . state is fully 'sovereign' and as such the final judge of its own constitutional rights and obligations; that consequently [each state] may. . . rule that any federal act . . . is unconstitutional; and . . . that [each state] may act on

---

[11] "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

6

this judgment by blocking the implementation" of that law.[12]  Nullification ignores

the phrase "we the people," and instead rests on the fallacious premise that the

Constitution is a loose contract among sovereign states, any of which can revoke

its consent.[13]  Proponents contend that determination of the constitutionality of a

federal statute does not lie in the federal judiciary, but rather in each state.[14]  At

bottom, nullification is the theory that states are only bound by federal laws that

they, according to the whims of their legislatures, agree with at any given time.[15]

---

[12] James H. Read & Neal Allen, *Living, Dead, and Undead: Nullification Past and Present, in* American Political Thought 263, 268 (Vol. 1, No. 2 Sept. 2012), https://www.jstor.org/stable/10.1086/667615?origin=JSTOR-pdf (hereinafter "Read and Allen").

[13] *Id.*; *see also* Austin Raynor, *The New State Sovereignty Movement*, 90 Ind. L.J. 613, 620–21 (2015); Kentucky General Assembly, *III. Resolutions Adopted by the Kentucky General Assembly, 10 November 179*8, FOUNDERS ONLINE, NATIONAL ARCHIVES (Nov. 10, 1798), https://founders.archives.gov/documents/Jefferson/01-30-02-0370-0004.

[14] Kentucky General Assembly, *supra* note 13.

[15] *See, e.g.*, The Avalon Project, *President Jackson's Proclamation Regarding Nullification, December 10, 1832,* YALE LAW SCHOOL (2008), https://avalon.law.yale.edu/19th_century/jack01.asp.  Jackson described nullification as

> the strange position that any one State may not only declare an act of Congress void, but prohibit its execution . . . that the true construction of [the Constitution] permits a State to retain its place in the Union, and yet be bound by no other of its laws than those it may choose to consider as constitutional. . . . [I]t is evident, that to give the right of resisting laws of that description, coupled with the uncontrolled right to decide what laws deserve

7

### A. Early Attempts to Nullify a Federal Statute Failed.

Our country has repeatedly rejected state nullification attempts, beginning more than 200 years ago. We illustrate several below.

### 1. The Kentucky and Virginia Resolutions of 1798 and 1799.

In 1798 and 1799, Kentucky and Virginia attempted to nullify the Alien and Sedition Acts. Those laws empowered the president to deport non-citizens he deemed a threat to national security, and criminalized speech critical of the federal government.[16] Rather than challenge this overreach through the federal courts, Kentucky and Virginia enacted laws asserting that the Alien and Sedition Acts were unconstitutional (but not preventing their enforcement). Instead, Kentucky and Virginia lobbied other states to pass similar laws, which the other states refused to do. The Kentucky and Virginia Resolutions failed to have a legal effect, and the Alien and Sedition Acts ultimately expired on their own terms.[17]

---

that character, is to give the power of resisting all laws.
For, as by the theory, there is no appeal, the reasons
alleged by the State, good or bad, must prevail.

[16] *An Act Concerning Aliens*, July 6, 1798; Fifth Congress; Enrolled Acts and Resolutions; General Records of the United States Government; Record Group 11; NATIONAL ARCHIVES, https://www.archives.gov/milestone-documents/alien-and-sedition-acts.

[17] Read and Allen, *supra* note 12, at 274.

## 2. *The South Carolina Nullification Ordinance of 1832.*

By contrast, South Carolina's Ordinance of Nullification went further and – like SAPA – attempted impede enforcement of a federal law. Then-Vice President John Calhoun, "a virulent defender" of slavery, "insisted that States had the right to 'veto' or 'nullif[y]' any federal law with which they disagreed."[18] In response to a set of federal tariffs, Calhoun forcefully asserted that it was "impossible to deny to the States the right of deciding on the infractions of their powers"[19] and "deem[ing] it not only the right of the state, but the duty of her representatives . . . to interpose [itself] if no other remedy be applied."[20] Calhoun's theory was enacted into the "South Carolina Ordinance of Nullification." The Ordinance declared that the relevant federal tariffs were unconstitutional and that any proceedings to enforce them were "utterly null and void." It required all state officers "take an oath . . . to . . . execute, and enforce this ordinance" under penalty of losing their office.[21]

---

[18] *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 550 (2021) (Sotomayor, J., concurring in part and dissenting in part).

[19] John C. Calhoun, *South Carolina Exposition and Protest*, S.C. STATE LIBRARY 30 (1828), https://dc.statelibrary.sc.gov/bitstream/handle/10827/21911/HOUSE_CR_Exposition_and_Protest_1828-12-19.pdf?sequence=1&isAllowed=y.

[20] *Id*. at 39.

[21] The Avalon Project, *South Carolina Ordinance of Nullification, November 24, 1832,* YALE LAW SCHOOL (2008), https://avalon.law.yale.edu/19th_century/ordnull.asp.

Critically, Calhoun explained that "the real cause" of South Carolina's action was not the tariffs themselves, but rather "the peculiar institution of the Southern States"—slavery—that required the South to take different views about "taxation and appropriations" than did "the majority of the Union."[22] The ultimate aim of the South Carolina nullification ordinance was to protect state-sanctioned slavery.

President Jackson forcefully rejected South Carolina's argument, despite his general support for the rights of individual states. He explained that "the power to annul a law of the United States, assumed by one State, [is] incompatible with the existence of the Union, [is] contradicted expressly by the letter of the Constitution, [is] unauthorized by its spirit, [is] inconsistent with every principle on which It was founded, and [is] destructive of the great object for which it was formed."[23] If nullification were permitted to interfere with the enforcement of federal laws, as President Jackson explained, the Supremacy Clause would be meaningless and "the Union would have been dissolved in its infancy."[24]

---

[22] Letter from John C. Calhoun to Virgil Maxcy, (Sept. 11, 1830), available in Freehling, William W., Prelude to Civil War: The Nullification Crisis in South Carolina 1816-1836, 257 (1965) ISBN 0-19-507681-8.

[23] The Avalon Project, *President Jackson's Proclamation Regarding Nullification, December 10, 1832*, YALE LAW SCHOOL (2008), https://avalon.law.yale.edu/19th_century/jack01.asp.

[24] *Id.* ("[O]ur social compact in express terms declares, that the laws of the United States, its Constitution, and treaties made under it, are the supreme law of the land.

Appellate Case: 23-1457     Page: 19     Date Filed: 08/17/2023 Entry ID: 5307122

Congress, too, at that time forcefully rejected nullification and the secessionist threat it represented, passing a Force Bill that authorized deployment of troops to South Carolina.[25] The bill recognized that South Carolina's threat to ignore federal law would lead to unrest, and when taken to its logical end, to secession.[26] The situation was ultimately defused, but led early proponents of nullification, such as James Madison, to change their minds: "it follows from no view of the subject, that a nullification of a [federal] law . . . can . . . belong rightfully to a single State."[27]

### B. The Framers of the Reconstruction Amendments Intended Them to Shut the Door on Nullification.

It took the immense loss of life, human suffering, and destruction of the Civil War to defeat the next attempted version of the nullification theory beginning in 1861. Once again, the nation was in a debate involving nullification, which "focused on whether sovereignty resided in the People of each state or in the People of the United States as a whole, and on how federalism should operate

---

. . . If this doctrine had been established at an earlier day, the Union would have been dissolved in its infancy.").

[25] Pub.L. 22−, 4 Stat. 632 (enacted March 2, 1833).

[26] *Id*.

[27] James Madison, *supra* note 8.

Appellate Case: 23-1457    Page: 20    Date Filed: 08/17/2023 Entry ID: 5307122

within [the] Union."[28]  That debate (about slavery) was ultimately decided by "final military judgment . . . entered at . . . Appomattox Courthouse."[29]  The Thirteenth, Fourteenth, and Fifteenth Amendments, passed in the wake of the Civil War, "were intended to be . . . limitations of the power of the States and enlargements of the power of Congres[s]."  *Ex parte Virginia*, 100 U.S. 339, 345–46 (1880).  Those amendments make clear that enforcement of federal law "is no invasion of State sovereignty," *id*., and should have put to final rest attempts by state legislatures to invoke nullification.

### C.  *Recent Attempts at Nullification Have Likewise Failed.*

Sadly, however, those favoring nullification refused to accept the verdict of the Civil War's outcome and the passage of the Reconstruction Amendments.  Nullification raised its ugly specter once again with states' resistance to the Supreme Court's emphatic rejection of official racial segregation in *Brown v. Board of Education ("Brown")*, its implementing decision in *Brown v. Board of Education*  ("*Brown II*"), and various following Supreme Court rulings on that subject.  347 U.S. 483 (1954), 349 U.S. 294 (1955).

---

[28] Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1429 (1987).

[29] *Id.* at 1512 n.341.

12

In 1954, the Supreme Court unanimously held in *Brown* that the Equal Protection Clause of the Fourteenth Amendment prevents states from maintaining racial segregation in their public schools. 347 U.S. 483 (1954). In *Brown II*, the Court ordered schools across the nation to integrate. "[T]he vitality of [the constitutional principles articulated in *Brown*] cannot be allowed to yield simply because of disagreement with them." 349 U.S., at 300.

*Brown II* was followed by "the adoption of a wide range of state and local anti-integration laws."[30] Various states passed many resolutions, statutes, and state constitutional amendments urging opposition to desegregation. These laws quoted from the original Virginia and Kentucky Resolutions, and purported to declare the *Brown* decisions null within the borders of their states.[31]

Arkansas was one such state. In 1957, the Governor of Arkansas called on his state's National Guard to block enforcement of the desegregation plan at Central High School in Little Rock, preventing nine Black students from entering

---

[30] Dan T. Carter, THE POLITICS OF RAGE: GEORGE WALLACE, THE ORIGINS OF THE NEW CONSERVATISM, AND THE TRANSFORMATION OF AMERICAN POLITICS 82–83 (1995).

[31] *See, e.g.*, *Interposition and Nullification -- Virginia*, 1 Race Rel. L. Rep. 445–47 (1956); *see* Christopher W. Schmidt, *Cooper v. Aaron and Judicial Supremacy*, 41 U. Ark. Little Rock L. Rev. 255, 265–66 (2019).

Appellate Case: 23-1457    Page: 22    Date Filed: 08/17/2023 Entry ID: 5307122

the building.[32]  In response, President Eisenhower deployed soldiers of the 101st Airborne Division and federalized the Arkansas National Guard, commanding them to restore order and support the desegregation efforts.[33]  The President decreed that the "demagogic extremists . . . cannot be allowed to override the decisions of our courts."[34]

In an attendant decision, the Supreme Court resoundingly rejected (yet again) the theory of nullification, holding that if state governments "may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery."  *Cooper v. Aaron*, 358 U.S. 1, 18–19 (1958).

In sum, the nullification doctrine has been at the heart of some of this nation's most trying times.  We urge this Court to squash this latest attempt in no uncertain terms.

---

[32] *See generally* Karen Anderson, LITTLE ROCK:  RACE AND RESISTANCE AT CENTRAL HIGH SCHOOL (Princeton Uni. Press 2010).

[33] *See generally id.*

[34]Schmidt, *supra* note 31, at 260 n.44 (quoting President Dwight D. Eisenhower, Radio and Television Address to the American People on the Situation in Little Rock (Sept. 24, 1957) (transcript available at https://www.presidency.ucsb.edu/documents/radio-and-television-address-the-american-people-the-situation-little-rock)).

Appellate Case: 23-1457     Page: 23     Date Filed: 08/17/2023 Entry ID: 5307122

## II. SAPA Exemplifies the Practical Problems Nullification Creates and Would Corrode Our Constitutional Order.

### A. *SAPA Is Without Any Doubt an Attempt to Nullify Federal Laws.*

SAPA goes well beyond declining to "lend [state] resources to the federal government to enforce federal laws," Appellant's Br. at 15 — it declares unequivocally that federal law is "deemed . . . invalid" in Missouri, and states that such laws "shall not be enforced by this state."[35]  Under SAPA, federal officials who participate in the enforcement of purportedly "null" laws may not later be hired by any Missouri political subdivision or law enforcement agency, creating a clear barrier for federal officials in Missouri to enforce federal law.[36]  The law also imposes explicit penalties on state officials.[37]  SAPA's core provisions thus represent an explicit attempt to frustrate and nullify federal law enforcement.

And SAPA goes further than other state nullification attempts.  Rather than merely prohibiting state and local cooperation with federal enforcement, Missouri's invalidation of federal firearms laws goes hand-in-hand with its decision to refuse to enforce those laws.  This is nullification, plain and simple, and it violates the Supremacy Clause.

---

[35] Mo. Rev. Stat. § 1.430.

[36] Mo. Rev. Stat. § 1.470.

[37] Mo. Rev. Stat. § 1.460.

Appellate Case: 23-1457    Page: 24    Date Filed: 08/17/2023 Entry ID: 5307122

Indeed, SAPA echoes word-for-word the historical nullification attempts discussed above.  The Kentucky Resolution of 1798–99 treats the Constitution as a "compact" among "the several states;"[38] SAPA likewise rests on the view that the Constitution is "a compact among the states."  The Kentucky Resolution also asserts that the federal government "was not made the exclusive or final judge" of what is constitutional, and that "each party [i.e., state] has an equal right to judge for itself [including] the mode and measure of redress."  Along similar lines SAPA likewise asserts that the federal government is not "the exclusive or final judge of the extent of the powers" granted by the Constitution, and directly copies the Kentucky Resolution language about equal right to judge and measure of redress.

Said otherwise, SAPA's plain language and the penalties it imposes on law enforcement for doing their job make clear that SAPA attempts to nullify federal laws.  SAPA is thus reminiscent of the prior nullification episodes described above and there should be no question that in enacting SAPA, Missouri is following closely in those footsteps.  In these respects, SAPA mirrors not only the Kentucky Resolution of 1798–99 but also South Carolina's Ordinance of Nullification and the numerous attempts to nullify *Brown*.

---

[38] Kentucky General Assembly, *supra* note 13.

Appellate Case: 23-1457      Page: 25      Date Filed: 08/17/2023 Entry ID: 5307122

Proponents of SAPA nevertheless contend that the statute only withdraws state assistance in enforcing federal laws, and so is simply an exercise of the state's Tenth Amendment rights under *New York v. United States*, 505 U.S. 144 (1992) and *Printz v. United States*, 521 U.S. 898 (1997). Proponents contend that SAPA does not amount to *real* nullification because it does not criminalize enforcement of federal laws. Both contentions are wrong.

Criminalization is not the touchstone of nullification. In a case regarding Virginia's Healthcare Freedom Act, which "purport[ed] to immunize Virginia citizens" from the Affordable Care Act's mandate that they buy health insurance, the Fourth Circuit nonetheless held the law to be an invalid attempt at nullification. *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 270 (4th Cir. 2011) ("Virginia lacks the sovereign authority to nullify federal law.").

By its terms, language, and effect, SAPA is a nullification statute.

### B. *Missouri's Attempt at Nullification Must Be Rejected.*

Nullification creates two significant problems: (1) allowing states to nullify federal law wrests away power that rightfully lies with the Federal Government—the power of Congress to promulgate comprehensive, national statutory schemes, and the power of the federal judiciary to "say what the law is," and (2) if a state can nullify a federal law simply by legislative proclamation (as Missouri has done), then any federal law is vulnerable.

Given free travel among states, actions in one will inevitably have effects in others. *Gonzales v. Raich*, 545 U.S. 1, 32 (2005); *Wickard v. Filburn*, 317 U.S. 111 (1942). This applies with particular force to firearms — guns sold in Missouri may travel across state lines and some will inevitably be the tools of violence and death in other states. The Ninth Circuit, in rejecting a law narrower than SAPA, explained that guns, even if initially sold only in Montana's intrastate market, will "make their way into the *inter*state market." *Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 982 (9th Cir. 2013) (emphasis added). A state's decision to invalidate federal firearms laws imposes real—deadly, and tragic—costs on other states. Such costs are among the reasons that the founders, and each successive generation, rejected nullification. Thus, that SAPA only purports to invalidate federal law within the borders of Missouri[39] does not mean its effects are felt only in Missouri: the law is still an attempt at nullification writ large because it defeats an enforcement scheme that requires consistency across states to achieve its purpose.

Further, allowing states to nullify federal law wrests away power that rightfully lies with Congress and the federal judiciary. The Federal Government holds a "decided advantage in this delicate balance" that is our constitutional

---

[39] *See* Appellants' Br. at 32–34.

system—"the Supremacy Clause." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991);

*New York*, 505 U.S. at 159. Congress is vested with the power to create federal

laws that bind the states, and the U.S. Supreme Court has the final authority to "say

what th[at] law is." *Marbury*, 1 Cranch at 177; *Cooper*, 358 U.S. at 18.

Nullification would disrupt these principles of our constitutional order.

Federal law could exist only until any state took issue with it. One can easily

imagine that every state legislator, regardless of party affiliation, could identify at

least one federal law unpopular with their constituents. South Carolina's attempt

to nullify federal tariffs shows that taxation laws could be a target.[40] Pro farming

legislation may be unpopular in industrial states; military appropriations may be

unpopular in others; financial regulation in others still. A consistent, nationwide

regulatory scheme makes the financial services industry possible; federal taxes and

national roads make the military work; and our national regulation of the skies

keeps planes flying.

For this reason, courts that have ruled on other states' narrower versions of

SAPA have decisively rejected any attempt to flout federal supremacy, writing that

"the Constitution could not be clearer on one point: if the National Firearms Act is

a valid exercise of Congressional taxing power . . . then it is the 'supreme Law of

---

[40] South Carolina Ordinance of Nullification, *supra* note 21.

19

the Land,' regardless" of the particular views of any individual state legislature. *United States v. Cox*, 235 F. Supp. 3d 1221, 1224 (D. Kan. 2017); *see Paxton v. Restaino*, No. 22-CV-0143, 2023 WL 4614124, at *4 (N.D. Tex. July 18, 2023) (noting that "the Supremacy Clause of the Constitution determines the winner of [the] duel" between Texas's nullification law and the Gun Control Act). The Ninth Circuit similarly found federal firearms laws to be a valid exercise of Congress's Commerce Clause power and to preempt a Montana law that only applied to firearms manufactured and sold in the state of Montana—a significantly narrower scope than SAPA's. *Montana Shooting Sports Ass'n,* 727 F.3d at 983. This Court must also hold firm in maintaining federal supremacy.

## III.   SAPA Impermissibly Interferes with Constitutional and Effective Federal Laws.

The legislative text of SAPA frames its nullification of federal law as an effort to protect the people of Missouri from unconstitutional laws and keep them safe,[41] but those arguments for SAPA fail. SAPA presumes that the federal firearms laws at issue violate the Second Amendment. They do not. Courts have

---

[41] "Because immediate action is necessary to ensure the limitation of the federal government's power and to protect the citizens' right to bear arms, . . . this act is deemed necessary for the immediate preservation of the public health, welfare, peace, and safety, and is hereby declared to be an emergency act within the meaning of the constitution." H.R. Res. 85 & 310, 101st Gen. Assemb., 1st Reg. Sess. (Mo. 2021) (H.R. Res. 85, *codified at* Mo. Rev. Stat. §§ 1.410–85).

Appellate Case: 23-1457     Page: 29     Date Filed: 08/17/2023 Entry ID: 5307122

repeatedly found that a range of firearms laws restricting the use of, or access to, firearms are fully consistent with the Second Amendment. Moreover, these laws make Missourians (and many others) safer.

### A. Federal Firearms Laws Are Compatible With the Second Amendment.

In *District of Columbia v. Heller*, the Supreme Court made clear that the rights secured by the Second Amendment are "not unlimited," and provided a non-exhaustive list of "presumptively" constitutional firearms regulations, including those on carrying concealed weapons (so long as open carry is permitted[42]), laws forbidding carrying firearms in sensitive places, laws placing conditions or qualifications on the commercial sale of arms, and limitations on carrying dangerous and unusual weapons. 554 U.S. at 626–27; *see also Bruen*, 142 S. Ct. at 2146–47. The Supreme Court's more recent decision in *Bruen* reaffirmed this analysis as consistent with the historical understanding of the Second Amendment. 142 S. Ct. at 2128.

Courts have repeatedly found that the National Firearms and Gun Control Acts are constitutional.[43] In a 2017 suit regarding Kansas's analogue to SAPA, the

---

[42] *See Bruen*, 142 S. Ct. at 2146–47.

[43] *See Sonzinsky v. United States*, 300 U.S. 506 (1937); *Nat'l. Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012); *U.S. v. Cabbler*, 429 F.2d 577, 578 (4th Cir. 1970) (*per curiam*), *cert. denied*, 400 U.S. 901; *Cox*, 235 F. Supp. 3d at 1223, *aff'd*, 906 F.3d 1170 (10th Cir. 2018).

Appellate Case: 23-1457    Page: 30    Date Filed: 08/17/2023 Entry ID: 5307122

court found the National Firearm Act's provisions "valid and constitutional acts adopted by Congress pursuant to its authority to levy and enforce the collection of taxes. As such, they constitute . . . 'the supreme Law of the Land.'" *Cox*, 235 F. Supp. 3d at 1229; *see also* Appellee's Br. at 43–44.

### B. Federal Firearms Laws Are Effective and Keep People Safe.

While SAPA's legislative text declares that SAPA is necessary to preserve Missourians' "safety," 2021 H.B. 85, *codified at* Mo. Rev. Stat. §§ 1.410-85, SAPA ignores the vital role federal firearms laws play in actually keeping people safe. Those laws are particularly important in states like Missouri, which otherwise has some of the most lenient firearms laws in the country and, relatedly, one of the highest rates of gun violence: 1,414 gun deaths in 2021 alone, including 151 children.[44] A separate study found that Missouri's 2007 repeal of its permit-to-purchase handgun law contributed to a 14 percent increase in the state's murder rate through 2012, or an "additional 49 to 68 murders per year."[45]

---

[44] Ari Davis, Rose Kim, & Cassandra Crifasi,, *U.S. Gun Violence in 2021: An Accounting of a Public Health Crisis*, JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH (2021), https://publichealth.jhu.edu/sites/default/files/2023-06/2023-june-cgvs-u-s-gun-violence-in-2021.pdf.

[45] Casandra Crifasi, *Repeal of Missouri's Background Check Law Associated with Increase in State's Murders*, John Hopkins Center for Gun Policy and Research (Feb. 17, 2014, updated May 15, 2014), https://publichealth.jhu.edu/2014/repeal-of-missouris-background-law-associated-with-increase-in-states-murders.

Appellate Case: 23-1457    Page: 31    Date Filed: 08/17/2023 Entry ID: 5307122

Where states like Missouri are repealing their already weak firearms safety laws, federal law provides a necessary backstop that prevents the gun violence epidemic from becoming even worse. In 2020, the federal background check system blocked over 300,000 illegal firearm sales, including 7,572 in Missouri.[46] Federal law also prohibits the possession of unregistered components that can be used to convert a firearm to fire automatically, effectively turning a gun into a machine gun.[47] Missouri state law alone would not prohibit these components—including auto sears[48] (which convert semiautomatic weapons into automatic weapons) —at a time when incidents of fully automatic gunfire in the state increased from 66 in 2021 to 339 in 2022.[49] Between 2017 and 2021, St. Louis

---

[46] Everytown for Gun Safety, *2020 FBI Data Obtained by Everytown Shows Background Checks Stopped Over 300,000 Illegal Gun Sales — A Record High, Nearly Double 2019 Numbers* (June 22, 2021), https://www.everytown.org/press/2020-fbi-data-obtained-by-everytown-shows-background-checks-stopped-over-300000-illegal-gun-sales-a-record-high-nearly-double-2019-numbers/; Everytown for Gun Safety, *National Instant Criminal Background Check System, data from Jan. 1, 2020 through December 31, 2020* (Feb. 4, 2021), https://www.everytown.org/documents/2021/06/background-checks-denials-data-2020.pdf.

[47] 26 U.S.C. § 5845(b).

[48] One very popular type of auto sear is the "Glock switch," which attaches to the slide of a Glock-style pistol.

[49] Dana Rieck, *St. Louis officials warn of uptick in attachments that make guns fully automatic*, St. Louis Post-Dispatch (Jan. 5, 2023), https://www.stltoday.com/news/local/crime-courts/st-louis-officials-warn-of-

Appellate Case: 23-1457    Page: 32    Date Filed: 08/17/2023 Entry ID: 5307122

had the second most crime gun trace requests to ATF of any medium city.[50]

Missouri's attempt to remove the protection of federal firearms laws will only

exacerbate its gun violence epidemic.

Far from preserving public safety, SAPA threatens the ability (and

willingness) of law enforcement to protect their communities.[51]  In October 2021,

the Missouri Police Chiefs Association explained that the law was vague and left

officers potentially open to lawsuits.[52]  The Kansas City Star reported that police

departments were withdrawing from federally funded task forces unrelated to guns,

such as drug task forces, out of concern for the potential consequences of SAPA.[53]

None of this makes Missouri safer.

---

uptick-in-attachments-that-make-guns-fully-automatic/article_d3f56870-cc02-5281-b3d3-6f3f91b38f3c.html.

[50] ATF, National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two Report, PART III:  Crime Guns Recovered and Traced Within the United States and Its Territories, 2, https://www.atf.gov/file/175291/download.

[51] Gabrielle Hays, *Law blocking federal gun regulation sows confusion in Missouri*, PBS (Jan. 27, 2023), https://www.pbs.org/newshour/nation/law-blocking-federal-gun-regulation-sows-confusion-in-missouri.

[52] Jeanne Kuang, *Missouri Police ask Republican legislators to amend act blocking federal gun laws*, KANSAS CITY STAR (Nov. 22, 2021), https://www.kansascity.com/news/politics-government/article255973367.html.

[53] *Id.*

# CONCLUSION

Our federal system provides for one nation. It is incompatible with

nullification statutes like SAPA, as history has shown. For the foregoing reasons,

and those set forth in the federal government's brief, this Court should hold that

SAPA is unconstitutional.

Dated: August 16, 2023

Respectfully submitted,

Rukesh A. Korde
Samuel J. Greeley
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
Tel: (202) 662-6000
rkorde@cov.com
sgreeley@cov.com

Priya S. Leeds
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Tel.: (415) 591-6000
pleeds@cov.com

Abigail O. Kertzman
Ryan A. Partelow
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Tel.: (212) 841-1000
akertzman@cov.com
rpartelow@cov.com

*Counsel for Amici*

25

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

Ryan A. Partelow
*Counsel for Amici*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,470 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

Under Circuit Rule 28A(h)(2), I further certify that this brief has been scanned for viruses and is virus-free.

Ryan A. Partelow
*Counsel for Amici*

26