Case No. 23-1457

IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF MISSOURI, ET AL.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
(District Court Case 2:22-CV-04022-BCW)

BRIEF OF *AMICUS CURIAE* OF JACKSON COUNTY,
MISSOURI AND ST. LOUIS COUNTY, MISSOURI
IN SUPPORT OF APPELLEE AND AFFIRMANCE

| | |
|---|---|
| **DANA TUCKER REDWING**<br>**ST. LOUIS COUNTY COUNSELOR** | **BRYAN O. COVINSKY**<br>**JACKSON COUNTY COUNSELOR** |
| Mary L. Reitz<br>Rachel D. Schwarzlose<br>Office of the St. Louis<br>County Counselor<br>41 S. Central Avenue, Ninth Floor<br>Clayton, MO. 63105<br>(314) 615-7042 | D. Ryan Taylor<br>Office of the Jackson County<br>Counselor<br>415 E. 12th Street, 2nd Floor<br>Kansas City, MO 64106<br>(816) 881-3656 |
| *Attorney for St. Louis County, MO* | *Attorney for Jackson County, MO* |

## TABLE OF CONTENTS

Table of Contents……………………………………………………….. 2

Table of Authorities…………………………………………………… 3

Identity and Interest of the Amicus Curiae………………………….. 4

Argument……………………………………………………………… 5

Certificate of Compliance................................................................. 12

Certificate of Service…………………………………………………... 13

# TABLE OF AUTHORITIES
**Cases**

*City of St. Louis, et. al. v. State of Missouri, et al.*, 643 S.W.3d 295 (Mo. 2022)…. 10

*United States v. Peters*, 9 U.S. 115, 3 L. Ed. 53 (1809)……………………….. 9

**Statutes**

Sections 1.410 to 1.485, RSMo………………………………………………… 4

Section 1.440, RSMo…………………………………………………………… 7

Section 1.460, RSMo…………………………………………………………… 8

Section 1.470, RSMo…………………………………………………………… 8

Section 1.480, RSMo……………………………………………………………7, 8

**Constitution**

US Constitution, Article VI, paragraph 2…………………………………………. 9

# IDENTITY AND INTEREST OF THE *AMICUS CURIAE*

Jackson County, Missouri and St. Louis County, Missouri ("Local Law Enforcement Agencies") are political subdivisions of the State of Missouri who employ law enforcement officers. The Local Law Enforcement Agencies have an interest in this case because the Second Amendment Preservation Act ("SAPA") directly affects them. SAPA directs their obligations under Missouri law, controls who they may employ, and subjects them to liability. *See* Sections 1.410 to 1.485, RSMo.

Both parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No other person contributed money that was intended to fund preparing or submitting of this brief.

# ARGUMENT

Violent crime is an endemic problem in Missouri, and the problem is particularly acute in St. Louis and Kansas City. As a critical part of the efforts to combat violent crime, local law enforcement agencies have traditionally partnered with federal law enforcement agencies. Through these partnerships, local police officers have participated with federal officers in investigations and arrests that involved violations of federal and state laws, including federal firearm violations.

The enactment of SAPA has undeniably impeded these efforts. The focus of this brief will be on these impediments, and the flaws in the claims by the amici proponents of SAPA, which downplay them. For example, in its amicus brief, the Missouri Firearms Coalition asserts that "Compliance With The Second Amendment Preservation Act is as Simple as Focusing on Crime Itself". Amici Brief, p. 19. Further, the Coalition argues "[w]hile collaborative efforts may have to be adjusted, our law enforcement system is not going to descend into anarchy." *Id.* at 21.

Statements like these may make sense in the abstract, but for those on the frontlines of combatting violent crime, the reality is much different. Before the enactment of SAPA and currently, some local agencies were and are parties to various reimbursement agreements, memoranda of understanding ("MOUs"), and other grant agreements, which govern multi-agency task forces. Pursuant to the task force MOUs, police officers employed by local agencies regularly participated with

5

federal officers in investigations and arrests that involved violations of federal and state laws. Law enforcement officers employed by local agencies and assigned to joint task forces functioned in a dual capacity and were deputized as federal law enforcement officers for purposes of task force participation. As such, in enforcing state and federal laws, such officers were acting as federal officers. Local agencies' officers assigned to joint task force operations frequently arrest persons who were on federal probation or conditional release due to federal law violations and who were in possession of a firearm at the time of arrest. Local agencies' law enforcement officers were also required to testify in federal court concerning federal violations of which they had knowledge. SAPA makes participation in these task forces impractical, because SAPA forbids the enforcement of federal gun laws which are frequently associated with the crimes the task force officers investigate.

As a result of participation in federal task force operations, local agencies received federal funds for training and equipment, received the use of federally-owned equipment and vehicles, and officers employed by local agencies received overtime pay for which they were reimbursed by federal funds. In addition, as a result of participation in federal task force operations, local agencies' officers received training at the expense of federal agencies and were granted security clearances which enabled them to assist in homeland security matters. All of this financial support, equipment, and training benefits the people of Missouri by

increasing crime fighting abilities and funding, thus reducing violent crime and keeping criminals off the street in federal custody. This support also frees up resources to fight crime violations of Missouri law, prosecute crimes, and house criminals violating only Missouri law. These benefits will be lost if SAPA is enforced.

Local agencies also participated in the National Integrated Ballistic Information Network ("NIBIN"), which contributed to the solving of crimes and the apprehension of criminals as a result of seizures of firearms and subsequent ballistic testing. The operation of NIBIN depends on the ability of police officers to seize firearms in connection with an arrest. The benefits of this tool will be lost if local agencies fail to use it due to SAPA.

In short, before the enactment of SAPA, local law enforcement officers could "simply focus on crime itself." Now, however, the picture is very different. Local law enforcement officers are confused about their duties and obligations and are unsure what they may legally do to combat violent criminals as many of the provisions of SAPA are unclear. What does it mean to protect these rights from infringement? *See* Section 1.440, RSMo. Are local law enforcement officers to actively impede federal investigations? What does it mean to be a law-abiding individual? *See* Section 1.480, RSMo. The statute defines the term but what about a person who is actively committing a crime but is not otherwise precluded under state

7

law from possessing a firearm at the time? What does it mean to provide material aid and support? *See* Section 1.480, RSMo. What does it mean for a state law to be substantially similar to a federal law? *See* Section 1.480, RSMo. Guessing wrong in answering these questions can cost local law enforcement officers their jobs, *see* Section 1.470, RSMo, and subject local agencies to monetary penalties. *See* Section 1.460, RSMo. Further, because of the confusion over these questions, the partnerships described above are in danger, and local law enforcement officers must spend time untangling the bureaucratic maze created by SAPA, rather than combatting crime.

These practical realities may not matter to the proponents of SAPA. However, for supervisors and officers of the local police departments and the individuals they protect, the problematic impact of SAPA affects every aspect of their lives from creating more dangers on the street for officers and individuals to potentially limiting or even eliminating income for officers. The problems with SAPA go beyond the above practical impacts because it does not comport with the Constitution, it does little to further the protections of the Second Amendment, and it creates obstacles to effective law enforcement. At no time, before or after, the enactment of SAPA, were local law enforcement officers working with federal officials to confiscate firearms from citizens who were not otherwise accused of a crime. Rather, local officers working in partnerships with federal officers arrested violent criminals and

drug dealers. Further, without SAPA, the United States Constitution remains to provide protections against any encroachments to rights protected by the Second Amendment.

The proponents of SAPA make a number of claims and assertions about federalism and sovereignty in support of the law. But they ignore the foundational principle that undergirds our constitutional structure. As Chief Justice Marshall explained: "If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, . . . the constitution itself becomes a solemn mockery . . . So fatal a result must be deprecated by all; and the people of Pennsylvania, not less than the individuals of every other state, must feel a deep interest in resisting principles so destructive of the union, and in averting consequences so fatal to themselves." *United States v. Peters*, 9 U.S. 115, 136, 3 L. Ed. 53 (1809). Until a federal law is found to violate the Constitution, it is the Supreme Law of the Land, "anything in the Constitution or laws of any State to the contrary notwithstanding." US Constitution, Article VI, paragraph 2.

SAPA clearly violates this principle. The law deems federal law as infringements and directs "the courts and law enforcement agencies of this state" to protect against the infringements. And it does so at great harm to law enforcement and the individuals of Missouri with limited benefits as the Constitution remains to protect against any infringement of Second Amendment rights.

Furthermore, Appellants' argument in support of reversal of the Judgment finding SAPA unconstitutional also includes an erroneous interpretation of *City of St. Louis, et. al. v. State of Missouri, et al.*.643 S.W.3d 295 (Mo. 2022). Appellants argue that the Supreme Court of Missouri made a substantive finding that HB 85 lacked operative fact. (*e.g.*, Br. 15, 18, 42). This is simply not the case. The Supreme Court of Missouri made findings that HB 85 contained substantive provisions to enforce the legislative directives in the initial portion of the statute. *Id.* at 297. It further found that these substantive provisions caused substantive injuries to plaintiffs for which the municipalities had no "adequate remedy at law." *Id.* at 302-03. This finding resulted in a decision overturning the dismissal of the claims of St. Louis City, St. Louis County and Jackson County on the basis the municipalities had an adequate remedy at law. *Id* at 302-303.

For all of these reasons, the Local Law Enforcement Agencies respectfully request the Court affirm the district court's judgment finding SAPA unconstitutional.

Respectfully submitted,

| | |
|---|---|
| **DANA TUCKER REDWING** <br> **ST. LOUIS COUNTY COUNSELOR** | **BRYAN O. COVINSKY** <br> **JACKSON COUNTY COUNSELOR** |
| */s/ Mary L. Reitz* <br> Mary L. Reitz, Mo. Bar 37372 <br> Rachel D. Schwarzlose, Mo. Bar 57269 <br> Office of the St. Louis <br> County Counselor <br> 41 S. Central Avenue, Ninth Floor <br> Clayton, MO. 63105 <br> (314) 615-7042 | */s/ D. Ryan Taylor* <br> D. Ryan Taylor. Mo. Bar 63284 <br> Office of the Jackson County <br> Counselor <br> 415 E. 12th Street, 2nd Floor <br> Kansas City, MO 64106 <br> (816) 881-3656 <br> rtaylor@jacksongov.org |

MReitz@stlouiscountymo.gov

*Attorney for St. Louis County, MO*    *Attorney for Jackson County, MO*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(1) because this document contains 1,976 words. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Time New Roman font. Pursuant to 8th Cir. R. 28A(h)(2), the Appellant states that the electronic copy of this brief is being generated by printing to Portable Document Format from the original word processing file, that it has been scanned for viruses and that it is virus-free.

*/s/ D. Ryan Taylor*

## CERTIFICATE OF SERVICE

I certify that a copy of the forgoing was filed electronically with the Clerk and delivered by operation of the CM/ECF system to the counsel of record on August 17, 2023.

<em>/s/ D. Ryan Taylor</em>