No. 23-1457

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔉𝔬𝔯 𝔱𝔥𝔢 𝔈𝔦𝔤𝔥𝔱 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF MISSOURI, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Western District of Missouri, the Honorable Brian C. Wimes

## REPLY BRIEF

**ANDREW BAILEY**
Missouri Attorney General

Missouri Attorney
General's Office
P.O. Box 899
Jefferson City, MO 65101
Tel: (314) 340-7366
Fax: (573) 751-0774

Joshua M. Divine, Mo. 69875
*Solicitor General*
Jeff P. Johnson, Mo. 73249
*Deputy Solicitor General*
jeff.johnson@ago.mo.gov

*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................i

TABLE OF AUTHORITIES.....................................................ii

INTRODUCTION.............................................................. 1

ARGUMENT ...................................................................8

   I.    Federal courts cannot second-guess the reasons States decide to exercise their authority under Printz ....................................8

  II.   The United States cannot satisfy Article III's requirements because SAPA is enforced solely against Missouri governmental entities by private Missourians (not the Governor or the Attorney General). ..............................9

       A. SAPA's private enforcement mechanism precludes causation and redressability required for standing. .............10

       B. The United States cannot show that it is entitled to state support to enforce its federal firearms laws, and therefore it has no injury-in-fact. ..........................................17

 III.   The district court erred in granting summary judgment because it misconstrued SAPA and failed to resolve reasonable inferences in favor of the non-moving party............23

       A. Summary judgment for the United States was improper.....23

       B. SAPA constrains state enforcement and does not nullify federal law. ............................................................25

       C. SAPA is neither preempted by federal law nor discriminates against the federal government......................27

 IV.   The Court must give life to SAPA's severability clause and only sever invalid applications. ........................................30

CONCLUSION ................................................................32

CERTIFICATE OF COMPLIANCE.....................................33

CERTIFICATE OF SERVICE............................................33

Appellate Case: 23-1457    Page: 2    Date Filed: 09/01/2023 Entry ID: 5312544

# TABLE OF AUTHORITIES

***Cases***                                                      Page(s)

*Arizona v. United States*
    567 U.S. 387 (2012) ................................................................ 4, 16, 17

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ............................................................................... 26

*Calzone v. Hawley*
    866 F.3d 866 (8th Cir. 2017) .............................................................. 13

*City of St. Louis v. State,*
    643 S.W.3d 295 (Mo. 2022) ....................................................... passim

*Commonwealth of Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ............................................................................... 18

*Cooper v. Aaron,*
    358 U.S. 1, 8 (1958) ................................................................................. 8

*Digital Recognition Network v. Hutchinson,*
    803 F.3d 952 (8th Cir. 2015) ......................................................... 10, 13

*Edgar v. MITE Corp.,*
    457 U.S. 624 (1982) ............................................................................... 11

*Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health & Hum. Servs.,*
    648 F.3d 1235 (11th Cir. 2011) ........................................................... 18

*Gamble v. United States,*
    139 S. Ct. 1960 (2019) .......................................................................... 27

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ..................................................................... 4, 7, 22

Appellate Case: 23-1457    Page: 3    Date Filed: 09/01/2023 Entry ID: 5312544

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................... 14

*Mille Lacs Band of Chippewa Indians v. Minn.,*
7124 F.3d 904 (8th Cir. 1997) ................................................ 22

*Montana Shooting Sports Ass'n v. Holder,*
727 F.3d 975, 978 (9th Cir. 2013) ......................................... 26

*New York v. United States,*
    505 U.S. 144 (1992) ............................................... 8, 17, 22

*New York State Rifle & Pistol Assn., Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ............................................................ 1

*Pennsylvania v. West Virginia,*
    262 U.S. 623 (1923) ............................................................. 17

*Printz v. United States,*
    521 U.S. 898 (1997) .................................................... passim

*Students for Fair Admissions, Inc. v. Pres. and Fellows of
Harvard College,*
    143 S. Ct. 2141(2023) ......................................................... 14

*Supervisors v. United States,*
    85 U.S. 71 (1873) .................................................................. 3

*United States v. Adler,*
    590 F.3d 581 (8th Cir. 2009) ......................................... 25, 28

*United States v. Alabama,*
 691 F.3d 1269 (11th Cir. 2012) ............................................. 16

*United States v. Cox,*
 906 F.3d 1170 (10th Cir. 2018) ............................................. 26

iii

*United States v. Mississippi*
308 U.S. 128 (1965) ......................................................... 16

*United States v. Missouri*
535 F.3d 844 (8th Cir. 2008) ........................................ 16, 21

*United States v. South Carolina,*
720 F.3d 518 (4th Cir. 2013) .......................................... 16

*United States v. Texas,*
143 U.S. 621 (1892) ......................................................... 16

*United States v. Texas*
340 U.S. 900 (1950) ......................................................... 17

*United States v. Texas,*
  No. 21-50949, 2021 WL 4786458 (5th Cir. Oct. 14, 2021) ................. 16

*United States v. Texas*
143 S. Ct. 1964 (2023) ................................................ 5, 10

*U.S. ex rel. Zissler v. Regents of Univ. of Minnesota*
154 F.3d 870 (8th Cir. 1998) .......................................... 16

*Wilson v. City of St. Louis.,*
  662 S.W.3d 749 (Mo. 2023) ........................................... 30

*Whole Woman's Health v. Jackson,*
  142 S. Ct. 522 (2021) .......................................... passim

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
  566 U.S. 189 (2012) ................................................... 21

### Statutes

Mo Rev. Stat. §§ 1.460.1, 1.470.1 ................................... passim

42 U.S.C. § 1983 ...............................................................

iv

Mo. Rev. Stat. § 1.450...................................................... 19, 27, 29

**_Rules_**

Fed. R. App. P. 28 and 32.............................................. 33

Fed. R. App. P. 32(a)(7)(B)(iii)....................................... 33

Appellate Case: 23-1457   Page: 6   Date Filed: 09/01/2023 Entry ID: 5312544

**<u>INTRODUCTION</u>**

The United States complains chiefly not about what the Second Amendment Preservation Act *does*, but instead *why* the legislature passed it. SAPA simply restricts political subdivisions and agencies from assisting federal officials with enforcing certain federal statutes. The United States does not dispute that Missouri has authority under *Printz* to decline to help enforce federal statutes. So instead, the United States challenges the reason the legislature chose to exercise its authority. It complains that the legislature did so "on the premise that federal law is [unconstitutional]," which the United States argues is a mistaken premise. U.S. Br. 41 (capitalization omitted); *see also id.* at 48 (similar).

No precedent authorizes federal courts to second-guess the factual reason a State chooses to exercise its authority under *Printz*. The General Assembly may act prophylactically to ensure against violations of changing federal law that equally applies to state officers. *See New York State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S. Ct. 2111 (2022). But motive is irrelevant here.

No better are the United States' fallback arguments. There, the United States confirms that the essential question is how to interpret a

1

state law. And there the United States runs headlong into the Missouri Supreme Court. The federal government brands § 1.420 as SAPA's "cornerstone" no fewer than five times and argues that SAPA "direct[s] state agencies, officials, or other regulated persons to assume duties and obligations premised on the invalidity of federal laws." U.S. Br. 2, 5, 17, 21, 48, 56. But the Missouri Supreme Court has determined that this provision is just a legislative declaration, not an enforcement provision. *City of St. Louis v. State*, 643 S.W.3d 295, 297 (Mo. 2022). The United States must ignore this construction, else its case collapses.

The United States then relies on its misconstruction to claim a host of problems, including: that this is not a "pre-enforcement lawsuit" (even though the United States seeks only prospective relief), U.S. Br. 21, that SAPA declares federal law invalid, U.S. Br. 42, that SAPA "purports to confer upon Missouri citizens a right to be free from all 'registration or tracking' of firearms," U.S. Br. 50, and that SAPA creates public confusion about the validity federal laws, U.S. Br. 25. This misconstruction should not be credited by this Court, and the district court erred by agreeing with the United States that SAPA "regulat[es] the United States directly." App. 151, R. Doc. 88, at 22; Add. 22.

This construction disregards SAPA's plain meaning and, as a result, ignores the Missouri Supreme Court's construction. This legal error violates a cardinal principle—"the construction of the statutes of a State by its highest courts, is to be regarded as determining their meaning and generally as binding upon United States courts." *Supervisors v. United States*, 85 U.S. 71, 81–82 (1873).

Trying to evade this issue, the United States incorrectly asserts that the court's exposition of SAPA "was not directed to resolving any contested legal issue." U.S. Br. 46. Yet, in declaring how SAPA operates, the Missouri Supreme Court rejected the construction offered by the United States participating as *amicus curiae*. U.S. Amicus Br. 11–16, *City of St. Louis v. State*, No. SC99290 (Dec. 21, 2021) (H.B. 85's "cornerstone provision announces that five categories of federal law are 'infringements on the people's right to keep and bear arms' under the U.S. and Missouri Constitutions."). The court's interpretation of SAPA and how the statute operates was necessary to the decision. This Court should not permit the United States a "do-over" after its interpretation was rejected by the Missouri Supreme Court. Missouri's construction of its laws are an element of sovereignty the federal government "is bound

3

to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)). Even if the Missouri Supreme Court's decision were not instructive, the United States' interpretation must be rejected under the canon of constitutional avoidance—a canon neglected by the district court and the United States.

Under the statute's plain text, SAPA "removes from Missouri entities, persons, public officers, state employees, and political subdivisions 'the authority to enforce or attempt to enforce any'" infringement and "impose[s] civil liability on state political subdivisions and law enforcement agencies" in sections 1.460 and 1.470. *City of St. Louis,* 643 S.W.3d 295, 297–98. Nothing more, nothing less. The State may regulate itself.

The United States' case fails for another, fundamental reason: As SAPA does not provide any enforcement against the United States or obstruct the United States from enforcing its laws, the United States cannot established Article III standing.

The analysis on redressability and causation is straightforward. All the incentives not to assist with enforcement of certain federal statutes stem from the availability of a private right of action. An

4

injunction against the Governor and Attorney General would not bind any private plaintiffs or state courts and would thus not alleviate the harms the United States cites. There is "no authority that might allow a federal court to parlay any defendant's enforcement authority into an injunction against any and all unnamed private parties." *Whole Woman's Health*, 142 S. Ct. at 525

As to the "injuries," no alleged injury—*e.g.*, reduced participation in task forces and information sharing—is "legally and judicially cognizable," *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023), because Missouri has constitutional authority not to participate in task forces and information sharing, *Printz v. United States*, 521 U.S. 898, 924 (1997). The federal government may not "impress into its service—and at no cost to itself—the police officers of the 50 States," *id.* at 922, solely because the loss of state "support impairs the efficacy of federal law enforcement," U.S. Br. 24.

Nor has the United States even identified any action taken by the State, the Governor, or the Attorney General to create any injury. The United States insists that "suits against state officials may proceed" for "*any* 'prospective action that would violate federal law,'" U.S. Br. 33–34

5

(emphasis in original), but they identify no federal law infringed and no action taken by any defendant to infringe.

The United States vaguely claims that it is injured by "the State's ongoing implementation of H.B. 85." U.S. Br. 20. But other than Missouri governmental units refraining from participating in federal enforcement as they see fit (well established under *Printz*), the United States fails to explain what "implementation" means. *Whole Woman's Health*, 142 S. Ct. at 534 (noting fatal failure to "direct this Court to any enforcement authority the attorney general possesses in connection with [statute] that a federal court might enjoin him from exercising."). The United States' strategy is to bandy "nullification" about and hope this Court will fill in all the gaps.

All these issues confirm that the United States seeks to "enjoin challenged laws themselves," which is outside the federal judicial equitable power. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021). It is thus no wonder the United States trains its fire on what it calls the "cornerstone" of the Act, section 1.420, which even the United States admits is declaratory. U.S. Br. 21. The United States is not harmed by any action any defendant has taken. *See Armstrong v.*

6

*Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) (requiring plaintiff to identify "unconstitutional actions" by state officers). It simply does not like that the Missouri legislature expressed an opinion that some federal statutes are unconstitutional. That abstract dispute is far afield of any Article III case or controversy.

SAPA exercises Missouri's "constitutional responsibility for the establishment and operation of its own government," *Gregory v. Ashcroft*, 501 U.S. 452, 462 (1991), and leaves the federal government to its own devices. The United States may not require Missouri to expend law enforcement resources to enforce federal criminal laws. *Printz*, 521 U.S. at 924. That is true of the federal legislature, federal executive, and the federal courts. The district court's order exercises a power foreign to the federal government, and it denies Missourians their sovereign right to self-government.

7

## ARGUMENT

## I.   Federal courts cannot second-guess the reasons States decide to exercise their authority under *Printz*.

The United States does not and cannot dispute that Missouri has authority to instruct its political subdivisions and officials not to help federal officials enforce certain laws. The Constitution "confers upon Congress the power to regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992). The federal government "may not conscript state governments as its agents" or "require the States to govern according to [its] instructions." *Id.* at 162, 178. The United States thus cannot complain that Missouri has instructed its political subdivisions and officials not to help enforce certain federal statutes.

Despite parading the term "nullify" throughout its brief, the United States must concede that statutes do not nullify a federal law unless they "'have the *effect*' of 'nullifying statutes.'" U.S. Br. 42 (quoting *Cooper v. Aaron*, 358 U.S. 1, 18–19 (1958)) (emphasis added) (brackets omitted). Because a law instructing political subdivisions not to facilitate enforcement of certain federal statutes has no such effect—it is a straightforward exercise of Tenth Amendment authority—the United States must focus its fire on something else.

8

So the United States complains about the *reason* the legislature instructed political subdivisions and officers to refrain. The United States objects that the legislature chose to exercise this authority "on the premise that federal law is [unconstitutional]," a premise with which the United States disagrees. U.S. Br. 41 (capitalization omitted); *see also id.* at 48 (similar).

But the United States nowhere cites any precedent for the idea that courts can question the reasons a State chooses not to allow its political subdivisions to help enforce federal law. Whether the reasons are based on correct factual premises or incorrect premises, it is the State that gets to decide whether to help federal officials enforce certain federal statutes. Falsely branding the State's decision as "an attempted nullification," as the United States repeatedly does, in no way compensates for the lack of any precedent.

## II. The United States cannot satisfy Article III's requirements because SAPA is enforced solely against Missouri governmental entities by private Missourians (not the Governor or the Attorney General).

SAPA entrusts Missourians to protect their Second Amendment rights, not the state entities that use the police power on a daily basis. The statute permits accountability through private enforcement, as the

9

Missouri Supreme Court recognized. *City of St. Louis,* 643 S.W.3d 295, 297–98. Though the United States uses the word "implementation" twenty-nine times, *e.g.*, U.S. Br. 20, the statute is "implemented" only through private causes of action—directed solely at state governmental entities. And because any Missourian may sue, a court order directed at the Governor and the Attorney General will do nothing to alleviate the United States' concerns. *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) ("The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute."). After all, no ruling by a federal district court will be binding on private individuals or state courts, where private causes of action under SAPA are brought. It is unsurprising, then, that the United States cannot demonstrate the requisite elements of standing.

### A. SAPA's private enforcement mechanism precludes causation and redressability required for standing.

Even if the United States could identify an injury that is "legally and judicially cognizable," *Texas*, 143 S. Ct. at 1970, it cannot show that any injury is fairly traceable to any Defendants' conduct or that an order barring Defendants' enforcement of the statute would redress an injury.

10

That is because SAPA is enforced solely by private litigants against Missouri governmental authorities—and the United States has completely failed to point to any other relevant "implementation."

1. Consider what would happen if this Court affirmed the district court's preliminary injunction. First, that order would apply only to the named Defendants, not to any private citizen, because there is "no authority that might allow a federal court to parlay any defendant's enforcement authority into an injunction against any and all unnamed private parties." *Whole Woman's Health*, 142 S. Ct. at 525. Second, because an injunction only prohibits officials from taking action, it would not grant any Missouri subdivision immunity from suit. *Id.*; *see also Edgar v. MITE Corp.*, 457 U.S. 624, 651–53 (1982) (Stevens, J., concurring in part) (rejecting the idea that a preliminary injunction "can fairly be construed as a grant of absolute immunity"). And third, any order by this Court or a federal district court would be at best persuasive authority in State court, not binding.

The result is that even if this Court affirmed an injunction against the Governor, Attorney General, or even the State, the United States would be unlikely to receive any redress. Private individuals could still

11

bring private suits in state court, and with the prospect of heavy penalties, political subdivisions would be unlikely to assist the federal government with enforcing certain federal statutes even with a federal injunction on the books. Indeed, the federal government has previously represented to this Court that a regulated entity cannot satisfy redressability when, to enforce a statute, "individuals may file private court actions without [the government's] involvement." Appellees' Br. 21, *The School of the Ozarks v. Biden*, No. 21-2270 (8th Cir. Sept. 2, 2021).

2. The fundamental problem of the United States is it cannot show any affirmative act by any Defendant that has caused any injury, and therefore no conduct by any Defendant can be proscribed or remedied by a court order.

Despite its claims that "[t]his is not a pre-enforcement suit" (even though the United States seeks prospective relief), U.S. Br. 28, the United States has failed to identify any conduct by the Governor or the Attorney General that "implemented" SAPA and caused the United States a legally cognizable injury. The fact section of their brief only mentions that the Governor signed SAPA, and there are no further references to the Governor's conduct, let alone conduct that caused an

12

existing or future injury. U.S. Br. 4–14 (signing HB 85 sole mention of Governor). The federal government fails to identify any past, current, or prospective action these officers may take that would violate federal law.

Indeed, the claims against these officers rely entirely on the abstract "legal authority" they hold and the theoretical "multiple means available to compel adherence to H.B. 85." U.S. Br. 35. The United States identifies no example in which any of this authority has been exercised to cause the United States injury. This is contrary to *Calzone v. Hawley*, where the state highway patrol superintendent directed her subordinates to "implement the statute *by* conducting vehicle inspections" that ultimately led to plaintiff's injury. 866 F.3d 866, 870 (8th Cir. 2017) (emphasis added). The United States claims that Defendants' positions as chief executive and chief legal officer are sufficient to show causation and redressability. *Id.* But similar legal authority already was held to be insufficient in *Digital Recognition Network*, 803 F.3d at 957–58, as Missouri explained. Br. 22–23. Similarly, the officer removal provisions that the federal government relies on require actions by independent third parties. Br. 26–27. The United States has not shown "that those choices have been or will be

13

made in such manner as to produce causation and permit redressability of injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Rather, "[t]he existence of one or more of the essential elements of [the United States'] standing 'depends on the unfettered choices made by independent actors not before the courts.'" *Id.* (citation omitted).

The United States submits that it can show causation and redressability needed for Article III simply because the State is a party. U.S. Br. 29–32. For example, the United States frequently asserts that SAPA "imposes a duty on state courts," *e.g.*, U.S. Br. 17, and the United States thinks that an injunction against the State will prohibit state courts from complying with SAPA. But the Supreme Court rejected this very argument just two years ago when it concluded that courts cannot "issue injunctions against state-court judges or clerks." *Whole Woman's Health*, 142 S. Ct. at 532. If courts cannot enjoin state courts directly, then parties cannot obtain the same effect simply by suing the State. "[W]hat cannot be done directly cannot be done indirectly." *Students for Fair Admissions, Inc. v. Pres. and Fellows of Harvard College*, 143 S. Ct. 2141, 2176 (2023) (citation omitted) (brackets in original).

The United States tries to dismiss *Whole Woman's Health* as irrelevant because that case involved a suit by a private party. U.S. Br. 31. The Supreme Court, however, explained that the "equitable powers of federal courts are limited by historical practice" and that it knew of no practice that would permit "an injunction against any and all unnamed private persons who might seek to bring their own" suit or "against state-court judges or clerks." *Whole Woman's Health*, 142 S. Ct. at 532, 535. The requested injunction here (to prohibit SAPA enforcement) is essentially an injunction to close state courts to Missourians. U.S. Br. 53 (claiming SAPA enforced by state courts). In fact, the United States seeks a more intrusive remedy than what plaintiffs sought in *Whole Woman's Health* because the injunction here would prevent a state court clerk from docketing a suit[1] (authorized by Missouri law) *against* the private citizen's own state government.

Although *Whole Woman's Health* involved private plaintiffs, the United States brought a companion case to *Whole Woman's Health*, which the Fifth Circuit rejected for the same reasons it rejected a suit by the

_____

[1] The decision in *Whole Woman's Health* also recognized that such injunctions raise adversity problems in the context of Article III. 142 S. Ct. at 533–34.

Appellate Case: 23-1457    Page: 21    Date Filed: 09/01/2023 Entry ID: 5312544

private parties in *Whole Woman's Health*. *United States v. Texas*, No. 21-50949, 2021 WL 4786458, at *1 (5th Cir. Oct. 14, 2021). Had these principles been limited to private parties in the *Ex Parte Young* posture, there would have been no reason for the Fifth Circuit to stay the injunction that the federal government had won. To follow the United States' suggestion here is to split with the Fifth Circuit on grounds that Supreme Court approved.

The United States cites cases where States have been a party and subject to suit (including injunctive relief), but none involve laws governing the State (and only the State). *U.S. ex rel. Zissler v. Regents of Univ. of Minnesota*, 154 F.3d 870, 871 (8th Cir. 1998) ("alleged misuse of federal grant money"); *United States v. Mississippi*, 380 U.S. 128, 130 (1965) (alleged violations of African Americans' federal right to vote); *United States v. Texas*, 143 U.S. 621, 624 (1892) (boundary dispute); *United States v. Missouri*, 535 F.3d 844, 846 (8th Cir. 2008) (alleged noncompliance with responsibilities under National Voter Registration Act); *Arizona*, 567 U.S. 387 (state criminal laws governing immigrants); *United States v. South Carolina*, 720 F.3d 518, 532 (4th Cir. 2013) (same); *United States v. Alabama*, 691 F.3d 1269, 1277 (11th Cir. 2012); *United*

16

*States v. Texas*, 340 U.S. 900 (1950) (dispute over Gulf of Mexico seabed ownership); *Pennsylvania v. West Virginia*, 262 U.S. 623, 624 (1923) (alleging violation of Commerce Clause by forcing third parties to keep natural gas for use within West Virginia). The cases involving immigration actually prevent States from enforcing federal requirements through state criminal code. *E.g.*, *Arizona*, 567 U.S. 387.

The United States' alleged injuries cannot be redressed by an injunction preventing Missourians from suing their local governments.

**B.  The United States cannot show that it is entitled to state support to enforce its federal firearms laws, and therefore it has no injury-in-fact.**

The United States agrees that "declin[ing] to assist with federal enforcement," R. Doc. 1, at 3 (citing *Printz*, 521 U.S. at 935), is lawful. To date, the United States has not shown why Missouri is prohibited from voluntarily ending all partnerships and task participation for no reason—even without a statute. Indeed, every action (or inaction) that has occurred is action that States may conduct under *Printz* and *New York v. United States*. The United States simply does not like the declared reason that the legislature included in SAPA, which is why this suit is about nothing other than "abstract questions of political power, of

17

sovereignty, of government" that are not legally cognizable. *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923).

The United States asserts five federal interests that were harmed, but none is sufficient to confer standing. Indeed, none is "legally and judicially cognizable." *Texas*, 143 S. Ct. at 1970.

First, it claims that reducing resources available for federal law enforcement is an injury. U.S. Br. 23–24. The case cited for that provision, *Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health & Hum. Servs.*, involved State standing to challenge the Medicaid provisions, and standing was undisputed. 648 F.3d 1235, 1243 (11th Cir. 2011). The government cites no requirement for Missouri to cooperate or provide resources. Moreover, the United States has agreed that States may decline to assist enforcing federal law. R. Doc. 1, at 3. Because Missouri has well-established authority not to provide resources to assist with

18

federal enforcement of certain federal statutes, this "injury" is not "legally and judicially cognizable." *Texas*, 143 S. Ct. at 1970.

Second, the United States complains about the "loss of investigative information and support[, which] impairs the efficacy of federal law enforcement." U.S. Br. 24. This assertion simply repackages the first.

Third, the United States claims that SAPA discourages the exercise of federal authority by state and local officers who are deputized. U.S. Br. 24–25. This reflects a fundamental misunderstanding—SAPA does not limit federal authority; it removes any State authority. Mo. Rev. Stat. § 1.450. SAPA applies only to state law enforcement. *City of St. Louis,* 643 S.W.3d 295, 297–98. Its penalty provisions do not even apply to individuals—only Missouri political subdivisions and law enforcement agencies face liability. Mo. Rev. Stat. §§ 1.460, 1.470. Any person may act under federal authority in accordance with the federal government's wishes.

Fourth, as previously explained, Br. 20, the United States' contention that the statute "creates confusion" proves too much. If the United States may sue any State or state official who expresses a contested view of the Constitution, then law professors and state lawyers

19

will have much to worry about. In any event, the United States has no grounds to complain about "confusion" because—by misrepresenting the law, declining to apply the canon of constitutional avoidance, and failing to accept the binding interpretation of the Missouri Supreme Court—the United States has contributed to any alleged confusion as anybody else. For example, its complaint alleges that federally deputized officers "are precluded from pursuing employment with 'any political subdivision or law enforcement agency' in the State of Missouri." R. Doc. 1, at 21. That is simply not true. Similarly, the United States originally told the district court that SAPA "expressly attempts to directly regulate the Federal Government and constrain its operations." R. Doc. 8, at 12. Also not true. In fact, the United States appears to have abandoned that claim. *See* U.S. Br. 31 (acknowledging that the United States "is not the directly regulated party"). The United States also notes litigation that has arisen in federal court, U.S. Br. 26 n.5, but if it heeded the Missouri Supreme Court's construction these cases would fail as a matter of law. To the extent confusion exists, the injury is self-inflicted.

Finally, the United States claims that it has an interest in its legal code and the "recognition [of that code] from other sovereigns." U.S. Br.

26. Yet the federal government misquotes precedent, where the Supreme Court describes two sovereign interests. One sovereign interest in creating a legal code, and a second in the "demand for recognition from other sovereigns" which usually "involves the maintenance and recognition of borders." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). Diplomatic recognition has no relevance to this case. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 198 (2012) (discussing Executive's "power to formulate recognition policy."). The United States cannot sue a State for daring to assert that some federal statutes may be unconstitutional—under the U.S. Constitution.

The failure to point to any requirement for Missouri to provide law enforcement resources or support federal efforts is telling. Unlike this Court's 2008 decision in *United States v. Missouri*, where the United States was allowed to sue Missouri for allegedly failing to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists," which was required by federal voting laws, 535 F.3d 844, 846 (8th Cir. 2008), the United States

21

identifies no requirement at all for Missouri or its officers and agents to help enforce certain federal firearms statutes.

The federal government's claim that *Printz* is inapplicable fails. U.S. Br. 46–47. It cites an Indian law case that simply noted that *Printz* was not relevant because the federal government was not "commanding state regulation." *Mille Lacs Band of Chippewa Indians v. Minn.*, 124 F.3d 904, 927 n.44 (8th Cir. 1997). Here, of course, the district court's order has exactly that same effect. If the federal government "may not conscript state governments as its agents," *New York*, 505 U.S. at 178, it necessarily follows that the federal government cannot prevent States from directing their governments not to participate in enforcement of certain federal statutes, *Gregory*, 501 U.S. at 463 (1991). The States reserve that Tenth Amendment authority.

The failure to show that Missouri is required to enforce certain federal laws, as opposed to prohibiting its officers and employees from such enforcement, is fatal to the United States' claim that it has suffered an injury in fact.

Appellate Case: 23-1457     Page: 28     Date Filed: 09/01/2023 Entry ID: 5312544

III. **The district court erred in granting summary judgment because it misconstrued SAPA and failed to resolve reasonable inferences in favor of the non-moving party.**

On the merits, the district court erroneously failed to apply binding precedent from the Missouri Supreme Court and erroneously resolved factual disputes—all while disregarding shortcomings in the factual narrative pressed by the United States. Both legally and factually, the district court's decision should be reversed.

A. **Summary judgment for the United States was improper.**

Despite Missouri pointing out that the declarations submitted by the United States "do not claim that state and local officials are blocking enforcement of federal law or breaking federal law," R. Doc. 40, at 46–47, the court made a finding at summary judgment that § 1.440 "effectively imposes an affirmative duty to effectuate an obstacle to federal firearms enforcement within the state," App. 151, R. Doc. 88, at 22; Add. 22. The district court's fact findings are procedurally improper at summary judgment, unsupported, and even contradicted by the United States' declarants. And on appeal, the United States does not dispute that:

23

- The evidentiary record lacks any facts showing that any Missouri law enforcement official obstructed federal law enforcement.

- The declarations showed that SAPA did not cause state law enforcement to obstruct federal law enforcement operations.

- There is no evidence that Missouri state and local law enforcement failed to abide by any enforceable promise, discriminated in favor of other States over the federal government, or refused to give assistance when required by federal law. *See* R. Doc. 8, at 22.

- No declarant expressed concern that federal employees would be barred from state service or that the United States has an interest in the future employment of its former employees.

Absent any of this evidence, there is no factual support for the district court's conclusion that Missouri "regulate[d] federal law enforcement or otherwise interfere[d] with its operations." App. 150–52; R. Doc. 88, at 21–23; Add. 21–23. Even if there were evidence of any of the above, those consequences would not be compelled by the statute, as explained below.

24

## B. SAPA constrains state enforcement and does not nullify federal law.

The federal government's insistence that SAPA nullifies federal law—even though it only applies to state governmental units—is telling.

For one thing, the federal government admits that there is a contrary interpretation that "may mitigate" its concerns. U.S. Br. 37. Like the district court, the United States never acknowledges this Court's duty to adopt interpretations that avoid "grave and doubtful constitutional questions." *United States v. Adler*, 590 F.3d 581, 583 (8th Cir. 2009). The United States cannot press an erroneous interpretation of the statute simply to justify bringing a lawsuit.

That is especially true where the Missouri Supreme Court has already interpreted the statute. SAPA applies to "*Missouri* entities, persons, public officers, state employees, and political subdivisions." *City of St. Louis,* 643 S.W.3d at 297 (emphasis added). Removing any doubt as to reach, the court made clear that the two operative provisions that the United States thinks are relevant, §§ 1.460 and 1.470, "impose civil liability on *state* political subdivisions and law enforcement agencies." *Id.* at 297–98 (emphasis added).

25

The United States asks the Court to find that the General Assembly used its law making powers to attempt to invalidate federal law. Yet it has no response to the State's explanation that SAPA "neither creates rights against federal law nor subtracts federal rights from third parties." Br. 57–58. Instead, the government explicitly argues the opposite—that SAPA creates a class of "law-abiding citizens" who allegedly possess rights to be free from regulation by the federal government. U.S. Br. 49. The Act does no such thing. It gives citizens a cause of action against local governments to prevent those governments from facilitating enforcement of certain federal statutes.

SAPA is also not similar to other "second amendment" cases cited by the United States. For one thing, the Kansas law cited by the United States *did* purport to directly regulate federal officials. It subjected those officials "to prosecution for 'a … felony.'" *United States v. Cox*, 906 F.3d 1170, 1189 (10th Cir. 2018) (quoting Kan. Stat. § 50-1207). For another, the court did not declare the statute unconstitutional: "[t]he validity of the Second Amendment Protection Act [in Kansas] has never been at issue in th[at] case." *Id.* at 1188. Indeed, while the United States here complains about "confusion," *Cox* expressly ruled that confusion in

26

Kansas did *not* bar the federal government from enforcing federal statutes. *Id.* at 1190–93. Similarly, in *Montana Shooting Sports Ass'n v. Holder*, the court did not invalidate the Firearms Freedom Act but dismissed a declaratory judgment suit asking for a ruling on whether Congress exceeded its Commerce Clause power. 727 F.3d 975, 981 (9th Cir. 2013). The plaintiff did not seek a declaration that the federal firearms licensing statutes violated the Second Amendment. *Id.* Neither case shows that SAPA seeks to nullify federal law.

## C. SAPA is neither preempted by federal law nor discriminates against the federal government.

The United States' entire preemption argument is based on misconstruing SAPA. It claims that it confers rights on individuals who are prohibited from possessing firearms under federal law and being subject to federal registration requirements. That is not true.

The plain text shows that SAPA does not contain any rights-conferring language. The only operative provisions remove authority from state officers to enforce infringements and provide the two causes of action against Missouri governmental entities. §§1.450–.470. SAPA does not envision preventing the federal government from enforcing its own laws. This Court must accept the plain text interpretation of SAPA as

27

expounded by the Missouri Supreme Court. *Adler*, 590 F.3d at 584 ("[S]ate courts are the ultimate expositors of state law.").

SAPA also is not preempted under obstacle preemption by federal firearms laws because the State and the United States are two separate sovereigns. *Gamble v. United States*,139 S. Ct. 1960 (2019). Each has a right to enforce its own criminal laws, and the facts show that the United States continues to do so. Nor did the federal government show that Missouri obstructed its ability to enforce federal law. The only contention the United States makes is that it is not able to enforce its statutes as efficiently without assistance by local government officials, but that is no injury under *Printz*.

The United States is also wrong that SAPA discriminates against the exercise of federal authority in violation of intergovernmental immunity. U.S. Br. 51. Section 1.460 explicitly applies to the employment by a state agency of any law enforcement officer who "knowingly deprives a citizen of Missouri of the rights or privileges ensured by" the Second Amendment, "while acting under the color of any state or federal law." This provision applies equally to state officials who violate Second Amendment rights, so it does not single out any federal

28

officials. And the provision permitting suit for employing former federal officials that violate the Second Amendment serves to put state employees (whose agency may have been penalized) on the same playing field as former federal officials.

For similar reasons, the district court wrongly concluded that §§ 1.450–1.470 regulate the United States and violate intergovernmental immunity. Section 1.450 applies only to "Missouri entities, persons, public officers, state employees, and political subdivisions." *City of St. Louis,* 643 S.W.3d at 297–98. And the private causes of action apply only to "state political subdivisions and law enforcement agencies." *Id.* at 297–98. That means there is no discrimination against the federal government or liability for federal law enforcement. The court's final conclusion that this is discriminatory because liability arises from federal firearms enforcement, App. 151–52, R. Doc. 88, at 22–23, Add. 22–23, similarly fails because the liability is identical for current state officials "acting under the color of any state or federal law," Mo. Rev. Stat. § 1.460.1. Liability arises not because of the source of the authority but instead because of conduct that infringes Missouri law.

29

## IV. The Court must give life to SAPA's severability clause and only sever invalid applications.

To the extent this Court disagrees with the Missouri Supreme Court's SAPA interpretation and Missouri's arguments, the Court should give effect to the severability clause. The United States asserts that the legislature certainly would not have prohibited localities from facilitating enforcement of certain federal statutes if it were not allowed to include a declaratory provision stating that those statutes are unconstitutional. U.S. Br. 54. That argument carries no water. It is just as likely that the legislature would pass the same statute without the declaration based on purely policy grounds or give form to Missouri's right to bear arms.

The federal government focuses substantially on individuals who have been deputized. But even the district court did not claim "the statute is unconstitutional as to those state law enforcement officers" who are not deputized. Br. 62. Although the federal government and the Missouri legislature might disagree about whether certain federal statutes are constitutional, there is no disagreement that a private cause of action to enforce Missourians' Second Amendment rights is constitutional. *Id.*; *see* 42 U.S.C. § 1983.

30

These provisions reflect the legislature's intent, as stated in § 1.410, to protect the Second Amendment rights of Missourians and with Missouri severability precedent. The severability provision expressly permits severing "applications" of the law. Mo. Rev. Stat. § 1.485. And Missouri courts have a strong severability canon, even permitting subclauses to be severed. *E.g., Wilson v. City of St. Louis*, 662 S.W.3d 749, 759 (Mo. 2023) (blue penciling statute).

31

## CONCLUSION

The Court should reverse the district court's judgment, vacate the injunction, and order the district court to dismiss the case and any other relief the Court believes is just.

Respectfully submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeff P. Johnson*
Joshua M. Divine, MO 69875
*Solicitor General*
Jeff P. Johnson, MO 73249
*Deputy Solicitor General*
Joshua M. Divine, MO 69875
*Solicitor General*
P.O. Box 899
Jefferson City, Missouri 65102
Phone: (314) 340-7366
Fax: (573) 751-0774
jeff.johnson@ago.mo.gov

*Counsel for Appellants*

32

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that Appellants' Brief complies with the typeface and formatting requirements of Fed. R. App. P. 28 and 32, in that it is written in Century Schoolbook 14-point font, and that it contains 5,946 words as determined by the word-count feature of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that the brief has been scanned for viruses and is virus-free. All required privacy redactions have been made. The hard copies submitted to the clerk are exact copies of the CM/ECF submission.

*/s/ Jeff P. Johnson*
Jeff P. Johnson

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was electronically filed on August 31, 2023, with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system; that all participants are registered CM/ECF users; and that service will be accomplished by the CM/ECF system.

*/s/ Jeff P. Johnson*
Jeff P. Johnson

33