No. 23A___

# In the
# Supreme Court of the United States

STATE OF MISSOURI, ET AL.,
*Applicants*,

v.

UNITED STATES OF AMERICA,
*Respondent.*

## EMERGENCY APPLICATION FOR IMMEDIATE ADMINISTRATIVE RELIEF AND A STAY OF THE INJUNCTION ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI

**ANDREW BAILEY**
Missouri Attorney General

Missouri Attorney
General's Office
P.O. Box 899
Jefferson City, MO 65101
Tel: (573) 751-8870
Fax: (573) 751-0774

Joshua M. Divine
*Solicitor General*
 *Counsel of Record*
Jeff P. Johnson
*Deputy Solicitor General*
josh.divine@ago.mo.gov


*Counsel for Applicants*

## PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are the State of Missouri, Missouri Governor Michael L. Parson, and Missouri Attorney General Andrew Bailey. The individual officers are sued in their official capacities only.

Respondent (plaintiff-appellee below) is the United States of America.

## RELATED PROCEEDINGS

United States District Court (W.D. Mo.):

*United States* v. *Missouri, et al.*, No. 2:22-CV-04022-BCW (Mar. 7, 2023)

United States Court of Appeals (8th Cir.):

*United States* v. *Missouri, et al.*, No.23-1457 (Sept. 29, 2023)

# TABLE OF CONTENTS

Parties to the Proceeding ........................................................................ i

Related Proceedings............................................................................... i

Table of Authorities ............................................................................. iii

Opinions Below ..................................................................................... 7

Jurisdiction ........................................................................................... 7

Constitutional and Statutory Provisions Involved.................................. 7

Statement.............................................................................................. 8

Argument ............................................................................................ 15

I.     The Eighth Circuit's unreasoned order merits an administrative stay to preserve the status quo pending disposition of this application.................... 18

II.    There is a "reasonable probability" that this Court will grant certiorari and reverse. ..................................................................... 19

     A.    The Federal Government's theory that district courts can second-guess any exercise of the Tenth Amendment is unprecedented and unbounded. ........................................................... 20

     B.    The district court exceeded fundamental constraints on equitable power that this Court made clear in just the last two years. .............. 22

     C.    If allowed to stand, the district court's opinion will conflict with decisions of several federal courts of appeals....................................... 24

III.   Missouri is likely to succeed on the merits. ....................................... 27

     A.    The district court's alternate holdings fail because no named defendant can enforce those provisions................................. 28

     B.    The United States lacks standing. ........................................ 30

     C.    Each of the district court's holdings fails on the merits. ..................... 32

IV.   Missouri has established irreparable harm, and the balance of harms favors a stay. ....................................................................... 36

Conclusion .......................................................................................... 38

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Alabama State Federation of Labor* v. *McAdory*,
    325 U.S. 450 (1945)................................................................................................33

*Alden* v. *Maine*,
    527 U.S. 706 (1999)................................................................................................38

*Biden* v. *Nebraska*,
    143 S. Ct. 2355 (2023)...........................................................................................21

*Biden* v. *Texas*,
    142 S. Ct. 2528 (2022)...........................................................................................21

*Bucklew* v. *Precythe*,
    139 S. Ct. 1112 (2019)...........................................................................................20

*California* v. *Texas*,
    141 S. Ct. 2104 (2021).............................................................................3, 23, 36

*City of St. Louis* v. *State*,
    643 S.W.3d 295 (Mo. 2022)................................3, 8, 9, 10, 13, 22, 31, 34

*Coalition for Economic Equity* v. *Wilson*,
    122 F.3d 718 (CA9 1997) .....................................................................................37

*Coleman* v. *Paccar, Inc.*,
    424 U.S. 1301 (1976)...............................................................................................7

*Digital Recognition Network, Inc.* v. *Hutchinson*,
    803 F.3d 952 (CA8 2015) .....................................................................................29

*Edgar* v. *MITE Corp.*,
    457 U.S. 624 (1982)................................................................................................31

*Ex parte Young*,
    209 U.S. 123 (1908)................................................................................................18

*Frank* v. *Walker*,
    574 U.S. 929 (2014)..................................................................................................6

*Gregory* v. *Ashcroft*,
    501 U.S. 452 (1991).............................................................................................6, 18

*Haaland* v. *Brackeen*,
    143 S. Ct. 1609 (2023) ................................................................ 30

*Hollingsworth* v. *Perry*,
    558 U.S. 183 (2010) ..................................................................... 15

*Hope Clinic* v. *Ryan*,
    249 F.3d 603 (CA7 2001) (en banc) ........................................... 29

*Maryland* v. *King*,
    567 U.S. 1301 (2012) ......................................................... 5, 17, 37

*McDonald* v. *City of Chicago*,
    561 U.S. 742 (2010) ....................................................................... 1

*McKesson* v. *Doe*,
    141 S. Ct. 48 (2020) .............................................................. 29, 30

*New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*,
    434 U.S. 1345 (1977) .............................................................. 5, 37

*Nken* v. *Holder*,
    556 U.S. 418 (2009) ............................................ 5, 8, 18, 19, 22, 23

*Ohio Citizens for Responsible Energy, Inc.* v. *Nuclear Regul. Comm'n*,
    479 U.S. 1312 (1986) ..................................................................... 7

*Planned Parenthood of Greater Texas Surgical Health Servs.* v. *Abbott*,
    734 F.3d 406 (CA5 2013) ............................................................ 37

*Printz* v. *United States*,
    521 U.S. 898 (1997) .............................................................. 1, 3, 17, 30

*Raines* v. *Byrd*,
    521 U.S. 811 (1997) ..................................................................... 30

*Rucho* v. *Common Cause*,
    139 S. Ct. 2484 (2019) ................................................................ 21

*Strange* v. *Searcy*,
    135 S. Ct. 940 (2015) ............................................................ 6, 38

*Supervisors* v. *United States*,
    85 U.S. 71 (1873) ......................................................................... 33

*Trump* v. *Hawaii*,
    138 S. Ct. 2392 (2018) ................................................................ 21

*United States ex rel. Attorney General* v. *Delaware & Hudson Co.,*
213 U.S. 366 (1909) ................................................................ 33

*United States* v. *California,*
921 F.3d 865 (CA9 2019) .................................... 16, 26, 27, 34

*United States* v. *Texas,*
143 S. Ct. 1964 (2023) ................................................ 3, 21, 30

*United States* v. *Texas,*
No. 21-50949, 2021 WL 4786458 (CA5 Oct. 14, 2021) ........................ 16

*United States* v. *Washington,*
142 S. Ct. 1976 (2022) ........................................................ 35

*Uzuegbunam* v. *Preczewski,*
141 S. Ct. 792 (2021) ......................................................... 30

*Webster* v. *Reprod. Health Servs.,*
492 U.S. 490 (1989) ........................................................ 22, 33

*Whole Woman's Health* v. *Jackson,*
141 S. Ct. 2494 (2021) ..................................................... 22, 23

*Whole Woman's Health* v. *Jackson,*
595 U.S. 30 (2021), ................... 2, 4, 16, 22, 23, 24, 27, 31

*Wolf* v. *Innovation Law Lab,*
141 S. Ct. 617 (2020) ......................................................... 21

## Statutes and Constitutional Provisions

28 U.S.C. § 2101(f) ............................................................ 6, 7

28 U.S.C. § 1651 ................................................................. 7

42 U.S.C. § 1983 ............................................................. 10, 25

U.S. Const, amend. II ..................................................... 8, 10, 36

Ark. Code §§ 25-16-703 ......................................................... 29

Mo. Const, art. I, § 23 .................................................... 10, 36

Mo. Rev. Stat. § 1.410 .......................................................... 8

Mo. Rev. Stat. § 1.420 ............... 8, 9, 11, 12, 22, 27, 28, 32, 34

Mo. Rev. Stat. § 1.430 ................................................................. 9, 12

Mo. Rev. Stat. § 1.440 ..................................................................... 17

Mo. Rev. Stat. § 1.450 ............................................. 9–13, 23, 27, 28, 32–35

Mo. Rev. Stat. § 1.460 ....................................... 9, 10, 13, 25, 27, 34, 36

Mo. Rev. Stat. § 1.470 .......................................... 9, 13, 27, 28, 34, 36

Mo. Rev. Stat. § 27.060 ............................................................... 28, 29

**To the Honorable Brett M. Kavanaugh,**
**Associate Justice of the Supreme Court of the United States and**
**Circuit Justice for the Eighth Circuit:**

Like many States, Missouri has disagreements with the Federal Government about the correct interpretation of the Second Amendment—and thus how to interpret and enforce certain federal firearms statutes. In light of this Court's recent Second Amendment decisions, the Missouri General Assembly believes that a small number of federal statutes may be unconstitutional; that the doctrine in this area is changing, *see, e.g., McDonald* v. *City of Chicago*, 561 U.S. 742 (2010); and that Missouri officials ought to strive to comply with the Second Amendment to the maximum extent possible. So in 2021, Missouri passed a law—the Second Amendment Preservation Act—publicly stating the legislature's interpretation of the Second Amendment, prohibiting Missouri's local governments from helping federal officials to enforce federal laws not in line with that interpretation, and creating a remedy akin to § 1983 against Missouri officials for violations of the Second Amendment.

In response, the United States sued Missouri. The United States does not dispute—and has in fact conceded—that Missouri has a right under the Tenth Amendment not to lend its resources to assist federal enforcement. App. 50a (citing *Printz* v. *United States*, 521 U.S. 898 (1997)). So the United States instead sued under a novel theory that a State cannot exercise its Tenth Amendment authority if the State's factual *reason* for doing so is mistaken. Here, the United States asserts in its complaint that the statute should be declared unconstitutional because Missouri's

reason for prohibiting local governments from facilitating federal enforcement "is premised" on an incorrect interpretation of the Second Amendment. *See* App. 72a; *see also* Brief of United States, *United States* v. *Missouri*, No. 23-1457, at 41 (CA8, Aug. 10, 2023) (complaining that the legislature chose to exercise its authority "on the premise that federal law is [unconstitutional]").

The district court accepted this novel theory. At the Federal Government's invitation, the district court focused not on what the law does, but on the legislature's reason for passing it. Fixating on the statute's legislative findings—which are, of course, purely declaratory—the district court concluded that the Missouri General Assembly's statement interpreting the Second Amendment is itself unconstitutional. And because the General Assembly's interpretation was central to the reason the legislature directed state agencies not to assist with federal enforcement, the district court struck down the Act in its entirety. Aggravating that error, the district court did so even though no named defendant is authorized to enforce the law.

The district court's order is deeply flawed for two basic reasons.

First, it directly conflicts with two of this Court's decisions issued in just the last two years. (The district court cites neither.) The cornerstone of the district court's opinion is that the General Assembly's legislative *finding* is wrong. On that basis, the district court declared the entire statute unconstitutional. But this Court was clear two years ago that federal courts may only "enjoin named defendants from taking specified unlawful actions," not "enjoin challenged laws themselves." *Whole Woman's Health* v. *Jackson*, 595 U.S. 30, 44 (2021). Judicial orders must operate

against "specific" parties; they "do not simply operate on legal rules in the abstract." *California* v. *Texas*, 141 S. Ct. 2104, 2115 (2021) (quotation marks omitted). Here, none of the named defendants enforces the statute, and *nobody* enforces the legislative finding that features as the centerpiece of the district court's analysis. The district court's injunction against a purely declaratory provision that nobody can enforce is a paradigmatic example of a forbidden injunction against the "laws themselves."

Second, the United States has no standing. As to injury, the Act can be enforced only against Missouri agencies and political subdivisions, not the Federal Government—as the Missouri Supreme Court has explained. *City of St. Louis* v. *State*, 643 S.W.3d 295, 297–298 (Mo. 2022). The United States thus has no injury. The Federal Government asserts that it is injured by local governments not helping it enforce federal laws. App. 65a. But this "injury" is not "legally and judicially cognizable," *United States* v. *Texas*, 143 S. Ct. 1964, 1970 (2023), because it is a necessary consequence of Tenth Amendment authority not to help enforce federal laws, *Printz*, 521 U.S., at 924. No better is the United States' protest in its complaint that the General Assembly's interpretation "cause[s] confusion among law enforcement officers, Federal Firearms Licensees, and the public at large." App. 69a. If that were enough, the United States could sue to impose a gag order on every law professor who dares to publish a paper disagreeing with the Department of Justice's interpretation of the Second Amendment. Nor has the United States ever identified

any offending action taken by the State, the Governor, or the Attorney General—the only individual defendants named.

As to redressability, all the incentives for local government officials not to assist with enforcement of certain federal statutes stem from the availability of a private right of action in state court. But an injunction against *public* officials (the Governor and Attorney General) in *federal* district court does not bind any private plaintiff or state court and thus cannot alleviate the (supposed) harms the United States cites. "Supposing the attorney general did have some enforcement authority under [the Act], the petitioners have identified nothing that might allow a federal court to parlay that authority, or any defendant's enforcement authority, into an injunction against any and all unnamed private persons who might seek to bring their own [state law] suits." *Whole Woman's Health*, 595 U.S., at 44. The district court's order thus does nothing to alleviate any injuries asserted by the Federal Government. It merely harms the State.

Pointing out these and other problems, Missouri asked the district court to stay the order on March 8, 2023, one day after the district court entered it. The district court declined to enter a full stay, but agreed to stay its order administratively until the Eighth Circuit could rule on a motion for a stay pending appeal. App. 2a–5a. Per the district court's order, Applicants and Respondents fully briefed the stay motion in the Eighth Circuit by March 20, 2023. *Ibid.*

More than six months passed without a ruling by the Eighth Circuit, and Missouri's law was allowed to stay in effect. Then, last Friday, September 29, the

Eighth Circuit denied Missouri's stay motion in a one-line order. App. 1a. The court offered no analysis. The Eighth Circuit's order is thus similar to the Fifth Circuit's order last year in *NetChoice, LLC* v. *Paxton*, where the Fifth Circuit "issued a one-sentence order" on a motion "filed … five months earlier," which "deprive[d] Applicants of the 'careful review and a meaningful decision' to which they are 'entitled.'" Emergency Application, *NetChoice, LLC* v. *Paxton*, No. 21A720, at 1 (May 13, 2022) (quoting *Nken* v. *Holder*, 556 U.S. 418, 427 (2009)) (brackets accepted). This Court vacated the Fifth Circuit's order and should do the same here. The district court's order here much more easily justifies a stay.

Staying the district court's order would maintain the status quo pending appeal. The Missouri General Assembly passed the Second Amendment Preservation Act in June 2021. The United States did not sue until February 2022 and never sought preliminary injunctive relief. So except for the 24-hour period between when the district court entered its order and its administrative stay and the two business days between the Eighth Circuit issuing its one-line order and Missouri filing this application, Missouri's law has been allowed to stay in effect for more than two years. By issuing a stay, this Court would maintain the status quo.

Absent a stay, the State of Missouri and its citizens face immediate, irreparable harm. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citing *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist,

J., in chambers)). And here, where the State has passed a statute to enable its citizens to hold their own state government accountable, the injury is especially poignant. *Gregory* v. *Ashcroft*, 501 U.S. 452, 460 (1991) ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign."). The injunction encroaches on the General Assembly's sovereign ability to define the authority of the State's own subdivisions. It denies everyday Missourians their right to hold their own state government accountable.

Applicants thus respectfully request immediate relief to maintain the status quo of Missouri's duly enacted legislation. Applicants request that this Court issue (1) a temporary administrative stay to permit Missouri's Second Amendment Preservation Act to remain in force while the Court considers this Application, and issue (2) an order—staying the district court's injunction pending the Eighth Circuit's decision on the merits—that will allow the parties the opportunity to seek timely review of that decision from this Court. Rule 23; 28 U.S.C. § 2101(f); *Frank* v. *Walker*, 574 U.S. 929 (2014). "When courts declare state laws unconstitutional and enjoin state officials from enforcing them, [this Court's] ordinary practice is to suspend those injunctions from taking effect pending appellate review." *Strange* v. *Searcy*, 135 S. Ct. 940, 940–41 (2015) (Thomas and Scalia, JJ., dissenting from denial of the application for a stay) (collecting cases). There is no reason to depart from this practice here.

## OPINIONS BELOW

The district court's opinion is available at 2023 WL 2390677, and reproduced at App. 6a–29a. The Eighth Circuit's one-line order denying a stay pending appeal is unreported and reproduced at App. 1a.

## JURISDICTION

The Court has jurisdiction under 28 U.S.C. §§ 1651, and 2101(f), and Supreme Court Rule 23. This Court has the inherent power to "hold an order in abeyance while it assesses the legality of the order," and this power has been "preserved in the grant of authority to federal courts to 'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.'" *Nken*, 556 U.S., at 426 (citation omitted). That is true even though "the Court of Appeals has not finally disposed of the case; indeed, it has not ruled on the merits nor apparently [ ]scheduled oral argument on the question presented." *See Coleman* v. *Paccar, Inc.*, 424 U.S. 1301, 1302–03 (1976) (Rehnquist, J., in chambers). Moreover, "the execution or enforcement of final orders [ ] is stayable under § 2101(f)." *Ohio Citizens for Responsible Energy, Inc.* v. *Nuclear Regul. Comm'n*, 479 U.S. 1312 (1986) (Scalia, J., in chambers).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The pertinent constitutional and statutory provisions are reproduced at App. 40a–47a.

## STATEMENT

1. Signed into law on June 12, 2021, the Second Amendment Preservation Act, or SAPA, contains nine sections. The Missouri Supreme Court has already authoritatively interpreted the statute. It held that the first four of these nine sections are declaratory—they simply contain "legislative findings and declarations"—and that the "five remaining sections comprise the substantive provisions to enforce these legislative declarations." *City of St. Louis*, 643 S.W.3d, at 297; App. 32a. The district court trained its attention almost exclusively on the declaratory provisions. App. 19a–27a.

The first section declares Missouri's policy of federalism and all duties that entails, including "support[ing] and defend[ing] the Constitution of the United States" and supporting Congress's authority "in the exercise of a few defined powers," while still "reserving for the state governments the power to legislate on matters concerning the lives, liberties, and properties of citizens in the ordinary course of affairs." Mo. Rev. Stat. § 1.410.2(2); App. 43a.

It is the second provision that drew the ire of the United States and the attention of the district court. The district court called this provision the "cornerstone" of the entire Act. App. 18a. This section declares that it is the opinion of the Missouri General Assembly that some federal statutes may be "infringements on the people's right to keep and bear arms, as guaranteed by Amendment II of the Constitution of the United States." § 1.420; App. 44a. This section describes these statutes not by name or citation but by effect. Included, are statutes that require "registration or tracking of the ownership of firearms" or impose taxes or fees that

have an unconstitutional "chilling effect" on the exercise of Second Amendment rights. *Ibid.*

The third and fourth provisions—the last of the four sections concerning "legislative findings and declarations," *City of St. Louis*, 643 S.W.3d, at 297—simply declare the truism that if a law is unconstitutional, it is invalid and should not be enforced. Without referencing § 1.420 or any statute described therein, § 1.430 states generically that any federal statutes "that infringe on the people's right to keep and bear arms as guaranteed by the Second Amendment to the Constitution of the United States" are "invalid to this state, shall not be recognized by this state, shall be specifically rejected by this state, and shall not be enforced by this state." § 1.430; App. 45a. The fourth section simply states that institutions of state government have a general duty to protect the constitutional rights of Missourians. § 1.440; App. 45a.

The "five remaining sections comprise the substantive provisions to enforce these legislative declarations." *City of St. Louis*, 643 S.W.3d at 297; App. 32a. The district court devoted barely more than one page to these actual substantive provisions. App. 27a–28a.

Section 1.450 exercises core Tenth Amendment authority by prohibiting state agencies from assisting with enforcement of federal statutes that the Missouri General Assembly believes may be unconstitutional, as described in § 1.420. App. 45a.

The next two sections create the Act's sole enforcement mechanism: suits by private citizens against state agencies. As the Missouri Supreme Court put it,

"Sections 1.460 and 1.470 impose civil liability on state political subdivisions and law enforcement agencies that employ individuals who knowingly violate 'section 1.450 or otherwise knowingly deprive[ ]' Missouri citizens of their rights to keep and bear arms." *City of St. Louis*, 643 S.W.3d, at 297–98; App. 32a, 46a–47a. Missouri governmental entities face a $50,000 civil penalty for their employees knowingly violating Missourians' federal and state right to bear arms. *City of St. Louis*, 643 S.W.3d, at 298; App. 32a–33a, 46a. In addition to imposing penalties for assisting with enforcement of statutes the General Assembly believes may be unconstitutional, § 1.460 also includes a provision akin to 42 U.S.C. § 1983. It imposes liability against political subdivisions that employ an official who "knowingly deprives a citizen of Missouri of the rights or privileges ensured by Amendment II of the Constitution of the United States or Article I, Section 23 of the Constitution of Missouri while acting under the color of any state or federal law." § 1.460; App. 46a.

The next section after the civil enforcement provisions includes definitions that narrow the scope of federal statutes that the General Assembly believes may be unconstitutional. § 1.480; App. 47a. Critically, it allows state agencies to assist with federal enforcement of federal laws that have state analogues, such as felony crimes involving "weapons violations substantially similar to those found in chapter 570 or 571." § 1.480; App. 47a. Chapters 570 and 571 have dozens of provisions and are respectively entitled "Robbery, Stealing and Related Offenses" and "Weapons Offenses."

SAPA concludes with a severability clause expressly declaring every provision "or the application thereof to any person or circumstance" to be severable. § 1.485; App. 47a.

2. More than eight months after SAPA was enacted, the United States sued Missouri in federal district court. App. 48a. Rather than focus on Missouri's decision in § 1.450 not to lend state resources to assist with federal enforcement—a decision undoubtedly constitutional under *Printz*—the Federal Government asked the district court to fixate on § 1.420, the provision where the General Assembly declares its opinion about how to interpret the Second Amendment.

The Federal Government alleged that, by declaring an opinion about the constitutionality of certain statutes at odds with the interpretation favored by the Federal Government, SAPA violated the Supremacy Clause as an "improper attempt at nullifying federal law," App. 72a, was preempted by federal firearms laws that "expressly forbid certain conduct that [SAPA] allows," App. 72a–73a, and violated "intergovernmental immunity by directly regulating the activities of Federal agents and those with whom the Federal Government deals," App. 73a. Twelve days after filing its complaint, the United States moved for summary judgment. R. Doc. 8. Missouri opposed and moved to dismiss. R. Docs. 13, 16, 25. The United States never moved for preliminary injunctive relief.

The court issued a permanent injunction on March 7, 2023. Following the Federal Government's invitation, the court focused its analysis on the declaratory provisions, §§ 1.420–1.440, especially § 1.420. App. 19a–27a. Of 11 pages of analysis,

the district court spent 9.5 evaluating provisions the Missouri Supreme Court construed to be simply declaratory. The district court held that the General Assembly's interpretation of the Second Amendment "is an impermissible nullification attempt that violates the Supremacy Clause" because the General Assembly declared its belief that some federal laws may be unconstitutional. App. 20a–21a. It then determined that SAPA is also preempted because the General Assembly's expression of opinion "creates confusion" for Missouri citizens, and thus the "statement stands as an obstacle" to the Federal Government. App. 22a. Then, having determined that the General Assembly's statement of opinion about how to interpret the Second Amendment is critical to the statute, the district court held that "SAPA is unconstitutional in its entirety." App. 25a, 28a.

In the remaining pages, the district court turned to the Federal Government's secondary argument about the doctrine of intergovernmental immunity. The district court again focused first on provisions that the Missouri Supreme Court has already held are merely declaratory. App. 26a–27a (assessing §§ 1.430–1.440). In the court's remaining analysis—barely one page long—the court finally turned to the substantive provisions.

First, it concluded that § 1.450 improperly attempts to regulate the Federal Government because it "states that '[n]o entity . . . shall have the authority to enforce or attempt to enforce any federal acts . . .' that are deemed infringements under § 1.420." App. 27a (quoting § 1.450) (alterations in original). The district court did not cite or apply the canon of constitutional avoidance, nor did it cite the Missouri

Supreme Court's determination that "Section 1.450 removes *from Missouri entities* … 'the authority to enforce'" certain federal statutes. *City of St. Louis*, 643 S.W.3d, at 297 (emphasis added).

Second, it concluded that §§ 1.460–1.470 violate the doctrine of intergovernmental immunity by penalizing state officials for enforcing federal law and also because these provisions might "discourage federal law enforcement recruitment efforts." App. 28a. The court then held that these provisions were necessary to enforce SAPA, so no part of SAPA was severable, and an injunction was justified prohibiting "any and all implementation and enforcement" of the Act by the named defendants. App. 29a.

The next day, the State moved to stay the judgment and injunction pending appeal. Doc. 91. The court denied the request for a regular stay but ordered an administrative stay until the U.S. Court of Appeals for the Eighth Circuit ruled on Missouri's forthcoming stay motion. App. 2a–5a. Per the Court's order, the motion was fully briefed on March 20, 2023. *Ibid.*

That administrative stay remained in place for more than six months. Then, last Friday, September 29, the Eighth Circuit issued a one-line order denying Missouri's motion to stay the judgment pending appeal, including a request for an administrative stay to keep the law in force while the State applied for emergency relief from this Court. App. 1a. The order is one line long and includes no legal reasoning, much less an explanation why the status quo should be suddenly upended after more than two years. The appeal on the merits before the Eighth Circuit has

been fully briefed since August and awaits panel assignment and a date for oral argument.

## ARGUMENT

Missouri respectfully requests that this Court stay the injunction pending resolution of the merits by the Eighth Circuit and, if necessary, disposition of a petition for a writ of certiorari. A stay of this kind is warranted if there is "(1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay." *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam). The Court may also balance the equities in close cases. *Id.* Applicants meet this standard easily.

First, an administrative stay is necessary to preserve the status quo while this Court considers this application. This Court has granted similar requests in the past, and the Eighth Circuit's unreasoned, one-line order provides no reason for upending the status quo that has until now existed for more than two years.

Second, there is a reasonable probability that this Court will grant certiorari and reverse. The decision directly conflicts with this Court's recent precedents, splits with the decisions of several courts of appeals, and places immense stress on settled concepts of sovereignty and federalism. Making matters worse, the United States does not even have standing.

The district court's judgment conflicts with fundamental constraints on equitable authority that this Court made clear very recently. Just two years ago, this Court explained that courts may only "enjoin named defendants from taking specified unlawful actions"; "under traditional equitable principles, no court may lawfully

enjoin the world at large, or purport to enjoin challenged laws themselves." *Whole Woman's Health*, 595 U.S., at 44 (internal quotation marks and citation omitted). But the district court's injunction does just that, holding unconstitutional a provision that the Missouri Supreme Court held was declaratory.

The order also conflicts with the decisions of multiple federal courts of appeals. For example, the Fifth Circuit stayed a preliminary injunction the United States had obtained against a Texas statute under similar circumstances. *United States* v. *Texas*, No. 21-50949, 2021 WL 4786458, at *1 (CA5 Oct. 14, 2021). And the Ninth Circuit squarely rejected the argument that this district court accepted here: that a State's exercise of its Tenth Amendment authority can be preempted under the doctrine of "obstacle preemption." *United States* v. *California*, 921 F.3d 865, 888 (CA9 2019).

The Court also routinely grants certiorari in cases where a State, as plaintiff against the United States, challenges the validity of federal action (even when there is no circuit split). The Court should be equally solicitous of the need for a State to vindicate its sovereign authority here because the district court's order places extraordinary stress on settled concepts of sovereignty and federalism. If successful, the United States' aggressive, novel argument would slash a gaping hole through the Tenth Amendment, enabling federal district courts to second-guess all kinds of otherwise valid policies of States. After all, the United States here never challenges Missouri's decision not to lend state resources to enforce federal laws; the United States instead challenges Missouri's *reason* for not lending resources. The district

court's order accepting that theory has the effect of co-opting "State and local law enforcement officials in Missouri" by the "Federal Government without fear of H.B. 85's penalties." App. 29a. This grants the Executive the power to "impress into its service—and at no cost to itself—the police officers of the 50 States," *Printz*, 521 U.S., at 922, based solely on disagreements about the reasons a State may choose not to lend its resources to the federal government. This lawsuit thus places much more tension on federalism than the state-against-federal challenges in which this Court routinely grants certiorari.

If that were not bad enough, the United States does not even have standing to sue. Neither of the injuries the United States cites is cognizable. State governments cutting off state resources for federal enforcement is not an injury; it is a feature of a State's settled Tenth Amendment authority. Similarly, the United States' assertion that it can sue because the General Assembly's declaratory statement creates "confusion" proves far too much; it would justify gag orders against law professors. The United States also cannot show redressability or causation because all of its alleged injuries stem not from enforcement by state officials (who are the only named parties), but enforcement by private plaintiffs.

Third, Applicants show irreparable harm. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567 U.S., at 1303 (2012) (Roberts, C.J., in chambers) (brackets in original). Here, because only private citizens enforce SAPA, the injunction operates on Missouri's courts and clerks that accept filings. *See* Mo.

Rev. Stat. § 1.440 ("It shall be the duty of the courts … of this state to protect the rights of law-abiding citizens to keep and bear arms …."). This has long been recognized as a grave injury to States, as "an injunction against a state court would be a violation of the whole scheme of our government." *Ex parte Young*, 209 U.S. 123, 163 (1908). Further, the injunction also invades a "decision of the most fundamental sort for a sovereign entity" by attempting to exempt Missouri's law enforcement agencies from the General Assembly's control. *Gregory*, 501 U.S., at 460.

The Eighth Circuit's unreasoned order denying a stay and changing the status quo upends a civil enforcement scheme that has been in effect for more than two years. The Court should enter an administrative stay of the district court's injunction pending review of this Application and a full stay after review.

## I. The Eighth Circuit's unreasoned order merits an administrative stay to preserve the status quo pending disposition of this application.

After reviewing the stay request for more than six months (keeping the district court's temporary stay in place), the Eighth Circuit summarily rejected Missouri's stay application without offering even a single reason why the Court thought the two-year status quo should be upended. This unreasoned decision does not "ensur[e] that appellate courts can responsibly fulfill their role in the judicial process." *Nken*, 556 U.S., at 427. The decision is especially perplexing given that the United States (1) waited to sue until eight months after the law was enacted, (2) has not claimed irreparable harm, and (3) never sought preliminary injunctive relief.

Just last year, this Court vacated a similarly timed and similarly perfunctory order where the equities were far less strong. There the Fifth Circuit "issued a one-

sentence order" on a motion "filed … five months earlier," which "deprive[d] Applicants of the 'careful review and a meaningful decision' to which they are 'entitled.'"  Emergency Application, *NetChoice, LLC* v. *Paxton*, No. 21A720 (May 13, 2022) (quoting *Nken*, 556 U.S., at 427) (brackets accepted).  This Court stayed the Fifth Circuit's order and should do the same here.

This Court has explained that a stay "temporarily suspend[s] the [lower court's] source of authority to act—the order or judgment in question" and thus "simply suspend[s] judicial alteration of the status quo."  *Nken*, 556 U.S., at 428–29.  It is undisputed that prior to the Eighth Circuit's order denying the stay motion that the district court's six-month administrative stay maintained the status quo.  App. 1a–4a.  Though courts should not issue stays "reflexively," *Nken*, 556 U.S. at 427, authorizing a stay is "consonant with the historic procedures of federal appellate courts," *id.*  Here an administrative stay (and a full stay) is justified because the Eighth Circuit upended a two-year status quo in a one-line, unreasoned order, putting into effect a district court injunction that places immense stress on federalism.

II.    **There is a "reasonable probability" that this Court will grant certiorari and reverse.**

If the district court opinion is allowed to stand, this Court will likely grant certiorari because the decision adopts a novel, disruptive concept of federalism that would create an end-run around Tenth Amendment doctrines, that directly conflicts with several of this Court's decisions, and that splits with other courts.

### A. The Federal Government's theory that district courts can second-guess any exercise of the Tenth Amendment is unprecedented and unbounded.

1. According to the Federal Government, while States may ordinarily exercise their authority under the Tenth Amendment not to assist with federal enforcement of federal law, they cannot do so if the State's *reason* for exercising its authority is incorrect.

But no precedent enables federal courts to second-guess the factual reason a State chooses to exercise its authority. And the Federal Government's (and district court's) theory has no discernible endpoint. The district court quite literally held that the General Assembly's public expression of its constitutional interpretation is unlawful because the statement "creates confusion." App. 22a; *see also* App. 23a, 26a. If the United States may sue any State or state official who expresses a contested view of the Constitution, then law professors, state lawyers, and all government officials have cause for serious concern. Every legislator has a duty to comply with the Constitution, which necessarily requires interpreting it. Under the United States' theory, each decision a state official makes can be second-guessed by a federal district court not because the decision is itself unlawful, but because the rationale behind the decision is incorrect.

Suppose, for example, that the majority leader in a liberal State announces that he is bringing a bill to the floor to abolish the death penalty under state law because he believes the death penalty is unconstitutional. Under the Federal Government's theory, the United States could sue to strike down that statute by asserting that the law is based on an incorrect factual premise rejected in *Bucklew* v.

*Precythe*, 139 S. Ct. 1112, 1122 (2019) ("The Constitution allows capital punishment."), and that the Federal Government will now have to bring more federal death penalty charges in that State.

Or suppose a state governor issues an order to construct border barriers on state lands, saying that the Federal Government has failed to do its job because there have been more than 3 million illegal border crossings this year. Under the Federal Government's theory, the United States could sue to stop barrier construction by asserting that the governor acted on a "mistaken premise," and that the actual number of border crossings was closer to 2.5 million.

If these examples are silly, it is because the Federal Government's theory is silly. "There are no legal standards discernible in the Constitution," *Rucho* v. *Common Cause*, 139 S. Ct. 2484, 2500 (2019), for striking down statutes simply because they were enacted on allegedly "mistaken premises."

2. At the very least, the extraordinarily serious federalism question presented by this case should warrant this Court's review even absent the district court's clear error or the split explained below. The Court routinely grants certiorari in cases where a State is a plaintiff against the United States and challenges the validity of a statute, often without any circuit split. *E.g.*, *Biden* v. *Nebraska*, 143 S. Ct. 2355 (2023); *United States* v. *Texas*, 143 S. Ct. 1964 (2023); *Biden* v. *Texas*, 142 S. Ct. 2528 (2022); *Wolf* v. *Innovation Law Lab*, 141 S. Ct. 617 (2020); *Trump* v. *Hawaii*, 138 S. Ct. 2392 (2018). The Court should be similarly solicitous of the need for a State to

vindicate its sovereign authority and defend its statutes when the United States is the plaintiff and seeks to dismantle a state statute so it can access state resources.

**B. The district court exceeded fundamental constraints on equitable power that this Court made clear in just the last two years.**

The district court exceeded the limits on the equitable powers of federal district courts by "enjoin[ing] challenged laws themselves." *Whole Woman's Health*, 595 U.S., at 44 (internal quotation marks and citation omitted).

Injunctions act in personam, *Nken*, 556 U.S., at 428, or as this Court explained, "federal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves." *Whole Woman's Health* v. *Jackson*, 141 S. Ct. 2494, 2495 (2021) (per curiam). Here, the district court fixated on the legislative declarations and findings. Nearly all the district court's analysis was dedicated to declaring §§ 1.420–1.440 unconstitutional. App. 19a–27a. The court devoted little more than a page to other sections. Yet, as the Missouri Supreme Court has held, these four sections are purely declaratory; they "contain legislative findings and declarations." *City of St. Louis*, 643 S.W.3d, at 297 (distinguishing these four sections from the "five remaining sections [that] comprise the substantive provisions"). The district court did not dispute this, even describing these provisions as definitional nine times. App. 20a–25a, 27a. Because these sections are purely declaratory—that is, *incapable* of enforcement by anyone—the district court's holding that these provisions are unconstitutional is simply an improper injunction against the "laws themselves." *Whole Woman's Health*, 595 U.S., at 44; *see also Webster* v. *Reprod. Health Servs.*, 492 U.S. 490, 506 (1989) ("It will be time enough for federal courts to address the meaning

of the preamble should it be applied to restrict the activities of appellees in some concrete way."). The district court overlooked *Whole Woman's Health*. It did not even cite the decision.

This case is thus no different from the recent challenge to the individual mandate of the Affordable Care Act—a mandate amended by Congress to eliminate any enforcement mechanism. There, this Court held that the plaintiffs did not have standing to sue: The "problem lies in the fact that the statutory provision, while it tells them to obtain that coverage, has no means of enforcement." *California* v. *Texas*, 141 S. Ct., at 2114. "Because of this, there is no possible Government action that is causally connected to the plaintiffs' injury." *Id.* So too, here. Legislative findings and declarations cannot be held unconstitutional, even if a district court thinks their content causes confusion. Federal courts have no equitable authority to "enjoin the world at large, or purport to enjoin challenged laws themselves." *Whole Woman's Health*, 595 U.S., at 44 (internal quotation marks and citation omitted).

The district court's decision is no stronger on the next three statutory provisions, §§ 1.450–1.470, which prohibit Missouri agencies from facilitating enforcement of certain federal statutes and enable private citizens to sue to enforce the prohibition. True, these provisions *can* be enforced—but not by any named defendant. As in *Whole Woman's Health*, private parties, not state officials, enforce violations of the Act, so the United States cannot sue the Governor or the Attorney General for relief. And because an injunction "operat[es] in personam" and must be "directed at someone, and govern[ing] that party's conduct," *Nken*, 556 U.S., at 428,

if the United States cannot sue a Missouri official, then the United States cannot sue the State of Missouri.

**C. If allowed to stand, the district court's opinion will conflict with decisions of several federal courts of appeals.**

1. This Court previously granted certiorari (before dismissing) in a case where the United States sued Texas over a law creating a private right of action against violators of Texas' abortion laws. The district court's injunction in this case, unless vacated, will create a split with the Fifth Circuit's decision.

Both cases involve the same fundamental question. In *United States* v. *Texas*, the United States framed the question presented as whether the Federal Government could "bring suit in federal court and obtain injunctive or declaratory relief against the State, state court judges, state court clerks, [or] other state officials, … to prohibit S.B. 8 from being enforced." Brief of the United States, *United States* v. *Texas,* No. 21-588, at *I* (Oct. 27, 2021). Here, the United States has similarly sued to enjoin "the State" and "state officials … to prohibit [SAPA] from being enforced." In *Texas*, as here, the statute gives enforcement authority only to private citizens, not state officials. The Texas law does not "allow state officials to bring criminal prosecutions or civil enforcement actions"; instead it "directs enforcement 'through ... private civil actions' culminating in injunctions and statutory damages awards." *Whole Woman's Health*, 595 U.S., at 35 (citation omitted). So too, here. The only individuals empowered by SAPA to enforce the Act are private citizens. Indeed, the statute *regulates* government officials; it does not empower them. The statute prohibits government officials from "knowingly depriv[ing] a citizen of Missouri of the rights or

privileges ensured by" the Second Amendment and declares that government officials "shall be liable *to the injured party*," not to the government. Mo. Rev. Stat. § 1.460.1 (emphasis added); App. 46a; *compare* 42 U.S.C. § 1983 (making defendants "liable to the party injured in an action at law").

Two other similarities are relevant. First, as here, the United States asserted that Texas was "nullifying" federal law. Brief of the United States, *United States* v. *Texas,* No. 21-588, at 3, 10, 12–14, 16, 19, 22, 24, 41–42, 45 (Oct. 27, 2021). Second, the United States has asserted in both cases that the targeted State passed a law for an impermissible reason—here, based on an incorrect view of the Constitution; in *Texas*, based on an improper desire to "insulat[e] a clearly unconstitutional statute from judicial review." *Id.*, at 16.

Indeed, all three counts in both cases are similar. Count I against Texas alleged that the Texas law violated the Supremacy Clause and the Fourteenth Amendment, Count II alleged that the law was preempted, and Count III alleged violations of intergovernmental immunity. *Id.*, at 8. Here, the United States alleges that SAPA violates the Supremacy Clause due to the alleged "nullification" of federal law, Compl. ¶¶ 76–80, App. 72a; that it "is preempted because it is contrary to federal firearm laws," Compl. ¶ 82, App. 72a–73a; and that it violates "intergovernmental immunity by directly regulating the activities of Federal agents and those with whom the Federal Government deals," Compl. ¶ 85, App. 73a.

This Court ultimately dismissed the *Texas* case—presumably because there was no need to answer questions about the United States' ability to sue States given

the clear holding in *Whole Woman's Health* about the limits of federal court equity. But if the district court's injunction in this case is allowed to stand, it will clearly split with the Fifth Circuit.

2. If upheld, the decision would also split with the Ninth Circuit. That is true for two reasons.

First, the district court decision is inconsistent with the Ninth Circuit's decision about whether a State's choice not to facilitate enforcement of federal law is subject to obstacle preemption analysis. Here, the district court focused on the General Assembly's statement interpreting the Second Amendment and held that the General Assembly's opinion was preempted: The "statement stands as an obstacle to the full purposes and objectives of federal firearms regulatory measures because it creates confusion …." App. 22a. In contrast, the Ninth Circuit has squarely held that "California's decision not to assist federal immigration enforcement in its endeavors is not an 'obstacle' to that enforcement effort" because otherwise "obstacle preemption could be used to commandeer state resources and subvert Tenth Amendment principles." *United States* v. *California*, 921 F.3d 865, 888 (CA9 2019) (citation omitted).

Second, the district court's decision conflicts with the same Ninth Circuit decision on intergovernmental immunity. Here, the district court concluded that SAPA violates the doctrine of intergovernmental immunity because civil penalties against Missouri political subdivisions might indirectly "discourage federal law enforcement recruitment efforts." App. 28a. But the Ninth Circuit concluded that

the doctrine "is not implicated when a state merely references or even singles out federal activities." 921 F.3d, at 881. Rather, the Act must affirmatively "treat the federal government worse than anyone else." *Ibid.* Here, SAPA does not regulate the federal government at all. And to the extent it "discourage[s] federal law enforcement recruitment efforts" of "state law enforcement officials" to assist with enforcement of federal laws, that happens *every* time a State exercises its authority under *Printz.* The injunction below is incompatible with the Ninth Circuit decision and "could be used to commandeer state resources and subvert Tenth Amendment principles." *Id.*, at 888 (citation omitted).

### III.    Missouri is likely to succeed on the merits.

The district court's most clearly incorrect holding is its principal one: that purely declaratory provisions are themselves unconstitutional. That holding fails for all the reasons stated above in Part II, A and B—namely, that this Court has clearly held that courts can only "enjoin named defendants from taking specified unlawful actions," not "enjoin challenged laws themselves." *Whole Woman's Health*, 595 U.S., at 44 (internal quotation marks and citation omitted).

But no better are the district court's two other holdings—comprising a sum total of two paragraphs, less than one full page. First, the court held that § 1.450 purports to regulate the Federal Government because it "states that '[n]o entity . . . shall have the authority to enforce or attempt to enforce any federal acts . . .' that are deemed infringements under § 1.420." App. 27a (quoting § 1.450) (alterations in original).    Second, it held that §§ 1.460–1.470 violate the doctrine of

intergovernmental immunity by penalizing state officials for enforcing federal law and because these provisions might "discourage federal law enforcement recruitment efforts." App. 28a. These holdings serve as no barrier to granting a stay because they are also incorrect. Each fails for the same fundamental reason as the district court's principal holding (no named defendant can enforce the challenged provisions); each fails because the United States lacks standing; and each independently fails for other reasons on the merits.

## A. The district court's alternate holdings fail because no named defendant can enforce those provisions.

Unlike § 1.420, the target of the district court's principal holding, §§ 1.450 through 1.470 are not declaratory provisions. They *can* be enforced—just not by any state official. Neither the district court nor the United States has identified any text in the Act that empowers state officials to enforce it. Rather, the only enforcement text in the Act plainly contemplates only enforcement by private citizens.

In an attempt to get around this problem, the district court's opinion suggests that the Attorney General *can* enforce SAPA because of a Missouri statute giving the Attorney General authority, generally, to maintain litigation "to protect the rights and interests of the state." App. 11a; Mo. Rev. Stat. § 27.060. But that general statute does not overcome the specific text in SAPA that expressly provides enforcement authority only to private individuals. Applied here, § 27.060 states only that the Attorney General is a proper party to bring suit in circumstances where a state official can sue. Where, as here, no state official can do so, § 27.060 has no effect.

In fact, the district court's holding directly conflicts with a decision of the Eighth Circuit. In that case, the court described the statute as one "provid[ing] for enforcement only through private actions for damages" even though the Arkansas Attorney General, like the Missouri Attorney General here, had authority to bring suit "in all litigation where the interests of the state are involved" and had "statewide law enforcement jurisdiction and authority." *Digital Recognition Network, Inc.* v. *Hutchinson*, 803 F.3d 952, 958 (CA8 2015); Ark. Code §§ 25-16-703; 25-16-713; *see also Hope Clinic* v. *Ryan*, 249 F.3d 603, 605 (CA7 2001) (en banc) ("Article III does not permit the federal judiciary to determine the constitutionality of a statute providing for private litigation, when the federal government (or its agents) are the only adverse parties to the suit.").

In any event, the district court's speculation that the Attorney General's authority under § 27.060 to maintain litigation on behalf of the State also authorizes him to enforce SAPA "is too uncertain a premise on which to address the question presented." *McKesson* v. *Doe*, 141 S. Ct. 48, 50 (2020). Rather, the district court should have done what this Court concluded the Fifth Circuit failed to do sua sponte: certify the question to the state courts. *Id.* Striking down an entire statute based on a highly disputed interpretation of state law was an abuse of discretion. Instead, "certification would ensure that any conflict in this case between state law and the [federal law] is not purely hypothetical." *Id.*, at 51. That is especially true here because the Federal Government has pressed an unusual claim that seeks to sidestep ordinary analysis under the Tenth Amendment. "The novelty of the claim at issue

here only underscores that '[w]arnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law.'" *Ibid.* (citation omitted) (brackets in original). Here, federal law allowed the district court to certify the issue to the Missouri Supreme Court sua sponte. *Id.*, at 50; § 477.004.

**B. The United States lacks standing.**

The United States lacks each of the three "irreducible" components of standing: injury, causation, and redressability. *Uzuegbunam* v. *Preczewski*, 141 S. Ct. 792, 797, (2021).

On injury, the United States has not and cannot establish an injury that is "legally and judicially cognizable." *United States* v. *Texas*, 143 S. Ct. 1964, 1970 (2023) (quoting *Raines* v. *Byrd*, 521 U.S. 811, 819 (1997)). The Act can be enforced only against Missouri agencies and Missouri political subdivisions, not the Federal Government—as the Missouri Supreme Court has explained. *City of St. Louis*, 643 S.W.3d, at 297–298. So the United States complains instead about reduced task forces and information sharing between state and federal officials. But Missouri has a constitutional right to direct its agencies not to participate in those task forces and information sharing. *Printz*, 521 U.S., at 924. A State's decision to exercise that authority is thus not a cognizable injury to the Federal Government. "Were it otherwise, [the United] State[s] would always have standing to bring constitutional challenges when" a State exercised its Tenth Amendment authority not to help enforce federal law. *Haaland* v. *Brackeen*, 143 S. Ct. 1609, 1640 (2023). The only

thing the United States has identified is a constitutional interpretation it dislikes. That is not an Article III injury.

On redressability, the United States fares no better. The district court's order applies only to the named defendants, not to any private citizen, because there is "nothing that might allow a federal court to parlay [the Attorney General's] authority, or any defendant's enforcement authority, into an injunction against any and all unnamed private persons who might seek to bring their own [state law] suits." *Whole Woman's Health*, 595 U.S., at 44. And because the injunction only prohibits state officials from taking action, it cannot grant any Missouri subdivision immunity from suit. *Id.*; *see also Edgar* v. *MITE Corp.*, 457 U.S. 624, 651–53 (1982) (Stevens, J., concurring in part) (rejecting the idea that a preliminary injunction "can fairly be construed as a grant of absolute immunity"). Finally, private actions under SAPA are brought in state courts where federal district court injunctions and Eighth Circuit opinions are at best persuasive, not binding.

In other words, the district court order provides the United States with no redress from their (noncognizable) injury of decreased federal-state partnerships. Private individuals could still bring private suits in state court, and with the prospect of heavy penalties, political subdivisions would be unlikely to assist the federal government with enforcing certain federal statutes even with a federal injunction on the books. Indeed, the Federal Government has previously represented to the Eighth Circuit that a regulated entity cannot satisfy redressability in a lawsuit against a government official when "individuals may file private court actions without [the

government's] involvement." Brief of the United States, *The School of the Ozarks, Inc.* v. *Biden*, No. 21-2270, at 21 (CA8 Sept. 2, 2021).

All this exposes the fundamental problem for the United States on the third irreducible component of standing: causation. The United States has not and cannot identify any affirmative act by any named defendant that has caused any injury. Simply put, the State and the state officials are nominal placeholder defendants sued so the United States can get a district court to tell the Missouri General Assembly that its interpretation of the Second Amendment is wrong. That abstract dispute provides no standing.

**C. Each of the district court's holdings fails on the merits.**

In addition to the procedural and equitable reasons why the district court's alternative holdings fails, those holdings independently (and quickly) fail on the merits. They fail because the holdings are substantively incorrect, and also because the scope of relief awarded (striking down the statute in its entirety) is much too broad.

1. Consider first the district court's three-sentence analysis holding that "[s]ection 1.450 regulates the United States directly in violation of the doctrine of intergovernmental immunity." App. 27a. The sole support the district court provides for this holding is the district court's argument that "Section 1.450 states that '*[n]o entity* . . . shall have the authority to enforce or attempt to enforce any federal acts . . .' that are deemed infringements under § 1.420." App. 27a (quoting § 1.450) (alterations in original) (emphasis added).

The district court's holding that § 1.450 directly regulates the Federal Government fails most readily because the Missouri Supreme Court has held the opposite. The Missouri Supreme Court expressly held that this language "removes *from Missouri entities* … 'the authority to enforce'" certain federal statutes. *City of St. Louis*, 643 S.W.3d, at 297 (emphasis added). This holding is binding on federal courts. *Supervisors* v. *United States*, 85 U.S. 71, 81–82 (1873). The district court plainly erred when it departed from the Missouri Supreme Court interpretation.

The district court's opinion similarly violates the canon of constitutional avoidance. If a statute is "reasonably susceptible of two interpretations," one of which is constitutional, then it is the court's "plain duty to adopt that construction which will save the statute from constitutional infirmity." *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U.S. 366, 407 (1909). This rule is particularly important when the court is "invited to pass upon the constitutional validity of a state statute which has not yet been applied or threatened to be applied by the state courts to petitioners or others in the manner anticipated." *Webster*, 492 U.S., at 506 ((quoting *Alabama State Federation of Labor* v. *McAdory*, 325 U.S. 450, 460 (1945)). Here it is plainly plausible to read "no entity" to refer only to state entities, not federal entities. Indeed, that is the more natural reading given the full text, which explicitly focuses on state entities, and which the district court omitted via ellipsis:

> No entity or person, including any public officer or employee *of this state* or any political subdivision *of this state*, shall have the authority to enforce or attempt to enforce any federal acts, laws, executive orders, administrative orders, rules, regulations, statutes, or ordinances

infringing on the right to keep and bear arms as described under section 1.420.

§ 1.450 (emphasis added); App. 45a.

Had the Missouri General Assembly intended to regulate federal entities, it would not have stressed that the statute covers public officials "of this state." Only by reading this statute in a vacuum and failing to apply the constitutional-avoidance canon could one conclude that the text regulates the Federal Government.

Next, consider the district court's holding that §§ 1.460–1.470 violate the doctrine of intergovernmental immunity because civil penalties against political subdivisions provided by these sections penalize "state law enforcement officials' enforcement of federal firearm regulations." App. 28a. This is the same error the district court made when determining that the Federal Government was injured. The district court determined that these sections violate the doctrine of intergovernmental immunity because they penalize enforcement of federal law. But the provisions prohibit enforcement of federal law *by state officials*. States have a constitutional right under the Tenth Amendment to regulate whether their own officials will help facilitate enforcement of federal law. "[A] decision not to assist federal [ ] enforcement in its endeavors is not an 'obstacle' to that enforcement effort" because otherwise the Federal Government could "commandeer state resources and subvert Tenth Amendment principles." *United States* v. *California*, 921 F.3d 865, 888 (CA9 2019) (citation omitted).

Finally, no better is the district court's single-sentence conclusion that these provisions, by imposing civil penalties, might somehow "discourage federal law

enforcement recruitment efforts." App. 28a. Not only did the district court not provide any support for that conclusory sentence, but a state law is not "unconstitutional just because it indirectly increases costs for the Federal Government, so long as the law imposes those costs in a neutral, nondiscriminatory way." *United States* v. *Washington*, 142 S. Ct. 1976, 1984 (2022). *Every* time a State exercises its authority not to help enforce federal law, that could hamper recruitment efforts of federal employees because it means that the employees will have to do all the work themselves rather than rely on assistance from state officials. But that is not a discriminatory cost. In fact, the only direct cost imposed by these penalty provisions is on Missouri governmental entities. The law thus treats the Federal Government *better* than Missouri's own government, not worse.

2. Even if one or more of the district court's holdings were valid, none would justify striking down the statute in its entirety. SAPA includes a severability clause expressly declaring every provision "or the application thereof to any person or circumstance" to be severable. § 1.485; App. 47a. The district court's decision to strike down the entire statute violates this provision.

Take, for example, the district court's determination that the main substantive provision, § 1.450, is unconstitutional because the district court (incorrectly) thought it regulates the federal government. Even if that holding were correct, the solution would be to hold that § 1.450 cannot be applied against federal entities, not that Missouri entities should suddenly become free from this constraint.

Similarly, the district court concluded that if the civil penalties provisions in §§ 1.460 and 1.470, are unconstitutional, then the entire statute must fall. App. 28a. But this Court adopted the exact opposite conclusion in the most recent Affordable Care Act case. There, Congress removed from the Affordable Care Act any means of enforcement, and this Court held that it could *not* strike down the rest of the law as unconstitutional. *California* v. *Texas*, 141 S. Ct., at 2114.

Finally, there is no doubt that SAPA can be applied constitutionally in at least some circumstances. The United States cannot dispute that Missouri is empowered to create a state law remedy, like § 1983, for private citizens to secure compensation against state officials for violations of their Second Amendment rights or rights under the Missouri Constitution. That is what the statute does. It imposes liability against political subdivisions that employ an official who "knowingly deprives a citizen of Missouri of the rights or privileges ensured by Amendment II of the Constitution of the United States or Article I, Section 23 of the Constitution of Missouri while acting under the color of any state or federal law." § 1.460; App. 46a. The Federal Government's (unripe) contention that the statute might sometimes afford a remedy where no right has been violated cannot be used to strike down provisions that are clearly legitimate.

## IV.     Missouri has established irreparable harm, and the balance of harms favors a stay.

Declaring that a duly enacted statute is unconstitutional in all respects is de facto irreparable harm. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable

injury." *Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citing *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). When the State is blocked from implementing its statutes, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law." *Planned Parenthood of Greater Texas Surgical Health Servs.* v. *Abbott*, 734 F.3d 406, 419 (CA5 2013); *Coalition for Economic Equity* v. *Wilson*, 122 F.3d 718, 719 (CA9 1997). Here, the General Assembly created a remedy for all Missouri citizens, and the district court removed it entirely. The injunction irreparably harms their interests and Missouri's interests.

Moreover, the public interest greatly favors Missouri. SAPA gives private individuals an additional remedy (against Missouri officials) beyond § 1983 to enforce their Second Amendment rights (and state constitutional rights). The Federal Government contends that SAPA sweeps too broadly, but there is no doubt that SAPA also protects against clearly established violations of the Second Amendment. The district court's decision thus harms the public interest because it burdens the private rights of Missouri's citizens and takes away from them a tool akin to § 1983 that they can use to keep their own state and local government accountable.

The United States cannot possibly show that a stay, pending appeal, would cause any injury, let alone irreparable injury, as the law requires. Not only can the United States not identify any injury at all, but the United States' litigation choices clearly establish that the United States does not face irreparable harm from delay. The United States waited to sue until 8 months after the law was enacted, and the

Federal Government never sought preliminary injunctive relief. After nearly two years, the United States has failed to show any attempted enforcement of SAPA against its own agencies and law enforcement officers.

## CONCLUSION

"When courts declare state laws unconstitutional and enjoin state officials from enforcing them, [this Court's] ordinary practice is to suspend those injunctions from taking effect pending appellate review." *Strange* v. *Searcy*, 135 S. Ct. 940, 940–41 (2015) (Thomas and Scalia, JJ., dissenting from denial of the application for a stay) (collecting cases). There is no reason to depart from this practice here.

The district court upended the constitutional balance between the federal government and Missouri on a matter central to Missouri's sovereignty: the conduct of Missouri law enforcement agencies and political subdivisions. Under the district court's order, the General Assembly can no longer set the bounds of Missouri law enforcement. The decision exacts a grave injury because "[w]hen the Federal Government asserts authority over a State's most fundamental political processes, it strikes at the heart of the political accountability so essential to our liberty and republican form of government." *Alden* v. *Maine*, 527 U.S. 706, 751 (1999).

This Court should immediately grant Applicants' temporary administrative relief from the District Court's permanent injunction pending consideration of this Application, and the Court should stay the District Court's permanent injunction pending both the Eighth Circuit's issuance of a decision on the merits and the

opportunity to seek timely review of that decision from this Court on a petition for writ of certiorari.

October 3, 2023

Respectfully submitted,

**ANDREW BAILEY**
**Missouri Attorney General**

*s/ Joshua M. Divine*
Joshua M. Divine
 *Solicitor General*
 *Counsel of Record*
Jeff P. Johnson
 *Deputy Solicitor General*
OFFICE OF THE MISSOURI
 ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, MO 65102
(573) 751-8870
josh.divine@ago.mo.gov

*Counsel for Applicants*