No. 23-1457

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔉𝔬𝔯 𝔱𝔥𝔢 𝔈𝔦𝔤𝔥𝔱 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF MISSOURI, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Western District of Missouri, the Honorable Brian C. Wimes

## APPELLANTS' BRIEF

**ANDREW BAILEY**
Missouri Attorney General

Missouri Attorney
General's Office
P.O. Box 899
Jefferson City, MO 65101
Tel: (314) 340-7366
Fax: (573) 751-0774

Joshua M. Divine, Mo. 69875
*Solicitor General*
Jeff P. Johnson, Mo. 73249
*Deputy Solicitor General*
jeff.johnson@ago.mo.gov

*Counsel for Appellants*

## SUMMARY OF THE CASE

At the United States' request, a federal district court found that the Second Amendment Preservation Act is unconstitutional. That Act declares the General Assembly's interpretation of the Second Amendment and creates a private right of action in Missouri courts against Missouri agencies and political subdivisions. Focusing its analysis almost entirely on a definitional provision, the district court held that the Act violated the Supremacy Clause, was preempted by the Constitution, and violated the doctrine of intergovernmental immunity.

This result is inconsistent with Constitution and the limits of federal equity jurisdiction. It upends the constitutional order by transferring Missouri law enforcement resources to the federal government, contrary to the General Assembly's wishes. Because no named defendant enforces the Act, the district court's order unlawfully enjoins the statute itself. It also disregards a state court's interpretation of the Act. Remarkably, despite binding precedent explaining that the Act applies only to Missouri entities, the district court found that Act regulated the U.S. government. The decision must be reversed.

Appellants respectfully request 20 minutes of oral argument.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE ........................................................................i

TABLE OF CONTENTS ........................................................................ii

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES .............................................................2

STATEMENT OF THE CASE ...............................................................4

SUMMARY OF THE ARGUMENT ......................................................12

ARGUMENT .......................................................................................17

I.   The district court erred because the United States does not have standing to enjoin a Missouri statute that applies against Missouri governmental entities .....................................................17

   A. Legal Standard .......................................................................17

   B. No injury is fairly traceable to the Missouri Governor or Attorney General - the only named defendants - because they do not enforce SAPA...........................................................18

     i. The district court improperly and expressly enjoined the declaratory provisions of the statute itself ...............................18

     ii. None of the named defendants enforce the substantive provisions of SAPA, so any injunction improperly runs against the statue itself ........................................................22

     iii. The district court failed to identify a cause of action ..............27

   C. The United States cannot satisfy the redressability prong......27

Appellate Case: 23-1457     Page: 3     Date Filed: 05/11/2023 Entry ID: 5276089

D. No injury-in-fact exists because the United States cannot show as a matter of law that SAPA invades a legally protected interest ................................................................. 32

II. The district court erred in granting summary judgment because it misconstrued SAPA and failed to resolve reasonable inferences in favor of the non-moving party ........................................ 41

A. Legal Standard ........................................................ 43

B. Summary judgment was improper because the undisputed facts favored Missouri ................................................ 44

C. The district court applied a wrong and conflicting interpretation of SAPA that must be overruled ........................... 51

D. Even setting aside the City of St. Louis decision, the United States' arguments on the merits fail. ........................... 56

III. The district court failed to sever allegedly unconstitutional provisions or applications as SAPA's severability clause instructs ................................................................ 59

CONCLUSION ............................................................ 64

CERTIFICATE OF COMPLIANCE ....................................... 66

CERTIFICATE OF SERVICE ............................................ 66

Appellate Case: 23-1457    Page: 4    Date Filed: 05/11/2023 Entry ID: 5276089

# TABLE OF AUTHORITIES

Cases

*Akin v. Dir. of Revenue,*
    934 S.W.2d 295 (Mo. banc 1996) ..........................................56

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015)................................................................26

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015) ..............................................................57

*Briscoe v. Bank of Commonwealth of Kentucky,*
    36 U.S. 257 (1837)................................................................22

*California v. Texas,*
    141 S. Ct. 2104 (2021)..................................................... passim

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..............................................................42

*City of St. Louis,*
    643 S.W.3d ..................................................................... passim

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)..............................................................25

*Commonwealth of Massachusetts v. Mellon,*
    262 U.S. 447 (1923)..............................................................32

*Cooper v. Aaron,*
    358 U.S. 1, 8 (1958)..............................................................57

*Dalton v. NPC Int'l, Inc.,*
    932 F.3d 693 (8th Cir. 2019) ...............................................17

iv

*Dakota, Minnesota & E. R.R. Corp. v. South Dakota,*
    362 F.3d 512 (8th Cir. 2004) ...............................................................56

*Digital Recognition Network v. Hutchinson,*
    803 F.3d 952 (8th Cir. 2015) ....................................................... passim

*Dodson v. Ferrara,*
    491 S.W.3d 542 (Mo. banc 2016) ................................................55, 56

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11 (1998) .......................................................................31, 34

*Gamble v. United States,*
    139 S. Ct. 1960 (2019) .......................................................................36

*GEO Grp., Inc v. Newsom, California,*
    15 F.4th 919 (9th Cir. 2021) ..............................................................38

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ...............................................................31, 37, 40

*Gross v. Parson,*
    624 S.W.3d 877 (Mo. 2021) ...............................................................55

*Hanson v. FDIC,*
    13 F.3d 1247 (8th Cir. 1994) ..............................................................42

*Jones v. Gale,*
    470 F.3d 1261 (8th Cir. 2006) ............................................................38

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...........................................................................26

*Marianist Province of United States v. City of Kirkwood,*
    944 F.3d 996 (8th Cir. 2019) ..............................................................42

v

*Montana Shooting Sports Ass'n v. Holder*,
727 F.3d 975, 978 (9th Cir. 2013) ........................................................58

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ...............................................................................56

*Nken v. Holder*,
556 U.S. 418 (2009) .........................................................................22, 28

*Printz v. United States*,
521 U.S. 898 (1997) .................................................................31, 32, 33

*Pub. Citizen v. U.S. Dep't of Just.*,
491 U.S. 440 (1989) ...............................................................................34

*Reno v. Condon*,
528 U.S. 141 (2000) ...............................................................................34

*Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*,
428 F.3d 1139 (8th Cir. 2005) ..............................................................25

*Segal v. Metro. Council*,
29 F.4th 399 (8th Cir. 2022) .................................................................42

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)
578 U.S. 330 (2016) ...............................................................................31

*Supervisors v. United States*,
85 U.S. 71 (1873) ....................................................................................51

*Three Expo Events, L.L.C. v. City of Dallas*,
907 F.3d 333 (5th Cir. 2018) .................................................................39

*United States v. Adler*,
590 F.3d 581 (8th Cir. 2009) .....................................................51, 52, 54

vi

*United States v. Cox,*
906 F.3d 1170 (10th Cir. 2018) ...........................................................58

*United States v. Reynolds,*
235 U.S. 133 (1914) ...........................................................................57

*United States v. Texas,*
No. 21-50949, 2021 WL 4786458 (5th Cir. Oct. 14, 2021) .................29

*Webster v. Reprod. Health Servs.,*
492 U.S. 490 (1989) ....................................................................18, 30

*Whittington v. Tyson Foods, Inc.,*
21 F.4th 997 (8th Cir. 2021) ..............................................................42

*Whole Woman's Health v. Jackson,*
141 S. Ct. 2494 (2021) ................................................................22, 28

*Whole Woman's Health v. Jackson,*
142 S. Ct. 522 (2021) ................................................................ passim

Statutes

5 U.S.C. 3372(a)(2) .............................................................................37

21 U.S.C. § 878 ...................................................................................37

28 U.S.C. § 1291 ...................................................................................2

28 U.S.C. § 1331 ...................................................................................2

28 U.S.C. § 2403(b) .............................................................................23

28 U.S.C. §§ 561(f) .............................................................................37

49 U.S.C. § 44922(c) ...........................................................................37

49 U.S.C.§ 44922(a) ...........................................................................37

vii

Ark. Code § 25-16-713 ........................................................ 24

Article III of the U.S. Constitution ................................... 16, 23

Mo. Rev. Stat. § 1.140 ......................................................... 56

Mo. Rev. Stat. § 1.410 ................................... 4, 5, 55, 56, 58

Mo. Rev. Stat. § 1.430 ......................................................... 35

Mo. Rev. Stat. § 1.450 ............................................. 34, 52, 53

Mo. Rev. Stat. § 1.460 .................................................. passim

Mo. Rev. Stat. § 1.470 .................................................. passim

Mo. Rev. Stat. § 1.485 ......................................................... 56

Mo. Rev. Stat. § 27.060 ................................................. 23, 24

Mo. Rev. Stat. § 106.110 ..................................................... 25

Mo. Rev. Stat. § 106.220 ....................................................... 8

Mo. Rev. Stat. § 106.230 ................................................. 24, 25

Mo. Rev. Stat. § 106.260 ..................................................... 25

Rules

Fed. R. App. P. 28 and 32 .................................................... 60

Fed. R. App. P. 32(a)(7)(B)(iii) ............................................ 60

Fed. R. Civ. P. 56(a) ........................................................... 42

Fed. R. Civ. P. 701(c) ......................................................... 48

Fed.R.Civ.P. 5.1 ................................................................................23

ix

# JURISDICTIONAL STATEMENT

The district court exercised subject matter jurisdiction over the case because the complaint makes claims arising under the U.S. Constitution and a federal district court's equitable jurisdiction. 28 U.S.C. § 1331. This Court has appellate jurisdiction because the grant of summary judgment and a permanent injunction disposing of all claims are final decisions under 28 U.S.C. § 1291. The district court's exercise of jurisdiction is contested by Appellants, as explained in section I.

The district court issued its judgment and order on March 7, 2023.App. 130, R. Doc. 88; Add. 1. Appellants timely filed their notice of appeal on March 8, 2023. R. Doc. 92.

1

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in finding that the United States had standing when it challenged a statute that does not apply to it and sued defendants that do not enforce it?

- *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015)

- *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021)

- *Printz v. United States*, 521 U.S. 898, 935 (1997)

- *City of St. Louis v. State*, 643 S.W.3d 295, 298 (Mo. 2022)

II.    Whether the district court erred in granting summary judgment because it failed to apply the Missouri Supreme Court's binding interpretation of SAPA and resolve reasonable inferences in the favor of the non-moving party?

- *City of St. Louis v. State*, 643 S.W.3d 295, 298 (Mo. 2022)

- *Printz v. United States*, 521 U.S. 898, 935 (1997)

- Mo. Rev. Stat. § 1.420

2

III. Whether the district court erred by failing to sever unconstitutional provisions under SAPA's severability clause and the strong presumption against unconstitutionality?

- *Dodson v. Ferrara*, 491 S.W.3d 542 (Mo. banc 2016)

- Mo. Rev. Stat. § 1.485

3

## STATEMENT OF THE CASE

On June 12, 2021, Governor Parson signed the Second Amendment Preservation Act into law. App. 138, R. Doc. 88, at 9; Add. 9. The Act's eight provisions enact a statutory scheme that limits Missouri law enforcement activities that infringe on the exercise of Missourians' Second Amendment rights to bear arms. Rather than regulating the citizenry to the maximum extent allowed under the U.S. and Missouri constitutions, Missouri encourages respect for these rights by limiting its law enforcement activities.

In addition to the Act's title, SAPA supports citizens exercising their Second Amendment rights to their fullest. It declares the General Assembly "is firmly resolved to support and defend the Constitution of the United States against every aggression" and "is duty-bound to oppose every infraction of those principles." Mo. Rev. Stat. § 1.410.2(1). The Act also reaffirms the constitutional commitment to a federal government of limited powers and the Tenth Amendment enshrines that all powers not delegated to the federal government in the Constitution of the United States are reserved to the states respectively or the people themselves. *Id.* § 1.410.2(3). The General Assembly declares that its general powers

4

are limited by the Second Amendment and the Missouri Constitution. *Id.* § 1.410.2(9). The General Assembly also affirms that "Missouri strongly promotes responsible gun ownership, including parental supervision of minors in the proper use, storage, and ownership of all firearms; the prompt reporting of stolen firearms; and the proper enforcement of all state gun laws." *Id.* § 1.410.2(10).

The next three sections declare the General Assembly's interpretations of the Second Amendment and its state analogue, including that certain restrictions on firearm ownership infringe those provisions, *id.* § 1.420; declare that these restrictions "shall be invalid to this state, shall not be recognized by this state, shall be specifically rejected by this state, and shall not be enforced by this state," *id.* § 1.430; and declare that state courts and state law enforcement agencies have a general duty to protect Missourians' rights, *id.* § 1.440.

The "five remaining sections comprise the substantive provisions to enforce these legislative declarations." *City of St. Louis*, 643 S.W.3d at 297–98. In § 1.450, the General Assembly removes state law enforcement's "authority to enforce" infringements listed in § 1.420. "Sections 1.460 and 1.470 impose civil liability on state political

5

subdivisions and law enforcement agencies that employ individuals who knowingly violate 'section 1.450 or otherwise knowingly deprive[ ]' Missouri citizens of their rights to keep and bear arms." *City of St. Louis*, 643 S.W.3d at 297–98. Missouri entities face a $50,000 civil penalty for their employees violating SAPA. *Id.* Section 1.480 carves out certain acts that are not violations of the other sections, and § 1.485 is a severability clause.

More than eight months after SAPA became law, the United States sued Missouri, the Governor, and the Attorney General in federal district court. R. Doc. 1. It alleged that SAPA violated the Supremacy Clause as an "improper attempt at nullifying federal law," *id.* ¶ 78, was preempted by federal firearms laws that "expressly forbid certain conduct that [SAPA] allows," *id.* ¶ 82, and violated "intergovernmental immunity by directly regulating the activities of Federal agents and those with whom the Federal Government deal," *id.* ¶ 85. Twelve days after filing its complaint, the United States moved for summary judgment. R. Doc. 8. Missouri opposed summary judgment and moved to dismiss. R. Doc. 13, R. Doc. 16, R. Doc. 25.

6

The district court denied Missouri's motions to dismiss and granted summary judgment and a permanent injunction to the United States. *First*, it held that the United States "has standing to challenge state laws that interfere with the federal government's operations and objectives." App. 134; R. Doc. 88, at 4–5; Add. 4–5. It credited the effect on "law enforcement operations" "through withdrawals from and/or limitations on cooperation in joint federal-state task forces, restrictions on sharing information, confusion about the validity of federal law in light of SAPA, and discrimination against federal employees and those deputized for federal law enforcement who lawfully enforce federal law." *Id.* The court found that this "concrete injury" was "attributable to Defendants' implementation and enforcement of SAPA." *Id.*

For causation purposes, the court found that this injury was "fairly traceable" to "SAPA" because the law "requires state and local law enforcement officials to cease enforcement of federal firearms regulations deemed infringements under § 1.420 and imposes a duty on state courts and state law enforcement agencies to protect citizens against the infringements." App. 135, R. Doc. 88, at 6, Add. 6. These injuries flow from the Missouri Attorney General, the court determined, because he

7

has the general authority to file suit "on the State's behalf." *Id.* And according to the district court, SAPA is enforceable by "Missouri law" because a local official may be removed from office for a knowing or willful failure to perform an official act or duty under Mo. Rev. Stat. § 106.220. *Id.*

The Court similarly held that the United States demonstrated redressability because "Defendants may enforce SAPA" and that state law enforcement resources are no longer being provided to the federal government. App. 136, R. Doc. 88, at 7; Add. 7. "[N]otwithstanding the SAPA's private cause of action provisions," the court found that the "United States satisfies the redressability requirement." App. 136, R. Doc. 88, at 7; Add. 7.

*Second*, the district court held that SAPA violates the Supremacy Clause. Focusing almost entirely on a provision that simply includes declarations and definitions, the court found that SAPA's declaration of certain infringements in § 1.420 was an "unconstitutional 'interposit[ion]' against federal law and is designed to be just that." App. 143, R. Doc. 88, at 14; Add. 14. The court agreed that SAPA "purports to invalidate substantive provisions of the [National Firearms Act] and the [Gin

8

Control Act] within Missouri, such an act is invalid under the Supremacy Clause." App. 144, R. Doc. 88, at 15; Add. 15. The court determined that "the regulatory measures are still valid in Missouri through the Supremacy Clause" and that SAPA "is an impermissible nullification attempt that violates the Supremacy Clause." App. 144–45, R. Doc. 88, at 15–16; Add. 15–16.

*Third*, the district court held that provisions of SAPA relating to registration and tracking requirements and possession of firearms by certain individuals "stand as obstacles to the full purposes and objective of federal firearms regulatory measures and are preempted." App. 146, R. Doc. 88, at 17; Add. 17. The court relied on SAPA creating "confusion regarding registration of firearms by purporting to invalidate federal licensing and registration requirements" and "confusion" about the lawful possession of firearms within Missouri. *Id.*

*Fourth*, the district court held that SAPA was unconstitutional in its entirety, finding that it was non-severable. App. 148, R. Doc. 88, at 19; Add. 19. Having determined that the definitional provision of § 1.420 was unconstitutional, and "each provision of SAPA relies on that definition," the whole law must fall. App. 149, R. Doc. 88, at 20; Add. 20.

9

*Fifth*, the court further held that sections 1.430-1.470 independently violate the doctrine of intergovernmental immunity. Section 1.430 is unconstitutional and causes confusion, according to the district court, because it "provides that all federal laws and acts that infringe on the people's right to keep and bear arms under the Second Amendment are invalid in Missouri." App. 150, R. Doc. 88, at 21; Add. 21. According to the district court, Section 1.440 requires Missouri courts and law enforcement agencies "effectuate an obstacle to federal firearms enforcement within the state." App. 151. R. Doc. 88, at 22; Add. 26. And contrary to the Missouri Supreme Court and the federal government's admissions before this Court, the district court held that § 1.450 "regulates the United States directly in violation of the doctrine of intergovernmental immunity." *Id.* Finally, the court determined that monetary penalties on Missouri political subdivisions and law enforcement agencies that employ an officer that either violates or has violated SAPA in the past discriminate against federal law enforcement, including by "discourag[ing] federal law enforcement recruitment efforts." *Id.* These sections are also non-severable because there "is no basis to conclude the Missouri General Assembly would have enacted

10

SAPA without the civil enforcement mechanisms." App. 152, R. Doc. 88, at 23; Add. 23.

The decision opines that "SAPA exposes citizens to greater harm by interfering with the Federal Government's ability to enforce lawfully enacted firearms regulations designed by Congress for the purpose of protecting citizens within the limits of the Constitution." App. 153, R. Doc. 88, at 24; Add. 24. It further orders that "State and local law enforcement officials in Missouri may lawfully participate in joint federal task forces, assist in the investigation and enforcement of federal firearm crimes, and fully share information with the Federal Government without fear of H.B. 85's penalties." *Id.*

The next day, the State filed the notice of appeal. R. Doc. 92. Shortly thereafter, the district court stayed its judgment until this Court rules on the motion to stay pending appeal filed on March 9, 2023.

11

## SUMMARY OF THE ARGUMENT

The district court's judgment and injunction run headlong into foundational principles of federal equity jurisdiction that the Supreme Court clarified in just the last few terms. The district court failed to cite these decisions and binding Circuit precedent.

**A.** Under *Whole Woman's Health*, courts can "enjoin named defendants from taking specified unlawful actions" but cannot "enjoin challenged laws themselves." Yet enjoining the law itself is exactly what the district court's order purports to do. Nearly all the district court's analysis is dedicated to holding sections 1.420 through 1.440 unconstitutional. Yet, as the Missouri Supreme Court has held, these three sections are purely declaratory; they "contain legislative findings and declarations." Indeed, the district court's opinion describes these provisions as definitional at least nine times. Because these sections are purely declaratory—that is, *incapable* of enforcement by anyone—the district court's declaration that these provisions are unconstitutional is simply an improper injunction against the "laws themselves."

To be sure, the district court devotes a page to the provisions in SAPA that are enforceable. But there it runs into another fundamental

12

problem: no named defendant enforces SAPA. The Act is enforced only by private civil actions, not any enforcement action by the Attorney General or Governor. The district court's determination that the Attorney General enforces SAPA through a Missouri statute granting him general authority to maintain litigation to protect the rights and interests of the state cannot be squared with this Court's decision in *Digital Recognition Network*. In that case, the Arkansas Attorney General's similar statutory authority did not permit a suit against him because the challenged statute "provide[d] for enforcement only through private actions for damages."

For similar reasons, the United States lacks a cause of action. Neither the district court nor the United States has ever identified one. As the Supreme Court has recently clarified, the Supremacy Clause provides no cause of action. And the United States cannot rely on an equitable cause of action because those run only against state officers who are, or plan to, violate federal law, and the United States has failed to name any defendant who can enforce SAPA.

**B.** The same enforcement issues show that the United States cannot satisfy Article III's redressability requirement. Again, the district

13

court ignored *Digital Recognition* and recent Supreme Court precedent explaining that redressability fails when remedy "simply operate[s] on legal rules in the abstract." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). Examining the injunction reveals that the United States is not the beneficiary of the injunction—as potential defendants to any SAPA suit, state and local law enforcement receive that benefit. Yet the prohibition also purports to burden Missouri and its officers and agents from enforcing SAPA. This novelty merely confirms that this declaratory judgment and injunction does not redress any injury to the federal government.

**C.** Setting aside thorny causation and redressability problems, the United States cannot even show an injury in fact. It complains that Missouri law enforcement under SAPA are not allowed to voluntarily partner with federal officials to enforce certain laws, but Missouri's authority to direct state officials not to enforce certain federal laws is well established under *Printz*. Because this is not a legally protected interest and the United States is not entitled to that Missouri's decision to reduce its enforcement of certain federal firearms laws is not a cognizable legal injury.

Appellate Case: 23-1457     Page: 24     Date Filed: 05/11/2023 Entry ID: 5276089

**II.** On the merits, summary judgment was improper because the undisputed facts favored Missouri. Under *Printz*, Missouri has no obligation to lend its resources to the federal government to enforce federal laws, but in any event, the United States has been able to prosecute its laws just fine.

Even setting that issue aside, the district court's interpretation of SAPA is fundamentally flawed. The district court purported to invalidate sections 1.420 through 1.440, but the Missouri Supreme Court has already determined that these provisions are declaratory only. Because they are not capable of enforcement, the district court could not enjoin them.

The district court also enjoined sections 1.450 through 1.470, concluding that these provisions violate the intergovernmental immunity doctrine, but SAPA neither regulates the United States, nor discriminates against the United States, so that doctrine does not apply. The United States admits it is not a regulated party. And although the district court expressed concern that political subdivisions might be less likely to hire federal officials who have enforced certain laws because of SAPA, the same is true when state officials enforce those laws. SAPA

15

thus treats state officials similarly to federal officials, so there is no discrimination and no violation of the intergovernmental immunity doctrine.

**III.** At the very least, the district court's severability analysis was fundamentally flawed. Missouri has a strong presumption in favor of severability. And SAPA itself states that any lawful application to any person must be given effect. But by holding definitional provisions unconstitutional—itself improper under *Whole Woman's Health*—the district court was able to conclude that the whole statute must fall because every provision is "inseparably connected with and dependent upon" these definitional provisions.

Appellate Case: 23-1457    Page: 26    Date Filed: 05/11/2023 Entry ID: 5276089

## ARGUMENT

I.  **The district court erred because United States does not have standing to enjoin a Missouri statute that only applies to Missouri governmental entities.**

The district court enjoined a Missouri statute that permits Missourians to seek monetary damages in Missouri courts against Missouri political subdivisions and law enforcement agencies. The injunction also runs against the Missouri Governor and its Attorney General who do not enforce the Act. To make matters worse, the United States, who is not subject to SAPA, filed the lawsuit. The decision violates nearly every requirement for standing.

### A.  Legal Standard

"Article III of the U.S. Constitution limits the jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *Digital Recognition Network*, 803 F.3d at 956–59 (citation omitted). "Standing is an essential and unchanging part of the case-or-controversy requirement." *Id.* (cleaned up). "To establish standing, a plaintiff must show that he has suffered an injury in fact that is fairly traceable to the challenged conduct of the defendant and will likely be redressed by a favorable decision." *Id.* The federal government "must establish standing for each type of remedy sought, including declaratory and injunctive relief." *Id.* This Court

17

reviews issues of standing de novo. *Id.* at 956. Including the denial of motions to dismiss under Rule 12(b)(1) and 12(b)(6). *Dalton v. NPC Int'l, Inc.*, 932 F.3d 693, 695 (8th Cir. 2019)

## B. No injury is fairly traceable to the Missouri Governor or Attorney General—the only named defendants—because they do not enforce SAPA.

Start first with the most glaring problem: because none of the named defendants enforce the statute, the district court was forced to "enjoin challenged laws themselves," which the Supreme Court has expressly declared to be improper. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) (quotations omitted).

### i. The district court improperly and expressly enjoined the declaratory provisions of the statute itself.

Federal courts have jurisdiction only to "enjoin named defendants from taking specified unlawful actions," *id.*, but the district court here enjoined the statute itself. Almost all of the district court's analysis is dedicated to holding sections 1.420 through 1.440 unconstitutional. Yet, as the Missouri Supreme Court has held, these three sections are purely declaratory; they "contain legislative findings and declarations." *City of St. Louis*, 643 S.W.3d at 297. Indeed, the district court's opinion describes these provisions as definitional at least nine times. App. 144–

18

49, R. Doc. 88, at 15–20, 22; Add. 15–20, 22. Because these sections are purely declaratory—that is, *incapable* of enforcement by anyone—the district court's declaration that these provisions are unconstitutional is simply an improper injunction against the "laws themselves." *Whole Woman's Health*, 142 S. Ct. 522, at 535; *see Webster v. Reprod. Health Servs.*, 492 U.S. 490, 506 (1989) ("It will be time enough for federal courts to address the meaning of the preamble should it be applied to restrict the activities of appellees in some concrete way.").

This case is thus no different from the recent challenge to the individual mandate of the Affordable Care Act—a mandate amended by Congress to eliminate any enforcement mechanism. There, the Supreme Court held that the plaintiffs did not have standing to sue. As the Supreme Court put it, the "problem lies in the fact that the statutory provision, while it tells them to obtain that coverage, has no means of enforcement." *California v. Texas*, 141 S. Ct. 2104, 2114 (2021). "Because of this, there is no possible Government action that is causally connected to the plaintiffs' injury." *Id.* So too, here. Legislative findings and definitions cannot be held unconstitutional, even if the district court thought that the definitions cause confusion. App. 146–47, R. Doc. 88, at

19

17–18; Add. 17–18. The United States has no standing to challenge purely declaratory provisions, and there is no federal jurisdiction to enjoin statutes themselves.

Tellingly, the district court fails to cite *Whole Woman's Health* or *California v. Texas*. It instead determines that these provisions are unconstitutional because they "create confusion." App. 146–47, 150, R. Doc. 88, at 17–18, 21; Add. 17–18, 21. But that proves far too much. The General Assembly is free to declare its interpretation of the Second Amendment whether by resolution, statute, or any other method. But under the district court's reasoning, any joint resolution declaring the General Assembly's interpretation of the Constitution is unconstitutional if the United States happens to disagree. Indeed, if a court can enjoin a simple declaration by the General Assembly on the ground that the declaration creates confusion, courts could place gag orders on the Speaker of the House from declaring his interpretation. That cannot be correct. Federal courts may enjoin only specific actions by persons, and "no court may lawfully enjoin the world at large." *Whole Woman's Health*, 142 S. Ct. at 535 (quotation omitted). Courts may not enjoin the statutes

20

themselves, no matter how much confusion the district court thinks the text might create.

Indeed, in their response to Missouri's stay motion, the United States made clear that it seeks an exemption from the ordinary principles of federal equity jurisdiction simply because it does not like the General Assembly's opinion about the Second Amendment and Commerce Clause. The United States does not dispute that Missouri can instruct its political subdivisions not to enforce certain federal laws. It simply does not like the legislature's declared *reason* for telling state officials not to enforce those laws, arguing that this declared reason is legally flawed and thus creates "confusion about the validity of federal law." Stay Opp. at 9, 17. The United States declares the legislature's expression of its opinion to be tantamount to an attempt to nullify federal law.

But this is the same "nullification" argument recently rejected by the Supreme Court. *See Whole Woman's Health*, 142 S. Ct. at 535. It would be a "radical answer," the Supreme Court determined, to allow plaintiffs to invoke federal equity jurisdiction simply by claiming that a statute itself rests on a mistaken view of the U.S. Constitution. Instead, plaintiffs must seek to "enjoin named defendants from taking specified

21

unlawful actions," not seek to "enjoin challenged laws themselves." *Id.* (quotations omitted). The district court erred when it purported to enjoin SAPA itself.

### ii. None of the named defendants enforce the substantive provisions of SAPA, so any injunction improperly runs against the statute itself.

The district court's passing discussion (barely one page) declaring three other provisions unconstitutional is equally problematic. True, these provisions (sections 1.450 through 1.470) *can* be enforced. But the district court opinion runs into another fatal problem: none of these provisions is enforced by any named defendant.

The district court erroneously found that the United States' potential injuries were "fairly traceable to the challenged conduct" of the defendants here. "When a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Digital Recognition Network*, 803 F.3d at 957-58 (cleaned up). But SAPA is not enforceable by the Attorney General or the Governor—the only named defendants. As in *Whole Woman's Health*, SAPA is instead enforceable by private suits.

22

Indeed, far from being enforced *by* the State, SAPA can only be enforced *against* Missouri's political subdivisions and law enforcement agencies. Mo Rev. Stat. Mo. Rev. Stat. §§ 1.460.1, 1.470.1. Accordingly, "private litigant[s] alone seek[] to enforce private rights under the statute." *Digital Recognition Network*, *Inc. v. Hutchinson*, 803 F.3d 952, 963 (8th Cir. 2015). So by suing the Attorney General and the Governor, the United States again runs headlong into this Court's precedent and *Whole Woman's Health*. Having failed to name a proper defendant, the United States seeks to "enjoin challenged laws themselves." *Whole Woman's Health*, 142 S. Ct. at 535

The United States cannot evade this problem by suing the "State of Missouri" in the abstract. Because an injunction "operat[es] in personam," it must be "directed at someone, and govern[] that party's conduct." *Nken v. Holder*, 556 U.S. 418, 428 (2009). Given that "[a] state can act only through its agents," *Briscoe v. Bank of Commonwealth of Kentucky*, 36 U.S. 257, 318 (1837), an injunction against Missouri must operate by requiring some agent to take, or refrain from taking, some action. *See, e.g., Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (per curiam) (noting "federal courts enjoy

23

the power to enjoin individuals tasked with enforcing laws, not the laws themselves") (citing *California v. Texas*, 141 S. Ct. 2104, 2115–16 (2021)). The federal government cannot end-run those limits on the federal judicial power by suing the State as a nominal defendant while seeking relief that runs against the state officers that it cannot sue directly.

Nor can the United States sue Missouri officials in anticipation of a private plaintiff filing suit under SAPA. A hypothetical (and thus unripe) future controversy potentially affecting the United States does not create a case or controversy between the United States and Missouri. *See Hope Clinic v. Ryan*, 249 F.3d 603, 605 (7th Cir. 2001) (en banc) ("*Muskrat* ... held that Article III does not permit the federal judiciary to determine the constitutionality of a statute providing for private litigation, when the federal government (or its agents) are the only adverse parties to the suit."). Just as in *Digital Recognition Network*, so too here: "The governor and attorney general do not have authority to enforce [SAPA], so they do not cause injury to [the federal government]. The Act provides for enforcement only through private actions for damages." *Id.* at 958 (emphasis added). "While the attorney general may intervene and defend the constitutionality of [SAPA] in a private damages suit, *see* 28 U.S.C.

24

§ 2403(b); Fed. R. Civ. P. 5.1; [Mo. Rev. Stat. § 27.060], the attorney general does not initiate enforcement or seek relief against a putative defendant." *Id.* The federal government's injury, to the extent it exists at all, "is 'fairly traceable' only to the private civil litigants who may seek damages under the Act and thereby enforce the statute against the [federal government]." *Id.*

The district court and the United States contend that the Attorney General can enforce SAPA because of a Missouri statute giving the Attorney General authority, generally, to maintain litigation "to protect the rights and interests of the state." App. 135, R. Doc. 88, at 6, Add. 6. This Court rejected precisely this argument when confronted with a materially identical Arkansas statute in *Digital Recognition Network*. 803 F.3d at 958 (citing Ark. Code § 25-16-703). As here, the Arkansas Attorney General expressly had "statewide law enforcement jurisdiction and authority." *Id.* (citing Ark. Code § 25-16-713). And yet, this Court had no trouble determining that, because the statute itself created a private cause of action but no express cause of action for the Attorney General, federal equity jurisdiction did not extend to the Attorney General.

The government also claimed that the Attorney General could remove some state officers under Mo. Rev. Stat. § 106.230, but the United States concedes that this authority only arises "if the local prosecuting attorney declines to pursue a complaint." R. Doc. 32, at 12. And under that statutory scheme the Attorney General does not initiate a government action until a third party files a complaint, the governor requires him to aid the prosecutor, and the prosecutor does not act. Mo. Rev. Stat. § 106.260. The United States cannot "rely on speculation about "the unfettered choices made by independent actors not before the court." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). This Court has also explained that without a complaint naming the proper party directing the Attorney General to take action, a preliminary injunction was improper. *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005).

The argument that the Governor can enforce the SAPA is even weaker. The United States contends that Mo. Rev. Stat. § 106.110 empowers the Governor to remove almost anyone. But that statute merely confirms that all governor-appointed officers are subject to his control. And § 106.220 says that municipal officials who neglect their job

26

enforcing state criminal laws are subject to removal—by the local prosecuting attorney under Mo. Rev. Stat. § 106.230.

### iii. The district court failed to identify a cause of action.

For similar reasons, the United States lacks a cause of action. Neither the district court nor the United States has ever identified one. The United States has pressed this case under three substantive theories: nullification, preemption, and intergovernmental immunity. Each boils down to an assertion that SAPA is invalid under the Supremacy Clause. But the Supremacy Clause is not the "source of any federal rights," and certainly does not create a cause of action. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–27 (2015). And although *Armstrong* recognizes an equitable cause of action "to enjoin unconstitutional actions *by state and federal officers*," *id.* at 327, the United States has not sued any state officer charged with enforcing this statute.

### C. The United States cannot satisfy the redressability prong.

When the court lacks standing because the defendants do not enforce a challenged statute, "it is not likely that [the federal government]'s injury would be 'redressed by a favorable decision.'"

27

*Digital Recognition Network*, 803 F.3d at 958 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The "redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute." *Id.* Again, this Court's precedent in *Digital Recognition Network*, which the district court failed to address, controls.

Although the causation and redressability prongs reach the same result, the reasoning differs. Redressability seeks to show that a court order will grant relief to the plaintiff. When a statute relies on private litigants to enforce it, a court order on the defendant officials merely provides "favorable judicial precedent" but "any judgment would not oblige private litigants to refrain from proceeding under the Act." *Id.* Because there is no relationship between the state officials and potential private litigants, those litigants would not "consider themselves bound to follow an order directed at the state officials." *Id.* at 959. As a result, a "declaration that [SAPA] is unconstitutional would not redress [the federal government]'s injury by virtue of its effect on the defendant officials." *Id.* at 958.

28

Supreme Court precedent confirms that remedies act on "specific" parties" and "do not simply operate on legal rules in the abstract." *California v. Texas,* 141 S. Ct. 2104, 2115 (2021) (quotation omitted). Thus when a statutory provision is unenforceable, "[t]here is no one, and nothing, to enjoin." *California,* 141 S. Ct. at 2115. The injunctive relief amounts "to no more than a declaration that the statutory provision they attack is unconstitutional," which does not supply jurisdiction. *Id.*

The *Whole Woman's Health* decision also highlights this problem. Texas passed a "law [that] generally does not allow state officials to bring criminal prosecutions or civil enforcement actions," it was enforceable only through "private civil actions." 142 S. Ct. at 530. Would-be defendants filed suit against Texas's courts and clerks to prevent them from docketing future complaints. *Id.* at 530. Although decided, in part, on *Ex Parte Young* grounds, that federal courts lack equitable jurisdiction to enjoin the machinery of state courts, *id.* at 532, the Court noted the many other problems with the suit, including a lack of adversity, a lack of a remedy, and supervision problems. *Id.* at 532–33 ("Instead, only further questions follow."). Justice Thomas recognized that "Petitioners also have not shown injury or redressability for many of the same reasons

29

they cannot satisfy *Ex parte Young*" citing *California v. Texas. Id.* at 540 n.1 (Thomas, J., concurring). When the United States sued over the same statute, the Fifth Circuit issued stayed order against the United States because Texas officials did not enforce the law. *United States v. Texas*, No. 21-50949, 2021 WL 4786458, at \*1 (5th Cir. Oct. 14, 2021).

As in *Whole Woman's Health* and *California v. Texas*, the injunction gives away the game. The district court's injunction expressly recognizes that "[s]tate and local law enforcement officials in Missouri may lawfully participate in joint federal task forces … without fear of [SAPA's] penalties." App. 153, R. Doc. 88, at 24, Add. 24. The United States gains nothing, and the entities that benefit from the injunction are potential *defendants* in future suits. Somehow, those entities are also subject to the injunction's prohibition. *Id.* (identifying injunction runs against Missouri and "its officers, agents, and employees"). This state of affairs where the enjoined parties are the beneficiaries of the injunction shows that the district court impermissibly "enjoin[ed] challenged laws themselves." *Whole Woman's Health*, 142 S. Ct. at 535 (2021).

By dedicating the bulk of its analysis to enjoining definitional provisions and legislative findings, the district court's decision operates

30

on legal rules in the abstract, not on specific enforcement actions. But federal courts cannot enjoin legislative declarations or preambles. *Webster*, 492 U.S. at 506. If they could, "the federal courts would be busy indeed issuing advisory opinions that could be invoked as precedent in subsequent litigation." *Digital Recognition Network*, 803 F.3d at 958–59. Such judgments "threaten to grant unelected judges a general authority to conduct oversight of decisions of the elected branches of Government." *California*, 141 S. Ct. at 2116.

The district court's decision cannot meet the redressability requirement because no party enforces SAPA (only private litigants) and enjoining the law itself fails to provide relief to the United States.

### D. No injury-in-fact exists because the United States cannot show as a matter of law that SAPA invades a legally protected interest.

The district court found that the United States was harmed because Missouri exercised its constitutional prerogative to limit how Missouri state and local law enforcement resources are used. The court held that because federal "law enforcement operations have been [negatively] affected" the United States suffered a concrete and particularized injury. App. 133–34, R. Doc. 88, at 4–5; Add. 4–5. But even if there is an effect,

31

the United States must show that they are legally entitled to such cooperation and resources, and it cannot. SAPA simply requires Missouri's law enforcement to, as the complaint agrees is lawful, "decline to assist with federal enforcement[.]" R. Doc. 1, at 3 (citing *Printz v. United States*, 521 U.S. 898, 935 (1997)). The Act exercises Missouri's "constitutional responsibility for the establishment and operation of its own government." *Gregory v. Ashcroft*, 501 U.S. 452, 462 (1991). The district court incorrectly found that any effect on federal law enforcement was sufficient for an injury-in-fact.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robin,* 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). A legally protected interest is one that is usually conferred by law, statute or long held private rights. *See id.* at 342–343 (FCRA conferred cause of action for violation procedural statutory right); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (injury-in-fact satisfied when plaintiff could not obtain information "the statute requires that AIPAC make public."). The Supreme Court has given examples of such

Appellate Case: 23-1457     Page: 42     Date Filed: 05/11/2023 Entry ID: 5276089

legally protected interests: rights of person or property, rights of dominion over physical domain, and quasi sovereign rights actually invaded or threatened. *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923). "[B]ut abstract questions of political power, of sovereignty, of government" are not legally protected interests, whether the questions involve an act of Congress or state statutes. *Id.*

The district court held that the United States suffered an injury-in-fact by withdrawals from or limitations on cooperation with federal task forces, restrictions on sharing information, confusion about the validity of federal law in light of SAPA, and discrimination against federal employees and those deputized for federal law enforcement. App. 134, R. Doc. 88, at 5, Add. 5. Only the last interest potentially raises a legally protected interest, but it is based on a misreading of the Act and is legally insufficient.

The Supreme Court's opinion in *Printz* establishes that the federal government has no legally protected interest in state law enforcement officers enforcing federal law. There, Congress sought to require the "chief law enforcement officer" of a locality to perform certain duties related to background checks for gun purchasers. *Printz*, 521 U.S. at

33

903–04.  The Court held that Congress' Commerce Clause power was insufficient to commandeer local law enforcement.  *Id.* at 924 (The Commerce Clause "does not authorize Congress to regulate state governments' regulation of interstate commerce.").  Discussing the importance of federalism, the Court explained that "[t]he power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States."  *Id.* at 922.  Moreover, the Court grounded its reasoning, in part, based on the constitutional principle that it is the President's duty to "administer the laws enacted by Congress," *id.* at 922, and that it would violate the separation of powers to permit Congress to work around the President "by simply requiring state officers to execute its laws," *id.* Far from irrelevant, *Printz* shows that the Federal Government has no legally protected interest in state officers enforcing federal firearms laws.

The district court's reasoning fares no better on any restrictions in information sharing.  Neither it nor the United States cited any provision showing that the federal government has a right to such information, and the Supreme Court typically requires some statutory authority for such an injury.  *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (injury-

34

in-fact satisfied when plaintiff could not obtain information "the statute requires that AIPAC make public."); *see also Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989) (injury-in-fact when statute permits requesting information). The one case previously cited for this proposition, *Reno v. Condon* involved the constitutionality of a statute that required, permitted, and prohibited certain transfers of driver information from DMV databases in interstate commerce. 528 U.S. 141, 143–45 (2000). It is undisputed that no statute provides this right to information.[1]

The United States also claimed that failing to share information was discriminatory because it treated the federal government differently from other states. But there is no discrimination because the prohibitions in SAPA apply also to Missouri law enforcement, *see* Mo. Rev. Stat. § 1.460, and no other sovereign has jurisdiction in Missouri. SAPA governs the conduct of Missouri political subdivisions and law enforcement as to Missouri citizens, "within the borders of this state,"

---

[1] The federal government appeared to allege, at one point, that it sustained an injury by issuing subpoenas for testimony. R. Doc. 8, at 28. The United States did not claim that state law enforcement failed to obey federal subpoenas. And SAPA does not prohibit obedience to judicial orders, like subpoenas. Mo. Rev. Stat. § 1.450

Appellate Case: 23-1457    Page: 45    Date Filed: 05/11/2023 Entry ID: 5276089

and under the U.S. and Missouri constitutions. *Id.* §§ 1.420, 1.460. The only sovereigns that may act within its borders are Missouri and the United States. Thus, SAPA does not discriminate against the United States; it precludes using Missouri resources against Missouri citizens within Missouri's borders for certain infringements.

Missouri is unaware of any case holding that confusion over what law controls is a legally protected interest, and if it existed, it would be inapplicable here. The Missouri Supreme Court has alleviated any confusion about SAPA's reach: Missourians have two new private causes of action against Missouri political subdivisions and law enforcement for state employees that infringe their Second Amendment rights. *City of St. Louis v. State*, 643 S.W.3d 295, 298 (Mo. 2022). The Act does not invalidate federal law as applied to third parties; the General Assembly's legislative declaration states that certain federal acts "shall be invalid *to this state*, shall not be recognized *by this state*, shall be specifically rejected *by this state*, and shall not be enforced *by this state*." Mo. Rev. Stat. § 1.430 (emphasis added). The court cited no provision that applies to third parties against federal government. The liberty maximizing features of federalism embed two systems of laws. As a result, it is "not

36

at all uncommon for the Federal Government to permit activities that a State chooses to forbid or heavily restrict," and "a State may choose to legalize an activity that federal law prohibits." *Gamble v. United States*, 139 S. Ct. 1960, 1968 (2019). And unlike the United States, Missouri has never argued that SAPA somehow controls the federal government.

The district court's final injury-in-fact also fails because there is no discrimination against the United States. SAPA only imposes liability on Missouri's political subdivisions and law enforcement agencies—not federal officers or agencies or any individuals. The United States claims that SAPA "penalizes the lawful exercise of federal authority" because § 1.460 and § 1.470 imposes a penalty on *state* law enforcement agencies that enforce an infringement and hire a former federal official who enforced an infringement. R. Doc. 8, at 28–29. Yet it is not the exercise of federal authority that is penalized; it is the decision by a political subdivision to employ a person who "knowingly deprives a citizen of Missouri of the rights or privileges ensured by" the Second Amendment—regardless of whether the person did so while serving as a state official or federal official. Mo. Rev. Stat. § 1.460. Section 1.470 ensures that former federal officials are treated the same as state law enforcement

37

officers.[2]   And Missouri may determine the qualifications of its government officials.  *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991).

The district court's conclusion that SAPA discriminates against state law enforcement deputized by federal law enforcement also is not a legally protected interest.   The United States claimed that SAPA "unconstitutionally constrain[s] the conduct of state and local law enforcement officers who are federally deputized Task Force Officers."  R. Doc. 8, at 27.   As *Printz* explains, the federal government may not commandeer State police forces.  This is confirmed by the "deputizing" provisions cited by the United States, 49 U.S.C.§ 44922(a), 21 U.S.C. § 878, 28 U.S.C. §§ 561(f), as they all rely on consent by the State.   5 U.S.C. 3372(a)(2) ("On request from or with the concurrence of a State or local government, and with the consent of the employee concerned, the head of a Federal agency may arrange for the assignment of an employee of a State or local government to his agency"); 49 U.S.C. § 44922(c) ("To deputize a State or local law enforcement officer under this section, the Administrator of the Transportation Security Administration shall enter

---

[2] The district court incorrectly assumed that § 1.470 would affect federal law enforcement efforts, but the United States did not cite any interest it has in the *future* employment of its *former* employees.

38

into a voluntary agreement with the appropriate State or local law enforcement agency"). The United States also confirmed that it has no legally protected interest because it complained it was injured by "prohibiting state and local employees from *voluntarily* enforcing [its] laws." R. Doc. 32, at 14 (emphasis added).

The United States has also claimed that even if SAPA only applied to state and local personnel, it would still have standing as the target of SAPA and due to its "widespread effects in the State." R. Doc. 32, at 15. None of its cited precedents apply. In *GEO Grp., Inc. v. Newsom*, California's attempt to end private prisons (for ICE and other federal entities) would "deprive the United States of the option to continue its contracts with GEO and its other contractors." 15 F.4th 919, 927 (9th Cir. 2021). Thus, the law interfered with a contractual interest that was legally protected, and it interfered with the United States' relationship with third parties, not California itself. The United States claims no contractual interest here. Nor is this like *Jones v. Gale*, where the restraint on alienation of their land "negatively affected [plaintiffs'] ability to earn income, borrow, and plan for their financial future." 470 F.3d 1261, 1267 (8th Cir. 2006). SAPA does not limit the United States'

39

property interests, and the objects of regulation are state and local entities. *See Three Expo Events, L.L.C. v. City of Dallas*, 907 F.3d 333, 341 (5th Cir. 2018) ("Three Expo sued the City of Dallas for denying it the use of its Convention Center"). Despite the federal government's objections, it must show that it has a legally protected interest at stake in the litigation—and it has not done so here. The requested relief, "an injunction against H.B. 85's implementation by the State Highway Patrol (and every other state or local law enforcement agency implementing the law)," R. Doc. 32, at 18, concedes that the United States is not the regulated party. The United States has not sued the Missouri State Highway Patrol or any other state or local law enforcement agency implementing the law. This relief requests an injunction to allow state and local law enforcement agencies to voluntarily resume federal law enforcement, not for the United States and its entities to be free from SAPA.

Even if volunteered assistance could be legally protected, the Missouri Supreme Court further explained that § 1.450 removes state law enforcement officers' "authority to enforce or attempt to enforce" certain federal firearms laws. *City of St. Louis*, 643 S.W.3d at 297. So

40

SAPA revokes any consent for state and local entities and personnel to "enforce or attempt to enforce" any act violating the Second Amendment. The federal government may not prohibit Missouri from ordering its subdivisions or determining the qualifications of its government officials. *Gregory*, 501 U.S. at 463 (1991).

## II. The district court erred in granting summary judgment because it misconstrued SAPA and failed to resolve reasonable inferences in favor of the non-moving party.

The court's summary judgment decision is long on the law and short on the facts—exactly opposite of what one expects at summary judgment. The decision does show that the court ignored binding Missouri Supreme Court precedent in favor of the United States' positions and failed to address shortcomings in the material facts.[3] Despite Missouri pointing out that the United States' declarations "do not claim that state and local officials are blocking enforcement of federal law or breaking federal law," R. Doc. 40, at 46–47, the court affirmatively found that § 1.440 "effectively imposes an affirmative duty to effectuate an obstacle to

---

[3] The United States will likely note that it supplied all the declarants for the summary judgment record but that does not matter. Missouri showed how the United States failed to present facts and that the declarations contained facts that contradicted its case.

41

federal firearms enforcement within the state," App. 151, R. Doc. 88, at 22; Add. 22. The district court's conclusions are unsupported and even contradicted by the United States' declarants.

Though the district court acknowledged the case existed, it failed to apply the Missouri Supreme Court's binding interpretation of SAPA. The district court does not say why it failed to address the opinion it received on April 27, 2022. App. 130, R. Doc. 48; Add. 1. But Missouri told the court that, under the Missouri Supreme Court's decision, SAPA's "first four sections" were "legislative findings and declarations" and the rest were "substantive provisions to enforce these legislative declarations." *Id.* The opinion made clear that SAPA only applied to state and local officials. *City of St. Louis v. State*, 643 S.W.3d 295, 297 (Mo. 2022) (noting provisions apply to Missouri or state entities). Yet, the district court improperly construed the statute as "regulat[ing] the United States directly." App. 151, R. Doc. 88, at 22; Add. 22. The federal government has properly abandoned this argument. Opp. to Motion to Stay, at 10–11 (arguing only that SAPA injures federal interests). This error infects the entire ruling and requires reversal.

42

## A. Legal Standard

This Court "review[s] a grant of summary judgment *de novo*." *Marianist Province of United States v. City of Kirkwood*, 944 F.3d 996, 1000 (8th Cir. 2019). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Whittington v. Tyson Foods, Inc.*, 21 F.4th 997, 1000 (8th Cir. 2021). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion … which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party has no evidence negating an element of the case, it must nevertheless affirmatively show the absence of evidence in the record." *Hanson v. FDIC*, 13 F.3d 1247, 1253 (8th Cir. 1994). The court must "view[] the evidence in the light most favorable to the non-moving party and resolv[e]

43

all reasonable inferences in its favor." *Segal v. Metro. Council*, 29 F.4th 399 (8th Cir. 2022).

### B. Summary judgment was improper because the undisputed facts favored Missouri.

The district court did not properly apply the summary judgment standard to the facts. Missouri pointed to the absence of facts in the evidentiary record and that the declarations supported that SAPA limits Missouri law enforcement's cooperation with federal law enforcement but does not obstruct such enforcement. R. Doc. 40, at 46–48. But the district court failed to even acknowledge these facts and took inferences *adverse* to the non-moving party.

The decision asserted few uncontroverted material facts, aside from quoting SAPA's provisions or describing what federal law requires. The court noted when the law was signed, that state and local law enforcement officers are "deputized as federal law enforcement officers and voluntarily serve" on joint task forces, and that ATF and the U.S. Marshal Service use joint task forces in Missouri. App. 142 , R. Doc. 88, at 13; Add. 13. The other undisputed material fact was that after SAPA was enacted, ATF sent an informational letter to federal firearms

44

licensees. *Id.* Unsurprisingly, these limited facts were hardly relied on by the district court.

Missouri showed that the declarations filed on the United States' behalf showed that federal officers continued enforcing federal law. Special Agent Winston explains that in 2021, "177 prosecutions were initiated (of which the vast majority involved firearms crime), defendants numbered 230, and the number of charges was 365." App. 51, R. Doc. 8-2, at ¶ 19. Local law enforcement provides assistance to ATF in emergency situations, App. 52–53, R. Doc. 8-2, at¶ 23, and some jurisdictions continue to input data into NIBIN, *id.* ¶ 25. Marshal Jordan explains that his Fugitive Task Force has not lost any members due to SAPA, App. 62, R. Doc. 8-3, at ¶ 12, and that in FY 2021 the Eastern District's Marshals had 421 federal related weapons warrants for new charges, 320 warrants related to supervised release and felon-in possession charges that were prosecuted federally, *id.* at ¶ 10. Additionally, the Task Force made 1,201 arrests for state and federal weapons offenses and "arrested 470 additional persons for homicide, assault, and robbery, which all involved firearms." *Id.* at ¶ 11. Jordan describes one incident where local police could not assist with the outer

45

perimeter of an operation, but he does not claim that it prohibited federal officers from enforcing federal law. App. 63, R. Doc. 8-3, at ¶ 13. Marshal Supervisor Stokes similarly explained that his task force continued to apprehend "30 individuals for federal firearms related charges" and seized 51 firearms in 2021. App. 67–68, R. Doc. 8-4, at ¶¶ 10–11. TSA Director Brooks similarly explained that TSA in Missouri had "183 firearm discoveries in 2021." App. 75, R. Doc. 8-5, at ¶ 10.

The summary judgment evidence debunked this notion that SAPA caused state law enforcement to obstruct federal law enforcement operations. Instead, state and local law enforcement simply "could not help any federal agency at this time." App. 63, R. Doc. 8-3, at ¶ 13; *id.* at ¶ 12 (describing passive behavior such as walking away and failing to volunteer information); App. 49–50, R. Doc. 8-2, ¶ 15 (noting state and local officers "have withdrawn from participation in ATF task forces"); *id.* ¶ 16 ("state and local law enforcement partners have limited their cross-jurisdictional cooperation"); App. 52, R. Doc. 8-2,¶ 22 (MSHP "will no longer provide any investigative support to ATF, to include assisting in providing background information on investigative targets"); App. 52, R. Doc. 8-2,¶ 24 ( state and local law enforcement "will no longer input

46

data"); App. 51, R. Doc. 8-2,¶ 31 (noting lack of referrals for prosecution); App. 70; R. Doc. 84, at ¶ 17 (noting reduced participation in fugitive operations). There is no evidence that Missouri state and local law enforcement failed to do something they promised to do. The declarations do not show that Missouri helps other states in ways that those authorities refuse to help the federal government. And of course, no declaration claims that state and local law enforcement refused to give assistance when required by federal law. *See* R. Doc. 8, at 22. These paragraphs all contradict the district court's repeated proposition that Missouri "regulate[]d federal law enforcement or otherwise interfere[d] with its operations." App. 150–52; R. Doc. 88, at 21–23; Add. 21–23.

The district court also glossed over what the declarations did not show. There were no claims that SAPA prevents federal officers from enforcing federal law. No declarant claimed that federal law enforcement was subject to SAPA or that any federal officer had been sued under SAPA. The Winston Declaration claims federal firearm licensees were "confused," but it does not report that ATF's letter failed to fix the alleged confusion or that any federal firearm licensee disobeyed federal law. App. 56–57, R. Doc. 8-2, ¶¶ 36–39. Not one claimed that state and local

47

officials are blocking enforcement of federal law or breaking federal law. Despite the United States' allegation, R. Doc. 8 at 28, that SAPA could prevent these officials from testifying and potentially violating the prohibitions on witness tampering and retaliation, no declarant supported that view. And no declarant expressed concern that federal employees would be barred from state service or that the United States has an interest in the future employment of its former employees.

TSA Director Brooks's declaration shows that, at best, federal officials feared issues that did not materialize. She stated that SAPA "poses a risk to the federal aviation system because it may discourage state and local law enforcement personnel at airports from assisting promptly in responding to TSA when firearms are discovered at the checkpoint." App. 77, R. Doc. 8-5, at ¶ 16. Despite the fact that in Missouri, one firearm is discovered for every 51,184 passengers, a "substantially higher [rate] than the nationwide average," *id.* ¶ 10, she reported no incidents where SAPA caused local law enforcement to jeopardize TSA's functions. *Id.* ¶ 16. Similarly, she did not report "[a]ny delay or hesitation in fulfilling" a critical duty, *id.* ¶ 18, or that any state and local law enforcement personnel at airports failed to provide TSA

48

with necessary information, *id.* ¶ 17.  Despite discovering 183 firearms in 2021, presumably some after SAPA was enacted, Director Brooks reported no incidents.  App. 75, R. Doc. 8-5, at ¶ 10.  The district court ignored these facts.

Though declarants made statements that SAPA caused decreases in federal law enforcement statistics, they presented no facts that any decreases were caused by SAPA rather than other factors.  *E.g.*, App. 51, R. Doc. 8-2, ¶ 19 ("The 2021 numbers represent a forty-four percent (44%), thirty-seven percent (37%), and forty-six (46%) percent drop, respectively from the 2019 numbers.  While *it is likely that other factors such as COVID-19 also played a role in the decline of prosecutions*, the SAPA was undoubtedly a factor.") (emphasis added); *see also* App. 67–68, R. Doc. 8-4, at ¶ 11 (after noting year-over-year reduction of 41 firearms seizures, "[a]lthough there are many factors involved, *including a reduction in TFOs and COVID*, H.B. 85 is the only change that caused the significant drop in the numbers.") (emphasis added).[4]  But the

---

[4] Missouri continues to object that this is inappropriate opinion testimony by a lay witness because the United States has not designated them an expert witness but attempted to have them testify based on specialized experience and knowledge.  Fed. R. Civ. P. 701(c); *see, e.g.*, App. 60,

declarations establish that other factors cannot be ruled out. Notably absent from the declarations is any acknowledgment that the Administration and enforcement priorities have changed since 2020 and 2019. *E.g., Biden DOJ Reinstates an Obama-Era Memo on Charging and Sentencing Policy*, The National Law Review (Feb. 1, 2021) (requiring individualized assessment of each matter on a case-by-case basis). Instead of consulting with law enforcement, the Administration receives advice from "activist groups like the NAACP Legal Defense and Educational Fund and the Leadership Conference on Civil and Human Rights." Chelsey Cox, *President Biden's promises on policing reform: What the administration has accomplished*, USA Today (May 4, 2021).

As noted by the Winston and Stokes declarations, COVID-19 measures and impacts should not be ignored. According to one survey from respondents in Illinois, Missouri, and Ohio, community policing lessened by over 80 percent, access to police declined, "[r]eductions in enforcement actions and in person response to calls or service were found to be 73% and 69% for all three states on average, and "arrests, traffic

---

R. Doc. 8-2, at ¶ 40 ("In sum, based upon my knowledge and law enforcement experience in working with state and local partners …").

Appellate Case: 23-1457    Page: 60    Date Filed: 05/11/2023 Entry ID: 5276089

stops and investigatory stops have declined mainly nationally." Niyazi Ekici and Dean C Alexander, *COVID-19's effect on police departments in Illinois, Missouri and Ohio, Security Magazine* (Sept. 14, 2021). State and local law enforcement also experienced staffing shortages in the past two years. Heidi Schmidt, *Decisions will have to be made KCPD Chief warns about staffing shortages*, FOX4KC (Sept. 28, 2021). The district court failed to credit the facts and reasonable inferences that favored Missouri, as the summary judgment standard requires.

When the moving party's declarations fail to show an absence of material fact and, in this case, support the non-movant's case, it is reversible error for the district court to grant summary judgment.

## C. The district court applied a wrong and conflicting interpretation of SAPA that must be overruled.

The district court's grant of summary judgment adopted the United States' erroneous interpretation of SAPA. The United States' urged the district court that SAPA "expressly attempts to directly regulate the Federal Government and constrain its operations," R. Doc. 8, at 12, and "rests on the unconstitutional premise that Missouri can declare federal firearm laws invalid and directly regulate federal authority," *id.* at 22. This is incorrect as a matter of law. SAPA acts only on Missouri

51

governmental entities. *City of St. Louis*, 643 S.W.3d at 297 (explaining legislative declarations "concern[] the relationship between the federal government and its federal acts, laws, executive orders, administrative orders, rules, and regulations … and the state as they impact Missouri's law-abiding citizens' right to keep and bear arms.").

It is well-settled "[t]hat the construction of the statutes of a State by its highest courts, is to be regarded as determining their meaning and generally as binding upon United States courts, cannot be questioned." *Supervisors v. United States*, 85 U.S. 71, 81–82 (1873); *United States v. Adler*, 590 F.3d 581, 584 (8th Cir. 2009) ("[S]ate courts are the ultimate expositors of state law."). The Missouri Supreme Court made two findings about SAPA that must be followed by federal courts. *First*, the first four provisions are "legislative findings and declarations" and the other provisions give substance to those findings. *City of St. Louis*, 643 S.W.3d at 297. *Second*, the decision explained that the substantive provisions only operate on "Missouri entities, persons, public officers, state employees, and political subdivisions." *Id.* This includes the two private causes of action that "impose civil liability on state political subdivisions and law enforcement agencies" in §§ 1.460 and 1.470. *Id.* at

52

297–98.  The Missouri Supreme Court's repeated statements that the Act applies to Missouri entities foreclose that its provisions apply to any other entities.  *Id.*

The Missouri Supreme Court's interpretation is important for three reasons.  The court agreed with the State's reading that SAPA only addresses and imposes obligations on state and local law enforcement, as urged in federal and state courts.  This superior reading of the statute's plain text[5] confirms that the General Assembly did not intend to regulate federal actors—SAPA only mentions current federal officials once in its substantive provisions.  Mo. Rev. Stat. § 1.450, (SAPA shall not "be construed to prohibit Missouri officials from accepting aid from federal officials in an effort to enforce Missouri laws.").  This reading also confirms that Missouri is not "nullifying" federal law because no substantive provision prevents federal authorities from enforcing federal law.  Finally, the reading shows that the first four sections expounding on the constitutionality of federal firearms statutes and regulations have no independent, operative force—these policy statements reflect the

---

[5] Additionally, the reading comports with this Court's duty to adopt interpretations that avoid "grave and doubtful constitutional questions." *United States v. Adler*, 590 F.3d 581, 583 (8th Cir. 2009).

53

General Assembly's conclusions as to what the Second Amendment permits and prohibits.

The *City of St. Louis* decision confirms that the district court erred in reading the statute on all three counts. The district court's holding that § 1.430 regulates federal law enforcement is incorrect as that section explains that the State will not enforce certain federal gun laws. 643 S.W.3d at 297. This is consistent with *Printz*'s holding that state law enforcement cannot be compelled to enforce federal firearms laws. Section 1.440 similarly does not obstruct federal firearms regulations, that section puts forth Missouri's policy to protect Second Amendment rights. *Id.*

The district court wrongly concluded that §§ 1.450–1.470 regulate the United States and violate intergovernmental immunity. Section 1.450 only applies to "Missouri entities, persons, public officers, state employees, and political subdivisions." *Id.* And the private causes of action only apply to "state political subdivisions and law enforcement agencies." *Id.* at 297–98. That means there is no discrimination against the federal government or liability for federal law enforcement. The court's final conclusion that this is discriminatory because liability arises

54

from federal firearms enforcement, App. 151–52, R. Doc. 88, at 22–23, Add. 22–23, similarly fails because the liability is identical for current state officials "acting under the color of any state or federal law," Mo. Rev. Stat. § 1.460.1. Liability does not arise due to the source of the authority but whether the conduct constitutes an infringement under Missouri law.

The United States will likely argue that the Missouri Supreme Court's interpretation is non-binding dicta because the interpretation is found in the "facts" section of the opinion. This claim should be rejected. The Missouri Supreme Court's interpretation of how the statute worked and what provisions afford a right to sue are necessary to the decision. The State argued that the private causes of action in § 1.460 and § 1.470 necessarily gave political subdivisions, like St. Louis, an adequate remedy to contest the constitutionality of the statute in a future private suit. *City of St. Louis,* 643 S.W.3d at 301. The Court could only determine that certain pending suits were unlikely to provide an adequate remedy to adjudicate plaintiffs' constitutional claims by determining the operative provisions and remedies under SAPA. *Id.* at 302. It would be highly imprudent to declare that the Missouri Supreme Court's section-by-section exposition was "dicta," especially when the

55

opinion offers the better reading of the statute. *See Adler*, 590 F.3d at 584 ("Even if *dicta*, the Nebraska Supreme Court's categorical statement nonetheless supports our reading.").

The district court misconstrued SAPA and conflicted with the better reading of the statute and the Missouri Supreme Court's interpretation. The court erred as a matter of law and the grant of summary judgment should be reversed.

### D. Even setting aside the *City of St. Louis* decision, the United States' arguments on the merits fail.

Apart from the intergovernmental immunity argument (addressed above), the United States has pressed this case under two other substantive theories: nullification and preemption. Neither are viable.

Contrary to the United States' allegations, SAPA reaffirms the General Assembly's duty "to support and defend the Constitution of the United States." Mo. Rev. Stat. § 1.410.2(1). It takes a more narrow view of Congress's powers and makes the unobjectionable statement that "[i]f the federal government assumes powers that *the people* did not grant it in the Constitution of the United States, its acts are unauthoritative, void, and of no force." *Id.* § 1.410.2(4) (emphasis added); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534–33 (2012) ("the Federal

56

Government 'can exercise only the powers granted to it.'") (opinion of Roberts, C.J.) (quoting *McCulloch v. Maryland*, 4 Wheat 316, 405 (1819)). SAPA's reliance on "the people of the several states," Mo. Rev. Stat. §§ 1.410.2 (2), (3), (6), (7), (9), echoes the Constitution's republican values that the House of Representatives be chosen by "the People of the several States." U.S. CONST. ART. I, § 2, CL.1. SAPA's focus on "the people" as the fount of political power expressly reinforces that "our fundamental instrument of government derives its authority from 'We the People.'" *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 820 (2015). This is a far cry from the nullification theory whereby the federal government is the agent of the states, who could "'interpose' their authority by nullifying the federal statute or action." R. Doc. 8-6, *Encyclopedia of the American Constitution*, 1832-33 (2d ed. 2000).

Prominent nullification cases bear out that nullification occurs when a State attempts to nullify federal law that applies to third parties. *E.g.*, *Cooper v. Aaron*, 358 U.S. 1, 8 (1958) (attempting to use state law to deny black students Equal Protection rights to desegregated education); *United States v. Reynolds*, 235 U.S. 133, 150 (1914) (Alabama law that

57

forced convicts into involuntary labor violated federal peonage statute); *United States v. Peters*, 5 Cranch 115 (1809) (Pennsylvania law attempting to overturn federal court's maritime prize award). SAPA neither creates rights against federal law nor subtracts federal rights from third parties—it gives its citizens a statutory mechanism to enforce federal rights.

Nor does federal law preempt SAPA, under conflict, field, or even p obstacle preemption. SAPA does not conflict "with a broad swath of federal firearm laws concerning registration, licensing, and tracking" and who may possess a firearm. *See* R. Doc. 8, at 23. All those laws apply to persons, but Missouri only prevents state enforcement of those laws against Missourians. Mo. Rev. Stat. § 1.430. SAPA does not purport to give anyone rights against the federal government, end federal licensing requirements, *see Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 978 (9th Cir. 2013), or attempt to prosecute federal law enforcement, *see United States v. Cox*, 906 F.3d 1170, 1189 (10th Cir. 2018) (citing Kan. Stat. § 50-1207). No conflict exists with §§ 1.410–430. SAPA requires Missouri entities to follow Missouri law and the Second Amendment.

58

Moreover, the United States agrees that SAPA's restraint on Missouri law enforcement is constitutional under *Printz*. It claims that § 1.440 and § 1.450 go further by requiring protection of those rights and applying to "any" law enforcement including federal officials. As explained above, SAPA only applies to Missouri entities, and it revokes any state authority to enforce certain federal firearms laws. The statute simply does two things: declare the legislature's interpretation of the Constitution and provide a state cause of action to enforce Missourians right to bear arms against Missouri political subdivisions and law enforcement agencies. Neither erases federal law or prevents the United States from enforcing federal law. *Printz* makes clear that Congress's Commerce Clause power is insufficient to require state law enforcement officers to enforce certain federal firearms laws. And the legislature declaring its interpretation of the Constitution no more "nullifies" federal law than would an identical declaration by a University of Missouri law professor.

Indeed, in their response to Missouri's stay motion, the United States made clear that it simply dislikes the *reason* Missouri has exercised its authority under *Printz*. The United States thinks the

59

constitutional opinion of the General Assembly creates "confusion." Stay Opp. at 9, 17. But disagreement about legal opinions does not turn a statute expressing that opinion into an unlawful text.

## III. The district court failed to sever allegedly unconstitutional provisions or applications as SAPA's severability clause instructs.

Even if this Court disagrees with the Missouri Supreme Court's interpretation of SAPA and Missouri's arguments, the district court failed to limit its holding and injunction to SAPA's applications to federal officers and deputized state officers. It held that the General Assembly would not have enacted any other provision of SAPA if § 1.420 was severed and that without § 1.460 and § 1.470 SAPA "has no practical or legal effect." App. 149; R. Doc. 88, at 20, Add. 20. Although the decision focused entirely on how SAPA affects federal entities, including federal firearms licensees, it held that SAPA was unconstitutional as to all persons, including state governmental entities. This is contrary to the United States' concession that SAPA is valid to limit Missouri's enforcement of federal law. App. 151, R. Doc. 8, at 22, Add. 22. The plain text of SAPA's severability clause that would give effect to this application, and the plain text is the best indicator of legislative intent.

60

*Gross v. Parson*, 624 S.W.3d 877, 884 (Mo. 2021). Legislative intent is the guiding principle in severability. *Dodson v. Ferrara*, 491 S.W.3d 542, 558 (Mo. banc 2016).

Whether an invalid provision is severable from statute is a question of state law that the Court reviews de novo. *Dakota, Minnesota & E. R.R. Corp. v. South Dakota*, 362 F.3d 512, 515 (8th Cir. 2004). Missouri has a strong presumption in favor of severability. Mo. Rev. Stat. § 1.140. SAPA has an even stronger severability provision: if any provision or *application to any person* is held invalid, it "shall not affect the provisions or applications of sections 1.410 to 1.485 that may be given effect without the invalid provision or application." Mo. Rev. Stat. § 1.485. Missouri courts give effect to such clauses. "Upon a finding of invalidity as to one provision of a statute, courts are to presume that the legislature intended to give effect to the other parts of the statute that are not invalidated." *Dodson*, 491 S.W.3d at 558 (citing *Akin v. Dir. of Revenue*, 934 S.W.2d 295, 300–301 (Mo. banc 1996)).

The district court's flawed severability analysis is readily apparent when it determined that sections 1.460 and 1.470 violate intergovernmental immunity and, therefore, the whole statute must fall.

61

App. 151–52;;R. Doc. 88, at 22–23; Add. 22–23.  It specifically held that "exposure to monetary penalties set forth in § 1.460 and 1.470 arise from federally deputized state law enforcement officials' enforcement of federal firearm regulations." *Id.*  But the court fails to address that these provisions have a larger constitutional application:  non-deputized state law enforcement officers.  The court does not argue that the statute is unconstitutional as to those state law enforcement officers.  And it is difficult to imagine that the General Assembly intended for SAPA to apply only to a few federally deputized officers serving on joint task forces.  Similarly, section 1.460 also provides liability for a section 1.420 infringement and for "otherwise knowingly depriv[ing] a citizen of Missouri of the rights or privileges ensured by" the Second Amendment.  Under Missouri's severability analysis, this provision must stand.

This same oversight infects the severability analysis of § 1.420.  The decision wrongly claims that section is preempted in its entirety and thus not severable.  But it fails to credit what the United States concedes is constitutional—the extent § 1.420 to which SAPA toes the line in *Printz* and limits Missouri law enforcement resources from enforcing federal law.  App. 151, R. Doc. 88, at 22; Add. 22.

Appellate Case: 23-1457     Page: 72     Date Filed: 05/11/2023 Entry ID: 5276089

Indeed, the district court's severability analysis on section 1.420 further exposes the district court's principal error: that it improperly enjoined the law itself, not named defendants charged with enforcing the laws. The district court's decision focuses almost entirely on section 1.420, but this provision is a definitional, declaratory provision only. It is enforced by nobody. The district court implicitly recognized this, describing sections 1.420 through 1.440 as definitional at least nine times. App. 144–49, ,R. Doc. 88, at 15–20, 22; Add. 15–20, 22. Yet the court enjoined these declaratory provisions anyway. Then, having enjoined the declaratory, definitional section 1.420, the district court concluded that "SAPA's other provisions are rendered meaningless without this definition" because other provisions are "essentially and inseparably connected with and dependent upon § 1.420." App. 149, R. Doc. 88, at 20; Add. 20 (quotation marks and ellipsis omitted).

That proves too much. Enjoining a definitional provision will always cause severability problems because definitional provisions are always "inseparably connected" with the rest of a statute. That is exactly why courts must adhere to the Supreme Court's recent, firm holding that federal courts have equitable jurisdiction only to "enjoin named

63

defendants from taking specified unlawful actions"; courts have no authority to "enjoin challenged laws themselves." *Whole Woman's Health*, 142 S. Ct. 522, at 535. Enjoining challenged laws themselves—as the district court did here—only makes a mess of severability analysis.

The statute's provisions are severable. The Court should follow the General Assembly's intent and strike only those provisions or applications of the statute—if any—that the Court determines to be invalid.

## CONCLUSION

The Court should reverse the district court's judgment, vacate the injunction, and order the district court to dismiss the case and any other relief the Court believes is just.

64

Respectfully submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeff P. Johnson*
Joshua M. Divine, MO 69875
*Solicitor General*
Jeff P. Johnson, MO 73249
*Deputy Solicitor General*
Joshua M. Divine, MO 69875
*Solicitor General*
P.O. Box 899
Jefferson City, Missouri 65102
Phone: (314) 340-7366
Fax: (573) 751-0774
jeff.johnson@ago.mo.gov

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that Appellants' Brief complies with the typeface and formatting requirements of Fed. R. App. P. 28 and 32, in that it is written in Century Schoolbook 14-point font, and that it contains 12,493 words as determined by the word-count feature of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that the brief has been scanned for viruses and is virus-free. All required privacy redactions have been made. The hard copies submitted to the clerk are exact copies of the CM/ECF submission.

*/s/ Jeff P. Johnson*
Jeff P. Johnson

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was electronically filed on May 11, 2023, with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system; that all participants are registered CM/ECF users; and that service will be accomplished by the CM/ECF system.

*/s/ Jeff P. Johnson*
Jeff P. Johnson

66