# In the
# United States Court of Appeals
## for the Eighth Circuit

United States Of America,

*Plaintiff-Appellee,*

v.

State of Missouri; Michael L. Parson, Governor of the State of Missouri,
in his official capacity; Andrew Bailey, Attorney General of the State of Missouri,
in his official capacity,

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Western District of Missouri – Jefferson City, No. 2:22-cv-04022-BCW.
The Honorable **Brian C. Wimes**, Judge Presiding.

## *AMICI CURIAE* BRIEF OF MISSOURI FIREARMS COALITION, AMERICAN FIREARMS ASSOCIATION, IOWA GUN OWNERS, OHIO GUN OWNERS, MINNESOTA GUN RIGHTS, GEORGIA GUN OWNERS, and WYOMING GUN OWNERS IN SUPPORT OF APPELLANTS AND REVERSAL

STEPHEN KLEIN
BARR & KLEIN PLLC
1629 K Street NW, Suite 300
Washington, D.C. 20006
steve@barrklein.com
(202) 804-6676 Telephone

*Counsel for Amici Curiae*



## Corporate Disclosure Statement

The Missouri Firearms Coalition, American Firearms Association, Iowa Gun Owners, Ohio Gun Owners, Minnesota Gun Rights, Georgia Gun Owners, and Wyoming Gun Owners have no parent corporation and no publicly held corporation owns 10% or more of their stock, respectively.

i

# Table of Contents

Corporate Disclosure Statement ................................................................. i

Table of Contents ................................................................................ ii

Table of Authorities ........................................................................... iii

Statement of Interest of *Amici Curiae* and Consent to File ......................................1

Summary of Argument ...........................................................................2

Argument..........................................................................................3

    I.    The Second Amendment Preservation Act Reflects Federalism and State Sovereignty Under the Tenth Amendment and Does Not Violate the Supremacy Clause ................................................................................3

    II.    The Second Amendment Preservation Act Is Not Preempted By Federal Law..................................................................................11

    III.    The Second Amendment Preservation Act Does Not Violate Intergovernmental Immunity ................................................................17

    IV.    Compliance With The Second Amendment Preservation Act is as Simple as Focusing on Crime Itself ...........................................................19

Conclusion .....................................................................................22

Certificate of Compliance .......................................................................24

Certificate of Service .........................................................................25

Appellate Case: 23-1457    Page: 3    Date Filed: 05/17/2023 Entry ID: 5278012

# Table of Authorities

## Cases

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................5, 6

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................................20

*M'Culloch v. Maryland*, 17 U.S. 316 (1819)..............................................................4

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................................5

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) ......................5

*Powhatan Steamboat Co. v. Appomattox R.R.*, 65 U.S. (24 How.) 247 (1860) ......15

*Printz v. U.S.*, 521 U.S. 898 (1997) ....................................................................9, 10

*Skilling v. U.S.*, 561 U.S. 358 (2010)......................................................................20

*South Dakota v. Dole*, 483 U.S. 203 (1987) .............................................................8

*U.S. v. Barrett*, 552 F.3d 724 (8th Cir. 2009) ........................................................22

*U.S. v. California*, 314 F.Supp.3d 1077 (E.D. Cal. 2018) ......................................17

*U.S. v. California*, 921 F.3d 865 (9th Cir. 2019) ........................................ 17, 18, 19

*U.S. v. Gilliam*, No. 19-00266-01-CR-W-RK, 2022 WL 567838 (W.D. Mo. Feb. 24, 2022) ...............................................................................................................15

*U.S. v. Gilliam*, No. 19-00266-01-CR-W-RK, 2022 WL 571540 (W.D. Mo. Feb. 3, 2022) ......................................................................................................... 15, 22

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) .20

*Washington v. U.S.*, 460 U.S. 536 (1983) ..............................................................18

## Statutes

18 U.S.C. § 922(g)(9).................................................................................................6

Appellate Case: 23-1457     Page: 4     Date Filed: 05/17/2023 Entry ID: 5278012

18 U.S.C. § 922(t) ....................................................................................10

18 U.S.C. § 924(a)(2) ..................................................................................6

42 U.S.C. § 2021e(d)(2) (1992) ...................................................................8

IRC § 501(c)(4) ........................................................................................1, 2

Mo. Rev. Stat. § 1.410 ...........................................................................7, 12

Mo. Rev. Stat. § 1.420 ..........................................................................13, 17

Mo. Rev. Stat. § 1.430 ................................................................................13

Mo. Rev. Stat. § 1.440 .............................................................................6, 14

Mo. Rev. Stat. § 1.450 ..........................................................................14, 17

Mo. Rev. Stat. § 1.460 ....................................................................14, 15, 17

Mo. Rev. Stat. § 1.470 ..............................................................14, 15, 17, 18

Mo. Rev. Stat. § 1.480 .............................................................................6, 20

Mo. Rev. Stat. § 571.010 .............................................................................20

## Other Authorities

2 J. Elliot, Debates on the Federal Constitution (2d ed. 1863) .................8

Kelsey Ables, *Washington state bans sales of assault weapons, including AR-15s*, Wash. Post, Apr. 25, 2023 ...................................................................5

*Missouri's Governor Pardons The St. Louis Lawyers Who Waved Guns At BLM Protesters*, Nat'l Pub. Radio, Aug. 3, 2021 ...........................................4

*President Biden on 2nd Amendment and Zero Tolerance Policy for Gun Dealers*, YouTube, June 23, 2021 ....................................................................6

The Declaration of Independence (U.S. 1776) ...........................................7

The Federalist No. 45 (James Madison) .....................................................7

iv

William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977) ...................................................................11

**Rules**

Fed. R. App. P. 29 ..........................................................................................1, 2

**Regulations**

Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6478 .............................................................................................................5, 22

**Constitutional Provisions**

Mo. Const. art. I, § 23 .........................................................................................1

U.S. Const. amend. II...................................................... 1, 3, 4, 5, 6, 7, 17, 19

U.S. Const. art. I, §§ 1-3 ....................................................................................7

U.S. Const. art. IV, § 2 .....................................................................................10

U.S. Const. art. VI, ¶ 2 .......................................................................... 1, 3, 11

## Statement of Interest of *Amici Curiae* and Consent to File[1]

The Missouri Firearms Coalition is Missouri's most effective gun rights organization. It is a nonprofit that is organized under section 501(c)(4) of the Internal Revenue Code. The Coalition has successfully supported the protections of the Second Amendment to the U.S. Constitution and Article I, Section 23 of the Constitution of Missouri through grassroots advocacy and engagement with Missouri policymakers. The Coalition was instrumental in supporting the passage and signing of the statute challenged in this case, the Second Amendment Preservation Act, House Bill Nos. 85 and 310 (2021), codified in Sections 1.410 to 1.485, Missouri Statutes (collectively, "SAPA").

By baselessly alleging that SAPA violates the Supremacy Clause of the U.S. Constitution, the United States threatens not only Missourians' right to bear arms but also the fundamental principles of federalism and state sovereignty. The Missouri Firearms Coalition offers this brief in defense of one of its most important achievements and to bolster its future efforts to protect the right to bear arms in Missouri.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that (1) no party's counsel authored the brief in whole or in part, (2) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and (3) no person other than *amici* contributed money that was intended to fund preparing or submitting this brief.

1

The American Firearms Association is a nonprofit organized under section 501(c)(4) of the Internal Revenue Code and supports the enactment of SAPA in states nationwide. Iowa Gun Owners, Ohio Gun Owners, Minnesota Gun Rights, Georgia Gun Owners, and Wyoming Gun Owners are all nonprofits organized under section 501(c)(4) of the Internal Revenue Code and support SAPA laws in their respective states. These organizations join the Missouri Firearms Coalition in its defense of state sovereignty and gun rights.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amici* certify that all parties have consented to the filing of this *amici* brief.

## Summary of Argument

The Court should reverse all three Supremacy Clause rulings made by the court below. SAPA is squarely in keeping with the Tenth Amendment because it strictly prohibits agents of the Missouri government from participating in the enforcement of certain federal firearms laws. Similarly, because SAPA does not contradict federal law, does not regulate federal agents in any way or provide a private right of action against federal actors, it is not preempted by federal law. Finally, because SAPA only regulates state political subdivisions and law enforcement agencies that employ any individual who has previously violated SAPA, it does not violate intergovernmental immunity. SAPA is nothing more than

an affirmation that in Missouri the Second Amendment is not a problem to be solved, and that state law enforcement must instead focus on crime.

## Argument

Plaintiff-Appellee United States—the federal government—challenged SAPA by asserting three different counts arising from the Supremacy Clause of the United States Constitution. U.S. CONST. art. VI, ¶ 2; Joint Appendix ("App.") 41-42, R. Doc. 1, at 25-26. In doing so, the federal government presented incorrect readings of SAPA and incorrect applications of the Supremacy Clause. The court below accepted these arguments, and its opinion threatens federalism—which explicitly reserves power to the Defendant-Appellant State of Missouri and other states that might enact a Second Amendment Preservation Act—and the protection of individual rights. App. 142-53, R. Doc. 88, at 13-24. This Court should reverse the opinion of the court below in its entirety.

## I. The Second Amendment Preservation Act Reflects Federalism and State Sovereignty Under the Tenth Amendment and Does Not Violate the Supremacy Clause

All of the federal government's counts arise from the Supremacy Clause, and as a whole suggest that it believes that federal law (and, by extension, the federal government itself) is simply supreme. The first count alleges that SAPA violates the Supremacy Clause generally or constitutes "attempted nullification" with "operative provisions [that] are inseparable and intertwined" with said attempt. App. 41, R.

3

Doc.1, at 25. It closes with the claim that "a state cannot 'control the operations of the constitutional laws enacted by [C]ongress[.]'" *Id.* (quoting *M'Culloch v. Maryland*, 17 U.S. 316, 322 (1819)). The court below agreed. App. 143-49, R. Doc. 88, at 14-20. But SAPA only reflects an important corollary: that the *federal* government may not commandeer the operations of *state* government. This Court should reverse on these grounds.

The aim of SAPA is to preserve the Second Amendment, which is contained in the same constitution as the Supremacy Clause. *See* U.S. CONST. amend II. This lawsuit notwithstanding, it is an understatement to say that gun rights are in a precarious situation in America, in spite of the nation's rich history of law-abiding citizens keeping and bearing arms for sport, self-defense, and national defense. Missouri is no exception, with polarized perspectives between government officials as to whether the Second Amendment solves problems or is itself a problem to be solved. *See Missouri's Governor Pardons The St. Louis Lawyers Who Waved Guns At BLM Protesters*, NAT'L PUB. RADIO, Aug. 3, 2021, https://www.npr.org/2021/08/03/1024446351/missouris-governor-pardons-the-st-louis-lawyers-who-waved-guns-at-blm-protesters [https://perma.cc/R8BQ-8CKY]. SAPA definitively establishes that in Missouri, gun rights are paramount and shall not be infringed or circumvented, and the law is constitutional in all respects to the U.S. and Missouri Constitutions.

Appellate Case: 23-1457     Page: 10     Date Filed: 05/17/2023 Entry ID: 5278012

The U.S. Supreme Court only recognized that the Second Amendment is an individual right in 2008. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Two years later, the Court ruled that the amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 767–87 (2010). Only last summer, in a strong rebuke to various paradigms utilized by courts of appeal that effectively left the Second Amendment a second-class right (if that) in the wake of *Heller* and *McDonald*, the Supreme Court clarified that a firearm regulation is only constitutional when "the government . . . affirmatively prove[s] that [it] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2127 (2022). But this is a boundary that branches of certain governments—including, today, the federal government—are determined to push as far as possible toward regulation and confiscation. *See, e.g.*, Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6478, *available at* https://www.govinfo.gov/content/pkg/FR-2023-01-31/pdf/2023-01001.pdf [https://perma.cc/H36J-6ZRE] (Final rule, Jan. 31, 2023); Kelsey Ables, *Washington state bans sales of assault weapons, including AR-15s*, WASH. POST, Apr. 25, 2023, https://www.washingtonpost.com/nation/2023/04/25/washington-state-assault-weapons-ban-guns/ [https://perma.cc/R6LZ-F9PF]. States like Missouri need not be mere bystanders as this occurs.

5

In 2021, President Biden announced a "zero tolerance" policy against gun dealers who "willfully sell a gun to someone who's prohibited from possessing it" while dismissing one of the foundational concerns underlying the Amendment— resisting tyranny. *President Biden on 2nd Amendment and Zero Tolerance Policy for Gun Dealers*, YOUTUBE, June 23, 2021, https://youtu.be/mMUQU4m9Z5U. Such is precisely the purpose of the right to bear arms, and a reason the Second Amendment was added to the Bill of Rights. "[T]he threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution." *Heller*, 554 U.S. at 599. Although the President's words may seem innocuous and are, to an extent, reflective of Missouri gun laws, federal law is much more restrictive than Missouri law in many respects. For example, federal law goes so far as to prohibit anyone "who has been convicted in any court of a *misdemeanor* crime of domestic violence" from ever possessing a firearm again, under penalty of felony. 18 U.S.C. § 922(g)(9) (emphasis added); 18 U.S.C. § 924(a)(2); *see* App. 26-28, R. Doc. 1, at 10-12. On this basis alone, federal and Missouri law distinguish between thousands—perhaps tens of thousands—of Missourians who may keep and bear arms. States thus have an important role in making gun rights a reality. *See* Mo. Rev. Stat. §§ 1.440, 1.480.1.

Federalism is also a founding principle; it reflects the American experience that powerful governance from afar tends to be unrepresentative and overzealous. *See generally* THE DECLARATION OF INDEPENDENCE (U.S. 1776). While it provides Missourians with representation in Washington, D.C. to help craft laws that govern the entire United States, the U.S. Constitution was drafted to largely let Missourians govern Missouri. U.S. CONST. art. I, §§ 1-3; *see* THE FEDERALIST No. 45 (James Madison) ("The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite."); *see also* Mo. Rev. Stat. § 1.410.2(2). Like the Second Amendment, the value of federalism is in many ways affirmed by the efforts of certain governments to undermine it. *See* App. 17-19, 26-28, 30, 33-34, 38, R. Doc. 1, at 1-3, 10-12, 14, 17-18, 22 (Complaint ¶¶1, 3, 9, 37, 38a, 38b, 38d, 43, 54, 57, 72a) (reflecting this lawsuit is based on what the federal government says SAPA "purports to" do); App. 142-144, R. Doc. 88 at 13-15. Although court challenges based on the Second Amendment remain unfortunately unpredictable at present, federalism and state sovereignty are, as here, cut-and-dry against commandeering.

The federal government may not commandeer the Missouri legislature. This was affirmed by the U.S. Supreme Court in a challenge to the Low-Level Radioactive Waste Policy Act, a response by the U.S. Congress to a serious issue: a

7

dearth of disposal sites for such waste across the country. *New York v. U.S.*, 505 U.S. 144, 150–52 (1992). The law contained provisions that, among other things, required state governments to choose between taking title (that is, liability) for waste or adopting federal guidelines for its disposal. *Id.* at 153–54 (quoting 42 U.S.C. § 2021e(d)(2) (1992)). These provisions were challenged by New York State and some of its local governments—which had established an intrastate approach to disposing of low-level waste—as a violation of the Tenth Amendment. *New York*, 505 U.S. at 154.

When analyzing this federal statute, the Court noted two important principles. First, that the drafters of the Constitution purposefully created a Congress with the power to enact laws that "'at once operate upon the people, and not upon the states[.]'" *Id.* at 166 (quoting 2 J. ELLIOT, DEBATES ON THE FEDERAL CONSTITUTION 197 (2d ed. 1863)). Second, that a distinction exists between lawful incentives and unconstitutional commandeering. *New York*, 505 U.S. at 167 (quoting *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)).

The *New York* Court ultimately found two out of three provisions of the challenged law were constitutional, but ruled that requiring a state to "either accept[] ownership of waste or regulat[e] according to the instructions of Congress" was commandeering and violated the Tenth Amendment. *New York*, 505 U.S. at 175–77.

> Unlike the first two sets of incentives, the take title incentive does not represent the conditional exercise of any congressional power

8

enumerated in the Constitution. In this provision, Congress has not held out the threat of exercising its spending power or its commerce power; it has instead held out the threat, should the States not regulate according to one federal instruction, of simply forcing the States to submit to another federal instruction. *A choice between two unconstitutionally coercive regulatory techniques is no choice at all*.

*Id.* at 176 (emphasis added). The Court found the federal government's contrary interpretations of the powers at issue unavailing, forcefully concluding that even a national problem such as radioactive waste does not permit federal law to "compel the States to enact or administer a federal regulatory program." *Id.* at. 188. Here, even if this Court accepts the federal government's claim about gun violence, a national interest in regulation does not change federalism or permit the federal government (or state agents that would like to cooperate with it) to dictate Missouri state law. *See* App. 31-32, R. Doc. 1, at 15-16.

The federal government may not commandeer Missouri executives, either. One of the strongest recognitions of federalism by the U.S. Supreme Court against such commandeering arose from a challenge by two county sheriffs in, appropriately enough, a case involving gun rights. *Printz v. U.S.*, 521 U.S. 898, 902–04 (1997). Rather than demanding the power to cooperate with the federal government, those sheriffs refused to comply with the federal Brady Act, which required them to participate in background checks for firearm purchases. *Id*. After extensively examining two centuries of federal legislation, the structure of the U.S. Constitution,

9

and jurisprudence, the Court found the Brady Act's background check provisions that "conscript[ed] the State's officers directly" were unconstitutional. *Id.* at 904–35. Dual sovereignty—under the U.S. Constitution—"contemplates that a State's government will represent and remain accountable to *its own citizens*" in inevitable conflicts with the federal government. *Id.* at 920 (emphasis added). This is impossible if the federal government may direct state law enforcement.

The import of *New York* and *Printz* could not be clearer: states do not have to devote any resources whatsoever to enforcing federal mandates that are not specifically required by the U.S. Constitution. *See, e.g.*, *Printz*, 521 U.S. at 908 (noting a federal statute implementing the Extradition Clause of the U.S. Constitution, art. IV, § 2). Thus, state-level officials may decline to participate in or enforce federal regulations that do not stem directly from the U.S. Constitution, such as background checks for firearm purchases. *Cf.* App. 24, R. Doc. 1, at 8 (noting the requirements of firearms dealers—private citizens—to conduct background checks under 18 U.S.C. § 922(t)). The courts' anti-commandeering principle, however, is not merely a matter of discretion for state law enforcement. In fact, state law may generally prohibit law enforcement from participating in the enforcement of federal law, unless the state's constitution commands otherwise.

Federalism is a powerful bulwark for the freedom of the states and their people, respectively. The federal government is undoubtedly "more powerful and

10

more pervasive than any in our ancestors' time." William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 HARV. L. REV. 489, 495 (1977). And "[t]he actual scope of the Federal Government's authority with respect to the States has changed over the years ... *but the constitutional structure underlying and limiting that authority has not*." *New York*, 505 U.S. at 159 (emphasis added). Federal law applies to Missourians, and still applies to Missourians following the passage of SAPA. But the fact is that the federal government cannot effectively regulate everyday life without state-level collaborators, making anti-commandeering a most powerful principle. *See, e.g.*, App. 31, R. Doc. 1 at 15. Thus, if it so desires, the legislature of a state may generally enact laws that prohibit collaboration by state and local officials with federal authorities unless there is a specific power in the U.S. Constitution that requires cooperation or a provision in the Missouri Constitution that prohibits curtailing it. The federal government's claims that SAPA generally violates the Supremacy Clause or in any way nullifies federal law are without merit, requiring reversal of the court below. App. 143-45, R. Doc. 88, at 14-16.

## II. The Second Amendment Preservation Act Is Not Preempted By Federal Law

The federal government's second count alleges that SAPA is preempted, or is "contrary to federal firearm laws[.]" App. 41-42, R. Doc. 1, at 25-26. This is, at best, a misreading of SAPA. It is more likely a rhetorical sleight of hand that the federal

11

government hopes can bypass the Tenth Amendment and affect unprecedented control over state and local government in Missouri and beyond. *See supra* part I; *see also* Mo. Rev. Stat. § 1.410.2(3). But SAPA does not contradict federal law in any meaningful respect or impede the execution of federal law and is thus not subject to a federal preemption challenge. The court below accepted the federal government's arguments and determined that the Missouri Legislature's reasoning behind SAPA is equivalent to the law's operation. App. 145-48, R. Doc. 88, at 16-19. This Court should reverse.

To make its preemption claim, the federal government alleges that declarations of the Missouri Legislature in SAPA are "nullification provisions[.]" App. 28-29, R. Doc. 1, at 12-13. The declarations are as follows:

> The following federal acts, laws, executive orders, administrative orders, rules, and regulations *shall be considered* infringements on the people's right to keep and bear arms, as guaranteed by Amendment II of the Constitution of the United States and Article I, Section 23 of the Constitution of Missouri, *within the borders of this state* including, but not limited to:
>
> (1) Any tax, levy, fee, or stamp imposed on firearms, firearm accessories, or ammunition not common to all other goods and services and that might reasonably be expected to create a chilling effect on the purchase or ownership of those items by law-abiding citizens;
>
> (2) Any registration or tracking of firearms, firearm accessories, or ammunition;

12

(3) Any registration or tracking of the ownership of firearms, firearm accessories, or ammunition;

(4) Any act forbidding the possession, ownership, use, or transfer of a firearm, firearm accessory, or ammunition by law-abiding citizens; and

(5) Any act ordering the confiscation of firearms, firearm accessories, or ammunition from law-abiding citizens.

Mo. Rev. Stat. § 1.420 (emphasis added); *see* App. 25-26, 41-42, R. Doc. 1, at 9-10, 25-26. Furthermore:

All federal acts, laws, executive orders, administrative orders, rules, and regulations, regardless of whether they were enacted before or after the provisions of sections 1.410 to 1.485, that infringe on the people's right to keep and bear arms as guaranteed by the Second Amendment to the Constitution of the United States and Article I, Section 23 of the Constitution of Missouri shall be invalid *to this state*, shall not be recognized *by this state*, shall be specifically rejected *by this state*, and shall not be enforced *by this state*.

Mo. Rev. Stat. § 1.430 (emphasis added). These provisions limit the reach of SAPA to the State of Missouri. They express—forcefully and correctly—staunch disagreement with myriad firearms policies of the federal government. Though the federal government obviously takes offense at this divergence, it in no way affects the operation of federal law. *Cf.* App. 145-48, R. Doc. 88 at 16-19. The next provision of the act supports this interpretation: "It shall be the duty of the courts and law enforcement agencies *of this state* to protect the rights of law-abiding citizens to keep and bear arms within the borders *of this state* and to protect these

13

rights from the infringements defined under section 1.420." Mo. Rev. Stat. § 1.440 (emphasis added). These provisions are entirely in keeping with the Tenth Amendment, as recognized in *New York* and *Printz. See supra* part I.

But the federal government's disagreement continues, and it makes an overbroad reading of the next provision of the law:

> No entity or person, including any public officer or employee *of this state* or any political subdivision *of this state*, shall have the authority to enforce or attempt to enforce any federal acts, laws, executive orders, administrative orders, rules, regulations, statutes, or ordinances infringing on the right to keep and bear arms as described under section 1.420. Nothing in sections 1.410 to 1.480 shall be construed to prohibit Missouri officials from accepting aid from federal officials in an effort to enforce Missouri laws.

Mo. Rev. Stat. § 1.450 (emphasis added); App. 30, R. Doc. 1, at 14. This should not be construed beyond the previous four sections of the law, this section's own limitation to the government of the State of Missouri or, just as importantly, the two sections of SAPA that follow it. That is, even if this provision is read to apply to the federal government, it is of no moment because there is no penalty against the federal government for enforcing federal firearms laws. Mo. Rev. Stat. §§ 1.460, 1.470; *cf.* App. 146-147, R. Doc. 88, at 17-18 (addressing "confusion" rather than the operation of SAPA).

In another ruling last year, the court below unfortunately had it both ways with SAPA. In *United States v. Gilliam*, the magistrate judge ruled that SAPA "is

preempted by the Supremacy Clause[.]" No. 19-00266-01-CR-W-RK, 2022 WL 571540, at *2 (W.D. Mo. Feb. 3, 2022), *report and recommendation adopted,* No. 19-00266-01-CR-W-RK, 2022 WL 567838 (W.D. Mo. Feb. 24, 2022). Yet the court also suggested that its ruling was limited to dismissing a self-serving argument put forth by the defendant that SAPA "'establishes that state gun laws trump federal ones.'" *Id.* at *1. The court reached the correct result—that no one is immune from federal prosecution due to SAPA—but the reasoning requires correction. This is plain not only from the opening sections of SAPA, but from the actual operation of the law.

It is axiomatic that when a statute penalizes an act, that act is unlawful. *Powhatan Steamboat Co. v. Appomattox R.R.*, 65 U.S. (24 How.) 247, 252 (1860). It is a truism that when a statute does *not* penalize an act, that act is *lawful*, at least so far as the statute in question goes. SAPA provides a private right of action against Missouri political subdivisions or Missouri law enforcement agencies who violate the law—that is, state agents who assist in the enforcement of federal firearms laws that go beyond state law. Mo. Rev. Stat. § 1.460. It also penalizes Missouri political subdivisions or law enforcement agencies for employing officials who previously violated the law. Mo. Rev. Stat. § 1.470. Finally, it provides a cause of action for injunctive relief against state violators. Mo. Rev. Stat. § 1.470.2. SAPA provides no right of action against the federal government, nor does it even hint at an

15

exclusionary rule or other safeguard that would apply in a state criminal prosecution, much less a federal criminal prosecution. The law governs state agents who might otherwise participate in enforcing certain federal firearms laws: there is nothing for federal law to preempt.

Perhaps aware of the dubiousness of their interpretation of SAPA, the federal government also alleges in this count that the law "otherwise impedes the accomplishment and execution of the full purposes and objectives of federal law." App. 41-42, R. Doc. 1, at 25-26. This, again, suggests an effort to thread a loophole through Tenth Amendment doctrine. *See* App. 148, R. Doc. 1, at 19 (continuing to focus on the law's purpose rather than its operation, and concluding it amounts to "obstacles to the full purposes and objectives of federal firearms regulatory measures[.]"). The Eastern District of California, affirmed by the Ninth Circuit Court of Appeals, aptly summarized that, properly construed, Tenth Amendment doctrine is not subject to federal preemption:

> California's decision not to assist federal immigration enforcement in its endeavors is not an "obstacle" to that enforcement effort. [The federal government's] argument that [California law] makes immigration enforcement far more burdensome begs the question: more burdensome than what? The laws make enforcement more burdensome than it would be if state and local law enforcement provided immigration officers with their assistance. But refusing to help is not the same as impeding. If such were the rule, obstacle preemption could be used to commandeer state resources and subvert Tenth Amendment principles.

16

> . . . . We agree. Even if [California law] obstructs federal immigration enforcement, the United States' position that such obstruction is unlawful runs directly afoul of the Tenth Amendment and the anticommandeering rule.

*U.S. v. California*, 921 F.3d 865, 888 (9th Cir. 2019) (quoting *U.S. v. California*, 314 F.Supp.3d 1077, 1104 (E.D. Cal. 2018)). This is the exact situation with SAPA: this Missouri law does not contradict federal law, and the state's refusal to assist in the enforcement of federal firearms law it believes are anathema to the Second Amendment is not an obstacle or impediment that is subject to preemption. The Court should reverse the preemption ruling below.

## III. The Second Amendment Preservation Act Does Not Violate Intergovernmental Immunity

The final count of the federal government's complaint alleges that SAPA "directly regulat[es] the activities of Federal agents" and others such as "*state* or local law enforcement officer[s] who seek[] to voluntarily enforce federal law" and thus violates intergovernmental immunity. App. 42, R. Doc. 1, at 26 (citing Mo. Rev. Stat. §§ 1.420, 1.450, 1.460, 1.470) (emphasis added). As established previously, SAPA does not regulate the activities of federal agents at all. *See supra* part II. By the federal government's own articulation in its complaint, it also failed to state a claim for intergovernmental immunity via discrimination. But the court below accepted this argument as well, and its ruling must also be reversed. App. 150-152, R. Doc. 88, at 21-23.

This Court has not addressed intergovernmental immunity, but recent rulings in other circuits have rejected arguments from the federal government that are indistinct from the claims it makes here and the ruling of the court below. These cases include challenges to state laws that curtail state cooperation with federal immigration enforcement. In the same decision in which it rejected obstacle preemption, the Ninth Circuit affirmed that intergovernmental immunity

> is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment. The Supreme Court has clarified that a state "does not discriminate against the Federal Government and those with whom it deals *unless it treats someone else better than it treats them*."

*California*, 921 F.3d at 881 (quoting *Washington v. U.S.*, 460 U.S. 536, 544–45 (1983)) (emphasis added). SAPA does not "discriminat[e] specifically against individuals who have previously participated in the lawful exercise of federal authority." App. 42, R. Doc. 1, at 26 (citing Mo. Rev. Stat. § 1.470). Rather, it discriminates against *state* political subdivisions and law enforcement agencies that employ any individual who has previously violated SAPA with a civil penalty of $50,000, whether that individual was a state or federal official at the time. Mo. Rev. Stat. § 1.470.[2] There is no discrimination or economic burden placed on the federal

---

[2] As argued previously, the cause of action for injunctive relief provided for in SAPA applies only to state political subdivisions and law enforcement. Mo. Rev. Stat. § 1.470.2; *see supra* part II.

Appellate Case: 23-1457     Page: 24     Date Filed: 05/17/2023 Entry ID: 5278012

government under the law, and thus intergovernmental immunity is not implicated. *See California*, 921 F.3d at 884 ("Only those provisions that impose an additional economic burden *exclusively* on the federal government are invalid under the doctrine of intergovernmental immunity." (emphasis added)).

SAPA is an exercise in federalism that bolsters gun rights in Missouri without encroaching upon the legitimate powers of the federal government. The Court should reverse all of the erroneous rulings of the court below as to the federal government's presentation of the Supremacy Clause.

## IV. Compliance With The Second Amendment Preservation Act is as Simple as Focusing on Crime Itself

Though not one of its counts, the federal government alleges, ironically, that SAPA contains "numerous aspects . . . that are vague and make it difficult for state and local law enforcement officials to definitively know what the law means[.]" App. 38-39, R. Doc. 1, at 22-23; *see also* App. 150, R. Doc. 88, at 21. Moreover, the suggestion here that the federal government has standing to make claims on behalf of state and local government officials further illustrates the Tenth Amendment concerns in this matter. *See supra* part I. However, with its allegations of vagueness the federal government ultimately shows that SAPA is straightforward in its text and purpose, and only requires Missouri law enforcement to focus their efforts on crime itself.

19

Vagueness is a serious concern in criminal law because clarity is fundamental to due process. *See Skilling v. U.S.*, 561 U.S. 358, 402–03 (2010). When other rights such as free speech are implicated, vagueness is an even greater concern, because citizens "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked" and thus forgo the exercise of their rights. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal quotation omitted). However, because SAPA only provides for a civil penalty and civil causes of action, it should be afforded greater tolerance by this Court. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982). Under these principles, SAPA does not raise vagueness concerns.

Importantly, SAPA does not *abridge* a fundamental right, it *bolsters* gun rights. Missouri law enforcement may not assist the federal government with the enforcement of federal gun laws against Missourians who are "not otherwise precluded under *state* law from possessing a firearm[.]" Mo. Rev. Stat. § 1.480.1 (emphasis added); *see* Mo. Rev. Stat. § 571.010, *et seq.* The federal government's complaint, in essence, is that SAPA requires Missouri law enforcement to steer far wider of enforcing unique federal gun laws than they might prefer. *See* App. 38-39, R. Doc. 1, 22-23. But it bears reiterating that it is wholly within a state legislature's prerogative to place such duties and prohibitions on all state executives, even if the unique federal restrictions in question were deemed constitutional by the United

20

States Supreme Court. *See supra* part I. State law enforcement do not have a constitutional right to enforce federal gun laws as they prefer, but Missourians do have a constitutional right to bear arms.

Earlier in this brief, *Amici* noted that Missouri law, unlike federal law, does not prohibit citizens convicted of misdemeanor domestic violence from possessing a firearm. *See supra* part I. This is cause for consternation by gun-control proponents and some law enforcement, under the belief that such a conviction raises too great a risk for gun violence by the perpetrator. Gun rights proponents (and, following SAPA, the Missouri Legislature and Governor of Missouri) consider gun rights to be something that should not be deprived owing to a misdemeanor. To give effect to this federal law, the federal government will simply have to operate independently. It probably won't, which gives the lie to the actual importance of such restrictions. It is important to note, however, that even after the passage of SAPA, felons are still prohibited from possessing firearms under both federal and Missouri law. *See* 18 U.S.C. § 922(g)(1), Mo. Rev. Stat. § 571.070.1(1). Thus, in enforcing such offenses, Missouri law enforcement may continue to collaborate with federal authorities. While collaborative efforts may have to be adjusted, our law enforcement system is not going to descend into anarchy.

Following passage of SAPA, Missouri law enforcement must in many instances pivot its focus to crime itself. Too often, individual rights are curtailed as

Appellate Case: 23-1457     Page: 27     Date Filed: 05/17/2023 Entry ID: 5278012

prophylactics against bad outcomes. Numerous federal gun restrictions are akin to banning parades because they might turn into riots. *See, e.g.*, 88 Fed. Reg. 6478 (*supra*). Moreover, federal firearms prosecutions, in the vast majority of instances, accompany charges with real crimes—that is, crimes that are not status offenses and inflict real harm. *See, e.g.*, *U.S. v. Barrett*, 552 F.3d 724, 725 (8th Cir. 2009); *Gilliam*, No. 19-00266-01-CR-W-RK, *supra*. No such prosecutions are curtailed by SAPA: murder, assault, and other crimes that might be committed with firearms are just as unlawful as they were before and may be investigated and prosecuted by state law enforcement officials, even in cooperation with the federal government. The only caveat is to stop pretending that guns are a suitable alternative target to crime.

## Conclusion

The opinion below joins the federal government in a radical tune, protest music against state sovereignty and federalism. It amounts to nothing more than disagreement with political rhetoric. Paradigm shifts can be difficult, but that does not a constitutional crisis make. To the contrary: SAPA is constitutional clarity, affirming that gun rights are not a problem to be solved. For the foregoing reasons, *Amici* support the State of Missouri and urge the Court to reverse the opinion of the court below.

Appellate Case: 23-1457    Page: 28    Date Filed: 05/17/2023 Entry ID: 5278012

Dated: May 16, 2023                    Respectfully submitted,

*/s/ Stephen Klein*
Stephen R. Klein
BARR & KLEIN PLLC
1629 K St NW Ste. 300
Washington, DC 20006
Tel/Fax: 202-804-6676
steve@barrklein.com

*Counsel for* Amici Curiae

## Certificate of Compliance

Excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,301 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman 14-point font.

The undersigned hereby certifies that I have filed electronically, pursuant to Circuit Rule 28A(h), a version of the brief in non-scanned PDF format. I hereby certify that the file has been scanned for viruses and that it is virus-free.

Dated: May 16, 2023

*/s/ Stephen Klein*
Stephen R. Klein
*Counsel for* Amici Curiae

Appellate Case: 23-1457    Page: 30    Date Filed: 05/17/2023 Entry ID: 5278012

**Certificate of Service**

I hereby certify that on May 16, 2023, an electronic copy of the foregoing brief *amici curiae* was filed with the Clerk of Court for the United States Court of Appeals for the Eight Circuit using the CM/ECF filing system and that service upon counsel for the parties will be accomplished using the CM/ECF system.

<div style="margin-left:50%">

*/s/ Stephen Klein*
Stephen R. Klein
*Counsel for* Amici Curiae

</div>

Appellate Case: 23-1457    Page: 31    Date Filed: 05/17/2023 Entry ID: 5278012