**No. 23-1457**

**In the**
**United States Court of Appeals for the Eighth Circuit**

UNITED STATES,
*Plaintiff-Appellee*,

v.

STATE OF MISSOURI, MICHAEL L. PARSON, in his official capacity as Governor of the State of Missouri, and ANDREW BAILEY, in his official capacity as Attorney General of the State of Missouri,
*Defendants-Appellants*.

**On Appeal from the**
**United States District Court for**
**the Western District of Missouri (Jefferson City Division)**

Brief *Amicus Curiae* of
Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Heller Foundation, America's Future, DownsizeDC.org, Downsize DC Foundation, Conservative Legal Defense and Education Fund, and Virginia Delegate David LaRock in Support of Defendants-Appellants and Reversal

RICK BOYER<br>
  Lynchburg, VA<br>
PATRICK MCSWEENEY<br>
  Powhatan, VA<br>
JAMES N. CLYMER<br>
  Lancaster, PA<br>
J. MARK BREWER<br>
  Houston, TX<br>
KERRY L. MORGAN<br>
  Wyandotte, MI

WILLIAM J. OLSON*<br>
JEREMIAH L. MORGAN<br>
ROBERT J. OLSON<br>
WILLIAM J. OLSON, P.C.<br>
370 Maple Avenue West, Suite 4<br>
Vienna, VA  22180-5615<br>
(703) 356-5070<br>
*Attorney of Record

*Attorneys for Amici Curiae*<br>
May 18, 2023

Appellate Case: 23-1457    Page: 1    Date Filed: 05/19/2023 Entry ID: 5278888

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the corporate *amici* do not have parent corporations, they are not publicly traded companies, and no publicly held corporation owns 10% or more of their stocks.

ii

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    The District Court Order Misapplied the Supremacy Clause to Nullify
      Missouri's Refusal to Enforce Federal Firearms Laws Deemed
      Unconstitutional by the State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Unconstitutional Federal Laws Are Not the Supreme Law
            of the Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    The District Court Fails to Address the Entire Text of the
            Supremacy Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.    Since Missouri Law Enforcement Is Not Required to Facilitate
            Federal Law Enforcement, Missouri State Law May Preclude It . . . . 6

II.   Evaluating the Constitutionality of a Federal Law in a Federal System . . . . 8

      A.    *McCulloch v. Maryland* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.    Neither Nullification nor Interposition, but Federalism . . . . . . . . . . . 9

III.  The District Court Decision Violates the Anti-commandeering
      Principle of *Printz v. United States* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      A.    *Printz v. United States* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      B.    *Gregory v. Ashcroft* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iii

    C.    *Washington v. United States* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.   Federal Courts Have a Duty to Protect State Prerogatives under the Tenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.    Federal Courts Have Accepted State Refusals to Enforce Federal Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.    The Ninth Circuit Recently Affirmed a State's Refusal to Cooperate in Federal Law Enforcement . . . . . . . . . . . . . . . . . . . . . . 24

    B.    A District Court Recently Refused to Compel State and Local Government to Enforce Federal Laws. . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Appellate Case: 23-1457    Page: 4    Date Filed: 05/19/2023  Entry ID: 5278888

# TABLE OF AUTHORITIES

Page

HOLY BIBLE
*Exodus* 1:15-22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
*Ezekiel* 22:30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
*I Samuel* 14:24-46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONSTITUTION
Article VI, Clause 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, *passim*
Amendment X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 23
Amendment XI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Amendment XVII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

STATUTES
Mo. Rev. Stat. § 1.420 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Mo. Rev. Stat. § 1.430 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Mo. Rev. Stat. § 1.450 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Mo. Rev. Stat. § 1.460 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20
Mo. Rev. Stat. § 1.470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

CASES
*In re Booth*, 3 Wis. 157 (1854) (rev'd by *Ableman v. Booth*, 62 U.S. 506)
    (1859) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
*Chisholm v. Georgia*, 2 U.S. 419 (1793) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
*City of Seattle v. Trump*, 2017 U.S. Dist. LEXIS 173376 (W.D. Wash.
    2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27
*Gregory v. Ashcroft*, 501 U.S. 452 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
*Marbury v. Madison*, 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
*McCulloch v. Maryland*, 17 U.S. 316 (1819) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9
*McMillian v. Monroe County*, 520 U.S. 781 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 7
*Printz v. United States*, 521 U.S. 898 (1997) . . . . . . . . . . . . . . . . . . . . . . . 3, *passim*
*United States v. California*, 921 F.3d 865 (9th Cir. 2019) . . . . . . . . . . . 24, 25, 26
*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) . . . . . . . . . . . . . . . 10, 11
*Washington v. United States*, 460 U.S. 536 (1983) . . . . . . . . . . . . . . . . . . . . . 19, 20

MISCELLANEOUS
R. Berger, Federalism: The Founders' Design (Univ. Ok. Press: 1987) . . . . . . . . 6

v

*The Federalist* (G. Carey & J. McClellan, eds., Liberty Fund: 2001). . . . 12, 21, 22

The Founders' Constitution (P. Kurland & R. Lerner, eds., Univ. of
   Chi. Press: 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

R.A. Rossum, Federalism, the Supreme Court, and the Seventeenth
   Amendment: The Irony of Constitutional Democracy (Lexington
   Books: 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

M. Trewhella, Doctrine of the Lesser Magistrate (CreateSpace: 2013) . . . . . . . . 11

vi

Appellate Case: 23-1457    Page: 6    Date Filed: 05/19/2023 Entry ID: 5278888

# INTEREST OF *AMICI CURIAE*

Gun Owners of America, Inc. ("GOA"), Gun Owners of California, and DownsizeDC.org are exempt from federal income taxation under section 501(c)(4) of the Internal Revenue Code ("IRC"). Gun Owners Foundation ("GOF"), Heller Foundation, America's Future, Downsize DC Foundation, and Conservative Legal Defense and Education Fund are exempt from federal income taxation under IRC section 501(c)(3). Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of the law.[1] GOA and GOF filed an amicus brief in a related matter, *City of St. Louis v. Missouri* in the Missouri Supreme Court, SC 99290, on January 28, 2022. David LaRock is a five-term member of the Virginia House of Delegates, representing the 33rd District.

# STATEMENT OF THE CASE

On June 12, 2021, Missouri Governor Michael Parson signed into law the "Second Amendment Preservation Act" ("SAPA"), Mo. Rev. Stat. §§ 1.410 - 1.485. *See United States v. Missouri*, 2023 U.S. Dist. LEXIS 37537 at *2 (W.D. Mo. 2023). SAPA declares certain federal restrictions on firearms to be

---

[1] Both parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

1

"infringements" of rights of Missourians protected by the Second Amendment to

the United States Constitution, including:

> I. (1) Any tax, levy, fee, or stamp imposed on firearms, firearm accessories, or ammunition not common to all other goods and services and that might reasonably be expected to **create a chilling effect** on the purchase or ownership of those items by law-abiding citizens;
> (2) Any **registration or tracking** of firearms, firearm accessories, or ammunition;
> (3) Any **registration or tracking** of the ownership of firearms, firearm accessories, or ammunition;
> (4) Any act **forbidding the possession, ownership, use, or transfer** of a firearm, firearm accessory, or ammunition by law-abiding citizens; and
> (5) Any act ordering the **confiscation** of firearms, firearm accessories, or ammunition from law-abiding citizens. [Mo. Rev. Stat. § 1.420 (emphasis added).]

SAPA orders that "[a]ll federal acts, laws, executive orders, administrative

orders, rules, and regulations [which] infringe on the people's right to keep and

bear arms as guaranteed by the Second Amendment ... **shall not be enforced by**

**this state**." *Id*. at 1.430 (emphasis added).

Additionally, SAPA provides that: "**No entity or person**, including any public

officer or employee **of this state** or any political subdivision of this state, **shall**

**have the authority to enforce** or attempt to enforce any federal acts, laws,

executive orders, administrative orders, rules, regulations, statutes, or ordinances

infringing on the right to keep and bear arms." *Id*. at 1.450 (emphasis added).

Finally, SAPA imposes a $50,000 civil fine on any "political subdivision or

2

law enforcement agency" that afterward hires any federal employee who attempted to enforce an "infringement."  *Id*. at 1.470.

On February 16, 2022, the United States filed suit against the State of Missouri in the U.S. District Court for the Western District of Missouri for violation of the Constitution's Supremacy Clause and on other grounds.  *Missouri* at *2.

In its motion to dismiss, Missouri argued that SAPA does not violate the Supremacy Clause because "no provision of SAPA imposes any liability on the federal government, or restricts the action of federal government officers in any way."  Missouri Motion to Dismiss, *United States v. Missouri*, Case No. 2:22-cv-04022-BCW, Doc. 16, at 3 (Mar. 14, 2022),  Missouri argued that "[t]he federal government lacks authority to "commandeer" Missouri's state officials and resources into the enforcement of federal regulatory programs — especially federal anti-gun programs," citing *Printz v. United States*, 521 U.S. 898, 935 (1997).  *Id.* at 1.

The district court declared SAPA "invalid, null, void, and of no effect" for having exceeded the state's authority under the Supremacy Clause.  *Missouri* at *3; *see also id.* at  *25, *30.

3

**ARGUMENT**

I. **THE DISTRICT COURT ORDER MISAPPLIED THE SUPREMACY CLAUSE TO NULLIFY MISSOURI'S REFUSAL TO ENFORCE FEDERAL FIREARMS LAWS DEEMED UNCONSTITUTIONAL BY THE STATE.**

The district court made both logical and legal errors in support of its sweeping order invalidating the Missouri SAPA and enjoining Missouri from implementing it in any manner:

> ORDERED [i] SAPA is invalidated as **unconstitutional** in its entirety as violative of the **Supremacy Clause**. [ii] H.B. 85 is **invalid, null, void, and of no effect**. [iii] State and local law enforcement officials in Missouri **may lawfully participate** in joint federal task forces, **assist** in the investigation and enforcement of federal firearm crimes, and **fully share** information with the Federal Government without fear of H.B. 85's penalties. [iv] The States [sic] of Missouri and its officers, agents, and employees and any others in active concert with such individuals are **prohibited** from any and all **implementation and enforcement** of H.B. 85. [*Missouri* at *37 (emphasis added).]

A. **Unconstitutional Federal Laws Are Not the Supreme Law of the Land.**

With respect to points (i) and (ii) in its order, *supra*, based on the Constitution's Supremacy Clause, the district court appeared to rule that all **federal laws** (*i.e.*, even those which the State of Missouri believe infringe on rights protected by the Second Amendment) are part of the "supreme Law of the Land" and **must be obeyed and enforced** by Missouri, its law enforcement officials, and its citizens. To reach that remarkable conclusion, the district court

4

utterly disregards the language of the Supremacy Clause "which shall be made in Pursuance thereof....":

> The Supremacy Clause provides that the "Constitution, and the Laws of the United States **which shall be made in Pursuance thereof** ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. [*Missouri* at *22-23 (emphasis added).]

Although the district court perfunctorily cites the language of the Supremacy Clause, it spends the remainder of its opinion assuming that every federal legislative enactment is *ipso facto* constitutional.[2] The court never again even mentions that constitutional text, rather conclusively presuming every federal law to be constitutional.

However, a federal law which violates the U.S. Constitution is in no sense a law made "in Pursuance" of that Constitution, but rather "in defiance" thereof, and therefore such a law is not only not supreme in any sense, but actually is a nullity. "[A]n act of the legislature, repugnant to the constitution, is void." *Marbury v.*

---

[2] *See id.* at *23 ("**federal law**" automatically trumps state law and "SAPA is an unconstitutional 'interposit[ion]' against **federal law**"); *26 ("A **federal law** preempts a state law if the two are in direct conflict"); *28, *30 (SAPA statutory sections "stand as obstacles to the full purposes and objectives of **federal firearms regulatory measures** and are preempted") (emphasis added).

5

*Madison*, 5 U.S. 137, 177 (1803)[3]; *see also Printz* at 924-25. (The authority and indeed the duty of states to protect themselves and their citizens from unconstitutional federal laws are discussed *infra*.)

> **B.** **The District Court Fails to Address the Entire Text of the Supremacy Clause.**

The district court also ignores the portion of the Supremacy Clause specifying (i) which state officials are actually bound by the Supremacy Clause and (ii) under what circumstances. The text states: "the **Judges** in every State shall be bound thereby, any Thing in the Constitution or **Laws of any State to the Contrary** notwithstanding." Article VI (emphasis added). By its text, the Supremacy Clause binds state judges only — not state legislatures nor state governors who enacted the Missouri SAPA. But even more critically, the text anticipates that there will be some state laws "to the contrary" of the "supreme Law of the Land" which remain unmolested by federal judges. The district court's order fails to grapple with this critical language in the Supremacy Clause on which it purports to base its order.

> **C.** **Since Missouri Law Enforcement Is Not Required to Facilitate Federal Law Enforcement, Missouri State Law May Preclude It.**

Elements (iii) and (iv) of the district court's order are even more shocking.

---

[3] *See*, *generally*, R. Berger, <u>Federalism: The Founders' Design</u> at 96-99 (Univ. Ok. Press: 1987).

6

Element (iii) denies to the State of Missouri the power to prevent "State and local law enforcement officials in Missouri" from participating in joint federal task forces, assisting in the investigation and enforcement of federal firearm crimes, and fully sharing information with the Federal Government.

The district court's order overrides Missouri law, to directly instruct "State and local law enforcement officials in Missouri" that they "**may**" participate in joint federal task forces and otherwise assist and share information with federal officials. Thus, the Order denies to the State of Missouri the power to determine whether Missouri state and local law enforcement officers ("LEOs") will assist federal officials.[4] The district court's order bypasses the state and grants the power to make the decision to enforce these federal laws to the subordinate units of a state — which are creatures of the state. *See McMillian v. Monroe County*, 520 U.S. 781, 790 (1997).

To the members of Missouri state and local law enforcement, the district court's actions: (i) striking down the state's findings that certain gun laws are unconstitutional, combined with (ii) the language which says LEOs "may" cooperate with federal officials, give the strong message that they should

---

[4] Apparently, even under the court's order, localities in Missouri and perhaps individual state law enforcement officials could decline to participate/assist/share information in aid of federal law enforcement.

7

cooperate — just short of the unlawful commandeering struck down by the U.S. Supreme Court in *Printz* at 933, discussed further in Section III, *infra*.

## II. EVALUATING THE CONSTITUTIONALITY OF A FEDERAL LAW IN A FEDERAL SYSTEM.

### A. *McCulloch v. Maryland*.

The district court never entertained the possibility that any existing federal law not yet declared unconstitutional by a court, might actually be unconstitutional. Thus, the court never needed to wrestle with how states could or should resist unconstitutional laws in a constitutional republic. Certainly the district court would agree that laws deemed unconstitutional by federal judges are not "made in Pursuance" of the Constitution and are therefore void, but the court appears to adopt the view that it is **only** the nation's 670 district court judges, 179 circuit court judges, and 9 Supreme Court Justices, individually or collectively, who may make that decision. Therefore, apparently, the 50 states have no right to a different opinion as to the constitutionality of federal laws. The district court leans on Chief Justice John Marshall's for support, stating:

> By this declaration, the states are prohibited from passing any acts which shall be repugnant to a law of the United States. [*McCulloch v. Maryland*, 17 U.S. 316, 361 (1819).]

However, nothing written here by Chief Justice Marshall would call into question the Missouri statute. Missouri did not enact a law which was "repugnant to a law

8

of the United States," but rather, **within the scope of its authority to control the actions of its own LEOs**, pronounced its view that certain federal firearms laws were repugnant to the Constitution of the United States.

The district court again quoted from *McCulloch*: "The states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the **constitutional laws** enacted by congress to carry into effect the powers vested in the national government." *Id*. at 317 (emphasis added). But here again, the language quoted by the court has no application, as the Missouri statute only deems certain federal laws to be unconstitutional **for the sole purpose of exercising the state's constitutional power to refuse to participate** in their enforcement.

### B. Neither Nullification nor Interposition, but Federalism.

To find a basis for the district court's order invalidating the law, the district court characterizes Missouri's SAPA as an impermissible exercise of nullification (*Missouri* at \*22,\* 23, \*24, \*25) defined by Merriam-Webster as "the action of a state impeding or attempting to prevent the operation and enforcement within its territory of a law of the U.S." And, the district court also accuses Missouri of an unlawful act of "interposition," (*Missouri* at \*23) defined as "the action of a state

9

whereby its sovereignty is placed between its citizens and the federal government."

The Missouri SAPA most certainly is not an act of nullification. By refusing to participate in the enforcement of federal laws deemed unconstitutional, Missouri is not protecting its citizens from unconstitutional acts of federal LEOs, but it is acting to protect its citizens from state LEOs helping federal LEOs violate the U.S. Constitution. Thus, the Missouri SAPA could be viewed as a modest step of interposition, to protect its citizens from unlawful state action — exactly what should be expected from states in a federal system.

As Justice Anthony Kennedy explained in *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995):

> Federalism was our Nation's own discovery. The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, **each protected from incursion by the other**. [*Id.* at 838 (Kennedy, J., concurring) (emphasis added).]

State resistance to federal overreach is not unheard of in America.[5] Indeed, it was anticipated by the Framers of the Constitution that, if the federal government was deemed to have exceeded its constitutionally enumerated powers, the States

---

[5] To be sure, a state may litigate to ask a federal court to deem certain federal firearms statutes unconstitutional, but no doubt the federal government would challenge the state's standing.

10

and their peoples would be expected — indeed, counted on — to "push back"

against such acts of federal usurpation.  Again, as Justice Kennedy stated in *Term*

*Limits*:

> The resulting Constitution created a legal system unprecedented in form and
> design, establishing **two orders of government**, each with its own direct
> relationship, its own privity, **its own set of mutual rights and obligations
> to the people** who sustain it and are governed by it.  [*U.S. Term Limits, Inc.*
> at 838 (emphasis added).]

Justice Kennedy's acknowledgment that we live under two distinctly

independent sovereigns, each with the duty to protect the people from the lawless

activities of the other, recognizes the structural foundation upon which the

American republic was built.  As the Declaration of Independence makes clear

whenever any government becomes destructive of protected rights, it is the duty of

the people — through their lower civil magistrates[6] — to resist the misuse of

power even to the point of taking up arms against tyranny as America's founders

did in 1776.  In 1776, those lower civil magistrates were the colonial assemblies;

today, the states serve that important function.  Indeed, it was for the very purpose

of warding off the prospect of another tyrant like George III and the English

Parliament that America's founders constituted not a unitary United States of

America, but rather a federation of independent, but interrelated, states which were

---

[6] *See generally* M. Trewhella, <u>Doctrine of the Lesser Magistrate</u>
(CreateSpace: 2013).

Appellate Case: 23-1457     Page: 17     Date Filed: 05/19/2023 Entry ID: 5278888

empowered to interpose on behalf of their own people should the national government exceed its constitutionally prescribed powers or violate the limits imposed upon it.

In fact, there is ample precedent for a state to take much more aggressive actions than the modest action taken by Missouri. The concept of interposition is well established in Holy Writ, such as when the Hebrew midwives refused the Pharaoh's command to kill newborn male children (*see Exodus* 1:15-22), or when the people refused King Saul's order to kill his son Jonathan for violating a command he had not heard (*see I Samuel* 14:24-46). There is a nobility in a state official who is willing to "stand in the gap" (*Ezekiel* 22:30), putting himself in harm's way and incurring the wrath of a superior to protect those under his responsibility.

In 1798, the federal government enacted the Alien and Sedition Acts, in response to which the Kentucky and Virginia legislatures adopted Resolutions to resist the Acts as exceeding the powers delegated. These Resolutions were in the tradition of Alexander Hamilton's Federalist No. 28:

> It may safely be received as an axiom in our political system, that the **state governments will ... afford complete security against invasions of the public liberty by the national authority**.... [Federalist No. 28, *The Federalist* (G. Carey & J. McClellan, eds., Liberty Fund: 2001) (emphasis added). *See also* Federalist No. 46.]

Appellate Case: 23-1457    Page: 18    Date Filed: 05/19/2023 Entry ID: 5278888

Contrary to the original plan, the States have, individually and collectively, dwindled in both stature and power.[7]

Throughout history, every government that moves toward tyranny becomes increasingly hostile to resistance and disobedience. The response of the federal government to Missouri's modest effort to push back against federal overreach may reveal how far we are along the freedom-tyranny continuum.

By way of contrast, there was a time when States resisted federal power in ways that make Missouri's SAPA appear mild by comparison, without the federal government raising much objection. Perhaps the most significant historical example of state interposition was a decision of the Wisconsin Supreme Court involving the imprisonment of abolitionist Sherman Booth for violating the Fugitive Slave Act by helping a slave escape to Canada. In 1854, the Wisconsin Court declared the Fugitive Slave Act unconstitutional, because it denied slaves the right to a jury trial before being forcibly returned to involuntary servitude, and ordered Booth released. The Wisconsin Supreme Court, by openly declaring the federal Fugitive Slave Act unconstitutional and refusing to file the U.S. Supreme

_____

[7] *See, e.g.*, W.J. Watkins, Jr., "The Kentucky and Virginia Resolutions," *Constitution.org* ("Though much has changed since Jefferson and Madison penned the Kentucky and Virginia resolutions, the nature of power remains the same — power can be checked only by power. The Resolves point to the states as the natural depository of the power to check the national government.").

Appellate Case: 23-1457     Page: 19     Date Filed: 05/19/2023 Entry ID: 5278888

Court's mandate to overturn the Wisconsin court's ruling, asserted a right, as the highest court of a sovereign state, to declare a federal law unconstitutional and unenforceable in Wisconsin.

> It is the practice, of late, to hold up before the mind such frightful pictures of "collision," "resistance," "civil discord," "revolution," "anarchy," and "dissolution," that it would seem, that any effort of **resistance to the exercise of unauthorized power**, ... that every diversity of opinion or action between the functionaries of the two governments, must necessarily terminate in a dissolution of the union.... But **the real danger to the union consists, not so much in resistance to laws constitutionally enacted, as in acquiescence in measures which violate the constitution.** It is much safer to resist unauthorized and unconstitutional power, at its very commencement, when it can be done by constitutional means, than to wait until the evil is so deeply and firmly rooted that the only remedy is revolution. [*In re Booth*, 3 Wis. 157, 201 fn. 1 (1854) (rev'd by *Ableman v. Booth*, 62 U.S. 506) (1859) (emphasis added).]

To this day, the website of the Wisconsin Supreme Court proclaims:

> The U.S. Supreme Court overturned that decision but the Wisconsin Supreme Court refused to file the U.S. Court's mandate upholding the fugitive slave law. That mandate has never been filed.[8]

What Missouri has done in interposing to protect its citizens in a distinctly limited way, minimizing the damage of unconstitutional federal laws by refusing to participate, is deeply rooted in America's history and tradition. State resistance to unconstitutional federal laws helps preserve our federal system, and is integral to the preservation not just of the Second Amendment, but of all our liberties.

---

[8] In Re: Booth, Wisconsin Supreme Court website.

14

## III. THE DISTRICT COURT DECISION VIOLATES THE ANTI-COMMANDEERING PRINCIPLE OF *PRINTZ V. UNITED STATES*.

The district court decision goes far to undermine the Supreme Court's ruling in *Printz v. United States,* a case which established the authority of state officials to resist federal efforts to compel their assistance to enforce federal gun legislation. To chart a path around the *Printz* doctrine, the district court appeared to misconstrue Missouri's prohibition on use of state resources to be *de facto* obstruction of federal law. The court first cited a case from this Circuit for the premise that "[a] 'direct conflict' occurs ... when a state law stands as an **obstacle** to the accomplishment and execution of the full purposes and objectives of Congress...." *Missouri* at *26 (quoting *Alliance Ins. Co. v. Wilson*, 384 F.3d 547, 551 (8th Cir. 2004) (emphasis added)). Second, the court found that Missouri's statute "stands as an **obstacle**" to enforcement of the gun licensing, registration, and taxation requirements of the National Firearms Act and the Gun Control Act and must fail under the Supremacy Clause. *Missouri* at *27 (emphasis added). Third, the court found that SAPA violates the doctrine of intergovernment immunity by "impos[ing] an affirmative duty" on state actors to "effectuate an obstacle" to federal firearms enforcement (*id.* at *34) and by "discriminat[ing] against the federal government" (*id*. at *33 (internal quotations omitted)). None of these findings can survive scrutiny.

15

### A.    *Printz v. United States.*

*Printz v. United States,* 521 U.S. 898 (1997) involved a challenge to the "Brady Bill," a handgun control bill that required the chief law enforcement officer ("CLEO") of any locality where a citizen attempts to purchase a handgun to carry out federally-mandated background checks on the purchaser.  The general principle established was:  "'The Federal Government may not compel the States to enact or administer a federal regulatory program,'" and the application was "The mandatory obligation imposed on CLEOs to perform background checks on prospective handgun purchasers plainly runs afoul of that rule."  *Printz* at 933.

To reach its decision, the *Printz* Court undertook a historical review of the constitutional roles of federal and state governments.  "It is incontestible that the Constitution established a system of dual sovereignty.  Although the States surrendered many of their powers to the new Federal Government, they retained 'a residuary and inviolable sovereignty,' The Federalist No. 39, at 245 (J. Madison)." *Printz* at 918-919 (some internal quotations omitted).

> The Framers' experience under the Articles of Confederation had persuaded them that **using the States as the instruments of federal governance** was both ineffectual and provocative of federal-state conflict.  [Thus the Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the state and federal governments would exercise concurrent authority over the people. [*Id*. at 919-920 (emphasis added).]

Appellate Case: 23-1457     Page: 22     Date Filed: 05/19/2023 Entry ID: 5278888

The dual sovereignty concept was explained: "The great innovation of this design was that 'our citizens would have two political capacities, one state and one federal, each protected from incursion by the other.'" *Id*. at 920.

> This separation of the two spheres is one of the Constitution's **structural protections of liberty**. "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will **reduce the risk of tyranny and abuse** from either front." To quote Madison once again ... "Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself." The Federalist No. 51.... [*Id*. at 921-922 (emphasis added).]

The *Printz* Court's reasoning destroys the foundation of the district court's ruling in this case. "When a 'Law ... for carrying into Execution' the Commerce Clause violates the principle of state sovereignty reflected in the various constitutional provisions we mentioned earlier ... it is not a 'Law ... *proper* for carrying into Execution the Commerce Clause,' and is thus, in the words of The Federalist, 'merely [an] act of usurpation' which 'deserves to be treated as such.' The Federalist No. 33, at 204 (A. Hamilton)." *Id.* at 923-924.

The district court's reasoning, that simply refusing to allow state officers to cooperate with federal officers constitutes "obstruction," cannot square with *Printz* and the notion of dual sovereignty serving to protect liberty and constrain tyranny.

17

### B.    *Gregory v. Ashcroft*.

Nor is *Printz* the only modern case in which the Court has reinforced the reason

the Framers defended state sovereignty against federal incursion.  In *Gregory v.*

*Ashcroft*, 501 U.S. 452 (1991), Justice O'Connor relied on Hamilton's words in

Federalist No. 28:

> Alexander Hamilton explained to the people of New York, perhaps optimistically, that the new federalist system would suppress completely "the attempts of the government to establish a tyranny":

> "In a confederacy the people, without exaggeration, may be said to be entirely the masters of their own fate.  Power being almost always the rival of power, the general government will at all times stand ready to check the usurpations of the state governments, and these will have the same disposition towards the general government.  The people, by throwing themselves into either scale, will infallibly make it preponderate.  If their rights are invaded by either, they can make use of the other as the instrument of redress."  The Federalist No. 28, pp. 180-181 (C. Rossiter ed. 1961).  [*Gregory* at 458-459.]

"If this 'double security' is to be effective," Justice O'Connor reminded us,

"there must be a proper balance between the States and the Federal Government.

These twin powers will act as mutual restraints only if both are credible.  In the

tension between federal and state power lies the promise of liberty."  *Id*. at 459.

Under the district court's formulation, all tension between federal and state

governments ceases to exist.  The states are "'reduc[ed ...] to puppets of a

ventriloquist Congress.'"  *Printz* at 928.  Yet "Congress cannot compel the States

18

to enact or enforce a federal regulatory program [and] cannot circumvent that prohibition by conscripting the State's officers directly." *Id*. at 935. Under *Printz*, mere state refusal to lend its officers for federal enforcement cannot equate to "stand[ing] as an obstacle" to the "purposes and objectives of Congress." The district court's formulation, like the conscription of state law enforcement officials under the Brady Bill, offends "the very *principle* of separate state sovereignty." *Id*. at 932.

### C. *Washington v. United States*.

Nor is Missouri guilty of "discriminat[ing]" against the federal government via SAPA. The Supreme Court held in 1983 that "[t]he State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544-545 (1983).

In *Washington*, the Supreme Court allowed state taxation of federal contractors, as long as the taxation did not exceed taxes imposed on other contractors. By way of comparison, SAPA imposes civil penalties against state actors who commit "infringements," or who hire current or former federal employees who commit infringements. It imposes no civil penalties against the federal government or its current or former employees. Mo. Rev. Stat. § 1.460 provides:

19

**Any political subdivision or law enforcement agency** that employs a law enforcement officer who acts knowingly, as defined under section 562.016, to violate the provisions of section 1.450 or otherwise knowingly deprives a citizen of Missouri of the rights or privileges ensured by Amendment II of the Constitution of the United States or Article I, Section 23 of the Constitution of Missouri while acting under the color of any state or federal law shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress, and subject to a **civil penalty** of fifty thousand dollars per occurrence.  [Emphasis added.]

And the next section provides:

**Any political subdivision or law enforcement agency** that knowingly employs an individual acting or who previously acted as an official, agent, employee, or deputy of the government of the United States, or otherwise acted under the color of federal law within the borders of this state, who has knowingly, as defined under section 562.016, after the adoption of this section: (1) Enforced or attempted to enforce any of the infringements identified in section 1.420; or (2) Given material aid and support to the efforts of another who enforces or attempts to enforce any of the infringements identified in section 1.420; shall be subject to a **civil penalty** of fifty thousand dollars per employee hired.  [Mo. Rev. Stat. § 1.470 (emphasis added).]

Under the *Washington* standard, SAPA neither punishes nor discriminates

against the federal government.

## IV.  FEDERAL COURTS HAVE A DUTY TO PROTECT STATE PREROGATIVES UNDER THE TENTH AMENDMENT.

Missouri did not initiate this litigation — the federal government did.  But now

that issue has been joined, Missouri asks the federal judiciary to rule consistent

with the Tenth Amendment.  Although questions of federalism certainly can be

implicated in cases involving private parties, they are never more central and prominent than when they pit a State against the national government.

It is through controversies such as this that we will know whether the federalists or the anti-federalists were better prognosticators of where the Constitution they were debating would lead.  Among the most contentious issues confronted in Philadelphia in 1787 was the degree to which the sovereignty of the several States would be preserved, and how it would be preserved.  By vesting "[t]he judicial power of the United States ... in one Supreme Court," the question arose as to whether that Court could be fair in protecting the several States.  Of course, most federalists denied that any particular constitutional provision, or the "whole mass" of "powers transferred to the federal government" could ever become "dangerous to the portion of authority left in the several states."  The Federalist No. 45.  However, one of the most prominent anti-federalist voices predicted:

> [t]he judicial power will operate to effect, in the most certain, but yet silent and imperceptible manner, what is evidently the tendency of the constitution: — I mean, an entire **subversion of the** legislative, executive and judicial **powers of the individual states**....  That the judicial power of the United States, will lean strongly in favour of the general government, and will give such an explanation to the constitution, as will favour an extension of its jurisdiction, is very evident....  [Brutus, No. 11 (Jan. 31, 1788) reprinted in 1 The Founders' Constitution at 282 (P. Kurland & R. Lerner, eds., Univ. of Chi. Press: 1987) (emphasis added).]

21

Federal encroachment on state prerogatives arose early.  Indeed, it was still the 18ᵗʰ Century when the Supreme Court was asked to decide whether federal courts had jurisdiction to hear disputes brought by private citizens against a State.  It decided that question in the affirmative in *Chisholm v. Georgia*, 2 U.S. 419 (1793), a decision that was viewed as so violative of the federalist structure that it was undone by the People only two years later by the Eleventh Amendment — the first constitutional amendment after the Bill of Rights.

The risk that States would become victimized by federal law and federal policies increased exponentially after the 1913 ratification of the Seventeenth Amendment, which altered the procedure for the selection of U.S. Senators contained in Article I, Section 3.  Rather than being chosen by legislatures of the several States, as they had been for 125 years, Senators would be selected by vote of the people.  Under the original plan as described by Madison, the right to select Senators was accorded to give "to the state governments such an agency in the formation of the federal government, as must secure the authority of the former, and may form a convenient link between the two systems."  The Federalist No. 62.  There is reason to believe that the erosion of State power resulting from the Seventeenth Amendment was inadvertent, as it was largely ignored during debate in the press, in congressional debates, and in State

22

legislatures during the ratification process. *See* R.A. Rossum, <u>Federalism, the</u> <u>Supreme Court, and the Seventeenth Amendment: The Irony of Constitutional</u> <u>Democracy</u> (Lexington Books: 2001) at 219. However, the Seventeenth Amendment has no doubt contributed to the undeniable subsequent erosion of that sphere of power reserved to the States by the Tenth Amendment. Lacking the ability to select and remove Senators, the States must increasingly look to the Courts for protection against federal usurpation of their important role in our Constitutional Republic.

## V. FEDERAL COURTS HAVE ACCEPTED STATE REFUSALS TO ENFORCE FEDERAL LAWS.

The Second Amendment Protection Acts that have been enacted in various states are not without precedent. Indeed, the effort to protect gun rights followed efforts by certain states to protect illegal aliens residing in their midst based on a policy — not a constitutional — disagreement with the federal government. A few lower federal courts have had occasion to review the legality of state and local resistance to federal authority in that area, defending their authority to refuse to facilitate federal law enforcement in any way. Two of those decisions are notable.

23

**A.    The Ninth Circuit Recently Affirmed a State's Refusal to Cooperate in Federal Law Enforcement**.

The Ninth Circuit recently denied the federal government's request for an injunction against a California law that forbade state and local authorities from cooperating with federal immigration enforcement.

> [California's] SB 54 **limits law enforcement's "discretion to cooperate with immigration authorities**."  [Cal. Gov't Code] § 7282.5(a).  Among other things, it prohibits state and local law enforcement agencies from "[i]nquiring into an individual's immigration status"; "[d]etaining an individual on the basis of a hold request"; "[p]roviding information regarding a person's release date or" other "personal information," such as "the individual's home address or work address"; and "[a]ssisting immigration authorities" in certain activities.  *Id*. § 7284.6(a)(1).  [*United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019) (emphasis added).]

The Ninth Circuit noted that the California law, just as SAPA here, "does not treat the federal government worse than anyone else; indeed, it does not regulate federal operations at all."  *Id*. at 881.  "The district court concluded that this frustration does not constitute obstacle preemption....  We agree.  Even if SB 54 obstructs federal immigration enforcement, the United States' position that such obstruction is unlawful runs directly afoul of the Tenth Amendment and the anticommandeering rule."  *Id*. at 888.

The Ninth Circuit expressly held that statutory prohibitions against lending state assistance to federal law enforcement are part of a state's prerogative.

24

Federal schemes are inevitably frustrated when states opt not to participate in federal programs or enforcement efforts. But **the choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal**. Extending conflict or obstacle preemption to SB 54 would, in effect, "dictate[] what a state legislature may and may not do," *Murphy*, 138 S. Ct. at 1478, because **it would imply that a state's otherwise lawful decision *not* to assist federal authorities is made unlawful when it is codified as state law.** [*California* at 890 (emphasis added).]

In a ruling directly on point as to the authority of Missouri to establish a state-wide rule of nonassistance, the Ninth Circuit concluded that since a state "cannot be compelled to assist in the enforcement of federal regulations within the state" it would make no sense for "a state's otherwise lawful decision *not* to assist federal authorities [to be] made unlawful when it is codified as state law." *Id*.

In *Printz*, the Supreme Court upheld the challenge to the Brady mandate brought by Sheriff Printz and Sheriff Mack, each serving as a Chief Law Enforcement Officer ("CLEO"). There was no discussion of whether their subordinate deputies could chart their own path and violate their CLEO's non-assistance directive. Likewise here, once the state of Missouri directed Missouri personnel not assist federal enforcement, there should be no discussion as to how subordinate cities, towns, or individual LEOs may disregard the state's non-assistance directive, as here ordered by the district court.

As to the intergovernmental immunity issue relied on by the United States here,

the Ninth Circuit concluded that "[a] finding that SB 54 violates the doctrine of

intergovernmental immunity would imply that California *cannot* choose to

discriminate against federal immigration authorities by refusing to assist their

enforcement efforts — a result that would be inconsistent with the Tenth

Amendment and the anticommandeering rule."  *California* at 891.

### B.  A District Court Recently Refused to Compel State and Local Government to Enforce Federal Laws.

The City of Seattle adopted "sanctuary city" Ordinance 121063, under which

"no Seattle City officer or employee shall inquire into the immigration status of

any person, or engage in activities designed to ascertain the immigration status of

any person."  *City of Seattle v. Trump*, 2017 U.S. Dist. LEXIS 173376, at *4

(W.D. Wash. 2017) (internal quotations omitted).  The Ordinance also provided

that "[t]he Seattle Police Department **will not enforce federal laws** relating to

illegal entry and residence, leaving such enforcement responsibility to

Immigration and Customs Enforcement."  *Id*. (emphasis added).  On January 25,

2017, President Trump signed Executive Order 13768, asserting that "sanctuary

jurisdictions" that refused to comply with immigration enforcement measures

would not be "eligible to receive Federal grants, except as deemed necessary for

law enforcement purposes," by the U.S. Attorney General or Secretary of

Homeland Security.

The U.S. District Court for the Western District of Washington struck down

that executive order, finding that imposing state and local cooperation with federal

law enforcement as a condition of federal funding violates the Tenth Amendment.

> "The Federal Government may neither issue directives requiring the States
> to address particular problems, nor command the States' officers, or those of
> their political subdivisions, to administer or enforce a federal regulatory
> program." *Printz v. United States*, 521 U.S. 898, 935, 117 S. Ct. 2365, 138
> L. Ed. 2d 914 (1997). The anti-commandeering principle prohibits both
> **direct and indirect coercion** by the Government on the States. *Nat'l Fed'n
> of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012). [*Id*. at \*21 (emphasis
> added).]

The district court continued: "The Executive Order's conditioning of federal

funds on the Cities' enforcement of federal regulations falls directly within the

ambit of the Tenth Amendment," "This kind of coercion is unconstitutional. *New

York* [*v. United States*, 505 U.S. 144] at 187 [1992]. ('But the Constitution

protects us from our own best intentions: It divides power among sovereigns and

among branches of government precisely so that we may resist the temptation to

concentrate power in one location as an expedient solution to the crisis of the

day.')." *Id*. at \*22.

27

# CONCLUSION

This Court should reverse the district court's judgment, vacate the injunction, and order the district court to dismiss the case.

Respectfully submitted,

  /s/ *William J. Olson*

RICK BOYER
  INTEGRITY LAW FIRM
  P.O. Box 10953
  Lynchburg, VA  24506

PATRICK MCSWEENEY
  3358 John Tree Hill Rd
  Powhatan, VA 23139

JAMES CLYMER
  CLYMER MUSSER & SARNO, P.C.
  408 West Chestnut St.
  Lancaster, PA 17603

J. MARK BREWER
  BREWER & PRITCHARD, P.C.
  800 Bering Drive, Suite 201A
  Houston, TX  77057

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
  *Attorney of Record

KERRY L. MORGAN
  PENTIUK, COUVREUR & KOBILJAK, P.C.
  2915 Biddle Avenue
  Wyandotte, MI 48192

May 18, 2023
*Attorneys for Amici Curiae*

28

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

IT IS HEREBY CERTIFIED:

1.  That the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Defendants-Appellants and Reversal complies with the page limitation set forth by Rule 29(a)(5), because this brief contains 6,396 words, excluding the parts of the brief exempted by Rule 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point Times New Roman.

  /s/ *William J. Olson*   
William J. Olson
Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Defendants-Appellants and Reversal, was made, this 18th day of May, 2023, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

   /s/ *William J. Olson*
William J. Olson
Attorney for *Amici Curiae*

30