Case No. 23-1457

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF MISSOURI, ET AL.,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
(District Court Case 2:22-CV-04022-BCW)

---

## BRIEF OF *AMICUS CURIAE* FREEDOM CENTER OF MISSOURI IN SUPPORT OF APPELLANTS AND REVERSAL

---

David E. Roland
FREEDOM CENTER OF MISSOURI
P.O. Box 693
Mexico, Missouri 65265
(573) 567-0307
dave@mofreedom.org

*Attorney for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Freedom Center of Missouri states that it does not have a parent corporation, it is not a publicly traded company, and no publicly held corporation owns 10% or more of its stock.

Appellate Case: 23-1457   Page: 2   Date Filed: 05/22/2023 Entry ID: 5279392

# TABLE OF CONTENTS

Corporate Disclosure Statement ..............................................................ii

Table of Contents ...................................................................................iii

Table of Authorities ................................................................................ v

Identity and Interest of Amicus Curiae ................................................... 1

Statement of the Case ............................................................................. 2

Argument ................................................................................................. 6

    I.    The power to control state and local law enforcement
            agencies and officials is reserved to the states under
            the Tenth Amendment. ................................................................. 6

    II.   The Supremacy Clause does not oblige states to assist
            in the enforcement of federal laws; a state does not
            violate this clause if it declines to provide such
            assistance. .................................................................................... 9

    III.  SAPA does not "nullify" any federal law. ...................................... 14

    IV.  No part of SAPA prevents any federal officer or agency
            from enforcing federal firearm laws in Missouri. .......................... 19

        A. Section 1.410 merely expresses the legislature's
            understanding of the principles of federalism. ........................... 19

        B. Section 1.420 expresses the legislature's opinion
            about the constitutionality of federal firearm
            laws; it does not suggest that opinion is binding
            on courts. .................................................................................... 24

        C. Sections 1.460 and 1.470 do not regulate the federal
            government or otherwise prevent any federal officer

Appellate Case: 23-1457    Page: 3    Date Filed: 05/22/2023 Entry ID: 5279392

or agency from enforcing federal firearm laws. .........................26

V.    The doctrine of constitutional avoidance favors
      interpretations of statutes that would minimize
      conflicts with the Constitution......................................29

Conclusion ...................................................................31

Certificate of Compliance .................................................32

Certificate of Service .....................................................32

iv

# TABLE OF AUTHORITIES

## CASES

*Chamber of Commerce of U.S. v. Whiting,*
   563 U.S. 582 (2011) ........................................................... 12

*City of St. Louis v. State,*
   643 S.W.3d 295 (Mo. 2022) ............................................ 2, 20

*EEOC v. Wyoming,*
   460 U.S. 226 (1983) .............................................................. 24

*Garcia v. San Antonio Metropolitan Transit Auth.,*
   469 U.S. 528 (1985) .............................................................. 22

*Gonzalez v. Carhart,*
   550 U.S. 124 (2007) .............................................................. 29

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ................................................................ 6

*Lawson v. Kelly,*
   58 F.Supp.3d 923 (W.D. Mo. 2014) .................................... 23

*M'Cullough v. Maryland,*
   17 U.S. (Wheat.) 316 (1819) .................................................. 9

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) .............................................................. 31

*New York v. U.S.,*
   505 U.S. 144 (1992) .......................................................... 7, 13

*Printz v. U.S.,*
   521 U.S. 898 (1997) ...................................... 7, 10, 13, 15

Appellate Case: 23-1457    Page: 5    Date Filed: 05/22/2023 Entry ID: 5279392

*U.S. v. California,*
    921 F.3d 865 (9th Cir. 2019)..........................................10-14, 26, 27

**S**TATUTES

Mo. Rev. Stat. § 1.410...............................................................2-3, 19-23, 30

Mo. Rev. Stat. § 1.420.............................................................3-4, 24-27, 29-30

Mo. Rev. Stat. § 1.430...................................................................................3

Mo. Rev. Stat. § 1.440.......................................................................2-3, 30

Mo. Rev. Stat. § 1.450...............................................................3-4, 27, 30

Mo. Rev. Stat. § 1.460...............................................................4, 26, 28

Mo. Rev. Stat. § 1.470...............................................................4, 26-28

Mo. Rev. Stat. § 1.480.......................................................................4

1 Statutes at Large of South Carolina....................................15-18, 25-26

Kan. Stat. § 50-1207...............................................................16-17, 26

Mass. Gen. Laws Chapter 489, § 1 (1855) .........................................15-16

Mass. Gen. Laws Chap. 489, §§ 7, 8 (1855) .........................................18

Mass. Gen. Laws Chap. 489, §§ 9-16 (1855) .........................................18

Mass. Gen. Laws Chap. 489, § 11 (1855) ...............................................18

**O**THER **A**UTHORITIES

Federalist 45......................................................................................21

Appellate Case: 23-1457    Page: 6    Date Filed: 05/22/2023 Entry ID: 5279392

Federalist 78 ........................................................................... 23

4 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (1836) ..... 21, 23

Mo. Const. Art. I, § 1 ................................................................ 2

Mo. Const. Art. I, § 3 ...................................................... 2, 6, 28

Mo. Const. Art. I, § 23 ................................................... 2, 25, 27

U.S. Const. art. VI, cl. 2. .......................................... *passim*

U.S. Const. Amend. X ......................................... 6, 7, 13, 22, 28

George Gardner, *Immigrant Sanctuary as the "Old Normal": A Brief History of Police Federalism*, 119 COLUM. L. REV. 1 (2019) ..... 8

Santiago Legarre, *The Historical Background of the Police Power*, 9 U. PA. J. CONST. L. 745 (2007) ........................................... 6

Appellate Case: 23-1457    Page: 7    Date Filed: 05/22/2023 Entry ID: 5279392

## IDENTITY AND INTEREST OF THE *AMICUS CURIAE*

The Freedom Center of Missouri is a non-profit, non-partisan organization dedicated to research, litigation, and education for the advancement of individual liberty and the principles of limited government. The Freedom Center emphasizes the importance of the Missouri Constitution as a safeguard for individual liberty that is independent of the U.S. Constitution's Bill of Rights and that frequently affords protections for liberty that are both more explicit and more extensive than those articulated in the U.S. Constitution's Bill of Rights. The Freedom Center litigates constitutional issues in state and federal courts and also assists citizen groups in the evaluation and drafting of statutes and constitutional amendments that would enhance individual liberty.

Both parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

Appellate Case: 23-1457    Page: 8    Date Filed: 05/22/2023 Entry ID: 5279392

The Missouri Constitution declares that the people of the state are its ultimate political authority and that they retain the "inherent, sole, and exclusive right to regulate the internal government and police thereof" as they see fit—including the power to impose limits on that government's authority. Mo. Const. Art. I, §§ 1, 3. The right to keep and bear firearms is a matter of utmost concern to the people of Missouri and they have made absolutely clear their intention to prevent state and local government entities from interfering with this right. In 2014 more than sixty percent of the state's voters chose to amend Article I, section 23 of the state constitution to dramatically increase the scope of the right to keep and bear arms and in 2021 the state legislature, acting on the people's behalf, passed the Second Amendment Preservation Act ("SAPA") which the Governor signed into law. Mo. Rev. Stat. §§ 1.410-1.485.

As the Missouri Supreme Court noted in *City of St. Louis v. State*, 643 S.W.3d 295, 297 (Mo. banc 2022), SAPA contains two types of provisions. The four sections in the first category, §§ 1.410-1.440, have no independent force but merely express the sentiments of the legislature

2

and provide essential context for understanding and applying the Act's operative elements. *Id*. Section 1.410 articulates the General Assembly's understanding of the principles of federalism insofar as they relate to the regulation of firearms. Section 1.420 identifies the types of firearm regulations that, in the General Assembly's opinion, exceed the federal government's constitutional limits. Section 1.430 declares that the state of Missouri declines to recognize or enforce the types of federal firearm regulations identified in § 1.420. Section 1.440, contains an aspirational statement regarding the duties of courts and law enforcement agencies, but also carries no penalty for non-compliance. Again, each of these sections provide important context for understanding and implementing the operative provisions of SAPA, but they have no independent legal effect.

The five sections in the second category, §§ 1.450-1.485, define and limit the authority of state and local law enforcement agencies, while also providing a mechanism through which citizens may hold state and local agencies accountable in the event that they overstep the limits the people have placed on their authority. Section 1.450 states that "public officer[s] or employee[s] of the state or any political subdivision of the state" lack

Appellate Case: 23-1457    Page: 10    Date Filed: 05/22/2023 Entry ID: 5279392

authority to enforce any of the types of federal firearm regulations identified in § 1.420.[1] Section 1.460 establishes legal consequences for political subdivisions or law enforcement agencies that employ persons who have knowingly violated § 1.450, authorizing persons injured by such a violation to sue the entity that employs an alleged transgressor and allowing successful plaintiffs to recover a civil penalty, costs, and attorney fees. Section 1.470 establishes the legal consequences for political subdivisions or law enforcement agencies that knowingly employ someone who, while acting as an official, agent, employee, or deputy of the federal government, enforced or provided material aid and support to others who were attempting to enforce the types of laws described in § 1.420. Section 1.480 defines certain terms and clarifies circumstances under which public officers or employees of the state are authorized to provide material aid to those enforcing federal firearm laws. Section 1.485 is a severability clause that explicitly expresses the legislature's intention that the various aspects of SAPA should be considered

---

[1] Although this section includes the phrase "[n]o entity or person," the penalties SAPA provides only apply against political subdivisions of the state and state and local law enforcement agencies whose employees have violated the section.

severable, such that a determination that one part of the law is invalid should not prevent the continuing validity or application of any remaining parts of the law.

For the purposes of this case, however, it is crucial to emphasize what SAPA *does not* do. SAPA *does not* purport to invalidate any federal law. It *does not* regulate the federal government or otherwise prevent federal authorities from enforcing any federal law. And it *does not* provide any mechanism that would immunize Missouri citizens from investigation or arrest by federal officers, or otherwise allow Missourians to directly interfere with federal officers enforcing these laws. Instead, as is expressly authorized by U.S. Supreme Court precedent and Article I, § 3 of the Missouri Constitution, SAPA explains and gives force to the General Assembly's decision to secure Missourians' right to keep and bear arms by carefully limiting the extent to which state and local officials may assist in the enforcement of certain federal laws.

Appellate Case: 23-1457    Page: 12    Date Filed: 05/22/2023 Entry ID: 5279392

**I. The power to control state and local law enforcement agencies and officials is reserved to the states under the Tenth Amendment.**

The U.S. Supreme Court has long recognized that within our federal system of government the states retain both the power and the responsibility to establish the parameters within which public officials will be permitted to exercise governmental authority. *See Gregory v. Ashcroft*, 501 U.S. 452, 462 (1991). From the time that states first started drafting their own constitutions—well before the drafting and ratification of the U.S. Constitution—roughly half made clear that the people of each state intended to exercise the sole, inherent, and exclusive right of governing or regulating the internal government and police of that state. *See* Santiago Legarre, *The Historical Background of the Police Power*, 9 U. PA. J. CONST. L. 745, 775 – 780 and FN 162. Indeed, Article I, § 3 of the Missouri Constitution was drawn directly from this venerable state constitutional tradition.

It is beyond dispute that under the federal system established by the U.S. Constitution the powers granted to the central government were intended to be "few and defined," THE FEDERALIST No. 45 (James

6

Madison), and the states (or the people) have reserved to themselves all powers not delegated to the United States by the Constitution. U.S. Const., Amend. X. The U.S. Supreme Court has held that in order to assess the boundaries our federal system imposes between the powers of the central government and those of the states, courts must seek guidance from historical understanding and practice, the structure of the U.S. Constitution, and the Supreme Court's own jurisprudence. *Printz v. U.S.*, 521 U.S. 898, 905 (1997). After engaging in just that sort of review, the Supreme Court has concluded that state legislatures are not subject to federal direction, *New York v. U.S.*, 505 U.S. 144 (1992), and neither may the federal government require state or local executive officials to assist in the administration of federal laws or programs, *Printz* at 918. Indeed, maintaining the separation between the federal government's sphere of authority and the states' spheres of authority is "one of the Constitution's structural protections of liberty." *Id*. at 921.

The United States has argued in this case that because certain state and local law enforcement agencies have previously agreed to assist in the enforcement of federal firearm laws and a number of officers employed by those agencies have been deputized for that purpose, the

7

state of Missouri must not be allowed to discontinue this cooperation. But the necessary implication of the federal government's position is that the U.S. Constitution *prevents* Missouri from limiting the authority of those law enforcement officials who are employed by state and local entities. Nothing in the historical understanding and practice of law enforcement, the structure of the U.S. Constitution, or the Supreme Court's own jurisprudence supports the federal government's position. To the contrary, for nearly two centuries the federal government took care not to encroach on state and government control of police and there is "substantial historical evidence that the public and its elected representatives have long understood federal deployment of police as antidemocratic and antithetical to a free society." George Gardner, *Immigrant Sanctuary as the "Old Normal": A Brief History of Police Federalism*, 119 COLUM. L. REV. 1 (2019). Particularly in recent years, when many states have seen fit to reject federal positions in the realm of drug criminalization, immigration policy, and, as here, firearm regulation, the states' ability to control—and limit—the authority of their own law enforcement officials has been a crucial element to maintaining the very sort of separation and balance of power that our federal system

8

Appellate Case: 23-1457    Page: 15    Date Filed: 05/22/2023 Entry ID: 5279392

of government was designed to foster. In this case, the federal government is asking the Court to erode states' ability to control their own law enforcement agencies and officials. There is no legitimate constitutional basis for this request and it should be firmly rejected.

## II. The Supremacy Clause does not oblige states to assist in the enforcement of federal laws; a state does not violate this clause if it declines to provide such assistance.

The Supremacy Clause ensures that when Congress engages in a proper exercise of the authority granted by the U.S. Constitution, the federal laws thus created will supersede any state laws or state constitutional provisions to the contrary. U.S. Const. art. VI, cl. 2. The Supremacy Clause does *not*, however, require state legislatures to concede that the enactment of any particular law or regulation was a proper exercise of the federal government's constitutional authority, nor does the Supremacy Clause require state or local governments to assist in the enforcement of federal laws, so long as they do not actively prevent federal entities (or state courts) from said enforcement. *See, e.g., M'Cullough v. Maryland*, 17 U.S. (Wheat.) 316, 322 (1819) ("[S]tates have no power … to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by [C]ongress to carry into

9

effect the powers vested in the national government."), *but see also Printz*, 521 U.S. at 935 ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.") Thus, there is no violation of the Supremacy Clause if a state legislature merely declares its opinion that the federal government has acted in excess of its constitutional powers, or forbids state and local employees from assisting in the enforcement of those laws.

The Ninth Circuit Court of Appeals recently addressed these concepts in a very similar context. Displeased with federal immigration policy, the state of California adopted a set of statutes "expressly designed to protect its residents from federal immigration enforcement." *United States v. California*, 921 F.3d 865, 872 (9th Cir. 2019). The federal immigration laws at issue allowed for cooperation between the states and the federal government and for local officials to "perform the function of an immigration officer," as well as providing other forms of assistance in the enforcement of federal immigration policies. *Id*. at 874. Having determined that it did not wish to cooperate in the enforcement of these

10

policies, California passed a law that prohibited both public and private employers from allowing immigration enforcement agents to enter non-public areas of a workplace or to access employee records unless the agent had a subpoena or a judicial warrant to do so. *Id*. at 875. Another California statute carefully restricted law enforcement entities' authority to cooperate with immigration authorities, prohibiting state and local law enforcement agencies from providing certain information to federal immigration officials or from transferring persons to federal custody except under specified circumstances. *Id*. at 876. The federal government sued, arguing that California's statutes were preempted and violated the Supremacy Clause—specifically, the doctrine of intergovernmental immunity. *Id*.

The Ninth Circuit rejected these claims. The court pointed out that the doctrine of intergovernmental immunity applies "where a state's discrimination negatively affected federal activities in some way," but not "when a state merely references or even singles out federal activities[,]" and that there is no such discrimination unless the state treats someone else better than it treats the federal government. *Id*. at 881. Although the court held that California had violated intergovernmental immunity by

11

imposing a review scheme that only applied to facilities contracting with the federal government, *id.* at 882, it upheld the statutory elements that restricted cooperation with federal immigration officials, *id.* at 881, and it specifically rejected the idea that a state's choice not to cooperate in the enforcement of federal law would, by itself, violate the principle of intergovernmental immunity. *Id.* at 891.

The Ninth Circuit also rejected the federal government's arguments about preemption, emphasizing that "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal act."[2] *Id.* at 879 (quoting *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011)). Although the court acknowledged that a state statute would be preempted if it expressly authorized citizens to engage in activities prohibited under federal law or if it penalized them for doing things *required* by federal law, the challenged California statutes did neither. *Id.* at 881-82. In discussing the statute that prohibited California

---

[2] The court clarified that intergovernmental immunity analysis applies only to state laws that discriminate against the federal government, whereas obstacle preemption analysis considers whether a state law imposes an obstructive, not-insignificant burden on federal activities regardless of whether the law specifically targets the federal government. *Id.* at 880.

Appellate Case: 23-1457    Page: 19    Date Filed: 05/22/2023 Entry ID: 5279392

law enforcement agencies from cooperating with federal immigration officials the Ninth Circuit first emphasized that there was no direct conflict because the federal law did not expressly mandate any action that California had forbidden its law enforcement agencies to take. *Id*. at 888. But the court then proceeded to explain that the Tenth Amendment and the anticommandeering doctrine, as articulated in *New York* and *Printz*, allow states to refuse to participate in federal programs or enforcement efforts. *Id*. at 888-90. The court rejected the federal government's invocation of "obstacle preemption" because accepting that argument "would imply that a state's otherwise lawful decision *not* to assist federal authorities is made unlawful when it is codified as state law." *Id*. at 890 (emphasis in original). Even if the policy California had adopted resulted in frustration of the federal government's immigration enforcement efforts, "that frustration is permissible, because California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts. … [T]he federal government was free to *expect* as much as it wanted, but it could not *require* California's cooperation without running afoul of the Tenth Amendment." *Id*. at 891.

13

This Court should follow the Ninth Circuit's well-reasoned lead. As will be explained below, SAPA honors Missourians' wishes by limiting the extent to which their political subdivisions and state and local law enforcement entities are permitted to assist in the enforcement of federal firearm laws. Clearly, the Appellee is frustrated by this decision, just as it was frustrated by California's choice not to cooperate in the enforcement of federal immigration laws. But the choice that SAPA represents is nonetheless entirely consistent with the federal form of government the U.S. Constitution has established. As such, this Court should reverse the district court's judgment, vacate its injunction, and order the district court either to dismiss the case or to enter summary judgment in favor of the Appellants.

## III.   SAPA does not "nullify" any federal law.

The district court ruled SAPA unconstitutional based on its conclusion that SAPA somehow "nullifies" federal law. But the fact is that no part of SAPA prevents any federal officer or agency from enforcing federal firearm laws. To the contrary, the parts of SAPA that the district court called "nullification" merely establish the *reasons* that the legislature has chosen to withdraw the authority that political

14

subdivisions and state and local law enforcement agencies previously had to assist in the enforcement of certain federal laws. The U.S. Constitution absolutely allows Missouri not only to restrict its public employees' authority in this way, but also to publicly explain its reasons for doing so.[3] *See, e.g., Printz* at 935.

The district court's repeated insistence that SAPA "nullifies" federal law demonstrates a flawed understanding of the entire concept. Historically, a "nullification" effort identified a specific federal enactment and then attempted to prohibit the enforcement of that federal law by directly and actively preventing anyone—including federal officers— from implementing the targeted law. *Compare* "An Ordinance to Nullify Certain Acts of the Congress of the United States, Purporting to be Laws, Laying Duties and Imposts on the Importation of Foreign Commodities," 1 Statutes at Large of South Carolina ("Nullification Ordinance") 329-30 *and* Kan. St. § 50-1207 (2013); *with* "An Act to Protect the Rights and Liberties of the People of the Commonwealth of Massachusetts," Mass.

_____

[3] To be clear, the General Assembly may only speak for and set policy for those state and local officials exercising legislative and executive powers. State courts will always be required to interpret and apply federal laws without regard to any opinions the state legislature has expressed in relation to those federal laws.

Appellate Case: 23-1457     Page: 22     Date Filed: 05/22/2023 Entry ID: 5279392

Gen. Laws Chapter 489, § 1 (1855). South Carolina's infamous Nullification Ordinance forbade that state's courts from hearing any case that might question the ordinance's authority or the authority of any state laws passed in order to effectuate the ordinance. Nullification Ordinance at 330. It also tried to forbid any party from appealing such a case to the U.S. Supreme Court, and it instructed the state's courts to "proceed to effectuate and enforce their judgments… without reference to such attempted appeal" and to hold persons attempting such an appeal in contempt of court. *Id.* The Nullification Ordinance required all public officers in that state either to swear to uphold the ordinance or be stripped of their office. *Id.* The courts were forbidden to empanel jurors unless they specifically swore to "well and truly obey, execute, and enforce" the Nullification Ordinance. *Id.* at 330-31.

While far less dramatic than South Carolina's Nullification Ordinance, the "Second Amendment Protection Act" Kansas passed in 2013 also attempted actual nullification of federal law, purporting to make it a felony for "any official, agent or employee of the government of the United States… to enforce or attempt to enforce any act, treaty, order, rule or regulation of the government of the United States regarding a

16

firearm, firearm accessory, or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains in the borders of the state of Kansas." Kan. Stat. § 50-1207.

SAPA, on the other hand, is much more similar to the statutes the Ninth Circuit upheld in *California* in that it only prevents state and local officials from assisting in the enforcement of federal laws that the General Assembly considers to infringe upon Missourians' constitutional right to keep and bear arms. Unlike South Carolina's Nullification Ordinance or Kansas's Second Amendment Protection Act, SAPA *does not* attempt to prevent federal officers from enforcing federal laws within Missouri's borders. Consequently, SAPA is much more analogous to Massachusetts's Personal Liberty Act of 1855, which was adopted in an effort to limit the impact of the federal Fugitive Slave Acts of 1793 and 1850. Although Massachusetts recognized that due to the terms of these federal statutes it could not directly prevent slave owners from attempting to remove alleged fugitive slaves from the commonwealth's borders, the Personal Liberty Act authorized courts to impose fines and imprisonment as a penalty for any person *other* than a slave's purported owner who had removed an alleged fugitive slave from the borders of the

17

commonwealth. *See* Massachusetts Gen. Laws Chap. 489, §§ 7, 8 (1855). The Massachusetts Act also allowed private citizens to file suit for damages against any such persons. *Id*. Further, the Personal Liberty Act forbade any state or local officials to assist in enforcing the federal Fugitive Slave Acts of 1793 and 1850; any person violating the law's restrictions would make themselves subject to removal from office and some would "be forever thereafter ineligible to any office of trust, honor, or emolument, under the laws of this Commonwealth." Massachusetts Gen. Laws Chap. 489, §§ 9-16 (1855). Similarly, attorneys who represented those attempting to claim fugitive slaves would be "deemed to have resigned any commission from the Commonwealth" and would "be thereafter incapacitated from appearing as counsel or attorney" in the Commonwealth's courts. Massachusetts Gen. Laws Chap. 489, § 11 (1855). In sum, because the Personal Liberty Act prohibited state and local officials from assisting with the enforcement of the federal Fugitive Slave Acts without directly preventing federal officers or slave owners from enforcing those acts, SAPA much more closely resembles Massachusetts's historical response to federal laws opposed by the people of that state than it does South Carolina's Nullification Ordinance. The

18

district court's conclusion that SAPA "nullifies" any federal law is unfounded and this Court should reverse its decision to hold SAPA unconstitutional on this basis.

## IV. No part of SAPA prevents any federal officer or agency from enforcing federal firearm laws in Missouri.

The United States clearly disagrees with the opinions the Missouri legislature expressed through SAPA as to the legitimate scope of Congress's power in regard to regulate firearms and with the policy of non-cooperation the legislature has adopted. But the only pertinent question where the federal government has claimed a violation of the Supremacy Clause is whether the challenged policy (1) discriminates against the federal government by treating it differently than it treats others, or (2) directly contradicts federal law by requiring something federal law forbids or forbidding something federal law requires. This section will demonstrate that SAPA neither discriminates against the federal government nor directly contradicts federal law.

### A. Section 1.410 merely expresses the legislature's understanding of the principles of federalism.

SAPA begins with a statement of general constitutional principles that undergird our federal system of government. Mo. Rev. Stat. § 1.410. The United States unambiguously acknowledged in the "statement of

interest" it submitted to the trial court in *City of St. Louis v. State*, 643 S.W.3d 295 (Mo. banc 2022), that section 1.410 has no "independent substantive effect." The legislature included this part of SAPA to explain why it believes that Congress has overstepped its constitutional boundaries and, thus, why it has chosen to limit the authority of state and local governments to enforce federal firearm laws. The Appellee argued to the district court below that the principles announced by the legislature resembled the "nullification" doctrines embraced by John C. Calhoun and the pre-Civil Rights era southern State legislatures, but this suggestion is historically illiterate. In truth, the principles of federalism the legislature expressed in § 1.410 are drawn almost entirely – and in many instances *word-for-word* – from James Madison, Thomas Jefferson, and Alexander Hamilton, and they have been echoed in two centuries of U.S. Supreme Court opinions.

Section 1.410.2(1) states:

> The general assembly of the State of Missouri is firmly resolved to support and defend the Constitution of the United States against every aggression, whether foreign or domestic, and is duty bound to oppose every infraction of those principles that constitute the basis of the union of the states because only a faithful observance of those principles can secure the union's existence and the public happiness.

Appellate Case: 23-1457     Page: 27     Date Filed: 05/22/2023 Entry ID: 5279392

This is simply a paraphrase of parts of the first two paragraphs of the Virginia Resolutions of 1798, authored by James Madison. *See* 4 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 528 (1836) ("[T]he General Assembly of Virginia doth unequivocally express a firm resolution to maintain and defend the constitution of the United States, and the Constitution of this state, against every aggression, either foreign or domestic, …it is their duty, to watch over and oppose every infraction of those principles, which constitute the only basis of that union, because a faithful observance of them, can alone secure its existence, and the public happiness.")

> Section 1.410.2(2) states:
>
> Acting through the Constitution of the United States, the people of the several states created the federal government to be their agent in the exercise of a few defined powers, while reserving for the state governments the power to legislate on matters concerning the lives, liberties, and properties of citizens in the ordinary course of affairs.

This is simply a paraphrase of the first sentence of the penultimate paragraph of James Madison's Federalist 45. ("The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State. …If the

new Constitution be examined with accuracy and candor, it will be found that the change which it proposes consists much less in the addition of NEW POWERS to the Union, than in the invigoration of its ORIGINAL POWERS. …The proposed change does not enlarge these powers; it only substitutes a more effectual mode of administering them."). *See also Garcia v. San Antonio Metropolitan Transit Auth.*, 469 U.S. 528, 568-72 (1985) (Powell, J., dissenting) (examining exchanges of ideas concerning division of powers among federal and state governments during debates about ratification of U.S. Constitution).

Section 1.410.2(3) states:

The limitation of the federal government's power is affirmed under Amendment X of the Constitution of the United States, which defines the total scope of federal powers as being those that have been delegated by the people of the several states to the federal government and all powers not delegated to the federal government in the Constitution of the United States are reserved to the states respectively or the people themselves.

This is simply a paraphrase of the Tenth Amendment to the U.S. Constitution ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people").

Section 1.410.2(4) states:

Appellate Case: 23-1457      Page: 29      Date Filed: 05/22/2023 Entry ID: 5279392

If the federal government assumes powers that the people did
not grant it in the Constitution of the United States, its acts
are unauthoritative, void, and of no force.

This is simply a paraphrase of part of the first paragraph of Thomas
Jefferson's Kentucky Resolutions of 1798 ("whensoever the general
government assumes undelegated powers, its acts are unauthoritative,
void and of no force"), which also echoed Alexander Hamilton's
observation in Federalist 78 that "no position… depends on clearer
principles than that every act of a delegated authority, contrary to the
tenor of the commission under which it is exercised, is void." *See Lawson
v. Kelly*, 58 F.Supp.3d 923, 935 (W.D. Mo. 2014).

The first three sentences of § 1.410.2(5) state:

The several states of the United States respect the proper role
of the federal government but reject the proposition that such
respect requires unlimited submission. If the federal
government, created by a compact among the states, were the
exclusive or final judge of the extent of the powers granted to
it by the states through the Constitution of the United States,
the federal government's discretion, and not the Constitution
of the United States, would necessarily become the measure
of those powers.

These sentences are simply a paraphrase of the remaining parts of the
first paragraph of Thomas Jefferson's Kentucky Resolutions of 1798. *See
4 Jonathan Elliot, *The Debates in the Several State Conventions on the
Adoption of the Federal Constitution* 540 (1836); *see also EEOC v.*

23

*Wyoming*, 460 U.S. 226, 268-75 (1983) (Rehnquist, C.J., dissenting) (discussing central importance of federalism in constitutional system and providing historical examples of states' expressed objections to federal acts).

Properly understood, the language that the district court labeled as "nullification" is merely the General Assembly's reiteration of some of the most essential, revered, and least-controversial aspects of our constitutional system of government. These statements do assert the sense of the General Assembly that the U.S. Constitution does not delegate to the federal government the authority to regulate firearms in the manner that SAPA notes, but none of these statements has any independent legal effect, and thus cannot reasonably be construed as "nullifying" any federal law or otherwise interfering with federal officers' efforts to enforce federal laws.

**B. Section 1.420 expresses the legislature's opinion about the constitutionality of federal firearm laws; it does not suggest that opinion is binding on courts.**

In order to clarify the limits that the Missouri legislature intended to place on political subdivisions and state and local law enforcement entities, § 1.420 offers a description of the types of federal laws the state

24

does not want them to enforce. This section expresses the *legislature's opinion* that these types of federal laws are "infringements on the people's right to keep and bear arms, as guaranteed by Amendment II of the Constitution of the United States and Article I, Section 23 of the Constitution of Missouri." Just as courts are not bound to agree with the opinions of executive officials, such as the attorney general, nothing in this section suggests that any court, state or federal, is obliged to agree with the legislature's perspective as to the Second Amendment or Article I, Section 23 of the Missouri Constitution. Instead, courts can and should view this section as nothing more than a description of the limits the legislature intended to place on the authority of political subdivisions and state and local law enforcement agencies.

The district court took the position that § 1.420 "purports to invalidate substantive provisions of" federal law. Not so. Compare the language of this section to the South Carolina Nullification Ordinance, which not only singled out a specific act of Congress for the purpose of declaring it null and void but also stated that "all judicial proceedings which shall be hereafter had in affirmance" of that act "are, and shall be held, utterly null and void." Nullification Ordinance at 329-30. The

25

Nullification Ordinance also instructed the South Carolina legislature to take action to prevent any person within the limits of the state from enforcing the federal law that the state was attempting to nullify. *Id.* at 330. The Kansas Second Amendment Protection Act suffered from a similar deficiency in that it attempted to impose criminal penalties on "any official, agent or employee of the government of the United States" who attempted to enforce certain federal firearm laws in that state. SAPA goes to no such lengths. As the Ninth Circuit explained in *U.S. v. California*, the text of § 1.420 neither discriminates against the federal government nor prevents federal officials from enforcing federal laws within the state's borders. Consequently, both this section and SAPA as a whole establish a policy of non-cooperation that remains firmly within the bounds of what our federal Constitutional system allows.

**C. Sections 1.460 and 1.470 do not regulate the federal government or otherwise prevent any federal officer or agency from enforcing federal firearm laws.**

Section 1.460 is the first of two parts of SAPA that provides a mechanism for citizens to hold political subdivisions or state and local law enforcement agencies accountable when employees have exceeded the authority the state has given them. It authorizes "any person injured

26

under this section" to file a lawsuit to enjoin a political subdivision or law enforcement agency from employing a law enforcement officer who knowingly violates the provisions of § 1.450 or otherwise knowingly deprives a citizen of rights or privileges ensured by the Second Amendment or Article I, § 23 of the Missouri Constitution. A citizen plaintiff in such a case may recover reasonable attorney's fees and costs from the government defendant, as well as a $50,000 civil penalty.

Section 1.470 is the second part of SAPA that allows citizens to enforce the policy the legislature has chosen. It authorizes "any person residing or doing business in a jurisdiction" to file a lawsuit to enjoin a political subdivision or law enforcement agency from employing an individual formerly or currently engaged in efforts to enforce the types of federal firearm laws identified in § 1.420, or to give material aid or support to others who enforce or attempt to enforce those laws. A citizen plaintiff in such a case may recover reasonable attorney's fees and costs from the government defendant, as well as a $50,000 civil penalty per individual so employed.

The district court asserted that these sections discriminate against the federal government, but the sections do not regulate the federal

government at all. *See California*, 921 F.3d at 881. To the contrary, sections 1.460 and 1.470 exercise the inherent power Missouri and it citizens have preserved for themselves—pursuant to the Tenth Amendment and Article I, Section 3 of the Missouri Constitution—to regulate *political subdivisions and law enforcement agencies of the state of Missouri* by allowing private citizens to take judicial action if and when one of these state or local entities employs a law enforcement officer who has knowingly exceeded the scope of the authority the people of the state have granted them. Nothing about these provisions restricts the federal government's authority to rely upon *federal employees* to enforce federal firearm laws and any person who wishes to enforce federal firearm laws within the state of Missouri is free to seek employment with the federal government. Nothing in these sections prevents those who have assisted in the enforcement of federal firearm laws from working for political subdivisions of the state or state and local law enforcement agencies— they merely establish certain penalties to which state or local governmental entities will be subject if they choose to employ such a person. Because these provisions do not discriminate against the federal government and do not directly conflict with any federal law, they do not

28

violate the Supremacy Clause and the district court erred in concluding that these sections were unconstitutional.

## V. The doctrine of constitutional avoidance favors interpretations of statutes that would minimize conflicts with the Constitution.

Where a party contends that a statute is unconstitutional, but the statutory language is susceptible of an interpretation that would avoid the alleged constitutional infirmity, the canon of constitutional avoidance holds that the court should adopt that interpretation. *Gonzalez v. Carhart*, 550 U.S. 124, 153 (2007) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."). In this case the district court interpreted several parts of SAPA to "nullify" laws enacted by Congress. But for each of the relevant statutes, the language could easily have been interpreted in a way that would avoid the alleged constitutional infirmity. The district court's judgment was incorrect because it failed to apply the canon of constitutional avoidance.

The district court held that "§ 1.420 purports to invalidate substantive provisions of the NFA and the GCA within Missouri," but by the time the district court reached that conclusion the Missouri Supreme

29

Court had already construed sections 1.410-1.440 as mere "legislative findings and declarations" as opposed to the "substantive provisions to enforce these legislative declarations" found in sections 1.450-1.485. *City of St. Louis*, 643 S.W.3d at 297-98. Under the Missouri Supreme Court's reading, § 1.420 merely expresses the legislature's perspective on the appropriate limits of federal power and does not in any way prevent federal officials from continuing to enforce federal laws in the state. Understood in this way, § 1.420 could not possibly present the alleged constitutional infirmity the district court relied upon to rule that the section violated the Supremacy Clause. Because there is a reasonable way of reading the statute that would alleviate constitutional concerns, the Court should adopt that reading.

Similarly, the district court held that § 1.450 "regulates the United States directly by stating that "no entity... shall have the authority to enforce or attempt to enforce" certain types of federal firearm laws, but the Missouri Supreme Court stated that this provision "removes [such authority] from *Missouri* entities, persons, public officers, state employees, and political subdivisions." *Id.* (emphasis added). In other words, the language of this provision is not only susceptible to a

30

construction that would avoid the constitutional problem the district court identified, *the Missouri Supreme Court has already adopted that construction*. To the extent that the Appellee might argue that the district court's reading of SAPA is more natural, the U.S. Supreme Court has held that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *NFIB v. Sebelius*, 567 U.S. 519, 563 (2012). Consequently, the canon of constitutional avoidance holds that this Court should adopt the less-problematic interpretation.

## CONCLUSION

For the foregoing reasons, the Freedom Center of Missouri urges this Court to reverse the district court's judgment, vacate the injunction, and order the district court either to dismiss the case or to enter judgment in favor of the Appellants.

Dated: May 22, 2023          Respectfully submitted,

_____
David E. Roland Mo. Bar #60548
FREEDOM CENTER OF MISSOURI
P.O. Box 693
Mexico, MO 65265
Phone: (573) 567-0307
dave@mofreedom.org

*Attorney for Amicus Curiae*

31

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(1) because this document contains 6,382 words. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font. Pursuant to 8th Cir. R. 28A(h)(2), the Appellant states that the electronic copy of this brief is being generated by printing to Portable Document Format from the original word processing file, that it has been scanned for viruses and that it is virus-free.

## CERTIFICATE OF SERVICE

I certify that a copy of the forgoing was filed electronically with the Clerk and delivered by operation of the CM/ECF system to the counsel of record on May 22, 2023.

David Rohal

Appellate Case: 23-1457     Page: 39     Date Filed: 05/22/2023 Entry ID: 5279392